**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

DAVID CARLSON,

    Plaintiff,

v.

EXETER PROPERTY GROUP, LLC,
and EQT AB,

    Defendants.

Civil Action No. _____

**COMPLAINT**

Plaintiff David Carlson ("Carlson" or "Plaintiff"), by his undersigned counsel, hereby alleges as follows for his Complaint against Defendants Exeter Property Group, LLC ("EQT Exeter") and EQT AB ("EQT AB") (together, "EQT" or "Defendants"):

**Background**

1. This dispute arises out of the acquisition of real estate investment management business Redwood Capital Group LLC ("Redwood") by EQT AB, through its subsidiary EQT Exeter (the "Transaction"). The Transaction is reflected in the Purchase Agreement (the "Purchase Agreement") dated May 22, 2022. A true and accurate copy of the Purchase Agreement is attached hereto as **Exhibit 1.**

2. David Carlson spent more than sixteen years in the prime of his professional career painstakingly building and nurturing Redwood, creating a thriving company that Carlson expected would represent his professional legacy, and by which he hoped to secure financial prosperity for himself, his family, and, of equal importance, for his tirelessly dedicated employees.

3. Because of EQT's misrepresentations related to its purchase of Carlson's business and EQT's subsequent mismanagement of that business, Redwood—which was a highly respected

1

and accomplished organization—now is shuttered, decimated by EQT's flagrant misconduct. This misconduct flowed from the top of EQT Exeter, which was led in the United States by Edward ("Ward") J. Fitzgerald III, whose malign influence was so destructive that EQT sidelined him just months after the Transaction before eventually forcing him out of EQT altogether.

4.      Adding injury to insult, EQT has failed to provide the compensation it promised to Carlson when it purchased the company.

5.      Defendant EQT AB is the largest private equity and fund management firm in Europe, and the third-largest such firm worldwide. In January 2021, in an effort to establish its presence in the United States real estate market, EQT purchased Exeter Property Group, which EQT publicly touted as "creat[ing] a scaled, global real estate investment platform, adding one of the largest and well performing value-add real estate investment managers in the world to EQT's successful platform."

6.      Following that acquisition, EQT turned its eyes on Redwood—seeing in Redwood an opportunity to substantially enhance its capabilities in the multifamily residential real estate investment sector. Redwood possessed qualities that set it apart from its competitors, such as a 16-year track record encompassing approximately 60 realized investments, totaling over 19,000 units and $2.2 billion in asset value, placing it among the top performers in the multifamily sector.

7.      In addition, around the time EQT sought to acquire it, Redwood had additional assets under management of approximately 17 unrealized investments in approximately 5,200 units, totaling over $1.2 billion in asset value. Redwood had successfully carried out joint ventures with some of the world's leading institutional investors, acquiring almost $3.5 billion in total assets.

8.      Redwood possessed a well-known, nationally respected reputation as a result of Carlson's leadership, and was recognized as an organization of the highest ethical and moral standards. As just one example, in 2021, Redwood was named one of the "Best Places to Work in Multifamily." Redwood offered an extensive vertically integrated investment platform built on the efforts of Carlson and Redwood's hard-working employees. The firm embodied expertise in investment management, asset management, and construction management, and had a well-established and effective in-house property management company.

9.      Redwood was founded in 2007 by David Carlson and his partner, Mark Isaacson, with both serving as Redwood's managing partners. At the time of the acquisition, Carlson and Isaacson had worked together for approximately 16 years to build the company from the ground up, and their hard work had paid off—Redwood was respected, profitable, and was the subject of numerous inquiries by potential acquirors and investors around the time that EQT began to pursue Redwood.

10.     EQT and Redwood began talks about a potential acquisition in the latter half of 2021. In negotiations with Redwood, EQT represented itself in a 2021 term sheet as a "purpose driven global investment organization" and suggested that EQT was "uniquely positioned to support Redwood's management through the resources of [its] global investment platform." EQT in turn led Carlson and Redwood to believe that a sale to EQT, and an ensuing partnership with EQT's platform, was an exceptional opportunity for Carlson to leverage both EQT's global organization and massive financial capabilities, in combination with Redwood's existing assets, track record, and dedicated team of professionals, to achieve even greater success.

11.     EQT also promised that the sale would reward Carlson's years of hard work via near-term payments reflecting the substantial value that Carlson had built in Redwood, as well as

establishing long-term stability for his dedicated and loyal employees—an equally critical reason for his and his partner's decision to sell. In fact, EQT stated to Carlson and his staff that "EQT is going to inject jet fuel into your organization," catapulting it to long term future success.

12.    From the earliest stages of negotiations between Redwood and EQT, and as reflected in numerous documents including EQT's November 2021 term sheet, EQT explicitly stated two central aspects of the potential deal:  (1) *EQT and its established capital raising team would lock arms with the Redwood team to raise two new funds; and (2) EQT's support for Redwood would maximize Carlson's opportunity to earn the maximum amount of his bargained-for acquisition price, some of which was based on considerable "Earn-Out Payments.*" More specifically, EQT committed to raise, with the assistance of EQT's capital raising team, more than $2 billion of equity for those two funds. From the beginning of negotiations, a fundamental tenet of the Transaction was that Carlson and Redwood would apply their efforts to work on __*two funds,*__ and that those were the funds for which Carlson would be entitled to Earn-Out Payments totaling $23,975,000.

13.    The two funds EQT launched, and on which it based its acquisition of Redwood, reflected two broad types of multi-family investments, and were described in the Purchase Agreement: one was a "Workforce Housing Value Fund or similar new investment vehicle" and the other was a "Core, Core+ Multifamily Fund I or similar new investment vehicle." These fund terms, such as "Core," "Core+", "Workforce" and "Value" represent commonly understood industry terms for categories of real estate investment funds.

14.    As the details of the transaction between EQT and Redwood took shape, EQT made promises to Carlson about another critical element of the deal: **that the Workforce Housing Value**

**Fund <u>was already in the process of being prepared and that it would be launched soon after the merger.</u>**

15.    On numerous merger conference calls, the discussions between EQT and Carlson focused specifically on the period of time over which Carlson could obtain the Earn-Out Payments. EQT insisted that Carlson's Earn-Out would be subject to a three-year time limit. Carlson, his advisors, and legal counsel heavily negotiated this point, indicating that raising two separate $1.0 billion funds was a monumental task—as these funds would be amongst the largest ever raised in the multifamily sector. Furthermore, each of these funds would be "first time" funds for EQT in the multifamily sector, further raising the challenge to obtain the Earn-Out within the three year period.

16.    On a call in May of 2022, EQT made explicit assertions that the three-year timeline would be easily satisfied since the first fund, EMVF II, already was in process, and the Private Placement Memorandum ("PPM") was almost complete. On that call, EQT explicitly stated that the value fund contemplated in the Purchase Agreement would be launched soon after the merger.

17.    EQT represented, and Carlson understood, that upon closing the sale of Redwood to EQT, Carlson would immediately begin work raising money for one of the two funds contemplated by the Transaction and be able to begin satisfying the conditions for the Earn-Out Payments. EQT's promises about the value fund (that it was being prepared and close to ready to launch) were critical to Carlson's acceptance of the deal, if not the singularly most important factor causing Carlson to agree to the deal.

18.    Immediately after the Transaction closed in June 2022, Carlson was provided the work product that had been prepared for the first fund—called the "Equity Multifamily Value-Add Fund II," or "EMVF II". Consistent with EQT's express representations to Carlson and his

understanding of industry terminology for categorizing fund types, EMVF II was the "Workforce Housing Value Fund or similar new investment vehicle" described in the Purchase Agreement.

19.     Upon receiving the materials EQT had already prepared for EMVF II, Carlson realized they were woefully deficient: the most important document, the PPM, was sloppy and disorganized, and appeared to Carlson to reflect the work of someone with no experience in drafting such a document. Recognizing the hole that EQT's poor preparation had created, Carlson set to work with his team getting the pitch materials ready to present to potential investors. By July of 2022, the materials were completed such that the fund could launch, and Carlson went to work raising money for the first fund by coordinating and participating in meetings with investors around the world. In marketing that fund, EQT relied heavily on Carlson's reputation, track record, vertically integrated company, and his fundraising efforts. *See* **Exhibit 2,** July 19, 2022 EMVF II Launch Letter.

20.     Due in significant part to Carlson's efforts, EMVF II quickly gained traction in the marketplace, completing multiple closings of investor commitments as fundraising got underway. As a result, under the terms of the Purchase Agreement, Carlson was entitled to an initial Earn-Out Payment of $6,713,000, having achieved a "first closing" in EMVF II.

21.     Even though Carlson and his team had immediate success in closing commitments in EMVF II, EQT did not fulfill its end of the bargain. Despite the occurrence of the Initial WH Triggering Event under the Purchase Agreement, and contrary to EQT's extensive earlier representations, EQT for the first time claimed that EMVF II somehow was <u>not</u> one of the funds contemplated by the Purchase Agreement. EQT had pulled a bait-and-switch: it had previously represented that EMVF II was the first fund for which Carlson would work toward his Earn-Out. Now, EQT said EMVF II was a "third fund," the existence of which had never been contemplated

6

by the Transaction—a fund for which EQT was willing to reap all of the benefits from leveraging Carlson's work and Redwood's reputation, without compensating Carlson as promised.

22.    Unequivocally, Carlson never would have agreed to the Transaction if EQT had indicated it did not consider EMVF II to be one of the funds contemplated by the Purchase Agreement. And in fact, EQT had represented the opposite on multiple occasions, including on conference calls on May 7 and 8, 2022 in which the parties negotiated the terms of the Transaction.

23.    Additionally, Carlson would have vehemently rejected the three-year time limit imposed on his Earn-Out had EQT informed him of a supposed predecessor fund *in addition* to the two contemplated in the Purchase Agreement.

24.    EQT's changed position had concrete, material consequences for Carlson. By refusing to pay Carlson the $6,713,000 to which he was entitled upon a first closing on EMVF II, EQT breached the Purchase Agreement.

25.    Carlson was entitled to more than just this $6,713,000 payment that EQT owes but withheld. Part of the bargain Carlson struck in selling Redwood was the opportunity to obtain additional Earn-Out Payments totaling $17,262,000, conditioned on reaching additional benchmarks (including completing the first closing of the second fund, and completing more than $1 billion in fundraising for each of the two funds). However, EQT's extensive wrongful conduct made it essentially impossible for Carlson to earn these amounts—because, if EQT's position were an accurate reflection of the parties' bargain (rather than a contrived scheme to defer or avoid its obligations to Carlson), Carlson would now have to raise a total of three $1.0 billion-dollar funds within the heavily negotiated three-year period during which he thought he was tasked with raising two funds only.

26.    EQT's goalpost-shifting around EMVF II was not the only wrongful conduct that thwarted Carlson's expectations. Almost immediately after the Transaction closed, Carlson realized that the reality within EQT was not at all what was promised: as described further below, the company was grossly mismanaged, which prevented him from carrying out the work he was hired to do (and for which EQT promised to compensate him).

27.    At the time Carlson joined EQT, it was managed in the United States by Ward Fitzgerald. Fitzgerald had been the head of Exeter Property Group before it was acquired by EQT, and he initially took the lead of EQT Exeter after that acquisition. Fitzgerald was an aggressive and capricious manager who fostered a toxic working environment. Eventually, EQT AB management in Sweden took steps to deal with problems with Fitzgerald's leadership, and he was forced out of EQT in mid-2024. However, both before and after Fitzgerald's employment ended, EQT mismanagement made it impossible for Carlson to work effectively, interfering with Carlson's ability to achieve any of the Earn-Out Payments beyond the $6,713,000 earned upon the first closings in EMVF II.

28.    From the time of the Transaction, Fitzgerald's conduct presented an impediment to Carlson's fundraising efforts. Acknowledging the problem, EQT installed a new head of capital raising, Alok Gaur, in the autumn of 2022. However, the transition to this new leadership took over a year to effectuate, as Fitzgerald repeatedly interfered in fundraising efforts. EQT Exeter associate Rayenne Chen assisted Fitzgerald with his interference. Numerous EQT employees revealed to Carlson their disdain and frustration with Fitzgerald, including concerns related to false statements Fitzgerald made to investors about the status of various EQT Exeter funds. Carlson was clear in communicating his ongoing problems with Fitzgerald to EQT management, including in a lengthy discussion with EQT CEO Christian Sinding in a June 2023 meeting in Stockholm, Sweden.

29.     When Carlson agreed to sell Redwood to EQT and continue as an employee of EQT, he thought he was furthering his personal and professional objectives by partnering with a well-known—and to the outside world, largely respected—major global investment firm. Instead, he found himself in a chaotic and impossible situation, thwarted by EQT's deceit and mismanagement. Carlson brings this lawsuit in an effort to recover a portion of the value of his life's work that was taken through EQT's wrongful conduct.

30.     In sum, Carlson seeks to recover from Defendants for (1) breaching the Purchase Agreement by failing to pay Carlson after he fulfilled his contractual promises by earning the first portion of his Earn-Out; (2) further breaching the Purchase Agreement by intentionally interfering with and frustrating Carlson's ability to earn all Earn-Out Payments; (3) fraudulently or negligently inducing Carlson to enter the Purchase Agreement and the Employment Agreement by misrepresenting and/or concealing the fundraising that would lead to the Earn-Out Payments; and (4) violating Carlson's Employment Agreement and the Illinois Wage Payment and Collection Act by failing to provide Carlson with adequate notice of the abrupt, without cause termination of his employment in December of 2024 and by failing to pay him agreed-upon severance.

## THE PARTIES

31.     Plaintiff David Carlson is an Illinois resident. Carlson is the founder of Redwood Capital Group LLC, a real estate investment management firm that he formed in 2007. At the time of the Transaction, Redwood was a Delaware limited liability company. Following EQT Exeter's acquisition of Redwood, Carlson worked as the Head of US Multifamily, EQT Exeter. EQT Exeter terminated Carlson's employment without cause and by verbal notice on December 2, 2024, with EQT Exeter ceasing to employ Carlson on December 13, 2024.

9

32.    Defendant Exeter Property Group, LLC is a Delaware limited liability company, wholly owned and controlled by EQT AB. On May 11, 2022, EQT Exeter entered into a Purchase Agreement with Carlson, Mark Isaacson, and TriPost Capital RCG Investments LP. That same day, EQT Exeter entered into an Employment Agreement with Carlson. A true and accurate copy of the Employment Agreement is attached hereto as **Exhibit 3.**

33.    At all relevant times after closing of the Transaction, EQT Exeter was Carlson's "employer" as defined by the Illinois Wage Payment and Collection Act ("IWPCA").

34.    At all relevant times after closing of the Transaction, Carlson was EQT Exeter's "employee" as defined by the IWPCA.

35.    Defendant EQT AB is a limited company organized under the laws of Sweden, and with its headquarters in Stockholm, Sweden. EQT AB is a global investment organization that conducts substantial business activities in the United States, including through its wholly owned subsidiary EQT Exeter. EQT AB management played a significant role in the negotiations with Carlson that culminated in the Transaction, and in management of EQT Exeter after the Transaction. As part of the Purchase Agreement, Carlson agreed to enter into two related agreements with EQT AB, a Share Forfeiture Letter and Lock-Up Agreement, copies of which are attached hereto as **Exhibit 4** and **Exhibit 5**, respectively. Carlson executed those agreements on June 10, 2022.

## JURISDICTION AND VENUE

36.    This Court has subject matter jurisdiction over the Defendants pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and all Defendants are of different citizenship than the Plaintiff. Plaintiff is a citizen of Illinois. Defendant EQT Exeter is a Delaware limited liability company, and on information and belief it has no members who are

citizens of Illinois, and its ownership flows directly and wholly to EQT AB. Defendant EQT AB is a citizen of Sweden.

37.    This Court has personal jurisdiction over Defendant EQT Exeter because it is organized under the laws of Delaware, and it consented to jurisdiction in Delaware state and federal courts under the terms of the Purchase Agreement.

38.    This Court has personal jurisdiction over Defendant EQT AB pursuant to 10 Del. C. § 3104(c)(1) because EQT AB conducts business through EQT Exeter, a Delaware limited liability company, and this lawsuit relates to EQT AB's involvement in EQT Exeter's negotiation, execution, and breach of the Purchase Agreement, and because EQT AB is itself a party to the Purchase Agreement through execution of the Share Forfeiture Letter and Lock-Up Agreement.

39.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this Complaint occurred in this District as it relates to the acquisition of one Delaware limited liability company by another, and each of the Defendants are subject to personal jurisdiction in this Court.

## FACTUAL ALLEGATIONS

**A.    For Over 16 Years, Redwood Was A Highly Successful Independent Real Estate Investment Management Company.**

40.    Carlson is an entrepreneur and investor with over three decades of experience in commercial and multifamily residential real estate investment. After years of working for highly regarded financial institutions at the start of his career, Carlson decided that he wanted to start his own company.

41.    Carlson was inspired to create a workplace that fostered a positive and fulfilling culture, enabling empowerment and loyalty while creating opportunities for employees at all levels. Recognizing that starting a company from scratch was no small feat, Carlson teamed up

with Mark Isaacson, a trusted partner who shared his business outlook and values, to develop a business plan.

42.    In early 2007, Carlson and Isaacson started Redwood, a multifamily residential real estate company that specialized in multifamily real estate investment management.

43.    At the time of the Transaction with EQT, Carlson and Isaacson, together with TriPost Capital RCG Investments, LP ("TriPost"), held 100% ownership interest in Redwood.

44.    Redwood quickly began to excel in the residential real estate sector and grew significantly over the 16 years following its founding. Throughout the company's existence, outside investors would periodically approach Carlson and Isaacson about potential joint ventures and asset acquisitions, recognizing the appeal of its track record to potential investors, and the effectiveness of its team of employees.

45.    By the beginning of 2021, Redwood's portfolio was valued at approximately $1.7 billion in apartment assets. That year, Redwood completed six acquisitions totaling approximately $400 million in value and added 1,706 apartment homes to its holdings.

46.    In October 2021, Redwood projected an additional $200 million in deals for the end of 2021 as its pipeline remained active. Redwood announced a five-year strategic plan to double its portfolio.

47.    During this time, investors continued to approach Carlson and Isaacson about potential joint ventures and acquisitions.

**B.    EQT Pitches An Acquisition of Redwood Based On A Two-Fund Model.**

48.    EQT AB is the third largest private equity company in the world. In 2021, EQT AB acquired Exeter Property Group, a real estate investment manager with over $10 billion of assets

12

at the time of EQT's acquisition of Redwood. Ward Fitzgerald served as Global Chief Executive Officer of EQT Exeter both prior to and following the acquisition.

49.     In the autumn of 2021, EQT indicated its interest in acquiring Redwood. EQT sought this transaction to develop its presence in the residential real estate market, to profit from Redwood's property management function, and to promote Redwood's proven track record to investors.

50.     On or around September 21, 2021, Fitzgerald informed Carlson, on behalf of EQT, that the firm was interested in working with Carlson and Isaacson to develop two funds in the residential real estate space. In the following months, EQT and Redwood continued to discuss potential terms surrounding an acquisition of Redwood.

51.     On November 17, 2021, EQT provided its first term sheet to Redwood. **Exhibit 6, November 17, 2021 Letter of Intent.** This term sheet reflected the two fund concept as well as the three year timeline.

52.     The parties continued to build out the two-fund concept over the next several months.

53.     At all relevant times, EQT expressed that it was crucial to EQT's plans for Carlson to stay involved in the business and become an employee of EQT Exeter following an acquisition. Carlson was expected to spearhead the US multifamily residential business on behalf of EQT, including efforts to solicit investors for investment in two funds.

54.     As discussions continued, the concept of "two funds" was a foundational element of the potential agreement under discussion. While the terminology surrounding the two funds was subject to occasional variation, the basic concept of the two funds at issue remained constant. The concept that EQT pitched was to have: (1) a "Core" or "Core+" Fund, and (2) a "Workforce

Housing" or "Value" Fund. The basic meaning of each type of fund is subject to certain common understanding among participants in the multifamily residential real estate business.

55.     In real estate parlance, and in simple terms, a "Core+" fund is a lower-risk investment that tends to focus on high profile, newer buildings that are generally in urban core or prominent suburban locations within top tier metropolitan markets, such as New York, Boston, Washington DC, Atlanta, Dallas, San Francisco, Miami, and similar areas. These buildings and areas exhibit more appealing and stable growth markets with large populations and employment areas. A "Workforce Housing" or "Value" fund targets somewhat riskier properties, including housing units that are rented by people who make between 60% and 120% of the median income in a particular area. These Workforce Housing investments are characterized as "Value" given their lower cost basis, higher yielding returns, and the need for property rehabilitations.

56.     As negotiations around the eventual Transaction moved forward, EQT agreed that Carlson's work post-acquisition would focus on these two funds, as ultimately reflected in the executed Purchase Agreement. In other words, Carlson was hired to exclusively work, from a fundraising perspective, on the Core/Core+ Fund and EMVF II.

57.     As part of Carlson's incentive to work on these two funds, and as compensation for the sale of Redwood, he negotiated compensation through Earn-Out Payment based on certain fundraising benchmarks. *See* **Ex. 1,** Section 1.5. Carlson could achieve the maximum amount of Earn-Out by raising more than $1 billion for each of the two funds within a prescribed time frame.

58.     EQT originally proposed a three-year timeline for the closing of both funds. Carlson repeatedly expressed his concerns that this timeline was too short to launch and raise two funds of more than $1 billion each.

59.    In response to these concerns, on multiple occasions during negotiations, Fitzgerald and others on behalf of EQT told Carlson that the Workforce Housing Value Fund was nearly ready to go, while Core+ Fund would require additional work from Carlson to get off the ground running.

60.    Specifically, Fitzgerald and Pete Lloyd, Managing Principal and Global Chief Financial Officer of EQT Exeter, repeatedly told Carlson that there was already a PPM being drafted. With preparations underway, according to Fitzgerald, the first fund would be ready to launch after the Transaction closed.

61.    During a negotiation call via Zoom on May 7, 2022, Lloyd also told Carlson that the first fund was nearly ready to launch, and that this first fund would be subject to the Earn-Out provisions in the Purchase Agreement.[1]

62.    Others at EQT, including numerous employees and executives of both EQT AB and EQT Exeter, were on the May 7, 2022 Zoom referenced above, participated in the conversations during which these statements were made, and never indicated any intent by EQT to raise more than two multifamily funds during the time period immediately following the Transaction.

63.    In short, EQT assured Carlson that three years was a plausible timeline to achieve his maximum Earn-Out Payments because efforts to launch the Workforce Housing Value Fund already were underway, including preparation of the pitch materials. EQT resisted Carlson's requests to disclose those materials during negotiation of the Transaction, but promised to provide them to Carlson immediately upon closing the Transaction.

---

[1] The May 7, 2022 Zoom call was attended by the following: Filip Mark – Organizer from EQT Partners; Viktor Leisnert – EQT Partners; Sandra Nordin – EQT Partners; Daniel Cole – DLA Piper (law firm for Carlson); David Iozzi – Debevoise (law firm for EQT); GP Burges – Debevoise; Jesse Criz – DLA Piper; S. Huberfeld – Debevoise; Emily Snyder – DLA Piper; Clayton Culler – DLA Piper; Paul Dali – EQT Partners; Mark Isaacson – Redwood; David Carlson – Redwood; Isac Sigfridsson – EQT Partners; Brian Fogarty – EQT Exeter; Laurann Stepp – EQT Exeter; and Pete Lloyd – EQT Exeter.

64. Relying upon these promises, Carlson agreed to a three-year timeline for the closing of both funds.

**C.     The Transaction Closes And Carlson Begins Working For EQT.**

65. On May 11, 2022, after months of negotiation, Carlson, Isaacson, and TriPost entered into the Purchase Agreement with EQT Exeter. ***See* Ex. 1.**

66. The Purchase Agreement explicitly considered the existence of both funds that Carlson was hired to operate: a "newly formed Workforce Housing Value Fund or similar new investment vehicle" and a "newly formed Core, Core+ Multifamily Fund I or similar new investment vehicle."

67. The Purchase Agreement further detailed the Earn-Out Payments to which Carlson was entitled based on reaching certain benchmarks for each of the two funds. For example, as to the Workforce Housing Value Fund, the Purchase Agreement provided the following with respect to the initial payment Carlson would receive after the "first closing" of that Fund:

(a) From and after the Closing, as additional contingent consideration for the Sale of Mr. Carlson's Company Interests, upon the occurrence of an applicable triggering event described below in this Section 1.5(a), and subject in each instance to Section 1.5(d) and (e), Mr. Carlson (or his heirs, if applicable) shall be entitled to receive from Buyer the following (collectively, the "Earn-Out Payments"):

(i) **promptly following**, but in no event more than ten (10) Business Days following, **the occurrence of the Initial WH Triggering Event, an additional purchase price payment of six million seven hundred and thirteen thousand dollars ($6,713,000)**;

**Ex. 1**, Section 1.5(a)(i) (emphasis added).

68. The Purchase Agreement in turn defines "Initial WH Triggering Event":

"**Initial WH Triggering Event" means the first closing** (if any) by the Company or an Affiliate thereof **of a newly formed Workforce Housing Value Fund or similar new investment vehicle** at any time within twelve (12) months of such investment vehicle's launch and, in any event, within thirty (30) months of the Closing (such fund or vehicle, the "Initial WH Fund").

16

**Ex. 1,** Section 10.1 (emphasis added).

69.    By these provisions, Carlson was entitled to a payment of $6,713,000 upon the "first closing" of the Workforce Housing Value Fund.

70.    The Purchase Agreement contained a similar provision entitling Carlson to an additional payment of $6,713,000 upon the first closing of the "Core/Core +" fund.

71.    Accordingly, EQT Exeter is contractually obligated to pay Carlson $6,713,000 within ten business days following the first closing of each of the "Core/Core+" Fund and the Workforce Housing Value Fund, provided that such closings occur within twelve months of the funds' launch. *Id*. at Sections 1.1, 1.5(a)(i).

72.    The Purchase Agreement details additional Earn-Out Payments that Carlson had the potential to receive based on reaching additional benchmarks. In addition to the $6,713,000 he could earn based on achieving initial closing of each fund, he could also earn a maximum of $4,795,000 in additional payments from his efforts for each fund, provided that by the fund's final closing it received commitments of more than $1 billion (with a smaller payout for fundraising that exceeded $750 million in commitments but did not reach $1 billion).

73.    In addition to the Purchase Agreement, Carlson and EQT Exeter also entered into an Employment Agreement on May 10, 2022. *See* **Ex. 3.**

74.    EQT Exeter hired Carlson to serve as the Head of US Multifamily for EQT Exeter. **Ex. 3**, Section 1(b). Carlson was specifically tasked with handling, managing, and otherwise carrying out the Core/Core+ Fund and the Workforce Housing Value Fund:

> Allocation of Incentive. During the Executive's employment hereunder, but subject to any contractual commitment entered in with Mark Isaacson, the Executive shall have the authority to allocate (and reallocate in the case of forfeiture by leavers) to eligible employees up to one third of any promote generated by each of the first newly formed (i) Core/Core+ Multifamily Fund I and/or (ii) Workforce Housing Value Fund (subject to changes in the names of such funds as may be determined, from time to time, by the Company, the "New Funds") that has its initial closing at

any time following, but on or prior to the second anniversary of, the Closing under the Purchase Agreement; provided that such allocation to eligible employees shall be subject to the Company's consent, which will not be unreasonably withheld. Notwithstanding the foregoing, any employee's entitlement to any promote shall be subject to the terms and conditions set forth in the governing agreements of the New Funds, including but not limited to the employee's commitment to make any required capital contributions in respect of their pro rata share of the general partner and co-investment commitments applicable to such New Fund.

**Ex. 3**, Section 1(d).

75.    The Employment Agreement allowed EQT Exeter to terminate Carlson's employment with or without cause. *See* **Ex. 3,** Section 3. In both situations, EQT Exeter was required to provide a written Notice of Termination. *Id*. at Section 4(a). The Notice of Termination must be provided at least sixty days in advance of the termination. *Id*. at Section 4(b). Upon a termination without cause, EQT Exeter is obligated to pay Carlson one year's salary, among other benefits. *See* **Ex. 3,** Section 5(b)(i).

76.    On June 10, 2022, one month after executing the Purchase Agreement and Employment Agreement, the Transaction closed. In connection with closing the Transaction, Carlson also entered into a Share Forfeiture Letter and Lock-Up Agreement with EQT AB. *See* **Exs. 4** and **5.**

77.    These agreements with EQT AB, which are incorporated into the Purchase Agreement, impose certain obligations on Carlson with respect to his use of the Earn-Out Payments to be received under Section 1.5 of the Purchase Agreement. In short, the Share Forfeiture Letter requires Carlson to use 50 percent of any Earn-Out Payment to purchase shares of EQT AB and subjects those shares to forfeiture in certain circumstances. The Lock-Up Agreement imposes restrictions on Carlson's ability to transact in those shares.

**D.     Carlson and EQT Launch Fundraising for EMVF II: The Workforce Housing Value Fund.**

78.     Shortly after the Transaction closed, EQT provided Carlson with information concerning the fund that was being prepared for launch: EMVF II. Consistent with EQT's statements during negotiations, and the characteristics of the fund, EMVF II is, and Carlson understood it to be, the "Workforce Housing Value Fund" described in the Purchase Agreement.

79.     It was immediately clear that EQT's preparation to launch EMVF II was not as far along as EQT had previously represented. Various members of the capital raising team acknowledged that the preparation of fund materials was sloppy and disorganized. People with no experience in the multifamily field had drafted most of the work product.

80.     The PPM and other pitch-related work product for EMVF II required significant changes from Carlson and his team members before he could begin soliciting investors. Faced with an imminent three-year timeline, Carlson immediately began work overhauling the offering materials so the fund could launch as soon as possible.

81.     On July 19, 2022, after more than a month of work revising the underlying documents for the fund, EMVF II officially launched. **Ex. 2**.

82.     At all relevant times, EQT knew EMVF II was the Workforce Housing Value Fund contemplated by the Purchase Agreement, and that Carlson understood it to be such—because they had told him during negotiations around the Transaction that this was the case. And in the months that Carlson was successfully raising initial funds for EMVF II, EQT said nothing different.

83.     All of the contemporaneous documentation surrounding the formation and launch of EMVF II support the premise that it was, in fact, the Workforce Housing Value Fund—one of the two funds Carlson was hired to develop and launch.

19

84.     For instance, when Carlson joined EQT, he was provided a PowerPoint deck dated June 9, 2022 that had been used to present two multifamily residential funds to EQT Exeter's fundraising committee. This deck focused on pre-launch efforts by EQT Exeter's fundraising committee to launch the Core/Core+ Fund and the Workforce Housing Value Fund that Carlson would ultimately spearhead. It referred to the Core/Core+ Fund as "EMCF II" and the Workforce Housing Value Fund as "EMVF II."

85.     Consistent with the two-fund structure of the Transaction, this presentation to the fundraising committee says nothing about a third fund under consideration.

86.     When EMVF II launched, EQT published a letter to investors discussing the launch. **Ex. 2.** This announcement discussed the characteristics of EMVF II in terms of the "value" aspect of the fund's strategy:

> Dear Investor,
>
> EQT Exeter is pleased to announce the fundraise for EQT Exeter Multifamily Value Fund II, LP ("EMVF II"), a $1.5 billion real estate private equity fund which will pursue a value-add strategy of acquiring, renovating, repositioning, and developing apartment properties across select U.S. markets. The Fund seeks to achieve a gross leveraged IRR of 16% to 20%, equating to a 13% to 16% net leveraged IRR— targets enhanced by favorable entry pricing due to the current market correction.[1]

87.     The letter to investors goes on to describe the "price-conscious" residents of the prospective housing units, another hallmark of "workforce" housing:

> Drawing on years of experience in leasing to the Fund's targeted renters, EQT Exeter will seek to acquire and develop apartment communities that offer an exciting and rare mix to these price-conscious residents of 1) convenience and proximity to burgeoning Meds, Eds & Tech employment clusters, 2) rental rate value paired with high quality finishes and relevant amenities, and 3) wellness and sustainability features. EQT Exeter believes that these characteristics will distinguish the Fund's properties from undifferentiated assets that merely compete on price alone.

88.     EQT prepared a "pitch deck" to show to prospective investors during fundraising meetings. This deck explicitly referenced the income range associated with "Workforce Housing"

(60% to 120% of area median income) and explained how housing acquired or developed within EMVF II would target renters included in that range.

89.    EQT began to seed the EMVF II fund with two property acquisitions. Both acquisitions were "Value" investments that exhibited workforce housing demographics and property rehabilitations and renovation. After the transaction, many potential acquisitions EQT sourced for EMVF II exhibited the same characteristics.

90.    Carlson and his team invested a significant amount of time and resources in soliciting investors for the Workforce Housing Value Fund. He traveled to over ten cities and more than five countries. Overall, Carlson presented to dozens of potential investors.

91.    Carlson consistently updated Ward Fitzgerald and other EQT executives and team members about his efforts. During the initial months of fundraising, Carlson was never informed that these efforts were not applicable to the Earn-Out provisions of the Purchase Agreement.

**E.    Carlson Earns Initial Earn-out Payment by Closing Over $60 Million in Capital Commitments From Investors For EMVF II.**

92.    Altogether, Carlson and EQT successfully raised over $60 million in commitments for EMVF II (the Workforce Housing Value Fund). Once the first of these investor commitments occurred, irrespective of the amount, Carlson was entitled to his initial Earn-Out Payment.

93.    The Purchase Agreement sets forth that the initial Earn-Out was to be paid on "first closing" of the Workforce Housing Value Fund.

94.    Through the efforts of Carlson and others on his team, EQT executed numerous closings on investor commitments to EMVF II, totaling more than $60 million in commitments. For instance, Carlson assisted in the closing of an investment in EMVF II by the Contra Costa County Employees' Retirement Fund on or about June 5, 2023. EQT's own pipeline report for

EMVF II, a fundamental document that tracked interest in the Fund, showed "Closed" commitments totaling at least $63.5 million.

95.    Because the "first closing" of EMVF II occurred, no later than June 5, 2023, Carlson was entitled to an Earn-Out Payment of $6,713,000 under the Purchase Agreement in ten days' time. But he has never received that payment.

**F.    EQT Reveals They Do Not Intend to Pay Carlson The Earn-out He is Due.**

96.    Despite the closings in EMVF II, EQT has taken the position that the funds that Carlson raised for EMVF II would not be attributed to the Workforce Housing Value Fund referenced in the Purchase Agreement. Instead, EQT has taken the position that EMVF II was a previously undisclosed third fund: another value fund, the existence of which Carlson was previously unaware.

97.    EQT had never mentioned the existence of a third fund during its contract negotiations with Carlson. Indeed, the Purchase Agreement and Employment Agreement do not contemplate the existence of a third fund. Nor do contemporaneous EQT documents.

98.    On information and belief, EQT had never disclosed the existence of a third fund to anyone, including EQT Exeter's own fundraising committee.

99.    Accordingly, Carlson was blindsided by EQT's assertion that all of the capital he would be raising for EMVF II would be inapplicable to the Earn-Out provisions of the Purchase Agreement.

100.    EQT's position did not just prevent Carlson from receiving his initial Earn-Out Payment. As egregiously, it put Carlson in an untenable situation with respect to earning his maximum Earn-Out Payments: with the prospect of trying to raise $1 billion for EMVF II, Carlson

22

would find it much more difficult, if not impossible, to mount the resources to raise $1 billion for two additional funds after EMVF II.

101.    There appear to be two conceivable explanations for EQT's post-Transaction position that a three-fund structure was intended: either (1) EQT invented the concept of a third fund in order to frustrate Carlson's ability to receive his full earnout, recognizing that raising three funds in this time period would be impossible; or (2) EQT was lying to Carlson from the beginning about the existence of a third fund as a means to induce his agreement to the Transaction. In either scenario, EQT's misconduct renders it liable to Carlson for the initial Earn-Out Payment, as well as other harm caused by its wrongful and deceitful conduct.

**G.    Despite EQT's Wrongful Conduct and Mismanagement, Carlson Attempts to Be a "Team Player" – But EQT Terminates Him Without Warning.**

102.    After Carlson became entitled to the initial Earn-Out Payment of $6,713,000 upon the first closing of EMVF II, Carlson repeatedly raised the issue with EQT. Instead of immediately paying Carlson the Earn-Out Payment to which he already was entitled, EQT repeatedly told Carlson that it would enable him to obtain the full amount he had bargained for in the Purchase Agreement. In the spirit of collaboration and based on EQT's continuing representations, Carlson engaged in discussions with EQT about extending the timeline for achieving his Earn-Out Payments and otherwise adjusting the process.

103.    As part of those discussions, Carlson had a Zoom meeting with Gustav Segerberg, EQT AB's Head of Business Development. In that meeting, Segerberg acknowledged the discussions in which EQT had ensured that Carlson would receive the Earn-Out Payments. And just a few months later EQT unceremoniously terminated Carlson.

104.    EQT's refusal to honor its obligation to pay the initial Earn-Out Payment was far from the only problem Carlson faced in his time with EQT. From the time Carlson joined EQT,

23

including during the time he was raising money for EMVF II, personnel within EQT Exeter and management at EQT AB became increasingly concerned with Ward Fitzgerald's management of EQT Exeter's residential real estate portfolio.

105.    Fitzgerald had an aggressive, controlling, and volatile management style. He continued to be aggressive and volatile at investor pitches, which directly impacted the fundraising team's ability to effectively fundraise capital. This caused significant internal turbulence on the capital fundraising team, as team members often felt gaslighted, abused, and harassed by Fitzgerald.

106.    Moreover, multiple EQT employees informed Carlson after the Transaction that Fitzgerald had burned bridges within the EQT organization after its acquisition of Exeter Property Group (and before the Transaction). As a result, other groups within EQT were unwilling to cross-sell to EQT Exeter, further impeding Carlson's ability to achieve his earnout. EQT was aware of the problems with Fitzgerald's leadership before its acquisition of Redwood.

107.    Finally, EQT took action to address the counterproductive nature of Fitzgerald's presence at EQT Exeter: sometime in the autumn of 2022, EQT removed Fitzerald from all external pitches relating to EMVF II.

108.    EQT replaced Fitzgerald with Alok Gaur, who took over as head of capital raising. Nevertheless, Fitzgerald continued to appear at pitches unannounced and behaved inappropriately. This continued to limit the fundraising team's ability to efficiently gather capital.

109.    Despite this change in Fitzgerald's day-to-day role with respect to EMVF II, management at EQT Exeter remained chaotic and dysfunctional—further impeding Carlson's abilities to raise money for EMVF II.

110. Later, following a report from Bain & Company, EQT asked Fitzgerald to step down as Global Head of EQT Exeter.

111. On September 3, 2024, Fitzgerald resigned, and Henry Steinberg became the global head of EQT Exeter.

112. Around this time, Lennart Blecher, chairperson of EQT Exeter announced that EQT was suspending all efforts relating to the Workforce Housing Value Fund and returning all capital to its investors.

113. Acknowledging that the future of EQT's real estate business was rapidly evolving, Carlson approached Steinberg about how to best move forward after Fitzgerald's departure. Despite EQT's deleterious conduct up to this point, Carlson's intent, as with all times during his employment at EQT, was to align his actions with the best interests of the company. Carlson presented alternative business plans to Steinberg, representing his best efforts to find a successful path for EQT in the multifamily residential sector.

114. Instead of working with Carlson to reach a solution, EQT terminated Carlson without cause.

115. Specifically, on December 2, 2024, Pete Lloyd called Carlson and informed him that EQT had "elected to go in a different direction" and Carlson's last day would be December 13, 2024. Despite EQT Exeter's without cause termination of Carlson's employment, it has not paid him severance of one year's salary to which he is entitled.

116. That same day, EQT fired Isaacson and approximately two-thirds of the US multifamily employees at EQT.

117. This massive lay-off effectively terminated EQT's multifamily residential real estate business altogether. Indeed, shortly after the lay-offs, EQT shut down its US multifamily

fund business and stated its intent to no longer pursue related investments. This effectively meant the end of the business that Carlson had spent over 16 years of his life building: within two and a half years of acquiring Redwood, EQT had decimated its value and eviscerated its team of dedicated employees.

**COUNT I**
**BREACH OF CONTRACT**
**(Breach of Purchase Agreement)**
**(Against All Defendants)**

118.    Carlson repeats and incorporates herein by reference each of the allegations set forth above as if fully set forth herein.

119.    Defendant EQT Exeter entered into a valid and binding Purchase Agreement with Carlson that, among other things, obligated it to pay Carlson $6,713,000 in Earn-Out Payments within ten business days following the closing of the Core/Core+ Fund or the Workforce Housing Value Fund, provided that the closing occurs within twelve months of the fund's launch, under Section 1.5 of the Purchase Agreement.

120.    The first closing of the Workforce Housing Value Fund (EMVF II) occurred within twelve months of the fund's launch.

121.    Defendant EQT Exeter breached Section 1.5 of the Purchase Agreement by failing to pay Carlson any Earn-Out Payments after the first closing of the Workforce Housing Value Fund.

122.    EQT Exeter acted as EQT's agent in breaching the Purchase Agreement by failing to pay Carlson the payments he was owed under the Purchase Agreement.

123.    At the time of the Transaction and at the time of the breach, EQT Exeter was a wholly owned subsidiary of EQT and under the control of EQT. On information and belief, EQT

controlled EQT Exeter with respect to the decision whether or not to pay the amounts owed to Carlson under the Purchase Agreement.

124. Due to the foregoing breach, Carlson is entitled to an award of damages in an amount to be determined at trial, but not less than $6,713,000.

**COUNT II**
**BREACH OF CONTRACT**
**(Breach of the Earn-Out Covenant in Purchase Agreement)**
**(Against All Defendants)**

125. Carlson repeats and incorporates herein by reference each of the allegations set forth above as if set forth fully herein.

126. Defendant EQT Exeter entered into a valid and binding Purchase Agreement with Carlson that, among other things, prohibited it from taking any action with the primary intent of interfering with Carlson's ability to achieve the maximum Earn-Out Payments, pursuant to Section 1.5(d) of the Purchase Agreement.

127. Defendant EQT Exeter breached Section 1.5(d) of the Purchase Agreement by wrongfully and improperly characterizing the Workforce Housing Value Fund as a "third fund" not contemplated under the Purchase Agreement, therefore preventing Carlson from receiving the benefit of the Earn-Out he was entitled to by completing the first closing of the EMVF II.

128. In addition to preventing Carlson from receiving the initial Earn-Out for the first closing of the Workforce Housing Fund ($6,713,000), Defendant EQT Exeter's wrongful re-characterization of the Workforce Housing Value Fund frustrated Carlson's ability to achieve the full amount of Earn-Out Payments he was potentially entitled to under the Purchase Agreement (an additional $17,262,000).

129. At the time of the Transaction and at the time of the breach, EQT Exeter was a wholly owned subsidiary of EQT and under the control of EQT. On information and belief, EQT

controlled EQT Exeter with respect to the decision to characterize EMVF II as a "third fund" not contemplated under the Purchase Agreement.

130.    Carlson was damaged as a result of this breach of the Purchase Agreement in an amount that will be proven at trial.

## COUNT III
## COMMON LAW FRAUD/FRAUDULENT INDUCEMENT
### (Purchase Agreement)
### (Against All Defendants)

131.    Carlson repeats and incorporates herein by reference each of the allegations set forth above as if set forth fully herein.

132.    Defendants knowingly, and with the intent to defraud, made or caused to be made misrepresentations and omissions of material fact, or such misrepresentations and omissions of material fact were made on Defendants' behalf, including, but not limited to, those set forth in this Complaint.

133.    Defendants made affirmative representations to Carlson during the negotiations around execution of the Purchase Agreement that his role would be dedicated to developing two funds and only two funds: the Core/Core+ Fund and the Workforce Housing Value Fund. Defendants further affirmatively represented that EQT Exeter had already begun developing one of the funds and would be transitioning that work to Carlson so that he could work on raising commitments for the first fund subject to the Earn-Out provision of the Purchase Agreement.

134.    As just one example, on a Zoom call on Saturday, May 7, 2022 attended by numerous employees and executives of both EQT Exeter and EQT AB, and lawyers for all parties, Pete Lloyd stated that the PPM for the first fund was "ready" and that Carlson would therefore receive his first Earn-Out Payment promptly.

135.     A similar Zoom call took place the next day on Sunday, May 8, 2022.[2] Once again, all parties agreed that the PPM was ready, and Carlson would promptly receive his first Earn-Out Payment.

136.     Defendants knew or recklessly disregarded that such representations were false, because they actually considered EMVF II to be a third fund for which Carlson was not eligible for an Earn-Out under the Purchase Agreement. Defendants intentionally misled Carlson so that he would believe that EMVF II was the same Workforce Housing Value Fund described under the Purchase Agreement and, thus, devote his time to develop that fund. Defendants did so in order to evade their contractual obligations to Carlson, including their obligation to pay Carlson $6,713,000 upon the first closing of the Workforce Housing Value Fund.

137.     Prior to the execution of the Purchase Agreement between Carlson and Defendant EQT Exeter, Defendants intentionally and actively concealed or suppressed material facts about the third fund. Defendants did not mention the existence of a third fund during their contract negotiations with Carlson, and the Purchase Agreement and the Employment Agreement do not contemplate the existence of a third fund.

138.     Defendants also made representations to Carlson in the Purchase Agreement and the Employment Agreement concerning the two-fund structure of the Transaction that they knew at the time were false, as set forth above.

---

[2] The May 8, 2022 Zoom call was attended by the following: Filip Mark – Organizer from EQT Partners; Eric Gunnarson – EQT Partners; Jacob Tegner – EQT Partners; Viktor Leisnert – EQT Partners; Sandra Nordin – EQT Partners; Daniel Cole – DLA Piper; David Iozzi – Debevoise; GP Burges – Debevoise; Jesse Criz – DLA Piper; S. Huberfeld – Debevoise; Emily Snyder – DLA Piper; Clayton Culler – DLA Piper; Paul Dali – EQT Partners; Mark Isaacson – Redwood; David Carlson – Redwood; Isac Sigfridsson – EQT Partners; Brian Fogarty – EQT Exeter; Laurann Stepp – EQT Exeter; Pete Lloyd – EQT Exeter; Lisa Beeson – Centercap Group; Marcus Jacobsson – DK EY; Paul Mullen – Centercap Group; Tim Annerkull – SE EY; and John Venick – DLA Piper.

139. Defendants knew that the representations and omissions as set forth above were false when made, or Defendants made the representations and omissions with reckless indifference to the truth.

140. Defendants also knew during negotiations that they were failing to disclose material facts about the existence of a "third fund." Defendants knew they failed to disclose their intention that the fund Carlson was led to believe was the Workforce Housing Value Fund was, in fact, a separate fund not defined under the Purchase Agreement and not covered by the Earn-Out provisions in the Purchase Agreement.

141. Defendants made these misrepresentations and omissions, and intentionally failed to disclose that they considered EMVF II to be different from the Workforce Housing Value Fund, with the intent to induce Carlson to consummate the transaction.

142. Defendants' representations and omissions were material. Defendants knew that Carlson would have never agreed to the terms of the Purchase Agreement, including the time frames it provided for achieving the benchmarks necessary to receive the Earn-Out Payments, unless (1) the fund underway at the time of the Transaction was tied to the Earn-Out provision, and (2) that his work at EQT would be committed to the two funds directly tied to the Earn-Out provisions.

143. Carlson reasonably and justifiably relied upon Defendants' misrepresentations and material omissions in the pre-closing due diligence and in the Purchase Agreement.

144. Carlson was induced into selling his portion of Redwood to Defendant EQT Exeter and entering into the Purchase Agreement. As a result of the Defendants' actions, he received less than the fair value of his shares of Redwood in the bargain to sell Redwood to EQT Exeter.

145.    Carlson would not have entered into the Purchase Agreement at all if he had known that Defendants intended to characterize EMVF II as something other than the Workforce Housing Value Fund, resulting in his fundraising for EMVF II being fruitless under the Purchase Agreement.

146.    As a direct result of the Defendants' misrepresentations and concealment of material information, Carlson has been damaged in an amount that will be proven at trial.

**COUNT IV**
**COMMON LAW FRAUD/FRAUDULENT INDUCEMENT**
**(Employment Agreement)**
**(Against All Defendants)**

147.    Carlson repeats and incorporates herein by reference each of the allegations set forth above as if set forth fully herein.

148.    Defendants knowingly, and with the intent to defraud, made or caused to be made misrepresentations and omissions of material fact, or such misrepresentations and omissions of material fact were made on Defendant EQT Exeter's behalf, including, but not limited to, those set forth in this Complaint.

149.    Defendants made affirmative representations to Carlson during the negotiations around execution of the Employment Agreement that his role would be dedicated to developing two funds and only two funds: the Core/Core+ Fund and the Workforce Housing Value Fund. Defendants further affirmatively represented that EQT Exeter had already begun developing one of the funds, and would be transitioning that work to Carlson so that he could work on raising commitments for the first fund subject to the Earn-Out provision of the Purchase Agreement.

150.    Defendants knew or recklessly disregarded that such representations were false, because they actually considered EMVF II to be a third fund for which Carlson was not eligible for an Earn-Out under the Purchase Agreement. Defendants intentionally misled Carlson so that

he would believe that EMVF II was the same Workforce Housing Value Fund described under the Purchase Agreement and, thus, devote his time to develop that fund. Defendants did so in order to evade their contractual obligations to Carlson, including their obligation to pay Carlson $6,713,000 upon the first closing of the Workforce Housing Value Fund.

151.    Prior to the execution of the Employment Agreement between Carlson and Defendant EQT Exeter, Defendants intentionally and actively concealed or suppressed material facts about the third fund. Defendants did not mention the existence of a third fund during their contract negotiations with Carlson, and the Purchase Agreement and Employment Agreement do not contemplate the existence of a third Fund.

152.    Defendants also made representations to Carlson in the Purchase Agreement and Employment Agreement concerning the two-fund structure of the Transaction that they knew at the time were false, as set forth above.

153.    Defendants knew that the representations and omissions set forth above were false when made, or Defendants made these representations and omissions with reckless indifference to the truth.

154.    Defendants also knew during negotiations that they were failing to disclose material facts about the existence of a "third fund." Defendants knew they failed to disclose their intention that the fund Carlson was led to believe was the Workforce Housing Value Fund was, in fact, a separate fund not defined under the Purchase Agreement and not covered by the Earn-Out provisions in the Purchase Agreement. Defendants knew this would undermine Carlson's efforts to achieve maximum Earn-Out Payments.

155.    Defendants made these misrepresentations and omissions, and intentionally failed to disclose that they considered EMVF II to be different from the Workforce Housing Value Fund,

with the intent to induce Carlson to sell his portion of Redwood for less than its value and become an employee of Defendant EQT Exeter.

156.    Defendants' representations and omissions were material. Defendants knew that Carlson would have never agreed to sell his portion of Redwood for less than its total value and agree to the terms of his Employment Agreement unless the funds he was to be raising commitments for were directly tied to the Earn-Out provisions.

157.    Carlson reasonably and justifiably relied upon Defendant EQT Exeter's misrepresentations and material omissions in agreeing to the terms of the Employment Agreement.

158.    Carlson was induced into selling his ownership in Redwood to Defendant EQT Exeter for significantly less than the value of his share in Redwood, and into becoming an employee of Defendant EQT Exeter.

159.    Carlson would not have entered into the Employment Agreement at all if he had known that Defendants intended to characterize EMVF II as something other than the Workforce Housing Value Fund, resulting in his fundraising for EMVF II being fruitless under the Purchase Agreement.

160.    As a direct result of Defendants' misrepresentations and concealment of material information, Carlson has been damaged in an amount that will be proven at trial.

**COUNT V**
**NEGLIGENT MISREPRESENTATION**
**<u>(Against All Defendants)</u>**

161.    Carlson repeats and incorporates herein by reference each of the allegations set forth above as if set forth fully herein.

162.    If the false statements or omissions set forth above were not made with knowledge or recklessness as to their falsity, then they were made negligently, or without due care, by Defendants.

33

163. Defendants failed to exercise care and competence in failing to communicate to Carlson that it considered the EMVF II to be separate and apart from the Core/Core+ Fund and the Workforce Housing Value Fund defined under the Purchase Agreement.

164. Defendants knew that Carlson would reasonably rely on its representations, and Defendants intended to influence Carlson through those representations.

165. Carlson was, in fact, deceived by those misrepresentations and omissions and reasonably and justifiably relied on them to his detriment.

166. As a direct and proximate result of those negligent misrepresentations, Carlson was led to believe that the EMVF II was the Workforce Housing Value Fund, and that completing a first closing on that fund would result in him taking the initial Earn-Out of $6,713,000. promised under the Purchase Agreement. Carlson would have never entered the Purchase Agreement or the Employment Agreement if he had been informed that EMVF II was not the Workforce Housing Value Fund contemplated by the Purchase Agreement.

167. As a direct result of Defendants' misrepresentations and omissions, Carlson has been damaged in an amount to be proven at trial.

### COUNT VI
### UNJUST ENRICHMENT/DISGORGEMENT
### (Against All Defendants)

168. Carlson repeats and incorporates herein by reference each of the allegations set forth above as if set forth fully herein.

169. As alleged herein, Defendants fraudulently induced Carlson to enter into, and complete, the Purchase Agreement and the Employment Agreement, and to provide Defendants with greater compensation in exchange for entering into such agreements than (a) was reasonable, or (b) Carlson would have agreed to provide were it not for Defendants' misconduct and deceptive practices.

34

170. As alleged herein, prior to the execution of the Purchase Agreement between Carlson and Defendant EQT Exeter, Defendants intentionally and actively concealed or suppressed material facts about the "third fund."

171. As alleged herein, Defendants also made representations to Carlson in the Purchase Agreement and the Employment Agreement concerning the two-fund structure of the Transaction that they knew at the time were false.

172. Defendants knew that the representations and omissions as set forth above were false when made, or Defendants made the representations and omissions with reckless indifference to the truth.

173. Defendants also knew during negotiations that they were failing to disclose material facts about the existence of a "third fund." Defendants knew they failed to disclose their intention that the fund Carlson was led to believe was the Workforce Housing Value Fund was, in fact, a separate fund not defined under the Purchase Agreement and not covered by the Earn-Out provisions in the Purchase Agreement.

174. Defendants made these misrepresentations and omissions, and intentionally failed to disclose that they considered EMVF II to be different from the Workforce Housing Value Fund, with the intent to induce Carlson to consummate the transaction.

175. Defendants reaped substantial financial benefits at the expense of Carlson in connection with the Purchase Agreement and related transactions.

176. Defendants further reaped substantial financial benefits at the expense of Carlson in connection with his employment by EQT Exeter.

177. Following the execution of the Purchase Agreement and the Employment Agreement, Defendants worked against the best interests of Carlson and for their own self-interest.

178.     Equity and good conscience do not allow for Defendants to keep the substantial financial benefits that it reaped from Carlson.

179.     Defendants have been unjustly enriched, and Carlson has been damaged in an amount to be established at trial.

## COUNT VII
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against All Defendants)

180.     Carlson repeats and incorporates herein by reference each of the allegations set forth above as if set forth fully herein

181.     Defendant EQT Exeter and Carlson are each a party to the Purchase Agreement, under which Defendant EQT Exeter owes contractual obligations to Carlson.

182.     At the time of the Transaction and at the time of the breach, EQT Exeter was a wholly owned subsidiary of EQT AB and under the control of EQT AB. On information and belief, EQT AB controlled EQT Exeter with respect to (1) whether or not to pay the amounts owed to Carlson under the Purchase Agreement, and (2) the decision to characterize EMVF II as a "third fund" not contemplated under the Purchase Agreement.

183.     Defendants' characterization of EMVF II as something other than the Workforce Housing Value Fund was not contemplated by the parties to the Purchase Agreement when they entered into the Purchase Agreement, was arbitrary and unreasonable, and has frustrated and continued to frustrate the fruits of the Purchase Agreement that Carlson reasonably expected.

184.     If Defendants' characterization of EMVF II as a "third fund" in order to evade its obligation to pay Carlson $6,713,000 upon the first closing of the Workforce Housing Value Fund does not breach the express terms of the Purchase Agreement, such action still breaches the implied covenant of good faith and fair dealing under the Purchase Agreement.

185.    If Defendants' frustration of Carlson's ability to receive Earn-Out Payments under Section 1.5 of the Purchase Agreement does not breach the express terms of the Purchase Agreement, then Defendants' breaches of the implied covenant of good faith and fair dealing have harmed, and continue to harm, Carlson and have effectively prevented Carlson from receiving the fruits of the contractual rights agreed to by the parties in the Purchase Agreement.

186.    Carlson has been damaged by the foregoing in amount to be proven at trial.

## COUNT VIII
## BREACH OF EMPLOYMENT AGREEMENT
### (Against EQT Exeter)

187.    Carlson repeats and incorporates herein by reference each of the allegations set forth above as if set fully set forth herein.

188.    On May 11, 2022, Carlson and EQT Exeter entered into the Employment Agreement.

189.    The Employment Agreement is valid, binding, and fully enforceable contract between Carlson and EQT Exeter.

190.    Carlson has performed all of his obligations pursuant to the Employment Agreement.

191.    The Employment Agreement required EQT Exeter to provide Carlson with a written Notice of Termination and further required EQT Exeter to provide Carlson with at least sixty days' notice prior to his termination. The Employment Agreement also required EQT Exeter to pay Carlson severance of one year's salary upon terminating his employment without cause.

192.    On December 2, 2024, EQT Exeter orally terminated Carlson's employment, without cause, and informed him that his last day of employment would be eleven days later on December 13, 2024.

193.    EQT Exeter did not provide Carlson with a written Notice of Termination.

194.    As such, EQT Exeter breached the Employment Agreement by, among other things, failing to provide Carlson with at least sixty (60) days' notice of his termination and by failing to provide him with a written Notice of Termination. EQT Exeter has further breached the Employment Agreement by, among other things, failing to pay Carlson severance of one year's salary.

195.    As a direct and proximate result of EQT Exeter's conduct, Carlson suffered, and continues to suffer, damages, including lost wages.

**COUNT IX**
**ILLINOIS WAGE PAYMENT AND COLLECTION ACT**
**(Against EQT Exeter)**

196.    Carlson repeats and incorporates herein by reference each of the allegations set forth above as if set forth fully herein.

197.    Under the IWPCA, an "employer" includes "any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee." 820 ILCS 115/2. Additionally, "any officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of [the IWPCA] shall be deemed to be the employers of the employees of the corporation." 820 ILCS 115/13.

198.    At all relevant times, EQT Exeter was Carlson's "employer" as defined by the IWPCA.

199.    At all relevant times, Carlson was EQT Exeter's "employee" as that term is defined by the IWPCA.

200.    The Employment Agreement is an agreement for wages under the IWPCA.

201.    The Employment Agreement required EQT Exeter to provide Carlson with a written Notice of Termination and further required EQT Exeter to provide Carlson with at least

38

sixty days' notice prior to his termination. The Employment Agreement also required EQT Exeter to pay Carlson severance of one year's salary upon terminating his employment without cause.

202.    On December 2, 2024, EQT Exeter orally terminated Carlson's employment and informed him that his last day of employment would be eleven days later on December 13, 2024.

203.    EQT Exeter did not provide Carlson with a written Notice of Termination.

204.    EQT Exeter violated the IWPCA by terminating Carlson without providing the required notice or a written Notice of Termination. EQT Exeter has further violated the IWPCA by, among other things, failing to pay Carlson severance of one year's salary.

205.    EQT Exeter's failure to comply with the IWPCA was reckless and willful.

206.    As a direct result of EQT Exeter's actions, Carlson suffered damages.

207.    Carlson is entitled to recover compensation owed to him under the Employment Agreement, all damages as to which he is entitled, statutory damages pursuant to the IWPCA, and attorneys' fees and costs.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Carlson respectfully requests that this Court enter judgment in its favor as follows:

1.    Against Defendants, in the amount of $6,713,000, as damages for EQT Exeter's failure to pay the initial Earn-Out Payment in breach of the Purchase Agreement or the implied covenant of good faith and fair dealing therein;

2.    Against Defendants, in the amount of $17,262,000, as damages for Defendants' breach of the Earn-Out Covenants provision of the Purchase Agreement or the implied covenant of good faith and fair dealing therein;

3.      Against Defendants, in an amount to be determined at trial, as damages for fraud in inducing Carlson to enter the Purchase Agreement and the Employment Agreement and causing him to surrender his interests in Redwood for less than their fair market value;

4.      Against Defendants, in an amount to be determined at trial, as damages for negligent misrepresentation resulting in Carlson's entry into the Purchase Agreement and the Employment Agreement and causing him to surrender his interests in Redwood for less than their fair market value;

5.      Disgorgement of ill-gotten gains obtained by Defendants;

6.      Against Defendant EQT Exeter for its breaches of the Employment Agreement and the IWPCA, for damages, lost wages and employment-related statutory damages in an amount to be determined at trial; and

7.      Any such other relief as the Court may deem just and proper.

*      *      *

**Dated:** April 24, 2025

Respectfully submitted,

/s/ *Noelle Torrice*
Noelle Torrice (#5957)
Kate Harmon (#5343)
**Benesch, Friedlander, Coplan & Aronoff LLP**
1313 North Market Street, Suite 1201
Wilmington, DE 19801-6101
Telephone: (302) 442-7057
Email: kharmon@beneshclaw.com
Email: ntorrice@beneschlaw.com

Charles Leuin (*pro hac vice* forthcoming)
William Walsh (*pro hac vice* forthcoming)
**Benesch, Friedlander, Coplan & Aronoff LLP**
71 South Wacker Drive, Suite 1600
Chicago, IL 60606-4637
Telephone: (312) 624-6344
Email: cleuin@beneschlaw.com
Email: wwalsh@beneschlaw.com
*Counsel for David Carlson*