# EXHIBIT 1

*EXECUTION VERSION*
*Confidential*

**PURCHASE AGREEMENT**

BY AND AMONG

**EXETER PROPERTY GROUP, LLC,**

**TRIPOST CAPITAL RCG INVESTMENTS, LP,**

**MARK ISAACSON,**

**AND**

**DAVID CARLSON**

**Dated as of May 11, 2022**

1007814448v22

**TABLE OF CONTENTS**

Page

ARTICLE I PURCHASE AND SALE ................................................................................... 6
    Section 1.1    Purchase and Sale of Company Interests ..................................................... 6
    Section 1.2    Closing ........................................................................................................ 6
    Section 1.3    Deliveries at Closing ................................................................................... 6
    Section 1.4    The Purchase Price ...................................................................................... 8
    Section 1.5    Earn-Out ..................................................................................................... 11
    Section 1.6    Escrow Agreement ...................................................................................... 13
    Section 1.7    Withholding ................................................................................................ 14

ARTICLE II REPRESENTATIONS AND WARRANTIES OF THE SELLERS ...................... 14
    Section 2.1    Organization ................................................................................................ 14
    Section 2.2    Authorization .............................................................................................. 14
    Section 2.3    Approvals .................................................................................................... 14
    Section 2.4    Non-Contravention ..................................................................................... 15
    Section 2.5    Binding Effect ............................................................................................ 15
    Section 2.6    Ownership of Company Interests and Transferred Residential
                     Interests ...................................................................................................... 15
    Section 2.7    Litigation .................................................................................................... 15
    Section 2.8    Compliance with Laws. Since January 1, 2019 (or earlier if
                     unresolved), such Seller has .................................................................... 15
    Section 2.9    Transaction with Interested Persons ........................................................... 16
    Section 2.10   Investor Status ............................................................................................ 16
    Section 2.11   Certain Regulatory Matters ........................................................................ 16
    Section 2.12   Finders' Fees .............................................................................................. 17
    Section 2.13   Acknowledgement of No Other Representations or Warranties ............... 17

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE PRINCIPAL
           SELLERS AS TO THE TARGET GROUP ENTITIES AND TARGET
           PROJECT COMPANIES ............................................................................................ 18
    Section 3.1    Organization; Qualification ........................................................................ 18
    Section 3.2    Capitalization .............................................................................................. 18
    Section 3.3    Non-Contravention ..................................................................................... 19
    Section 3.4    Target Project Companies ........................................................................... 20
    Section 3.5    Financial Statements ................................................................................... 21
    Section 3.6    Litigation and Claims ................................................................................. 22
    Section 3.7    Taxes .......................................................................................................... 22
    Section 3.8    Benefit Plans .............................................................................................. 24
    Section 3.9    Labor .......................................................................................................... 26
    Section 3.10   Compliance with Laws .............................................................................. 27
    Section 3.11   Intellectual Property ................................................................................... 29
    Section 3.12   Material Contracts ...................................................................................... 31
    Section 3.13   Real Property .............................................................................................. 34
    Section 3.14   Absence of Changes ................................................................................... 34

Section 3.15 Finders' Fees ................................................................................................. 34
Section 3.16 Insurance ...................................................................................................... 35
Section 3.17 Certain Regulatory Matters.......................................................................... 35
Section 3.18 Ownership of Assets .................................................................................... 36
Section 3.19 Acknowledgement of No Other Representations or Warranties................... 36

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER................................. 36
Section 4.1 Organization; Qualification ......................................................................... 37
Section 4.2 Authorization ............................................................................................... 37
Section 4.3 Governmental Approvals ............................................................................. 37
Section 4.4 Non-Contravention ...................................................................................... 37
Section 4.5 Litigation...................................................................................................... 37
Section 4.6 Solvency....................................................................................................... 37
Section 4.7 Investment Intention .................................................................................... 38
Section 4.8 Binding Effect.............................................................................................. 38
Section 4.9 Finders' Fees ................................................................................................ 38
Section 4.10 Sufficient Funds........................................................................................... 38
Section 4.11 Acknowledgment of No Other Representations or Warranties ................... 38

ARTICLE V COVENANTS; ADDITIONAL AGREEMENTS.................................................. 40
Section 5.1 Conduct of Business .................................................................................... 40
Section 5.2 Reasonable Best Efforts............................................................................... 43
Section 5.3 Access and Information ................................................................................ 45
Section 5.4 Tax Matters.................................................................................................. 45
Section 5.5 Public Announcements ................................................................................ 48
Section 5.6 D&O Indemnification and Insurance........................................................... 48
Section 5.7 280G Matters ............................................................................................... 49
Section 5.8 Pre-Closing Restructuring........................................................................... 50
Section 5.9 Termination of Affiliate Arrangements ...................................................... 50
Section 5.10 Exclusivity ................................................................................................... 50
Section 5.11 Notice of Certain Developments.................................................................. 50
Section 5.12 Employee Matters ........................................................................................ 50

ARTICLE VI CONDITIONS TO CLOSING ............................................................................ 52
Section 6.1 Conditions to the Obligations of Buyer and the Sellers............................. 52
Section 6.2 Conditions to the Obligations of Buyer ...................................................... 52
Section 6.3 Conditions to the Obligations of the Sellers ............................................... 53

ARTICLE VII INDEMNIFICATION AND SURVIVAL ......................................................... 54
Section 7.1 Survival........................................................................................................ 54
Section 7.2 Indemnification by the Sellers: ................................................................... 54
Section 7.3 Indemnification by Buyer. ........................................................................... 55
Section 7.4 Limitations ................................................................................................... 55
Section 7.5 Procedure for Indemnification ..................................................................... 57
Section 7.6 Payment........................................................................................................ 58
Section 7.7 Remedies Exclusive. .................................................................................... 59
Section 7.8 Tax Treatment of Indemnification Payments .............................................. 59

1007814448v22

ARTICLE VIII TERMINATION .................................................................................................. 59
    Section 8.1    Termination ................................................................................................. 59
    Section 8.2    Effect of Termination .................................................................................. 60

ARTICLE IX MISCELLANEOUS .............................................................................................. 60
    Section 9.1    Notices ........................................................................................................ 60
    Section 9.2    Fees and Expenses ...................................................................................... 61
    Section 9.3    Amendment; Waiver ................................................................................... 62
    Section 9.4    No Assignment or Benefit to Third Parties ................................................ 62
    Section 9.5    Entire Agreement ....................................................................................... 63
    Section 9.6    Confidentiality ........................................................................................... 63
    Section 9.7    Disclosure Letter ........................................................................................ 64
    Section 9.8    Governing Law; Jurisdiction ...................................................................... 64
    Section 9.9    Waiver of Trial by Jury .............................................................................. 65
    Section 9.10    Specific Performance .................................................................................. 65
    Section 9.11    Counterparts ............................................................................................... 65
    Section 9.12    Construction ............................................................................................... 66
    Section 9.13    Severability ................................................................................................ 67

ARTICLE X DEFINITIONS AND TERMS ................................................................................ 67
    Section 10.1    Certain Definitions ..................................................................................... 67
    Section 10.2    Table of Defined Terms .............................................................................. 79

## ANNEXES AND EXHIBITS

| | |
|---|---|
| Annex I | Sellers and Company Interests |
| Annex II | Pre-Closing Restructuring |
| Annex III | Employment Agreement Parties |
| Annex IV | Knowledge Parties |
| Exhibit A | Accounting Principles |
| Exhibit B | Initial Allocation |
| Exhibit C | Forms of Employment Agreement |
| Exhibit D-1 | Form of Assignment of Company Interests |
| Exhibit D-2 | Form of Assignment of Transferred Residential Interests |
| Exhibit E | Liquidated Damages Letter |
| Exhibit F | A&R Residential LLC Agreement |
| Exhibit G | Debt Calculation Example |
| Exhibit H | Net Working Capital Calculation Example |

4

1007814448v22

This PURCHASE AGREEMENT, dated as of May 11, 2022, is made by and among David Carlson ("Mr. Carlson"), Mark Isaacson ("Mr. Isaacson" and, together with Mr. Carlson, each a "Principal Seller"), TriPost Capital RCG Investments, LP, a Delaware limited partnership (the "TriPost Seller" and together with Mr. Carlson and Mr. Isaacson, each, a "Seller", and collectively, the "Sellers"), and Exeter Property Group, LLC, a Delaware limited liability company ("Buyer").

W I T N E S S E T H:

WHEREAS, the Sellers currently own, collectively, 100% of the issued and outstanding Company Interests of Redwood Capital Group Holdings, LLC, a Delaware limited liability company (the "Company"), and each Seller owns a portion of the Company Interests, as set forth opposite such Seller's name on Annex I;

WHEREAS, in connection with the transactions contemplated by this Agreement, prior to the Closing Date (as defined below), the Company and the Sellers will effectuate the restructuring transactions described on Annex II (the "Pre-Closing Restructuring");

WHEREAS, following the Pre-Closing Restructuring and immediately prior to the Closing, (i) TriPost Seller will own, a 14.4118% interest in Redwood Residential, LLC, an Illinois limited liability company ("Redwood Residential " and, such liability company interests, the "Transferred Residential Interests "), (ii) the Principal Sellers will own a 15% interest in Redwood Residential, and (iii) Redwood Capital Group, LLC, an Illinois limited liability company and wholly-owned Subsidiary of the Company, will, collectively, own the remainder of the issued and outstanding limited liability company interests of Redwood Residential.

WHEREAS, on the terms and conditions set forth herein, the Sellers desire to sell, assign, convey, transfer and deliver, or cause to be sold, assigned, conveyed, transferred and delivered, to Buyer, and Buyer desires to purchase, accept and acquire from the Sellers 100% of the Company Interests (the "Sale") and, in the case of the TriPost Seller, all of the Transferred Residential Interests, in consideration for (i) the Purchase Price and (ii) solely with regards to Mr. Carlson, subject to the terms and conditions set forth in Section 1.5, the additional contingent Earn-Out Payments described therein as additional contingent purchase price for the Sale of his Company Interests;

WHEREAS, at the Closing, and as a condition and inducement to Buyer's willingness to enter into this Agreement, the Company will enter into employment agreements in the form attached hereto as Exhibit C with at least five (5) of the individuals listed on Annex III hereto, to be effective at, and contingent on, Closing (each, an "Employment Agreement"); and

WHEREAS, the parties to each of the other Ancillary Agreements have entered into each such Ancillary Agreement contemporaneously with entry into this Agreement or will enter into such Ancillary Agreements at the Closing, as applicable;

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants, agreements and obligations contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as set forth herein.

5

1007814448v22

## ARTICLE I

## PURCHASE AND SALE

Section 1.1    <u>Purchase and Sale of Company Interests</u>.  On the terms and subject to the conditions set forth herein, (a) at the Closing, (x) each Seller shall sell, assign, convey, transfer and deliver to Buyer, and Buyer shall purchase, accept and acquire from each such Seller, all of the Company Interests held by such Seller, and (y) the TriPost Seller shall sell, assign, convey, transfer and deliver to Buyer, and Buyer shall purchase, accept and acquire from the TriPost Seller, all of the Transferred Residential Interests, in each case (x) and (y), free and clear of all Encumbrance (other than restrictions on transfer arising under applicable securities Laws) and (b) Buyer shall pay (1) at the Closing, to each Seller's account their respective portion of the Estimated Purchase Price set forth on <u>Annex I</u> (solely with regards to the Principal Sellers, less the Escrow Amount) in cash by wire transfer to the account designated by the Sellers at least three (3) Business Days prior to the Closing Date (with regards to each Seller, such Seller's "<u>Seller Account</u>"), and (2) after the Closing in accordance with <u>Section 1.5</u> hereof, the Earn-Out Payment (if any) to Mr. Carlson, as additional contingent consideration for the Sale of Mr. Carlson's Company Interests, subject to the satisfaction of the conditions set forth in <u>Section 1.5</u>.

Section 1.2    <u>Closing</u>.  The closing (the "<u>Closing</u>") shall take place at the offices of Debevoise & Plimpton LLP at 10:00 a.m. New York time, on the fifth (5th) Business Day following the date on which the conditions set forth in Article VI (other than those conditions that by their nature are to be satisfied at the Closing but subject to the fulfillment or waiver of those conditions) have been satisfied or waived, or at such other time and place as the parties hereto may mutually agree in writing; <u>provided</u> that the Sellers and Buyer shall consult with each other in good faith to determine a mutually acceptable Closing Date.  The date on which the Closing occurs is referred to as the "<u>Closing Date</u>."

Section 1.3    <u>Deliveries at Closing</u>.

(a)    <u>Deliveries by Buyer</u>.  At the Closing, Buyer shall deliver or cause to be delivered the following:

(i)    to the TriPost Seller's Account eighteen million dollars ($18,000,000) by wire transfer of immediately available funds;

(ii)    an amount in the aggregate equal to the sum of the Transaction Expenses owed to third parties (and for which a customary invoice has been delivered to the Sellers or the Company and provided to Buyer), by wire transfer of immediately available funds to the accounts provided by Principal Sellers to Buyer at least three (3) Business Days prior to the Closing Date (as set forth in the applicable invoice and in accordance with the Estimated Closing Statement);

(iii)    to the Escrow Agent, by wire transfer of immediately available funds to the account designated in writing by Escrow Agent, (x) an amount in cash equal to the Escrow Amount for deposit into a separate escrow account (the "<u>Escrow Account</u>") established pursuant to the Escrow Agreement;

6

1007814448v22

(iv)    to the account or accounts designated in the Payoff Letters delivered to Buyer at least five (5) Business Days prior to the Closing Date, on behalf of the Company or the other Target Group Entities, the amount of outstanding principal and accrued but unpaid interest, fees and other amounts payable on the Closing Date under the Outstanding Facilities; provided that notwithstanding anything contained herein to the contrary, any earnest money deposits that were funded using funds drawn on the Existing Facility (which includes the Seasons Property, defined below), upon return, shall be paid, and belong, to Mark Isaacson and David Carlson;

(v)    after taking in account (and, as applicable, being reduced by) the payments made pursuant to Sections 1.3(a)(i) – (iv), to each Principal Seller's Account, that portion of the balance of the Estimated Purchase Price set forth on Annex I;

(vi)    to the Sellers, a duly executed counterpart to the amended and restated limited liability company agreement of Redwood Residential LLC, in the form attached hereto as Exhibit FF (the "A&R Residential LLC Agreement");

(vii)    to the individuals listed on Annex III hereto that have executed their Employment Agreement, duly executed counterparts by the applicable Buyer Group Entity to the Employment Agreement to which such individual is a party;

(viii)    to the Principal Sellers, the Escrow Agreement, duly executed by Buyer and the Escrow Agent; and

(ix)    to the Sellers, the certificate to be delivered pursuant to Section 6.3(c).

(b)    Deliveries by the Sellers.  At the Closing, the Sellers shall deliver, or cause to be delivered, to Buyer the following:

(i)    duly executed counterparts by the individuals listed on Exhibit B hereto to the share forfeiture letter and the lock-up letter, in the forms attached as Attachments 1 and 2, respectively, to Exhibit B hereto;

(ii)    duly executed counterparts by Mark Isaacson and David Carlson to the A&R Residential LLC Agreement;

(iii)    duly executed counterparts by at least five (5) of the individuals listed on Annex III hereto to the Employment Agreement to which each such individual is a party;

(iv)    instruments of transfer, (i) in form attached hereto as Exhibit D-1, sufficient to transfer the Company Interests from each Seller to Buyer and (ii) in form attached hereto as Exhibit D-2, sufficient to transfer the Transferred Residential Interests from the TriPost Seller to Buyer;

(v)    the Escrow Agreement, duly executed by the Principal Sellers;

7

(vi)    a duly executed counterpart by Mr. Carlson to the liquidated damages letter in the form attached hereto as Exhibit E;

(vii)    the certificate to be delivered pursuant to Section 6.2(c); and

(viii)    a duly executed and completed valid IRS Form W-9 from each Seller.

Section 1.4    The Purchase Price.

(a)    At least three (3) Business Days prior to the Closing, the Sellers shall cause the Company to deliver to Buyer (x) a statement setting forth details of each Seller's Company Interests as at the proposed Closing Date (the "Closing Ownership Notice"), together with (y) a statement (the "Estimated Closing Statement") duly certified by the Chief Financial Officer (or other comparable officer) of the Company, setting forth the Principal Sellers' good faith estimate of the Purchase Price, which shall include reasonable supporting detail regarding each element of such estimate (the "Estimated Purchase Price"), together with reasonable supporting calculations therefor as applicable.  Following delivery of the Estimated Closing Statement, the Principal Sellers shall, and shall cause the Target Group Entities to, provide Buyer and its Representatives with reasonable access to all relevant information, records, data, working papers and relevant personnel of the Principal Sellers and the Target Group Entities used in the preparation of the Estimated Closing Statement as Buyer may reasonably request.  The Estimated Closing Statement shall be prepared with substantially the same level of detail as a year-end financial close, on a consolidated basis, and in accordance with the Accounting Principles and the other applicable provisions of this Agreement and so as not to give effect to the consummation of the Transactions or the incurrence or arrangement of any financing incurred or to be incurred by Buyer or any of its Affiliates in connection therewith.  Prior to the Closing Date, the Principal Sellers shall cause the Company to consider in good faith any proposed changes to the Estimated Closing Statement and the calculations set forth thereon that are proposed by Buyer. For the avoidance of doubt, no position taken or failed to be taken by any party with respect to the Estimated Closing Statement shall limit the positions that may be taken in connection with the post-Closing adjustments pursuant to Section 1.4(a) through Section 1.4(g).

(b)    Within sixty (60) days following the Closing Date, Buyer shall prepare and deliver to the Principal Sellers a statement (the "Closing Statement") setting forth Buyer's calculation of the Purchase Price, and reasonable supporting detail regarding each element thereof, together with reasonable supporting calculations as applicable.  The Closing Statement shall be prepared in accordance with the same requirements applicable to the preparation of the Estimated Closing Statement as set forth in Section 1.4(a).

(c)    From delivery to Principal Sellers of the Closing Statement until the final determination of the Closing Statement in accordance with this Section 1.4, Buyer shall, and shall cause the Target Group Entities to, provide the Principal Sellers with reasonable access during normal business hours to the books and records (including work papers) of the Target Group Entities to the extent relevant to, and for purposes of, Principal Sellers' review of the Closing Statement and the preparation of any Notice of Disagreement.

8

(d)     The Closing Statement, and all of the calculations, amounts and line items included therein, shall become final and binding upon all of the parties thirty (30) days following delivery thereof to the Principal Sellers, unless the Principal Sellers gives written notice of its disagreement with the Closing Statement or the calculation of any of the amounts included therein (a "Notice of Disagreement") to Buyer on or prior to such date.  Any Notice of Disagreement shall specify in reasonable detail the nature and amount of any disagreement so asserted, including alternative calculations with respect to any disagreement so asserted.  Any item not objected to in the Notice of Disagreement (an "Undisputed Item") shall become final and binding on Buyer and the Sellers, except to the extent an adjustment made to a disputed item requires an offsetting adjustment to be made to an Undisputed Item.

(e)     If a timely Notice of Disagreement is delivered to Buyer pursuant to Section 1.4(d), then the Closing Statement and the calculation of the items included therein (as revised in accordance with this Section 1.4) shall become final and binding upon the parties hereto on the earlier of (i) the date any and all matters specified in the Notice of Disagreement are finally resolved in writing by the Principal Sellers and Buyer, and (ii) the date any and all matters specified in the Notice of Disagreement and not resolved in writing by the Principal Sellers and Buyer are finally resolved in writing by the Accounting Firm.  The Closing Statement and the calculation of the Purchase Price included therein shall be revised by the Principal Sellers and Buyer to the extent necessary to reflect any resolution by the Principal Sellers and Buyer of any disputed item and any final resolution made by the Accounting Firm in accordance with this Section 1.4.  During the fifteen (15) days immediately following the delivery of a Notice of Disagreement, or such longer period as the Principal Sellers and Buyer may agree in writing, the Principal Sellers and Buyer shall seek in good faith to resolve in writing any differences which they may have with respect to any matter specified in the Notice of Disagreement, and all such discussions related thereto shall (unless otherwise agreed in writing by the Principal Sellers and Buyer) be governed by Rule 408 of the Federal Rules of Evidence and any applicable similar Law.  At the end of such fifteen (15) day period (or such longer period to the extent such fifteen (15) day period has been extended as agreed in writing by Buyer and the Principal Sellers), the Principal Sellers and Buyer shall submit to the Accounting Firm for review and resolution any and all matters (but limited to only such matters) that remain in dispute and that were included in the Notice of Disagreement.

(f)     If submitted to the Accounting Firm pursuant to Section 1.4(e), the Principal Sellers and Buyer shall instruct the Accounting Firm to, and the Accounting Firm shall, make a final determination of: (i) all such matters (but limited to only such matters) that remain in dispute and that were included in the Notice of Disagreement and (ii) all Undisputed Items that require offsetting adjustments as a result of any change to a disputed item.  The Principal Sellers and Buyer shall cooperate with the Accounting Firm during the term of its engagement. The Accounting Firm shall act solely as an expert and not as an arbitrator.  The Principal Sellers and Buyer shall instruct the Accounting Firm not to, and the Accounting Firm shall not, assign a value to any item in dispute greater than the greatest value for such item assigned by the Principal Sellers, on the one hand, or Buyer, on the other hand, or less than the smallest value for such item assigned by the Principal Sellers, on the one hand, or Buyer, on the other hand.  The Principal Sellers and Buyer shall also instruct the Accounting Firm to, and the Accounting Firm shall, make its determination based solely on presentations by the Principal Sellers and Buyer, the Accounting Principles and, to the extent applicable, the terms and provisions of this

Agreement.  The Principal Sellers and Buyer shall request the Accounting Firm to deliver its final determination in writing within thirty (30) days following final submission of the disputed matters to it, which final determination shall be final and binding upon all the parties hereto, absent manifest error or fraud.  The fees and expenses of the Accounting Firm shall be borne by the Principal Sellers, on the one hand, and Buyer, on the other hand, based on the percentage that the portion of the contested amount not awarded to the Sellers, on the one hand, and Buyer, on the other hand, bears to the amount actually contested by the Principal Sellers or Buyer.  Such allocation of fees and expenses shall be calculated by the Accounting Firm and such calculation shall be final and binding on the parties.  At any time, the Principal Sellers and Buyer may agree to settle any objections raised in a Notice of Disagreement, which agreement shall be in writing and binding upon all of the parties hereto with respect to the subject matter of any such dispute so resolved.

(g)    The Purchase Price, as finally determined pursuant to this Section 1.4, shall be the "Adjusted Purchase Price".

(i)    If the Adjusted Purchase Price is greater than the Estimated Purchase Price, then (x) the Estimated Purchase Price shall be deemed the final Purchase Price (y) Buyer and the Principal Sellers shall deliver joint written instructions to the Escrow Agent to release to Mr. Isaacson and Mr. Carlson, their allocable portion of all funds available in the Escrow Account as set forth on Annex I, with no further payment due from Buyer.

(ii)    If the Adjusted Purchase Price is less than the Estimated Purchase Price (the amount of the difference, a "Downward Adjustment"), then  (x) Buyer and the Principal Sellers shall deliver joint written instructions to the Escrow Agent to release to Buyer the amount of the Downward Adjustment, and, if the amount of the Downward Adjustment exceeds the funds available in the Escrow Account, Mr. Carlson and Mr. Isaacson shall, severally and not jointly, be obligated to pay Buyer their allocable portion of such excess as set forth on Annex I, and (y) to the extent the funds available in the Escrow Account exceed the amount of the Downward Adjustment, Buyer and the Principal Sellers shall deliver joint written instructions to the Escrow Agent to release to Mr. Carlson and Mr. Isaacson their allocable portion of the balance of the Escrow Account following payment of the Downward Adjustment as set forth on Annex I.

(iii)    Any payments required to be made pursuant to this Section 1.4(g) shall be made within five (5) Business Days after the date on which the Adjusted Purchase Price is finally determined pursuant to this Section 1.4.  All payments of cash shall be made by wire transfer of immediately available funds pursuant to the instructions specified in writing by the receiving party.

(h)    For the avoidance of doubt, the parties acknowledge and agree that the calculations and the purchase price adjustment to be made pursuant to this Section 1.4 are meant only to reflect the proper calculation of Adjusted Purchase Price (and the inputs thereto) in accordance with the applicable definitions contained therein and otherwise in this Agreement and the applicable terms and conditions of this Agreement, and is not intended to permit a party to introduce  accounting  policies,  principles,  judgments,  practices  or  methodologies  in  the

10

preparation or review of the Estimated Closing Statement or the determination thereof different than the Accounting Principles.

Section 1.5    Earn-Out.

(a)    Earn-Out Payments. From and after the Closing, as additional contingent consideration for the Sale of Mr. Carlson's Company Interests, upon the occurrence of an applicable triggering event described below in this Section 1.5(a), and subject in each instance to Section 1.5(d) and (e), Mr. Carlson (or his heirs, if applicable) shall be entitled to receive from Buyer the following (collectively, the "Earn-Out Payments"):

(i)    promptly following, but in no event more than ten (10) Business Days following, the occurrence of the Initial Core Triggering Event, an additional purchase price payment of six million seven hundred and thirteen thousand dollars ($6,713,000);

(ii)    if each of the Initial Core Triggering Event and the Second Core Triggering Event has occurred, then promptly following, but in no event more than ten (10) Business Days following, the occurrence of the final closing of the Initial Core Fund (including any extensions to the initial fundraising period for the Initial Core Fund whether provided in the fund documents or otherwise approved or effected by Buyer), an additional purchase price payment of (A) fifty percent (50%) of the Maximum Second Core Payment if the Initial Core Fund has received fee-paying capital commitments of more than seven hundred and fifty million dollars ($750,000,000) but less than one billion dollars ($1,000,000,000) by its final closing (including any extensions to the initial fundraising period for the Initial Core Fund whether provided in the fund documents or otherwise approved or effected by Buyer) and (B) the Maximum Second Core Payment if the Initial Core Fund has received fee-paying capital commitments equal to or greater than one billion dollars ($1,000,000,000) by its final closing (including any extensions to the initial fundraising period for the Initial Core Fund whether provided in the fund documents or otherwise approved or effected by Buyer); the "Maximum Second Core Payment" means five million seven hundred and fifty four thousand dollars ($5,754,000);

(iii)    promptly following, but in no event more than ten (10) Business Days following, the occurrence of the Initial WH Triggering Event, an additional purchase price payment of six million seven hundred and thirteen thousand dollars ($6,713,000); and

(iv)    if each of the Initial WH Triggering Event, Initial Core Triggering Event and the Second WH Triggering Event has occurred, then promptly following, but in no event more than ten (10) Business Days following, the occurrence of the Second WH Triggering Event, an additional purchase price payment of fifty percent (50%) of the Maximum Second WH Payment if (A) the Initial WH Fund has received fee-paying capital commitments of more than seven hundred and fifty million dollars ($750,000,000) but less than one billion dollars ($1,000,000,000) by its final closing (including any extensions to the initial fundraising period for the Initial WH Fund whether provided in the fund documents or otherwise approved or effected by Buyer) and (B) the Initial Core Fund and the Initial WH Fund have together received fee-paying capital commitments of at least one billion seven hundred and fifty million dollars

11

($1,750,000,000); the "Maximum Second WH Payment" means four million seven hundred and ninety-five thousand dollars ($4,795,000);

(v)    if (A) each of the Initial Core Triggering Event, the Initial WH Triggering Event, the Second Core Triggering Event and the Second WH Triggering Event have occurred, (B) the Maximum Second Core Payment and Maximum Second WH Payment have not been paid in full and (C) the Initial Core Fund and the Initial WH Fund have received fee-paying capital commitments of at least two billion dollars ($2,000,000,000) in the aggregate by their respective final closings (including any extensions to the initial fundraising period for either such fund whether provided in the applicable fund documents or otherwise approved or effected by Buyer), then Mr. Carlson shall receive any portion the Maximum Second Core Payment and the Maximum Second WH Payment not previously paid  pursuant to Section 1.5(ii) and Section 1.5(iv).

(b)    Allocation of Employee Earn-Out Payments. Additional contingent payments shall be allocated at Closing (and reallocated following Closing, if applicable, as provided in Mr. Carlson's employment agreement with Buyer or its applicable Affiliates) as incentive compensation to employees of the Target Group Employees as set forth on Exhibit B (any such person, an "Incentive Plan Participant"); provided, however, as a condition to any such allocation, the Incentive Plan Participant must enter into an employment agreement or other applicable services agreement with a Target Group Entity that provides for a contingent entitlement to such payment and provides for a lock-up letter and share forfeiture letter (which shall be in the forms attached hereto as Attachments 1 and 2 to Exhibit B hereto); provided, further, that an Incentive Plan Participant shall cease to be entitled to receive any such portion of the applicable Earn-Out Payment if, at any time prior to the date on which such payment is made, such Incentive Plan Participant is not then employed or engaged by any Target Group Entity (in which case, the portion previously allocated to such Incentive Plan Participant may be reallocated by Mr. Carlson as provided in Mr. Carlson's employment agreement with Buyer or its applicable Affiliates or, if he is no longer employed by Buyer or its Affiliates, then by Buyer). Such additional amounts shall not exceed: (i) in respect of the Initial Core Triggering Event, $287,000 in the aggregate to all Incentive Plan Participants, (ii) in respect of the Second Core Triggering Event, $246,000 in the aggregate to all Incentive Plan Participants, (iii) in respect of the Initial WH Triggering Event, $287,000 in the aggregate to all Incentive Plan Participants, (iv) in respect of the Second WH Triggering Event, $205,000 in the aggregate to all Incentive Plan Participants. For the avoidance of doubt, (A) all amounts payable to Mr. Carlson as Earn-Out Payments together with amounts payable to all Incentive Plan Participants shall not exceed: (i) in respect of the Initial Core Triggering Event, seven million dollars ($7,000,000), (ii) in respect of the Second Core Triggering Event, six million dollars ($6,000,000), (iii) in respect of the Initial WH Triggering Event, seven million dollars ($7,000,000), (iv) in respect of the Second WH Triggering Event, five million dollars ($5,000,000) and (B) the aggregate payments to Mr. Carlson as Earn-Out Payments together with amounts payable to all Incentive Plan Participants pursuant Section 1.5(a)(a)(ii), Section 1.5(a)(a)(iv) and Section 1.5(a)(a)(v) shall not exceed eleven million dollars ($11,000,000).

(c)    Form of Earn-Out Payment. Notwithstanding anything contained herein to the contrary, fifty percent (50%) of each Earn-Out Payment and any contingent payments made pursuant to Section 1.5(b) that shall become due hereunder shall be paid to Mr. Carlson or to the

12

applicable Incentive Plan Participant in cash by wire transfer of immediately available funds and, solely in the case of an Incentive Plan Participant, through the payroll system of the employing entity of such Incentive Plan Participant.  The remaining fifty percent (50%) of such Earn-Out Payment or other contingent payment shall be paid to the Acquisition Coordinator (solely in the case of an Incentive Plan Participant, through the payroll system of the employing entity of such Incentive Plan Participant). The Acquisition Coordinator shall receive the payment on behalf of Mr. Carlson and the then-eligible Incentive Plan Participants to purchase EQT Shares on behalf of Mr. Carlson and such Incentive Plan Participants (and, accordingly, no cash will be paid, wired or transferred to Mr. Carlson or such Incentive Plan Participant in respect thereof). Payment in accordance with this Section 1.5(c) shall be in full discharge of Buyer's obligations with regard to Mr. Carlson and each applicable Incentive Plan Participant.  Immediately following the payment of the applicable portion of any Earn-Out Payment or other contingent payment to the Acquisition Coordinator pursuant to this Section 1.5(c), and in any event within ten (10) Business Days following the applicable triggering event, the Acquisition Coordinator acting as the agent of Mr. Carlson and the applicable Incentive Plan Participants shall apply such amount to acquire EQT Shares for Mr. Carlson or the applicable Incentive Plan Participant.

(d)    Earn-Out Covenants. From and after the Closing until the earlier of (i) payments of all Earn-Out Payments, and (ii) the third anniversary of Closing (such period, the "Earn-Out Period"), Buyer covenants and agrees as follows:

(i)    neither Buyer nor any of its Affiliates (including after the Closing, the Target Group Entities) shall take any action with the primary intent of interfering with the Mr. Carlson's ability to achieve the maximum Earn-Out Payments;

(ii)    Buyer shall, and shall cause the Buyer Group Entities to, cause the business activities and operations of the Target Group Entities to be accounted for separately from the Buyer's and to maintain such books and records with respect thereto as shall be necessary to carry out the provisions of Section 1.5 of this Agreement; and

(iii)    Buyer covenants and agrees that neither it nor any Buyer Group Entity shall enter into any agreement or Contract in a manner that would, by its terms, restrict payment of the Earn-Out Payments.

(e)    Acceleration. If an Acceleration Event occurs prior to the end of the Earn-Out Period, then notwithstanding anything contained herein (including, but not limited to, the satisfaction of the trigger events enumerated in Section 1.5(a), Buyer shall promptly (but in any event within ten (10) Business Days of such Acceleration Event) make all Earn-Out Payments contemplated hereunder that have not been paid prior to such date.

(f)    The Parties agree that all of the Earnout Payments made pursuant to this Section 1.5 shall be treated for all applicable Tax reporting purposes as additional consideration for Mr. Carlson's Company Interests, unless otherwise required by a change in applicable Tax Law.

Section 1.6    Escrow Agreement.  The Escrow Agreement shall be entered into on the Closing Date by Buyer, Principal Sellers and the Escrow Agent in a form reasonably acceptable

13

1007814448v22

to each party thereto. The amount contained in the Escrow Account shall serve solely as a security for Buyer's rights pursuant to Section 1.4. All fees, costs and expenses of the Escrow Agent shall be paid by Buyer; provided, that the Principal Sellers, on the one hand, and Buyer, on the other hand, shall jointly bear the indemnification obligations set forth in the Escrow Agreement. Buyer shall be treated as the owner of the Escrow Account for Tax purposes.

Section 1.7    Withholding.  Buyer shall be entitled to deduct and withhold from the amounts otherwise payable pursuant to this Agreement to any Person such amounts as Buyer determines is required to deduct and withhold with respect to the making of such payment under applicable Tax Law, and pay such withheld amounts over to the appropriate Tax Authority.  If Buyer determines any deduction or withholding is so required under the Code, or any other provision of  applicable Tax Law, with respect to the Estimated Purchase Price or Adjusted Purchase Price (other than (a) in respect of payments that are treated as compensation for services or (b) as a result of the failure to provide the forms described in Section 1.3(b)(viii), then Buyer shall use commercially reasonable efforts to consult with Sellers regarding such determination and to notify the applicable payee a reasonable period of time prior to the Closing or any subsequent date that the applicable payment is to be made to provide the applicable payee an opportunity to provide any applicable certificates, forms or other documentation that would eliminate or reduce the requirement to deduct or withhold Tax under the applicable Tax Law. To the extent that amounts are so deducted and withheld by any party and paid to the appropriate Tax Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person, in respect of which such deduction or withholding was made.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as set forth in the Seller Disclosure Letter, each Seller, severally and not jointly, represents and warrants to Buyer as of the date hereof and, in respect of the Fundamental Representations, as of Closing as follows:

Section 2.1    Organization.  Such Seller is a natural person or, if not a natural person, is duly organized, validly existing and in good standing (to the extent applicable) under the laws of its jurisdiction of organization.

Section 2.2    Authorization.  Such Seller has the capacity and full power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which such Seller (as applicable) is a party, to perform such Seller's obligations hereunder and thereunder and to consummate the Transactions.  The execution, delivery and performance by such Seller of this Agreement and each of the Ancillary Agreements to which such Seller is a party has, in the case of each Seller that is not a natural person, been duly and validly authorized by all necessary organizational action, and no further action on the part of such Seller is required in connection with the execution, delivery and performance by such Seller of this Agreement or any of the Ancillary Agreements to which such Seller is a party.

Section 2.3    Approvals.  Except for the Project Company Consents or as otherwise set forth in Section 2.3 of the Seller Disclosure Letter (collectively, the "Seller Consents"), no

14

material Consent, filing or notification is required to be obtained by such Seller from, or to be given by such Seller, or made by such Seller with, any Governmental Authority in connection with the execution, delivery and performance by such Seller of this Agreement and the Ancillary Agreements to which it is a party.

Section 2.4    Non-Contravention.  The execution, delivery and performance by such Seller of this Agreement and the Ancillary Agreements to which it is a party, and the consummation of the Transactions, do not and will not, in each case assuming the receipt of the Seller Consents, (a) violate any provision of the Organizational Documents of such Seller, in the case of any Seller that is not a natural person, (b) conflict with, or result in the breach of, or constitute a default under, or result in the termination, cancellation, modification, acceleration or violation of, or create in any Person the right to terminate, cancel, modify, accelerate, revoke or exercise any other material right or remedy under, or require any Consent or notification under, any Material Contract to which such Seller is a party or (c) violate in any respect or result in a breach of or constitute a default under any Law to which such Seller is subject, or under any Governmental Approval relating to such Seller, except in the case of clause (b) or (c), where such matters would not, individually or in the aggregate, reasonably be expected to be material to the Target Group Entities, taken as a whole or materially affect the ability of such Seller to consummate the Transactions.

Section 2.5    Binding Effect.  This Agreement and each of the Ancillary Agreements to which such Seller is a party, when executed and delivered by Buyer and the other parties hereto and thereto (assuming due authorization), constitutes, or will constitute, a valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with their respective terms, except as may be affected by Enforceability Limitations.

Section 2.6    Ownership of Company Interests and Transferred Residential Interests. Such Seller owns, beneficially and of record, all of his or its Company Interests, free and clear of any Encumbrances, except for those arising under applicable securities Laws.  As of immediately prior to the Closing, the TriPost Seller will own, beneficially and of record, all of the Transferred Residential Interests, free and clear of any Encumbrances, except for those arising under applicable securities Laws.  Other than this Agreement, the Ancillary Agreements and the Company's Organizational Documents, such Seller is not a party to or bound by any Contract relating to the Company Interests or the Transferred Residential Interests (including any economic or voting interests therein) or the nomination, designation or election of members of a board of directors, managers, or similar governing body or Person of any of the Target Group Entities.

Section 2.7    Litigation.  There are no Actions pending or, to the Knowledge of such Seller, threatened in writing against such Seller that would reasonably be expected to have a material adverse effect on the ability of such Seller to consummate the Transactions.

Section 2.8    Compliance with Laws. Since January 1, 2019 (or earlier if unresolved), such Seller has not received any written notice from any Person including from any Governmental Authority (i) alleging any material violation of or material non-compliance with any applicable Law or Order by any Target Group Entity or (ii) that a Target Group Entity or any

15

of its Representatives or Affiliates must undertake, or bear all or a portion of the cost of, any material remedial action of any nature related to its assets, properties or business.

Section 2.9    Transaction with Interested Persons.  No Target Group Entity is a party to any Contract with such Seller, any equityholder, member, officer, director or partner of such Seller or such Affiliates (other than a Target Group Entity or Target Project Company), any individual with the title of "Partner" (or a more senior title) of such Seller or any immediate family members or estate planning entities of any of the foregoing, in each case excluding (a) Contracts relating to compensation and benefits entered into in the ordinary course of business (including Contracts relating to the Target Benefit Plans), (b) Contracts relating to the ownership of Equity Interests held by such Persons directly or indirectly in, or rights relating to the right to receive carried interest or promote from, the Target Group Entities, (c) subscription agreements pursuant to which employees and partners of the Target Group Entities are permitted to invest in the Target Project Companies on terms made available to all other third-party Investors (save in respect of management fees, carried interest or promote) other than with respect to management fees, carried interest or promote which for employees and partners are waived, (d) this Agreement and the Ancillary Agreements, (e) the Organizational Documents of the Target Group Entities and Target Project Companies, and (f) any Target Management Contract.  None of the foregoing Persons (i) owns, directly or indirectly, on an individual or joint basis, any Equity Interest (excluding any investments by the TriPost Seller or any of its Affiliates in any Equity Interests, and passive investments in the shares or other Equity Interests of any enterprise that are publicly traded, provided that any such individual's holdings therein, together with any holdings of his or her immediate family members and their respective estate planning entities, are less than five percent (5.0%) of the outstanding shares or comparable interest in such entity in the aggregate (a "Passive Investment")) in, or serves as an employee, independent contractor, officer, director, member, partner or in another similar capacity of, any investment advisory firm that is a competitor of the Target Group Entities, or (ii) owns any material interest in any material asset used by any of the Target Group Entities or in any material consultant, service provider, supplier, landlord, creditor or debtor of or to any Target Group Entity or Target Project Company, except any Passive Investment and except for their interest in any Target Group Entity.

Section 2.10    Investor Status.  Such Seller is an "accredited investor" as defined in Rule 501 of Regulation D promulgated under the Securities Act.

Section 2.11    Certain Regulatory Matters.

(a)    Such Seller is not nor, to the Knowledge of such Seller, are any directors, officers, employees, agents or representatives (in each such Person's capacity as such) of such Seller, in violation of U.S. Sanctions or: (i) the subject of any sanctions administered by the United States Department of the Treasury's Office of Foreign Assets Control, the United Nations, the European Union, HM Treasury and the Foreign and Commonwealth Office of the United Kingdom, or other applicable sanctions authority (collectively, "Sanctions") or (ii) located, organized or ordinarily resident in a country or territory that is the subject of Sanctions (including Crimea, Cuba, Iran, North Korea, Syria, and the so-called Luhansk People's Republic and Donetsk People's Republic, collectively, "Sanctioned Countries").

16

1007814448v22

(b)    For the past three (3) years, such Seller has not nor, to the Knowledge of such Seller, have any directors, partners, officers, employees, agents or representatives (in each such Person's capacity as such) of such Seller, in violation of U.S. Sanctions, directly or knowingly indirectly engaged in, nor is now directly or knowingly indirectly engaged in, any dealings or transactions in any Sanctioned Country or with or involving or for the benefit of any Person that at the time of the dealing or transaction is or was the subject of Sanctions.

(c)    Such Seller is and, to the Knowledge of such Seller, any directors, officers, employees, agents or representatives (in each such Person's capacity as such) of such Seller, is, and for the past three (3) years has been, in compliance with the applicable provisions of the U.S. Bank Secrecy Act and all other applicable anti-money laundering Laws, as amended from time to time (collectively, the "AML Laws"), in the jurisdictions in which such Seller conducts business.

(d)    For the past three (3) years, such Seller, and to the Knowledge of such Seller, each director, officer, partner, employee, agent or representative thereof (in each such Person's capacity as such), (i) has been and is currently in compliance with the U.S. Foreign Corrupt Practices Act, as amended from time to time, the UK Bribery Act 2010 and all other applicable anti-bribery or anti-corruption laws, rules and regulations (collectively, "Anti-Corruption Laws") in the jurisdictions in which such Seller or the Target Group Entities and Target Project Companies conduct business and (ii) has not offered, paid, agreed in writing to pay, authorized the payment of, received, or solicited anything of value under circumstances such that all or a portion of such thing of value would be offered, given or promised, directly or indirectly, to any Person to obtain any improper advantage in violation of any Laws.

(e)    For the past three (3) years, such Seller, and to the Knowledge of such Seller, each director, officer, partner, employee, agent or representative thereof (in each such Person's capacity as such), has not (i) conducted or initiated any internal investigation or made a voluntary, directed or involuntary disclosure to any Governmental Authority or similar agency with respect to any alleged act or omission arising under or relating to any potential noncompliance with any Anti-Corruption Laws, AML Laws or Sanctions, or (ii) been the subject of current, pending or threatened investigation, formal inquiry or enforcement proceedings for violations of Anti-Corruption Laws, AML Laws or Sanctions or received any notice, request or citation for any actual or potential noncompliance with any Anti-Corruption Laws, AML Laws, or Sanctions.

Section 2.12    Finders' Fees.  Except as set forth on Section 2.12 of the Seller Disclosure Letter, there is no investment banker, broker, finder or other similar intermediary or advisor that has been retained by or is authorized to act on behalf of, or who might be entitled to any fee or commission from, such Seller in connection with the Transactions and which would not otherwise be paid in full by such Seller at Closing.

Section 2.13    Acknowledgement of No Other Representations or Warranties.  Such Seller acknowledges and agrees that, on behalf of itself, (a) except for the representations and warranties contained in Article IV or any certificate delivered by Buyer pursuant hereto, neither Buyer nor any of its Affiliates or Representatives makes or has made, nor is such Seller relying on, and expressly disclaims any reliance on, any representation or warranty, either express or

17

implied, concerning Buyer or any of its businesses, operations, assets, liabilities, results of operations, condition (financial or otherwise), or prospects or the Transactions, and (b) Buyer, its Affiliates and each of their respective Representatives hereby disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information communicated, or furnished (orally or in writing) by Buyer or any of its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to such Seller by any Representative of Buyer or its Affiliates) except for the representations and warranties expressly set forth in Article IV or any certificate delivered by Buyer pursuant hereto.  Subject to all of the foregoing provisions of this Section 2.13, such Seller and Buyer retains all of its rights and remedies with respect to claims based on Fraud.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF THE PRINCIPAL SELLERS AS TO THE TARGET GROUP ENTITIES AND TARGET PROJECT COMPANIES

Except as set forth in the Seller Disclosure Letter, each Principal Seller represents and warrants to Buyer as of the date hereof and, in respect of the Fundamental Representations, as of Closing as follows:

Section 3.1    Organization; Qualification.  Each Target Group Entity is duly organized and validly existing under the Laws of its jurisdiction of formation or organization. Each Target Group Entity has all requisite organizational power and authority to carry on its business as it is now being conducted and to own, lease and operate its respective properties and assets in all material respects. Each Target Group Entity is qualified or licensed to do business and is in good standing (or the equivalent thereof, in the jurisdictions in which such concept is applicable) in each jurisdiction in which the nature of the business conducted by or it the character or location of the properties and assets owned, leased or operated by it makes such qualification or licensing necessary, except where failure to be so qualified, licensed or in good standing would not, individually or in the aggregate, have a Target Material Adverse Effect.  The Principal Sellers have delivered to Buyer correct and complete copies of the Organizational Documents of each Target Group Entity as currently in effect as of the date hereof.  No Target Group Entity is in violation in any material respect of any provision of its Organizational Documents or any resolution adopted by its governing body or holders of its Equity Interests.

Section 3.2    Capitalization.

(a)    Section 3.2(a) of the Seller Disclosure Letter sets forth, as of the date hereof, a correct and complete list of each Target Group Entity, together with the type of entity, jurisdiction of organization and beneficial and record holders of Equity Interests of each such Target Group Entity.  There are no outstanding Equity Interests of any Target Group Entity that are not described in Section 3.2(a) of the Seller Disclosure Letter. As of the consummation of the Transactions, Buyer will own all of the Company Interests, free and clear of all Encumbrances, except for those (i) arising under applicable securities Laws or the Organizational Documents of any Target Group Entity or Target Fund or (ii) created by Buyer or any of its Affiliates.

18

(b)    All of the issued and outstanding Equity Interests of each Target Group Entity have been duly authorized, validly issued and are fully paid and non-assessable (to the extent such concepts are applicable) and were not issued in violation of any applicable Law, Order, preemptive or similar right, purchase option, call or right of first refusal or similar right or other Contract, with such Equity Interests owned beneficially (if such concept is applicable) and of record as of the date hereof by the Persons set forth in Section 3.2(a) of the Seller Disclosure Letter, in the amounts set forth in such section, free and clear of any Encumbrances, except for those arising under applicable securities Laws or the Organizational Documents of any Target Group Entity.  Except as set forth in this Agreement, the Ancillary Agreements, or in the Organizational Documents of the Target Group Entities, none of the Target Group Entities is subject to any obligation to issue, purchase or sell any Equity Interests of any Target Group Entity, or any securities or obligations of any Target Group Entity or convertible or exchangeable into or exercisable for any Equity Interests of any Target Group Entity.

(c)    Other than the Pre-Closing Restructuring and as listed as set forth in Section 3.2(c) of the Seller Disclosure Letter, there are no (i) outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights with respect to the shares of common stock, partnership interests or other Equity Interests of any Target Group Entity, and (ii) voting trusts, voting agreements, proxies or other agreements, instruments or undertakings with respect to the voting of any Equity Interests in any Target Group Entity (other than the Organizational Documents).  Except as set forth in the Organizational Documents of the applicable Target Group Entities, there are no "tag-along", "drag-along", right of first refusal, right of first offer, preemptive or similar rights applicable to the Equity Interests of any Target Group Entity.

(d)    Except for Equity Interests of another Target Group Entity, Target Project Companies or Portfolio Investments, no Target Group Entity owns any Equity Interests of any other Person.  Except as set forth on Section 3.2(d) of the Seller Disclosure Letter, no Target Group Entity has any express obligation requiring it to make any investment (in the form of a loan, capital contribution, or otherwise) in any other Person.

Section 3.3    Non-Contravention.  The execution, delivery and performance by the Principal Sellers of this Agreement and the Ancillary Agreements to which any of them is a party, and the consummation of the Transactions, do not and will not, in each case assuming the receipt of the Seller Consents, (a) violate any provision of the Organizational Documents of any of the Target Group Entities or Target Project Companies, (b) conflict with, or result in the breach of, or constitute a default under, or result in the termination, cancellation, modification, acceleration or violation of, or create in any Person the right to terminate, cancel, modify, accelerate, revoke or exercise any other material right or remedy under, or require any Consent or notification under, any Material Contract to which a Target Group Entity or Target Project Company is a party (other than under Target Management Contracts to the extent set forth on Section 3.4(e) of the Seller Disclosure Letter), or (c) violate or result in a breach of or constitute a default under any Law to which the Target Group Entities or Target Project Companies are subject, or under any Governmental Approval relating to a Target Group Entity or Target Project Company, except in the case of clause (b) or (c), where such matters would not, individually or in the aggregate, reasonably be expected to be material to the Target Group Entities, taken as a whole.

19

Section 3.4    <u>Target Project Companies</u>.

(a)    Set forth in <u>Section 3.4(a)</u> of the Seller Disclosure Letter is, as of the date hereof (unless otherwise specified), (i) the name of each Target Project Company, (ii) the name of the general partner or manager of (or entity acting in a similar capacity with respect to) such Target Project Company, (iii) the name of any property manager, asset manager, and construction manager (if a Target Group Entity) of such Target Project Company, and (iv) any property management, asset management fee, construction management or other similar fee payable to a Target Group Entity by or in respect of each such Target Project Company under the applicable Target Management Contract or any other arrangement or agreement pursuant to which a Target Group Entity is entitled to such fee revenues (including, if applicable, any limitation, waiver, cap, offset, restriction or reimbursement obligation on any amounts payable to a Target Group Entity) (the "<u>Target Project Company Schedule</u>").

(b)    The Principal Sellers have delivered to Buyer correct and complete copies of the Organizational Documents with respect to each Target Project Company and any side letter or other similar agreement in respect of each Target Project Company, in each case as in effect on the date hereof.

(c)    As of the date hereof, to the Knowledge of the Principal Sellers (i) there is no pending effort to seek to remove any of the general partner, manager or investment manager thereof or the termination or dissolution of such Target Project Company, and (ii) no Target Project Company Client or representative thereof has solicited or requested such removal, termination or dissolution.

(d)    As of the date of this Agreement, no "key person" or similar event has occurred with respect to any Target Project Company, nor to the Knowledge of the Principal Sellers has any Target Group Entity received written notice from any Target Project Company Client expressing an intention to terminate or materially reduce its investment relationship with the Target Group Entities or Target Project Companies or adjust the fee schedule with respect to a Target Management Contract or with respect to the fees a Target Project Company Client is required to bear pursuant to the Target Project Company Operative Documents applicable to it in a manner that would reduce the fees or other payments to the Target Group Entities (including after giving effect to the Closing).

(e)    Except as set forth in the Organizational Documents of any Target Group Entity, any Target Project Company, or any constituent member or partner of any Target Project Company, no Target Group Entity has any liability to return any amount distributed or deemed distributed to it by any Target Project Company or to otherwise repay or return to any Target Project Company Client any management fees received by such Target Group Entity. No Target Group Entity has waived or deferred or has any liability to offset or reduce its entitlement to receive any management fees with respect to any Target Project Company Client.  To the Knowledge of the Principal Sellers, no general partner or manager of (or entity acting in a similar capacity with respect to) any Target Project Company has any Liabilities that are Liabilities of any Target Group Entity other than such Liabilities included in full in the calculation of the Estimated Purchase Price.

20

(f)    Section 3.4(f) of the Seller Disclosure Letter sets forth a true and complete list of each Consent (including the party or parties from whom and the manner in which, such Consent must be obtained) required pursuant to any Target Investment Advisory Contract, financing Contract or Organizational Documents of the Target Project Companies or their respective Subsidiaries (such Consents, inclusive, in the case of any Consent obtained other than by affirmative consent, of the expiry of all applicable time periods during which a Person may object without any objection being raised, formally or informally, the "Project Company Consents") in connection with the consummation of the Transactions.

(g)    Except as set forth on Section 3.4(g) of the Seller Disclosure Letter, no Target Project Company receives asset management or property management services from any person that is not a Target Group Entity.

(h)    As of the date hereof, no Person, other than the Target Group Entities and the Persons named in Section 3.4(h) of the Seller Disclosure Letter, is entitled to receive fees of any description, including management, consulting, advisory, transactional and other similar fees or placement agents entitled to fees, in each case, in respect of raised capital, from any Target Project Companies (but excluding, for the avoidance of doubt, in any event, carried interest, promote or other performance-based allocations from the Target Project Companies or other payments to Investors; consultant or consulting fees that consist of exit fees; and fees payable under service contracts in the ordinary course of business).

(i)    No Target Group Entity is liable or obligated in connection with, on behalf of or for any obligations of any Target Project Company, except for such Liabilities which would not be material to the Target Group Entities, taken as a whole.

Section 3.5    Financial Statements.

(a)    Attached to Section 3.5(a) of the Seller Disclosure Letter are correct and complete copies of the following:

(i)    the unaudited aggregated statement of financial condition of the Target Group Entities as of February 28, 2022 (respectively, the "Most Recent Balance Sheet" and the "Most Recent Balance Sheet Date") and the related unaudited consolidated statements of operations, changes in cash flows of all Target Group Entities for the two-month period then ended (together with the Most Recent Balance Sheet, the "Most Recent Unaudited Financial Statements"); and

(ii)    the unaudited consolidated statements of financial condition of the Target Group Entities as of December 31, 2021 and December 31, 2020 and the related unaudited consolidated statements of operations, changes in cash flows and profits and losses of the Target Group Entities for the fiscal years then ended (the "Unaudited Financial Statements", collectively, and together with the Most Recent Unaudited Financial Statements, the "Financial Statements").

(b)    The Financial Statements (i) have been delivered to Buyer, (ii) present fairly, in each case as of the respective dates thereof, subject to normal year-end adjustments, (A) the financial condition of the Target Group Entities (on a consolidated basis), as of the

21

respective dates thereof and (B) the results of operations, cash flows and changes in partners' capital of the Target Group Entities (on a consolidated basis) for the periods indicated. The Financial Statements have been prepared from, and are in accordance, and consistent, in all material respects, with, the books and records of all Target Group Entities.

(c)    All Target Group Entities have established and maintain systems of internal accounting controls that are designed to provide reasonable assurances that all transactions are executed in accordance with management's general or specific authorization, and are recorded as necessary to permit the preparation of financial statements in accordance with past practice and (ii) regarding the prevention or timely detection of unauthorized acquisition, use or disposition of the assets of the Target Group Entities. Since January 1, 2019, none of the Target Group Entities has received any complaint, allegation, assertion, notice or claim, in each case in writing, or otherwise to the Knowledge of the Sellers, regarding the accounting or auditing practices, procedures, methodologies or methods of any Target Group Entity or their respective internal accounting controls.

(d)    The Target Group Entities have no Liabilities other than (i) Liabilities set forth in Section 3.5(d) of the Seller Disclosure Letter, (ii) Liabilities disclosed or reflected in the Most Recent Balance Sheet, (iii) Liabilities pursuant to any Contracts entered into by the Target Group Entities in the ordinary course of business (excluding Liabilities resulting from a breach or violation thereof or default thereunder), (iv) Liabilities incurred in the ordinary course of business since the date of the Most Recent Balance Sheet Date (none of which relates to any breach of Contract, tort, violation of Law or any Action) and (v) Liabilities that would not, individually or in the aggregate, be material to the Target Group Entities, taken as a whole.

Section 3.6    Litigation and Claims. Since January 1, 2019, there have not been any claims, suits, arbitrations, investigations, litigations, complaints, examinations, inspections, audits decisions, judgments, actions or proceedings ("Actions") pending or threatened, by or against the Target Group Entities or any of their respective Representatives (in each such Representative's capacity as such) relating to any Target Group Entity by or before any Governmental Authority that would reasonably be expected to, individually or in the aggregate, be material to the Target Group Entities, taken as a whole. Neither the Target Group Entities or their respective assets, is subject to any outstanding Order that, individually or in the aggregate, would reasonably be expected to be material to the Target Group Entities cause a Target Material Adverse Effect. There exist no unresolved material violations, deficiencies or exceptions of, or under, applicable Law claimed or asserted in writing or, to the Knowledge of the Principal Sellers, orally by any Governmental Authority with respect to any Target Group Entity.

Section 3.7    Taxes.

(a)    All income and other material Tax Returns of the Target Group Entities that are required to be filed have been timely filed, all such Tax Returns are true, correct and complete in all material respects. All material Taxes required to be paid by any Target Group Entity, whether or not shown on such Tax Returns, have been timely paid. No Target Group Entity is currently the beneficiary of any extension of time to file any Tax Return that has not been filed, other than any such extension received in the ordinary course of business. Each

22

Target Group Entity has otherwise materially complied with applicable Law relating to reporting (including information reporting) of Taxes.

(b)    No deficiency for any Tax has been claimed, proposed, assessed or threatened in writing by a Tax Authority against any Target Group Entity.

(c)    There is no audit, claim or investigation currently ongoing, pending, threatened or asserted in writing with respect to any Target Group Entity in respect of any Tax or failure to file any Tax Return.

(d)    None of the Target Group Entities has agreed to any extension or waiver of the statute of limitations applicable to any Tax Return, or agreed to any extension of time with respect to a Tax assessment or deficiency, which period (after giving effect to such extension or waiver) has not yet expired.

(e)    Each Target Group Entity has withheld or collected all material Taxes required to have been withheld or collected by it under applicable Law and, to the extent required, has paid such material Taxes to the proper Tax Authority.

(f)    There are no Encumbrances for Taxes (other than Permitted Encumbrances) upon any of the assets of the Target Group Entities.

(g)    No Target Group Entity has ever been a member of an affiliated group filing a consolidated, combined, affiliated or unitary income Tax Return nor does any Target Group Entity have any liability for the Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local, or non-U.S. Law), as a transferee or successor, or otherwise under applicable Law or any contractual agreement.

(h)    No written claim has been made by any Tax Authority with respect to any jurisdiction in which any Target Group Entity does not file a particular type of Tax Return or pay a particular type of Tax that any such Person is required to file such Tax Return or pay such type of Tax in such jurisdiction.

(i)    Neither Buyer nor any of its Affiliates (including, following the Closing, the Target Group Entities) will be required to include any material item of income in, or exclude any material item of deduction from, taxable income as a result of any (i) change in method of accounting for a taxable period ending on or prior to the Closing Date under Section 481 of the Code (or any corresponding provision of state, local or foreign income Tax law), (ii) installment sale or open transaction disposition made on or prior to the Closing Date or (iii) amount received by a Target Group Entity on or prior to the Closing Date.

(j)    No Target Group Entity has ever been resident in or had a permanent establishment in a jurisdiction other than its jurisdiction of formation or incorporation, as applicable.

(k)    No letter ruling from the IRS (or any comparable ruling from any other Tax Authority) has been issued to any Target Group Entity; none of the Target Group Entities have applied to any Tax Authority for any such ruling.

23

(l)     No Target Group Entity has participated in a "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4(b)(2).

(m)     No Target Group Entity has (i) claimed any Tax credits under Sections 7001 through 7005 of the Families First Act and Section 2301 of the CARES Act or (ii) sought (nor has any Affiliate that would be aggregated with the Company and treated as one employer for purposes of Section 2301 of the CARES Act sought) a covered loan under paragraph (36) of Section 7(a) of the Small Business Act (15 U.S.C. 636(a)), as amended by Section 1102 of the CARES Act.

(n)     For U.S. federal income tax purposes, and where applicable, for U.S. state and local Tax purposes, (i) the Company is, and has been at all times since its formation, an entity treated as a partnership and (ii) each of Redwood Capital Group, LLC and Redwood Construction, LLC is, and has been at all times since its formation, a disregarded entity. Section 3.7(n) of the Seller Disclosure Letter lists the current and any prior tax classification (including each entity classification election and change in entity classification that has been made under U.S. Treasury Regulation Section 301.7701-4) with respect to each other Target Group Entity for U.S. federal income tax and applicable U.S. state and local and non-U.S. tax purposes and no action has been taken, or election made, contrary to such current tax classifications.

Section 3.8     Benefit Plans.

(a)     Section 3.8(a) of the Seller Disclosure Letter sets forth a list of all material Target Benefit Plans as of the date hereof.  With respect to each Target Benefit Plan, the Principal Sellers have delivered to Buyer true, correct, current and complete copies, to the extent applicable, of (i) each writing constituting such Target Benefit Plan or, in the case of unwritten Target Benefit Plans, a written description of the material terms thereof, (ii) most recent summaries of material modifications, annual reports, summary annual reports and the most recent summary plan description for each Target Benefit Plan for which such a summary plan description is required, (iii) the most recent favorable determination letter from the IRS with respect to each Target Benefit Plan intended to qualify under Section 401(a) of the Code and (iv) all current trust agreements, insurance contracts and other documents relating to the funding or payment of benefits under any Target Benefit Plan.  No Target Group Entity has agreed or committed to institute any Benefit Plan for the benefit of any employee, former employee or individual independent contractor other than the Target Benefit Plans, or to make any material amendments to any of the Target Benefit Plans.

(b)     There are no claims, assessments, investigations or disputes of any kind pending or, to the Knowledge of the Principal Sellers, threatened with respect to any Target Benefit Plan, other than claims for benefits in the ordinary course of business.  None of the Target Benefit Plans are presently under audit or examination by (nor has written notice been received of a potential audit or examination) the Internal Revenue Service, the Department of Labor or any other Governmental Authority.

(c)     (i) Each Target Benefit Plan, including any associated trust or fund, has been established, maintained, administered and funded in all material respects in accordance with its terms, and in material compliance with the applicable provisions of ERISA, the Code and

24

other applicable Laws, rules and regulations, (ii) each Target Benefit Plan that is intended to be qualified within the meaning of Section 401(a) of the Code has received a favorable determination letter as to its qualification, and nothing has occurred, whether by action or failure to act, that would reasonably be expected to cause the loss of such qualification and (iii) none of Target Group Entities has incurred, would reasonably be expected to incur any current or projected liability in respect of post-employment or post-retirement health, medical or life insurance benefits for any of the employees, former employees or individual independent contractors (including dependents thereof) of the Target Group Entities, except as required under Section 4980B of the Code or otherwise except as may be required pursuant to any other applicable Law.

(d)    With respect to each Target Benefit Plan and to the Knowledge of the Principal Sellers, (i) there have been no non-exempt "prohibited transactions" (as defined in Section 406 of ERISA or Section 4975 of the Code) that would reasonably be expected to result in a material liability to any Target Group Entity and (ii) no "fiduciary" (as defined in Section 3(21) of ERISA) has breached its fiduciary duties in connection with the administration or investment of the assets of such Target Benefit Plan.

(e)    No Target Benefit Plan is subject to the funding requirements of Title IV of ERISA or is, a "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA), a multiple employer plan as described in Section 413(c) of the Code or Sections 210, 4063, 4064 or 4066 of ERISA or a "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA, and no member of the Controlled Group of the Target Group Entities, nor any of the Target Group Entities has at any time sponsored or contributed to, or has or had any liability or obligation in respect of, any multiemployer plan or other plan subject to Title IV of ERISA.

(f)    Except as disclosed on Section 3.8(f) of the Seller Disclosure Letter, neither the execution and delivery of this Agreement nor the consummation of the Transactions will (either alone or in connection with any other event or events) (i) result in, cause the accelerated vesting, funding or delivery of, or increase the amount or value of, any payment or benefit to any current or former employee, director or individual consultant of the Target Group Entities, (ii) constitute a stated triggering event under any Target Benefit Plan that will result in any payment (whether severance pay or otherwise) becoming due from any Target Group Entity to any current or former officer, employee, director, manager or individual contractor (or dependents thereof) or (iii) result in any payment that would reasonably be construed, individually or in combination with any other such payment, to constitute an "excess parachute payment" under Section 280G of the Code. No Target Group Entity has any obligation to gross-up or reimburse any individual for any Tax or related interest or penalties incurred by such individual, including under Section 409A or 4999 of the Code or otherwise.

(g)    Without limiting the generality of the foregoing, with respect to each Target Benefit Plan that is subject to the laws of a jurisdiction other than the United States (a "Foreign Plan"): (i) each Foreign Plan required to be registered has been registered and has been maintained in good standing in all material respects with applicable Governmental Authorities; (ii) each Foreign Plan intended to receive favorable tax treatment under applicable tax Laws has been qualified or similarly determined to receive favorable tax treatment under such Laws; (iii) no Foreign Plan is a defined benefit plan (as defined in ERISA, whether or not subject to

25

ERISA); and (iv) no Foreign Plan has any material unfunded liabilities that are not reflected or reserved against on the Financial Statements, nor are such unfunded liabilities reasonably expected to arise in connection with the Transactions.

Section 3.9    Labor.

(a)    The Principal Sellers have previously delivered to Buyer or its Representatives a true, correct and complete list of each person who is providing services to any of the Target Group Entities as an employee, partner or member as of the date hereof (a "Current Service Provider"), including, as applicable: (i) title; (ii) work location; (iii) exempt/non-exempt status; (iv) full-time/part-time status; (v) base salary or hourly rate; (vi) fixed profit share entitlement; (vii) date of hire; (viii) notice period; (ix) leave status; (x) bonus or other incentive compensation eligibility; and (xi) variable profit share or manager's incentive fee sharing entitlement. No offer of employment or engagement has been made to any person who is not a Current Service Provider by any Target Group Entity that has not yet been accepted, or that has been accepted but where the employment or engagement has not yet started, and that would or will entitle such person to an annualized compensation or profit share entitlement of $150,000 or more.

(b)    No Current Service Provider is currently represented by a trade union, staff association, staff council, works council, information and consultation body or any other worker representative ("Representative Body")  with respect to his or her employment or engagement by such Target Group Entity and none of the Target Group Entities is a party to or bound by any labor agreement, union contract or collective bargaining agreement or any other agreement or arrangement with a Representative Body with respect to any Current Service Provider.

(c)    There is, and since January 1, 2019 there has been, no labor organizational effort pending or, to the Knowledge of the Principal Sellers, threatened by, or on behalf of, any Representative Body or group of employees or service providers to organize employees or service providers of any Target Group Entity, and no demand for recognition or certification of employees or service providers of any Target Group Entity has been made by, or on behalf of, any Representative Body or group of employees or service providers.  Since January 1, 2019, there has been no actual or, to the Knowledge of the Principal Sellers, threatened unfair labor practice charge, material labor grievance, material labor arbitration, strike, lockout, work stoppage, slowdown, picketing, handbilling or other material labor dispute or material industrial or trade dispute against or affecting any Target Group Entity and, to the Knowledge of the Principal Sellers, no such disputes are currently pending or threatened.

(d)    Each Target Group Entity is, and since January 1, 2019 has been, in compliance in all material respects with all applicable Laws respecting labor, employment, worker and employment practices, including all Laws respecting terms and conditions of employment (and those applicable to workers), health and safety, wages and hours (including the classification of independent contractors and exempt and non-exempt employees), immigration (including the completion of Forms I-9 and the proper confirmation of employee visas), employment harassment, discrimination or retaliation, whistleblowing, disability rights or benefits, equal opportunity, plant closures and layoffs (including the WARN Act), employee

trainings and notices, workers' compensation, labor relations, employee leave, holiday, COVID-19 and unemployment insurance.  Except as would not result in material liability to the Target Group Entities, taken as a whole, each Target Group Entity has fully and timely paid all wages, salaries, profit share, drawings, manager's incentive fee, wage premiums, commissions, bonuses, severance and termination payments, fees and other compensation that has come due and payable as of the last payroll date prior to the date hereof to its current or former employees and individual independent contractors.

(e)     Except as occurred as a result of COVID-19, no employee layoff, facility closure or shutdown, reduction-in-force, furlough, temporary layoff, or reduction in salary or wages affecting employees of any Target Group Entity has occurred since January 1, 2020, or is currently contemplated, planned or announced.

(f)     Each Target Group Entity has investigated all harassment (including sexual harassment), discrimination or retaliation allegations in respect of activities at or involving such Target Group Entities of which it is or has been made aware since January 1, 2019.  Neither the Principal Sellers nor any Target Group Entity reasonably expects any material liabilities with respect to any such allegations.  To the Knowledge of the Principal Sellers, no allegation of harassment (including sexual harassment) or discrimination has ever been made against any Target Group Entity or any executive officers or Principal Sellers (or individual equityholders of any Seller) connected to their involvement with the Target Group Entities. Neither the Principal Sellers nor any Target Group Entity is currently seeking, and since January 1, 2019 has not entered into, any settlement agreement that relates primarily to an allegation of harassment (including sexual harassment) or discrimination committed by any current or former executive officer or Seller (or individual equityholder of any Seller) connected to his or her involvement with the Target Group Entities.

(g)     Each Current Service Provider who requires permission to work in the jurisdiction in which he or she provides service has current and appropriate permission to work in such jurisdiction.

(h)     As of the date hereof, there are no loans to any current or former officer, director, employee, partner or member of any Target Group Entity (or to any nominees or associates of such officer, director, employee, partner or member) made or arranged by any Target Group Entity or any employee benefit trust or similar arrangement established by any Target Group Entity.

(i)     There are no employee benefit trusts, family benefit trusts or similar arrangements established by any Target Group Entity under which a current or former officer, director, employee, partner or member of any Target Group Entity may benefit in any form.

Section 3.10    Compliance with Laws.

(a)     Section 3.10(a) of the Seller Disclosure Letter describes each material Permit required for the ownership, leasing, conduct, management or operation of the Business. The Target Group Entities have, and since January 1, 2019 have had, all such Permits, or exemptions from the requirements to obtain such Permits, in each case except as would not,

27

individually or in the aggregate, be material to the Target Group Entities, taken as a whole.  To the Knowledge of the Principal Sellers, to the extent required, each employee, officer, director, partner or member of the Target Group Entities has all such Permits in connection with the Business.  All such Permits are in full force and effect and none of such Persons are in breach, violation or default under any such Permits, in each case except as would not, individually or in the aggregate, reasonably be expected to be material to the Target Group Entities, taken as a whole.  Since January 1, 2019, neither the Principal Sellers nor any Target Group Entity has received any written notice from any Governmental Authority alleging non-compliance with or threatening revocation or suspension of any such Permit, or been subject to any investigation by any Governmental Authority, except for instances of non-compliance that would not reasonably be expected to be material to the Target Group Entities, taken as a whole.

(b)     The Principal Sellers have delivered to Buyer correct and complete (i) copies of the policies and procedures of the Target Group Entities in relation to compliance with applicable Law, including in respect of conflicts of interest, (ii) a list of all Permits that are material to the effective carrying on of the business of the Target Group Entities in the places and in the manner in which such business is now carried on, and (iii) copies of any material correspondence between any member of the Target Group Entities or any Target Project Company and any Governmental Authority, including any examination report, since January 1, 2019.

(c)     The Target Group Entities (in their own corporate capacity and, if applicable, as a general partner or manager of a Target Project Company) have, since January 1, 2019, conducted their business in compliance with applicable Law and Orders, except for such non-compliance that would not, individually or in the aggregate, reasonably be expected to be material to the Target Group Entities, taken as a whole.  Since January 1, 2019 (or earlier if unresolved), no Target Group Entity has received any written notice from any Person including from any Governmental Authority (i) alleging any material violation of or material non-compliance with any applicable Law or Order by any Target Group Entity or (ii) that a Target Group Entity or any of its Representatives or Affiliates must undertake, or bear all or a portion of the cost of, any material remedial action of any nature related to its assets, properties or business. The Principal Sellers have delivered to Buyer correct and complete copies of all material filings with Governmental Authorities made by the Principal Sellers relating to the Target Group Entities or by the Target Group Entities since January 1, 2019 that are not otherwise publicly available.

(d)     Each Target Group Entity has sufficient regulatory capital for its respective activities as required by any Governmental Authority.

(e)     Each Target Group Entity (whether in its own corporate capacity or as a general partner or manager of a Target Project Company) has complied and continues to comply with all applicable Laws with respect to regulated financial services business. Since January 1, 2019, no Target Group Entity has been informed by any Governmental Authority of any outstanding issues regarding the standard of regulatory compliance that has applied or may still apply in the conduct of its business, its internal organization, its risk management disciplines or its other relevant control functions, except as would not be material.

28

(f)　　No Target Group Entity is (i) subject to any cease and desist, censure or other disciplinary or similar Order issued by, (ii) a party to any Contract, memorandum of understanding or disciplinary agreement with, (iii) a party to any commitment letter or similar undertaking to, (iv) subject to any Order by or (v) a recipient of any supervisory letter from, any Governmental Authority.

(g)　　None of the Target Group Entities is registered as, or required to be registered as, an "investment company" under the Investment Company Act (a "Registered Investment Company"), or as a result of interpretive positions of the staff of the SEC pursuant to Section 7(d) of the Investment Company Act.

(h)　　No no-action letters or exemptive orders have been issued by the SEC or its staff or any applicable non-U.S. Governmental Authority to the Target Group Entities.

(i)　　Without limiting Section 3.10(a) or Section 3.10(c), no Target Group Entity (i) is required under applicable Law to be registered, licensed or qualified as a broker or dealer in any jurisdiction that requires such registration, licensing or qualification, (ii) is or has been a member of the Financial Industry Regulatory Authority or (iii) is a "broker" or "dealer" within the meaning of the Exchange Act.

(j)　　No Target Group Entity is required to be registered, licensed or qualified as a commodity pool operator, futures commission merchant, commodity trading advisor, bank, trust company, real estate broker, insurance company or insurance broker or transfer agent under any applicable Law or is subject to any liability or disability by reason of any failure to be so registered, licensed or qualified.  As of the date hereof, since January 1, 2017, no Target Group Entity has received written notice of any proceeding concerning any failure to obtain any commodity pool operator, futures commission merchant, commodity trading advisor, bank, trust company, real estate broker, insurance company, insurance broker or transfer agent registration, license or qualification.

(k)　　No Person with whom a Target Management Contract has been entered into is or has during any relevant time been deemed to hold "plan assets" within the meaning of Section 3(42) of ERISA or otherwise to be subject to the requirements of Title I of ERISA, Section 4975 of the Code or any other U.S. federal, state or local or non-U.S. Law substantially similar to ERISA or Section 4975 of the Code.  No Target Group Entity is a "party in interest" to any employee Benefit Plan subject to ERISA by reason of providing services to such employee Benefit Plan under Section 3(14)(B) of ERISA (excluding the Target Benefit Plans).  None of the Target Group Entities, nor any officer or director of, or partner in, any of the foregoing (in each case determined as of the date hereof) has, within the ten (10) years preceding the date hereof, been convicted or released from imprisonment as a result of any of the crimes listed in paragraph (g) of Part I of prohibited transaction class exemption 84-14 promulgated by the U.S. Department of Labor.

Section 3.11　　Intellectual Property

(a)　　Section 3.11(a) of the Seller Disclosure Letter sets forth all Intellectual Property registrations and pending applications therefor owned or purported to be owned by the

Target Group Entities (the "Target Registered IP" and, together with all other Intellectual Property owned or purported to be owned by the Target Group Entities, the "Target Owned IP"), indicating for each item (i) the current owner (including, with respect to domain names, the current registrant), (ii) the jurisdiction where the application, registration or issuance is filed and (iii) the application, registration and issue number (as applicable). The Target Group Entities own or have valid and continuing rights to use, pursuant to valid and enforceable written agreements, all material Intellectual Property used or necessary for the conduct of the Business. The Target Registered IP is subsisting and unexpired, and to the Knowledge of the Principal Sellers valid, and the Target Owned IP is owned exclusively by a Target Group Entity free and clear of all Encumbrances other than Permitted Encumbrances, and to the Knowledge of the Principal Sellers is valid and enforceable.

(b)     The Target Group Entities have taken commercially reasonable actions to maintain (i) the validity and enforceability of the Target Owned IP under all applicable Laws (including making and maintaining in full force and effect all necessary filings, registrations and issuances) and (ii) the secrecy of all Trade Secrets used in the business of the Target Group Entities.

(c)     All Persons (including current and former employees and independent contractors) who have created (alone or jointly with others) material Intellectual Property for or on behalf of the Target Group Entities have validly and irrevocably assigned to a Target Group Entity in writing all of their rights in such Intellectual Property. As of the date hereof, there are no Actions pending or threatened against any of the Target Group Entities with respect to Intellectual Property. To the Knowledge of the Principal Sellers, the operation of the business of the Target Group Entities, as conducted since January 1, 2019, has not infringed, misappropriated, diluted or otherwise violated the Intellectual Property of any other Person, and no Third Party is infringing upon, misappropriating, diluting or otherwise violating any Intellectual Property of the Target Group Entities.

(d)     The IT Assets of the Target Group Entities function properly and are free of any material viruses, Malware and other corruptants and vulnerabilities and are in good repair and operating condition. The Target Group Entities use commercially reasonable methods to protect the confidentiality, integrity, security and continuous operation of their IT Assets and to prevent unauthorized access, use, interruption, modification, corruption, destruction, loss or disclosure to or of personal data, including Personal Information, and confidential information of their business, and since January 1, 2019, to the Knowledge of the Principal Sellers there have been no failures, breakdowns, persistent substandard performances, violations, Security Incidents (including ransomware attacks), outages or unauthorized uses of or unauthorized access to such IT Assets (or any data, including personal data and Personal Information processed thereby) or other adverse events that has caused or would reasonably be expected to cause any material disruption to the conduct of the business of the Target Group Entities or present a material risk of unauthorized access, disclosure, use, corruption, destruction or loss of any Personal Information or other nonpublic information.

(e)     Since January 1, 2019, (i) a privacy statement regarding the collection, use, and disclosure (collectively, "Use") of the Personal Information of individuals who are visitors to the websites or mobile applications of the Target Group Entities (a "Privacy

30

Statement") has at all times been and is posted and accessible to individuals on each website or mobile application of the Target Group Entities; and (ii) the Target Group Entities have been and are in compliance in all material respects with the Privacy Statement and with any and all applicable Laws, binding regulatory guidelines, contractual requirements pertaining to the processing of Personal Data, internal policies and industry standards binding on the Target Group Entities applicable to such Use. Since January 1, 2019, there have been no Actions pending or, to the Knowledge of the Principal Sellers, threatened by or against any Target Group Entity relating to IT or data security or data privacy, including in relation to the Data Protection Laws.

(f)    To the Knowledge of the Principal Sellers, the Target Group Entities have not suffered a Security Incident and have not been required to notify any Person or Governmental Authority of any Security Incidents.

(g)    The Target Group Entities have implemented and maintained reasonable information security, business continuity and backup and disaster recovery processes.

(h)    The Target Group Entities have cybersecurity and data breach insurance that, in the resonable business judgment of the Target Group Entities, covers such risks and are in such amounts as the Target Group Entities believe is appropriate.

Section 3.12    Material Contracts.

(a)    Section 3.12 of the Seller Disclosure Letter sets forth a complete and accurate list, as of the date hereof, of all Material Contracts.  For purposes of this Agreement, the term "Material Contract" means any of the following executory Contracts (together with all material exhibits, amendments and schedules thereto) (which, for the avoidance of doubt, shall be deemed not to include any Contracts related to a Portfolio Investment) to which any of the Target Group Entities is a party:

(i)    any Target Project Company Operative Document and any other Contract with any Target Project Company Client;

(ii)    any Contract (A) consisting of a joint venture, strategic alliance, teaming or similar Contract, (B) otherwise involving a sharing of profits, losses, costs or liabilities or management rights or (C) granting any Person any discount, fee cap, fee waiver, fee reduction or rebate or similar concession with respect to investments by such Person in more than one Target Project Company;

(iii)    other than any Contract responsive to Section 3.12(a)(xxii), any Contract that is not cancellable without penalty by the Target Group Entity party thereto upon ninety (90) or fewer days' notice and that involves payments by or to the Target Group Entities in excess of $100,000 in any twelve (12) month period;

(iv)    any Contract relating to Debt of a Target Group Entity or that obligates a Target Group Entity to, directly or indirectly, make any advance, loan, extension of credit or capital contribution to, or other investment in, any Person, in each case in excess of $100,000;

31

1007814448v22

(v)    any Contract relating to credit lines, borrowings or any other form of funded Debt of a Target Project Company with a principal amount outstanding of at least $100,000 (but excluding in any event any borrowings secured by any property owned by such Target Project Company);

(vi)    any Contract relating to the disposition or acquisition of any corporation, partnership or other business organization or Person, or any material assets or properties or lines of business, pursuant to which a Target Group Entity or Target Project Company has any material surviving obligations;

(vii)    any Contract under which the Leased Property is occupied, used or held for use;

(viii)    any Contract (A) relating to confidentiality or non-competition restrictions or that similarly restricts the manner in which the business of the Target Group Entities is conducted as of the date hereof, would restrict the manner in which the business of the Target Group Entities is conducted after the Closing or would purport to bind any Affiliate of the Target Group Entities (including, after the Closing, Buyer or any of its Affiliates) (other than, in each case, confidentiality obligations entered into in the ordinary course of business), (B) containing a "most favored nation" or similar provision or (C) containing provisions requiring future contingent or non-contingent "earnout" or similar payments to be made by any Target Group Entity;

(ix)    any Contract providing for a guarantee or similar commitment by a Target Group Entity or a Target Project Company with respect to Liabilities existing as of the date hereof of any other Person in excess of $100,000 (excluding any obligations of any Target Project Company as borrower under any loan documents entered into with respect to any properties owned by each applicable Target Project Company);

(x)    any settlement, conciliation, or similar Contract entered into by any Target Group Entity during the past three (3) years arising out of or related to any Action (x) which has a value greater than $100,000, (y) pursuant to which any Target Group Entity will have any material outstanding obligation, or (z) relates primarily to an allegation of sexual harassment or discrimination;

(xi)    any Contract with a Governmental Authority (other than a limited partnership agreement, side letter or related Contract with a Target Project Company Client);

(xii)    any hedging, derivatives or similar Contract;

(xiii)    any Contract requiring any Target Group Entity or any Target Project Company (A) to co-invest with any other Person, (B) to provide seed capital or similar investment, (C) to make any Capital Commitment or investment or (D) to invest in any investment product (including any such Contract requiring additional or "follow-on" capital contributions to any Target Project Company);

(xiv)    any Contract that contains (A) "key person" provisions pertaining to employees of a Target Group Entity, (B) any of the following rights provided to a Target

32

Project Company Client with respect to a client advised by a Target Group Entity: (1) special withdrawal or redemption rights, (2) capacity rights, (3) designation rights regarding advisory boards or similar provisions, (4) anti-dilution rights or (5) special notice or reporting requirements or (C) early termination rights with respect to a Target Project Company;

(xv)     any Contract (including any side letters or other similar agreements relating to such Contract but excluding any subscription agreements with Investors of the Target Project Companies) for the placement, distribution or sale of shares, units or other ownership interests of a Target Project Company, including solicitation agreements and investor referral agreements;

(xvi)     any Contract that contains a "clawback" or similar undertaking requiring the reimbursement or refund of any carried interest, promote or fees or return of any amounts (whether performance-based or otherwise) paid or distributed to any equityholder, member or partner of any Target Group Entity and any Contracts providing guarantees of such obligations;

(xvii)   any Contract for capital expenditures in excess of $100,000 in any twelve (12) month period;

(xviii) any Contract that contains an exclusive dealing provision, or grants, or agrees to grant, any Person a right of refusal, standstill, first offer, priority, first negotiation or similar right, a right to participate in "co-invest" or other investment opportunities;

(xix)     any material Contract for the distribution or sale of interests of a Target Project Company (other than subscription agreements, side letters or similar agreements), including any material finders agreements, placement agent agreements and external revenue sharing agreements;

(xx)     any Contract that contains a provision under which any Person has been granted a license or other right by a Target Group Entity or the Principal Sellers with respect to use of any "track record" or performance data;

(xxi)     any material Contract relating to Intellectual Property or IT Assets, excluding Off-the-Shelf Software and Off-the-Shelf IT Assets; or

(xxii)   any Contract for the employment or engagement of any director, officer, employee, partner, employee, individual independent contractor or other similar individual service provider (A) providing for annual base compensation in excess of $250,000 or otherwise restricting any Target Group Entity's ability to terminate the employment or engagement of such Person upon less than thirty (30) days' notice for any reason or no reason without penalty or liability, or (B) providing for the payment or accelerated vesting of any compensation or benefits upon the consummation of the Transactions.

(b)     Each Material Contract (i) is a legal, valid and binding obligation of the applicable Target Group Entity party thereto and, to the Knowledge of the Principal Sellers, each other party thereto, and (ii) is in full force and effect and is enforceable against the applicable Target Group Entity party thereto, except, for such failures as would not, individually or in the

33

aggregate, reasonably be expected to be material to the Target Group Entities, taken as a whole, and, to the Knowledge of the Principal Sellers, each other party thereto in accordance with the express terms thereof, except as may be affected by Enforceability Limitations. The Principal Sellers have delivered to Buyer correct and complete copies of all Material Contracts. No Target Group Entity has received written notice under any Material Contract of any violation, breach or event of default or event or condition that, after notice or lapse of time or both, would constitute a violation, breach or event of default thereunder, or would give any Person the right to exercise any material remedy under, or to accelerate the maturity or performance of or to cancel, terminate or modify, any Material Contract, except as would not, individually or in the aggregate, reasonably be expected to be material to the Target Group Entities, taken as a whole. No Target Group Entity has given or received any written notice relating to termination or intention to terminate or any actual, alleged or potential breach under, or renegotiation of any material rights or amounts paid or payable under, any Material Contract, in each case except as would not be material to the Target Group Entities, taken as a whole.

Section 3.13    Real Property.    The Target Group Entities do not own any direct interests in real property. Section 3.13 of the Seller Disclosure Letter sets forth a correct and complete list as of the date hereof, including addresses, of all real property leased, subleased or licensed by, or for which a right to use or occupy has been granted to, any Target Group Entity (the "Leased Property"). One or more of the Target Group Entities has good and valid title to use or occupy each Leased Property. The use and operation of the Leased Property in the conduct of the business of the Target Group Entities does not violate any applicable Law, covenant, condition, restriction, easement, Permit or agreement except as would not reasonably be expected, individually or in the aggregate, to be material to the Target Group Entities, taken as a whole. There are no Contracts granting to any Person (other than a Target Group Entity) the right of use or occupancy of all or any portion of the Leased Property. The Leased Property constitutes all of the real property used or occupied by any of the Target Group Entities in connection with the Business (other than real property used by service providers of the Target Group Entities in connection with any "work from home" or similar arrangement). No Target Group Entity (nor any Person for whom such liabilities have been assumed by any Target Group Entity) has released, disposed of or arranged for the disposal of, exposed any Person to, or owned, leased or operated any Leased Property contaminated by, any hazardous substance, material or waste, or received any notice of the foregoing, except in each case, as would not be material to the Target Group Entities, taken as a whole.

Section 3.14    Absence of Changes.    Since December 31, 2020, the business of the Target Group Entities has been conducted in the ordinary course in all material respects. Since December 31, 2020, there has been no Target Material Adverse Effect. Since the Most Recent Balance Sheet Date, no Target Group Entity has taken any action that, if taken during the period from the date hereof to the Closing, would have required disclosure to, or consent of, Buyer pursuant to Section 5.1.

Section 3.15    Finders' Fees.    Except as set forth on Section 3.15 of the Seller Disclosure Letter, no Target Group Entity has engaged investment banker, broker, finder or other similar intermediary or advisor that has been retained by or is authorized to act on behalf of, or who might be entitled to any fee or commission from, the Target Group Entities in connection with the Transactions and which would not otherwise be paid in full at Closing.

34

Section 3.16    Insurance.  Section 3.16 of the Seller Disclosure Letter lists, as of the date hereof, all material insurance policies maintained by or for the benefit of the Target Group Entities.  There is no claim by or with respect to any of the Target Group Entities pending under any of such policies as to which coverage has been denied or disputed by the underwriters of such policies or in respect of which such underwriters have reserved their rights.  Such policies are in full force and effect, and are sufficient for all applicable requirements under Law as of the date hereof.  The Target Group Entities (i) are not in material default under the provisions of any such policies and (ii) have not received written notice of, and, to the Knowledge of the Principal Sellers there is no other threatened termination of, premium increase with respect to, or alteration of coverage under, any of such policies.  Correct and complete copies of such policies have been made available to Buyer.  Taken together, such policies provide reasonably adequate insurance coverage for the Target Group Entities in accordance with customary industry practice.  All premiums due on such policies have been timely paid in full.  There is no self-insurance arrangement affecting the business of the Target Group Entities or any obligation of any Target Group Entity to provide insurance coverage to Third Parties.

Section 3.17    Certain Regulatory Matters.

(a)    None of the Target Group Entities, Target Project Companies, nor to the Knowledge of the Principal Sellers, any directors, officers, employees, agents or representatives (in each such Person's capacity as such) of any Target Group Entity or Target Project Company, is, or is controlled by, in violation of U.S. Sanctions, any Person that is: (i) the subject of any Sanctions or (ii) located, organized or ordinarily resident in a Sanctioned Country.

(b)    For the past three (3) years, no Target Group Entity, Target Project Company, Seller nor to the Knowledge of the Principal Sellers, any directors, officers, partners, employees, agents or representatives (in each such Person's capacity as such), of any Target Group Entity or Target Project Company, has in violation of U.S. Sanctions, directly or knowingly indirectly engaged in, nor is now directly or knowingly indirectly engaged in, any dealings or transactions in any Sanctioned Country or with or involving or for the benefit of any Person that at the time of the dealing or transaction is or was the subject of Sanctions.

(c)    Each Target Group Entity, Target Project Company, and to the Knowledge of the Principal Sellers, each director, officer, partner, employee, agent or representative thereof (in each such Person's capacity as such), is, and for the past three (3) years has been, in compliance with AML Laws in the jurisdictions in which the Target Group Entities and Target Project Companies conduct business.

(d)    For the past three (3) years, each Target Group Entity, Target Project Company, and to the Knowledge of the Principal Sellers, each director, officer, partner, employee, agent or representative thereof (in each such Person's capacity as such), (i) has been and is currently in compliance with Anti-Corruption Laws in the jurisdictions in which the Target Group Entities and Target Project Companies conduct business and (ii) has not offered, paid, agreed in writing to pay, authorized the payment of, received, or solicited anything of value under circumstances such that all or a portion of such thing of value would be offered, given or promised, directly or indirectly, to any Person to obtain any improper advantage in violation of any Laws.

1007814448v22

(e)    For the past three (3) years. no Target Group Entity nor, to the Knowledge of the Principal Sellers, Target Project Company, nor any officer, director, employee, agent or representative thereof (in each such Person's capacity as such) has (i) conducted or initiated any internal investigation or made a voluntary, directed or involuntary disclosure to any Governmental Authority or similar agency with respect to any alleged act or omission arising under or relating to any potential noncompliance with any Anti-Corruption Laws, AML Laws or Sanctions, or (ii) been the subject of current, pending or threatened investigation, formal inquiry or enforcement proceedings for violations of Anti-Corruption Laws, AML Laws or Sanctions or received any notice, request or citation for any actual or potential noncompliance with any Anti-Corruption Laws, AML Laws, or Sanctions.

Section 3.18    Ownership of Assets.    The Target Group Entities have good and marketable title to, a valid leasehold interest in or the right to use or otherwise commercially exploit all of the material properties, rights and assets whether real or personal and whether tangible or intangible, that are used by them in the conduct of the Business.  None of the material properties, rights or assets, whether real or personal and whether tangible or intangible, owned by the Target Group Entities are subject to any Encumbrance other than Permitted Encumbrances. The property, rights and assets that are owned, licensed or leased by the Target Group Entities constitute, and immediately following the Closing will constitute, all of the properties, rights and assets sufficient to conduct the business of the Target Group Entities independent from the Principal Sellers following the Closing as conducted as of the date hereof (assuming any relevant Consents are obtained and taking into account the operations of the Target Group Entities in the ordinary course of business following the date hereof (including acquisitions and dispositions of assets in the ordinary course of business)).  Without limiting the foregoing, the Target Group Entities own and have the right to use and otherwise commercially exploit all material "track record" and performance data of the Target Group Entities and Target Project Companies.

Section 3.19    Acknowledgement of No Other Representations or Warranties.    Such Seller acknowledges and agrees that, on behalf of itself, (a) except for the representations and warranties contained in Article IV or any certificate delivered by Buyer pursuant hereto, neither Buyer nor any of its Affiliates or Representatives makes or has made, nor is such Seller relying on, and expressly disclaims any reliance on, any representation or warranty, either express or implied, concerning Buyer or any of its businesses, operations, assets, liabilities, results of operations, condition (financial or otherwise), or prospects or the Transactions, and (b) Buyer, its Affiliates and each of their respective Representatives hereby disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information communicated, or furnished (orally or in writing) by Buyer or any of its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to such Seller by any Representative of Buyer or its Affiliates) except for the representations and warranties expressly set forth in Article IV or any certificate delivered by Buyer pursuant hereto.  Subject to all of the foregoing provisions of this Section 3.10, such Seller and Buyer retains all of its rights and remedies with respect to claims based on Fraud.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF BUYER

36

1007814448v22

Buyer represents and warrants to the Sellers as of the date hereof and, in respect of the Fundamental Representations, as of Closing as follows:

Section 4.1    Organization; Qualification.  Buyer is duly organized and validly existing under the Laws of its jurisdiction of formation or organization.  Buyer has full limited liability company or other power and authority to carry on its business as it is now being conducted and is in good standing in each jurisdiction where the operation or conduct of its business as presently conducted requires such qualification, except where failure to be so qualified or in good standing or to have such power or authority (as applicable) would not, individually or in the aggregate, have a Buyer Material Adverse Effect.

Section 4.2    Authorization.  Buyer has full power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is a party, to perform its obligations hereunder and thereunder and to consummate the Transactions.  The execution, delivery and performance by Buyer of this Agreement and each of the Ancillary Agreements to which it is a party has been duly and validly authorized by all necessary action and no further action on the part of Buyer is required in connection with the execution, delivery and performance by Buyer of this Agreement or any of the Ancillary Agreements to which it is a party.

Section 4.3    Governmental Approvals.  No Consent is required to be obtained by any Buyer Group Entity from, or to be given by any Buyer Group Entity to, or made by any Buyer Group Entity with any Governmental Authority or other Third Party, in each case in connection with the execution, delivery and performance by Buyer of this Agreement and the Ancillary Agreements to which it  is a party, except in each case, where not receiving such Consent would not, individually or in the aggregate, reasonably be expected to prevent, enjoin, alter or materially delay the Transactions.

Section 4.4    Non-Contravention.  The execution, delivery and performance by Buyer of this Agreement and the Ancillary Agreements to which it is a party, and the consummation of the Transactions, do not and will not (a) violate any provision of the Organizational Documents of Buyer, (b) conflict with, or result in the breach of, or constitute a default under, or result in the termination, cancellation, modification, acceleration or violation of, or create in any Person the right to terminate, cancel, modify, accelerate, revoke or exercise any other material right or remedy under, or require any Consent under, any Contract to which a Buyer Group Entity is a party or (c) violate or result in a breach of or constitute a default under any Law to which any Buyer Group Entity is subject, or under any Governmental Approval relating to a Buyer Group Entity, except in the case of clause (b) and (c), where such matters would not, individually or in the aggregate, have a Buyer Material Adverse Effect.

Section 4.5    Litigation.  There are no Actions pending or, to the Knowledge of Buyer, threatened in writing against Buyer that would reasonably be expected to have a material adverse effect on the ability of Buyer to consummate the Transactions.

Section 4.6    Solvency.  Assuming (solely for purposes of this Section 4.6) that (a) the conditions to the obligation of Buyer to consummate the Transactions have been satisfied, (b) the representations and warranties set forth in Article II and Article III are true and correct in all

37

respects, (c) any financial projections or forecasts provided by the Target Group Entities, the Sellers or their respective Representatives to Buyer prior to the date hereof have been prepared in good faith on assumptions that were and continue to be reasonable, and (d) immediately prior to the Closing, the Target Group Companies are, individually and taken together, solvent, then at and immediately following the Closing and after giving effect to all of the Transactions, Buyer, the Target Group Companies will, individually and taken together, be solvent.  Buyer is not entering into the Transactions with the intent to hinder, delay or defraud either present or future creditors.

Section 4.7    Investment Intention.  Buyer is acquiring the Company Interests and the Transferred Residential Interests for its own account, for investment purposes only and not with a view to, or for sale in connection with, any distribution thereof in violation of the Securities Act, or any applicable state or foreign securities Laws. Buyer understands that neither the Company Interests nor the Transferred Residential Interests have been registered under the Securities Act, or any applicable state or foreign securities Law, and cannot be sold unless subsequently registered under the Securities Act or applicable foreign securities Laws or pursuant to an applicable exemption therefrom and pursuant to state securities Laws, as applicable.

Section 4.8    Binding Effect.  This Agreement and each of the Ancillary Agreements to which Buyer is a party, when executed and delivered by Buyer, and the other parties hereto and thereto (assuming due authorization), constitutes, or will constitute, a valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except as may be affected by Enforceability Limitations.

Section 4.9    Finders' Fees.  There is no investment banker, broker, finder or other similar intermediary or advisor that has been retained by or is authorized to act on behalf of, or who might be entitled to any fee or commission from, any Buyer Group Entity in connection with the Transactions.

Section 4.10    Sufficient Funds.  Buyer has, and shall have available at and at all times prior to the Closing, sufficient cash, marketable securities, available lines of credit or other sources of immediately available funds to pay all obligations of Buyer hereunder, including the amounts payable pursuant to Section 1.3(a) and all of the out-of-pocket costs of Buyer arising in connection with the consummation of the Transactions, and there is no restriction on the use of such cash for such purposes. Buyer acknowledges and agrees that its obligations hereunder are not subject to any conditions regarding Buyer's, its Affiliates' or any other Person's ability to obtain any financing for the consummation of the Transactions.

Section 4.11    Acknowledgment of No Other Representations or Warranties.

(a)    Buyer has conducted its own independent investigation, verification, review, and analysis of the businesses, operations, results of operations, financial condition, assets, liabilities, and prospects of the Target Group Companies, Target Project Companies, and their respective Affiliates and Representatives, to the extent necessary and appropriate for Buyer to make, together with the representations and warranties contained in Article II and Article III or any certificate delivered by the Company or the Sellers pursuant hereto, a fully informed

38

decision with respect to whether to enter into this Agreement and to consummate the Transactions.  Buyer acknowledges and agrees that, to the Knowledge of Buyer, it and its Affiliates and Representatives have been provided with all access that it has requested to the personnel, properties, and records of the Target Group Companies, Target Project Companies, and any of their respective Affiliates or Representatives.

(b)    Buyer acknowledges and agrees that, except for the representations and warranties contained in Article II and Article III or any certificate delivered by the Company or the Sellers pursuant hereto, (i) neither the Sellers, Target Group Entities, Target Project Companies, nor any of their respective Affiliates or Representatives makes or has made, nor is Buyer relying on, and Buyer expressly disclaims any reliance on, any representation or warranty, either express or implied, of any kind whatsoever, including any representation or warranty concerning (x) the Sellers, the Target Group Entities, the Target Project Companies, or any of their respective Affiliates or Representatives; (y) any of the Sellers', Target Group Companies', Target Project Companies', or any of their respective Affiliates' or Representatives' respective businesses, operations, assets, liabilities, results of operations, condition (financial or otherwise), or prospects; or (z) the Transactions, and (ii) the Sellers, Target Group Companies, Target Project Companies, and any of their respective Affiliates or Representatives hereby disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information communicated, or furnished (orally or in writing) by the Sellers, the Target Group Companies, Target Project Companies, and any of their respective Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any Representative of the Sellers, the Target Group Companies, the Target Project Companies or any of their respective Affiliates or Representatives) except for the representations and warranties contained in Article II and Article III or any certificate delivered by the Company or the Sellers pursuant hereto.

(c)    Without limiting the generality of clauses (a) and (b) above, Buyer acknowledges and agrees that (i) in connection with its investigation of the Target Group Companies, the Target Project Companies, and any of their respective Affiliates, Buyer has received from or on behalf of the Sellers, the Target Group Companies, and the Target Project Companies, certain projections, including projected statements of operating revenues and income from operations of the Target Group Companies, the Target Project Companies, and any of their respective Affiliates or Representatives, and certain business plan information of the Target Group Companies, the Target Project Companies, and any of their respective Affiliates or Representatives, (ii) there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, and that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy and completeness of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), (iii) neither the Sellers nor the Target Group Companies, the Target Project Companies, nor any of their respective Affiliates or Representatives make any representations or warranties whatsoever with respect to such estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), and Buyer has not relied thereon, and (iv) Buyer will have no claim against the Sellers, the Target Group Companies, the Target Project Companies, and any of their respective Affiliates or Representatives or any other Person with respect thereto.

39

(d)    Subject to all of the foregoing provisions of this Section 4.11, each of the Sellers and Buyer retains all of its rights and remedies with respect to claims based on Fraud.

ARTICLE V

COVENANTS; ADDITIONAL AGREEMENTS

Section 5.1    Conduct of Business.    During the period from the date hereof to the Closing, except as set forth in Section 5.1 of the Seller Disclosure Letter, as otherwise expressly contemplated by this Agreement or any Ancillary Agreement (including in connection with the Pre-Closing Restructuring), as may be required by applicable Law or as Buyer otherwise consents in writing, the Principal Sellers shall cause the Target Group Entities to (i) conduct the Business in the ordinary course and in accordance with applicable Laws in all material respects, (ii) use reasonable best efforts to preserve intact the present business operations, organization, assets, Material Contracts, Permits and goodwill of the Business and key Business relations and (iii) use reasonable best efforts to maintain in full force and effect insurance coverage comparable in scope and amount as in effect on the date hereof.  Without limiting the generality of the foregoing, except as set forth in Section 5.1 of the Seller Disclosure Letter, as otherwise expressly contemplated by this Agreement or any Ancillary Agreement, the Pre-Closing Restructuring, or as may be required by applicable Law, without Buyer's written consent, the Principal Sellers shall not, and shall cause the Target Group Entities not to, take any of the actions set forth below:

(a)    enter into any line of business unrelated in any material respect to the business conducted by the Target Group Entities as of the date hereof;

(b)    make or adopt any amendments to its Organizational Documents (including, for the avoidance of doubt, entering into, amending, varying or altering any side letter or other written agreement to or with any Investor) other than amendments to Organizational Documents of Target Group Entities (other than the Company) in the ordinary course of business that do not adversely affect any Target Group Entity;

(c)    appoint or remove a Person as a director of a Target Group Entity other than as permitted in accordance with the terms of the applicable Organizational Documents of such Target Group Entity, or appoint any individual as a partner or member of the Company;

(d)    (i) issue, grant, sell, transfer, encumber or otherwise dispose of, or permit an Encumbrance to be incurred on, redeem, acquire or authorize the issuance, grant, sale, transfer, Encumbrance or other disposition of, redemption or acquisition of, any Company Interests or Equity Interests, or securities convertible into or exercisable or exchangeable for any such Company Interests or Equity Interests, in the Target Group Entities, in each case other than grants, purchases or other issuances of Company Interests or Equity Interests representing carried interest, promote or other performance-based allocations, or general partner, manager or co-investment commitments, in each case in respect of Target Project Companies in accordance with the applicable Target Management Contract to any personnel of the Target Group Entities in the ordinary course, consistent with past practice, (ii) effect any recapitalization, reclassification, split, reverse split, subdivision or similar transaction with respect to any of its

40

Equity Interests or (iii) declare, set aside or establish a record date with respect to any dividend or other distribution on or in respect of any Company Interest or Equity Interest that is payable after the Determination Time;

(e)     (i) except for draws on that certain line of credit as evidenced by that certain Note dated June 18, 2021 executed by Redwood Capital Group, LLC in favor of CIBC Bank USA in the principal amount of $2,500,000 and memorialized, in part, by that certain Business Loan Agreement between Redwood Capital Group, LLC and CIBC Bank USA (the "Existing Facility"), incur, assume, guarantee, endorse, issue, amend, refinance or become obligated (as a debtor) with respect to any Debt for borrowed money, (ii) forgive, compromise or cancel any Debt with a book value in excess of $100,000, (iii) make any loans or advances to any Person (other than advances to employees or other service providers or trade credit in the ordinary course of business) or, (iv) from the Determination Time until the Closing, repay any Debt, except for the Existing Facility, which may be repaid in whole or in part prior to Closing without Buyer's consent;

(f)     (i) sell, transfer, lease, abandon, license or dispose of any material assets or properties of the Target Group Entities, other than in the ordinary course of business, in an amount not to exceed $250,000 individually or $500,000 in the aggregate, or (ii) subject any material assets or properties of the Target Group Entities to any Encumbrance, other than Permitted Encumbrances or otherwise in the ordinary course of business with respect to assets having a value of no more than $250,000 individually or $500,000 in the aggregate;

(g)     acquire (including by merger, stock purchase or otherwise) any corporation, partnership or other business organization, or business or division thereof (for the avoidance of doubt, the foregoing shall not restrict any acquisitions or investments by Target Project Companies);

(h)     make any capital expenditures with respect to the Target Group Entities in excess of $250,000 individually or $500,000 in the aggregate;

(i)     (i) other than as required by applicable Law or by employment or other Contracts existing as of the date hereof or as contemplated by this Agreement or any Ancillary Agreement, (x) increase or accelerate the timing of payment of compensation to any employee, partner or member, other than (1) payment of annual or quarterly bonuses, increases in salary, hourly wage rates or guaranteed payments in the ordinary course of business and consistent with past practice or (2) increases which do not, individually or in the aggregate, increase the annual compensation payable to any such person by more than five percent (5%), in either case, with respect to employees, partners or members, as applicable, of the Target Group Entities whose annual compensation is not in excess of $250,000, or (y) increase the severance protection applicable to any employee, partner or member of any Target Group Entity; (ii) hire or engage any employee, partner or member whose annual compensation would exceed $250,000, or terminate any such individual other than for "cause" (with notice to, and consultation with, Buyer as to such termination); or (iii) except as otherwise required by applicable Law, negotiate, modify, extend or enter into any collective bargaining agreement, or recognize or certify any union or group of employees or other service providers as the bargaining representative for any employees of any Target Group Entity;

41

1007814448v22

(j)    adopt, terminate, amend or modify any Target Benefit Plan or any plan, program, arrangement, practice or agreement that would be a Target Benefit Plan if it were in effect on the date hereof, other than any such actions undertaken in the ordinary course of business, or to the extent required by applicable Law or the terms of any Target Benefit Plan;

(k)    (i) make any changes in financial accounting methods, principles or practices, except insofar as may be required by GAAP or by Law, including statutory or regulatory accounting rules or (ii) appoint (except for reappointment of existing auditors) auditors for any Target Group Entity other than any "big four" accounting firm;

(l)    (i) other than in the ordinary course of business, waive, cancel, modify terminate or amend any material rights under any Target Management Contract or other Material Contract, (ii) enter into a Target Management Contract or other Contract that would be a Material Contract if in effect on the date hereof or (iii) enter, extent of or materially amend any finders agreement, placement agent agreement or external revenue sharing agreement;

(m)    settle or compromise any pending or threatened Action (i) involving rights or payments in excess of $250,000 individually or $500,000 in the aggregate or (ii) imposing conditions or restrictions on the business or operations of any Target Group Entity or any of their Affiliates (including Buyer or any of its Affiliates, but excluding any Target Project Company) following the Closing;

(n)    adopt a plan or agreement of complete or partial liquidation, dissolution or merger or otherwise consolidate, liquidate, merge, wind up, terminate or dissolve, or engage in any similar transaction with respect to, any Target Group Entity;

(o)    make any distributions or dividends, other than distributions of proceeds from Project Companies and Legacy Promotes (each as defined in the Company LLC Agreement);

(p)    make any investment in another Person, other than another Target Group Entity, Target Project Company or Portfolio Investment or any capital expenditures in the ordinary course of business permitted pursuant to Section 5.1(h);

(q)    change the fiscal year of any Target Group Entity;

(r)    with respect to a Target Group Entity or Target Project Company, (i) make or change any material Tax election, (ii) adopt or change any material accounting period or method, (iii) amend any material Tax Return, (iv) enter into any closing agreement with respect to material amounts of Tax, (v) settle or compromise any proceeding with respect to any material Tax claim or assessment or (vi) file, settle or surrender any claim relating to any refund of a material amount of Taxes, in each case, unless with the consent of Buyer, such consent not to be unreasonably withheld, conditioned or delayed;

(s)    other than in the ordinary course of business or as required by any Contract, amend or modify or agree to amend or modify the economic or other material terms applicable with respect to an Investor in a manner that is materially less favorable to any Target Group Entity than the terms applicable with respect to such Investor as of the date hereof;

42

1007814448v22

(t)    allow any policy of insurance covering any Target Group Entity to lapse or become void without providing a substantially similar replacement coverage;

(u)    carry on part of any Target Group Entity business or Target Project Company business other than through a Target Group Entity or Target Project Company, as applicable, or enter into or terminate, or vary materially the terms of participation in, any joint venture, or become or cease to be a member of, or vary materially the terms of participation in, a partnership or other unincorporated association (except for trade associations); or

(v)    authorize any of, or commit or agree to take any of, the foregoing actions.

Notwithstanding anything contained herein to the contrary, any acquisition fees payable in connection with the acquisition of any property located at 400 South Randall Road, West Dundee, Illinois  60118 (the "Seasons Property"), pursuant to definitive agreements executed prior to the date hereof, sponsored by any Affiliate of the Company to the extent not capitalized with capital sourced by Buyer shall belong to Mr. Isaacson and Mr. Carlson regardless of when the transaction closes (whether before or after Closing); provided that the Company shall hold such acquisition fees on its balance sheet until Closing and if this Agreement is terminated such fees shall be permanently retained by the Company.

Section 5.2    Reasonable Best Efforts.

(a)    Each party shall cooperate and use reasonable best efforts to fulfill as promptly as practicable the conditions precedent to such party's obligations hereunder and the other parties shall cooperate and use reasonable best efforts to fulfill as promptly as practicable the conditions precedent to such party's obligations hereunder.

(b)    The Principal Sellers and Buyer shall cooperate with each other and use reasonable best efforts to:

(i)    as soon as practicable after the date hereof, obtain all Governmental Approvals and satisfy all conditions, undertakings and requirements as may be necessary or appropriate to obtain all such Governmental Approval.  Such reasonable best efforts shall not include an obligation to (A) contest, litigate or resist (including through any applicable appeals process) any Action which may be instituted by a Governmental Authority challenging the Transactions, or (B) seek to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other Order that resulted from an Action instituted by a Governmental Authority, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation of the Transactions. Notwithstanding anything to the contrary, such reasonable best efforts shall not include an obligation to (x) propose, negotiate, commit to or agree to effect, by consent decree, hold separate order or otherwise, the sale, divestiture or disposition of any assets or businesses of Buyer or any of its Affiliates or (y) otherwise take or commit to take actions that after the Closing Date would limit the freedom of Buyer or its Affiliates with respect to, or their ability to retain, one or more businesses, product lines or assets.

(ii)    prepare all necessary documentation (including furnishing all information requested by a Governmental Authority pursuant to any applicable Laws to effect

43

promptly all necessary filings with any Governmental Authority and to obtain all necessary, proper or advisable actions or nonactions, approvals, consents, waivers, exemptions and approvals of any Governmental Authority necessary to consummate the Transactions).  Each party hereto shall provide to the other party copies of all substantive correspondence between it (or its advisors) and any Governmental Authority relating to the Transactions or any of the matters described in this Section 5.2(b).  Each of the parties hereto shall promptly inform the other of any substantive oral communication with, and provide copies of any substantive written communications with, any Governmental Authority regarding any such filings or any such transaction, unless prohibited by reasonable request of any Governmental Authority.  No party hereto shall independently participate in any substantive meeting or substantive conference call with any Governmental Authority in respect of any such filings, investigation or other inquiry without giving the other party prior notice of the substantive meeting or substantive conference call and, to the extent permitted by such Governmental Authority, a reasonable opportunity to attend or participate.  In the event a party is prohibited from participating in or attending any meeting or substantive conference call, the participating party shall keep the other party promptly and reasonably apprised with respect thereto, to the extent permitted by applicable Law.

(c)     The Principal Sellers shall use their, and shall cause the Target Group Entities to use their, reasonable best efforts to obtain, as promptly as practicable after the date hereof, the Consents of the Target Project Companies described in Section 5.2(c) of the Seller Disclosure Letter, in each case in the manner set forth therein and in accordance with applicable Law and the applicable Target Management Contract (the "Client Consents").  In connection with requesting or obtaining such Client Consents, in no event shall the Seller, any Target Group Entity or any of their respective Affiliates reduce (or offer to reduce) any management fee, carried interest, promote or similar performance-based compensation in respect of any Target Project Companies or offer any other materially adverse modification of a Target Management Contract or Organizational Documents of the Target Project Companies or other similar inducement that would, from and after the Closing, materially and adversely affect the economic value of such Target Project Company or Investor relationship, except as consented to or directed by Buyer in writing.  The Seller shall (i) provide to Buyer for review and approval in advance of distribution (which approval shall not be unreasonably withheld, conditioned or delayed) the general forms of the consent notice, (ii) keep Buyer reasonably apprised of any substantial developments with respect to the matters set forth in this Section 5.2(c) and of the status of obtaining such Client Consents (including any conditions requested and providing copies of correspondence relating to such requests) and (iii) provide to Buyer for review and comment in advance of distribution any other substantive notices or other substantive materials to be distributed by the Principal Sellers, the Target Group Entities to Investors or their Representatives, as applicable, in order to obtain such Client Consents (and use reasonable best efforts to consider and incorporate any such comments prior to distribution).  Buyer shall, and shall cause its Affiliates to, reasonably cooperate with the Principal Sellers and the Target Group Entities in taking the actions described in this Section 5.2(c).

(d)     Prior to the Closing, to the extent permissible under applicable Law or Contract in effect as of the date hereof, the Principal Sellers shall provide Buyer with drafts of any material marketing and governing documents of any proposed Investor prior to furnishing such materials to prospective investors in order to provide Buyer with a reasonable period of time to review and provide comments on such materials, and the Seller and Buyer shall

44

reasonably cooperate in good faith to address any such comments. Any investment in a Target Project Company or Target Management Contract made or entered into after the date hereof until Closing shall include a Consent to the Transactions from the applicable Target Project Company or Investor, as applicable.

Section 5.3   Access and Information. From the date hereof to the Closing Date, the Principal Sellers shall, and shall cause the Target Group Entities to, permit Buyer and its Representatives to have reasonable access to the information, data, books and records, Contracts, Investors (solely with the Principal Sellers' prior consent not to be unreasonably withheld, conditioned or delayed) and personnel of the Target Group Entities and Target Project Companies; provided that none of the Principal Sellers nor the Target Group Entities shall be required to violate any confidentiality obligations, provide access to any information that relates to any sale process of the Target Group Entities, cause the risk of loss of any legal privileges or violate any applicable Law in providing such access; provided further that, notwithstanding the foregoing, the Principal Sellers and the Target Group Entities shall reasonably cooperate with Buyer in any reasonable arrangement proposed by Buyer that would allow access to any such information, that does not violate any applicable Law or confidentiality obligations or would preserve legal privileges. Such access shall only occur during normal business hours upon reasonable advance written notice by Buyer or its Representatives to the Principal Sellers and shall be conducted in a manner that does not unreasonably interfere with the operations of the Principal Sellers or the Target Group Entities. All requests for information made pursuant to this Section 5.3 shall be in writing and directed to Principal Sellers, consistent with Section 9.1, or such other Person or Persons as may be designated by the Principal Sellers for such purpose. All information received pursuant to this Section 5.3 shall be governed by the terms of the Confidentiality Agreement (provided such information is Confidential Information (as defined in the Confidentiality Agreement); provided, further, that the restrictions in the Confidentiality Agreement on engaging or disclosing Confidential Information to financing sources shall not apply).

Section 5.4   Tax Matters.

(a)   Transfer Taxes. All federal, state, local or foreign or other excise, sales, use, value-added, transfer (including real property transfer or gains), stamp, documentary, filing, recordation and other similar Taxes and fees that may be imposed or assessed as a result of the Transactions, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties ("Transfer Taxes"), shall be borne 50% by Buyer and 50% by the Principal Sellers, provided that Transfer Taxes imposed on the Pre-Closing Restructuring shall be borne 100% by the Principal Sellers. Any Tax Returns that must be filed in connection with Transfer Taxes shall be prepared by the party primarily responsible under applicable local Law for filing such Tax Returns, and such party will use its reasonable best efforts to provide such Tax Returns to the other party at least five (5) Business Days prior to the date such Tax Returns are due to be filed. The Principal Sellers and Buyer shall cooperate in the timely completion and filing of all such Tax Returns and in the mitigation of any Transfer Taxes.

(b)   Assistance and Cooperation with Respect to Taxes. After the Closing, the parties hereto shall, upon the reasonable request of any of them, cooperate in preparing for any audits of, or disputes with any Governmental Authority regarding, any Tax Returns and

payments in respect thereof.  Each party shall (i) provide timely notice to the other in writing of any pending or proposed audits or assessments with respect to Taxes for which such other party or any of its Affiliates may have liability under this Agreement and (ii) furnish the other with copies of all relevant correspondence received from any Governmental Authority in connection with any audit or information request with respect to any Taxes referred to in clause (i). Notwithstanding the foregoing, to the extent any such audit or dispute (A) relates to a Target Group Entity treated as a partnership for U.S. federal income tax purposes (a "Relevant Target Group Entity") in respect of a Pre-Closing Tax Period or (B) could reasonably be expected to result in Sellers having liability under Article VII which would not exceed (taking into account any other claims for which Sellers have indemnification responsibility under this Agreement) the amount for which Sellers have indemnification responsibility under Section 7.32 (any such audit or dispute, a "Relevant Target Tax Dispute"), Sellers shall be entitled to control such audit or dispute (at their own cost), provided that Sellers shall not settle such audit or dispute without the consent of Buyer (which shall not be unreasonably withheld, conditioned, or delayed). Sellers shall consult with Buyer with respect to such Relevant Target Tax Dispute and consider in good faith all comments of Buyer.

(c)     Pre-Closing Tax Periods.  From and after the Closing, without the consent of the Principal Sellers (such consent not to be unreasonably withheld, conditioned or delayed), Buyer shall not (i) make or change any Tax election in respect of a Target Group Entity, (ii) amend any Tax Return of a Target Group Entity, or (iii) waive or extend any statute of limitations for the assessment or collection of any Tax of a Target Group Entity, in each case that relates to a Relevant Target Group Entity in respect of a Pre-Closing Tax Period. Notwithstanding anything to the contrary in this Agreement, Buyer shall be entitled to cause any Target Group Entity to make the election under Section 6226 of the Code (or corresponding provision of state, local or non-U.S. Tax Law) with respect to any taxable period (or portion thereof) ending on or prior to the Closing Date.

(d)     Responsibility for Filing Tax Returns.

(i)     Principal Sellers shall prepare or cause to be prepared and file or cause to be prepared and filed on a timely basis (taking into account extensions), all Tax Returns for the Target Group Entities that relate solely to Pre-Closing Tax Periods, including any Final Partnership Income Tax Return (collectively, the "Seller Prepared Returns").  The Seller Prepared Returns shall be prepared in accordance with the most recent past positions and practices of the Target Group Entities (unless otherwise required by applicable Law), provided that Buyer shall be entitled to cause Redwood Residential, LLC to make an election under Section 754 of the Code for the taxable period including the Closing Date.  At least fifteen (15) days prior to the due date of any Seller Prepared Return (taking into account any applicable extensions), the Principal Sellers shall provide a draft of such Seller Prepared Return (other than a Seller Prepared Return relating to sales, use, payroll or other Taxes that is required to be filed contemporaneously with, or promptly after, the close of a Tax Period, for which a copy shall be delivered to Buyer contemporaneously with such filing), together with all supporting documentation, to the TriPost Seller and Buyer for review.  Principal Sellers shall consider in good faith all reasonable comments that are timely received from the TriPost Seller and Buyer in writing with respect to such Seller Prepared Return, and Principal Sellers will cause such Seller Prepared Return to be timely filed.

(ii)    Buyer, at its sole cost and expense, shall prepare or cause to be prepared and file or cause to be filed on a timely basis all Tax Returns of the Target Group Entities (other than the Seller Prepared Returns) for all Straddle Periods (collectively, the "Buyer Prepared Returns"). The Buyer Prepared Returns shall be prepared in accordance with the most recent past positions and practices of the Target Group Entities (unless otherwise required by applicable Law). At least fifteen (15) days prior to the due date of any Buyer Prepared Return (taking into account any applicable extensions), Buyer shall provide a draft of such Buyer Prepared Return (other than a Buyer Prepared Return relating to sales, use, payroll or other Taxes that is required to be filed contemporaneously with, or promptly after, the close of a Tax Period, for which a copy shall be delivered to Principal Sellers contemporaneously with such filing), together with all supporting documentation, to Sellers for review. Buyer shall consider in good faith all reasonable comments that are timely received from Sellers with respect to such Buyer Prepared Return.

(e)    Tax Allocation. Sellers and Buyer agree that the Purchase Price will be allocated (i) in the case of the Sellers, solely to Company Interests and the interests in Redwood Residential and (ii) in the case of Buyer, to the Transferred Residential Interests and among the assets of the Company in a manner consistent with Section 1060 of the Code and the regulations promulgated thereunder and consistent with the methodology set forth on Schedule 5.4(e) (the "Tax Allocation"). A draft of the Tax Allocation will be prepared by Buyer and delivered to Sellers for review and comment within ninety (90) days following the Closing. The Sellers shall cooperate with Buyer in such preparation. If Sellers have any objection to the Tax Allocation, Sellers shall deliver to Buyer a written statement setting forth their objections and suggested adjustments within thirty (30) days from the delivery of the Tax Allocation. Buyer agrees to consider any such objections in good faith. The Tax Allocation shall be adjusted from time to time to reflect the Adjusted Purchase Price, as determined for Tax purposes in a manner consistent with this Section 5.4(e). Each party shall file all Tax Returns consistently with the Tax Allocation as finalized pursuant to this Agreement and shall not take any position that is inconsistent with the Tax Allocation, unless required by applicable Law.

(f)    Straddle Periods; Pre-Closing Tax Periods. For purposes of this Section 5.4 and for determining the amount of Tax assets or Tax liabilities included in Working Capital and Debt, in the case of any Pre-Closing Tax Period that includes (but does not end on) the Closing Date (a "Straddle Period"), (i) the amount of Taxes of the Target Group Entities attributable to the applicable Pre-Closing Tax Period for Taxes that are property, ad valorem or similar Taxes assessed on a periodic basis shall be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days in the Tax period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period, and (ii) the amount of any other Taxes of the Target Group Entities that relate to the Pre-Closing Tax Period portion of a Straddle Period will be determined based on an interim closing of the books as of the end of the Closing Date (and for such purpose, the taxable period of any partnership or other pass-through entity in which the applicable Target Group Entity holds an interest shall be deemed to terminate at such time); provided, that any item determined on an annual or periodic basis (such as deductions for depreciation or real estate Taxes) shall be apportioned on a daily basis.

47

(g)    <u>Tax Treatment</u>.  The Sellers and Buyer agree that the sale and purchase of the Company Interests shall be treated for federal income Tax purposes, and any analogous state or local income Tax purposes, in a manner consistent with Revenue Ruling 99-6, 1999-1 C.B. 432 (Situation 2).

(h)    <u>Tax Refund</u>.  Except to the extent included as an asset in Closing Working Capital or taken into account in Closing Debt as finally determined pursuant to <u>Section 1.4</u>, any Tax refunds that are received by Buyer or any of the Target Group Entities and any credits against Taxes otherwise due and payable in a Tax period ending after the Closing Date that, in each case, relate to Taxes of the Target Group Entities for Pre-Closing Tax Periods (including the pre-closing portion of the Straddle Period (collectively, "<u>Tax Refunds</u>")) shall be for the benefit of the Sellers, and Buyer shall pay over to the Sellers (for subsequent distribution to the Sellers) any such Tax Refund net of reasonable out-of-pocket expenses of Buyer or any of its Affiliates that, in each case, are attributable to such Tax Refund within fifteen (15) days after receipt or entitlement thereof.

Section 5.5    <u>Public Announcements</u>.  The Buyer Group Entities, on the one hand, and the Sellers and the Target Group Entities, on the other hand, shall consult with each other before issuing any press release, making any other public statement or scheduling any press conference or conference call with investors or analysts with respect to this Agreement and the Ancillary Agreements or the Transactions contemplated hereby and thereby and shall not issue any such press release, make any such other public statement or schedule any such press conference or conference call without the prior approval thereof by the other parties, such approval not to be unreasonably withheld, conditioned or delayed; <u>provided</u> that any party may discuss this Agreement and the Ancillary Agreements or the Transactions contemplated hereby and thereby with investors and others (including on earnings calls), so long as such discussion is consistent with information that has been previously publicly disclosed or consistent with talking points previously agreed upon by Buyer, the Principal Seller and the TriPost Seller.  Nothing in this <u>Section 5.5</u> shall prevent disclosures permitted pursuant to <u>Section 9.6</u>.

Section 5.6    <u>D&O Indemnification and Insurance</u>.

(a)    Following the Closing, Buyer shall, and shall cause the Target Group Entities to, honor and fulfill the obligations of the Target Group Entities under (i) any and all indemnification, advancement of expenses and similar provisions of the Organizational Documents of the Target Group Entities for the benefit of their respective current or former directors, managers, officers, employees, partners or members and any successor, assign, heir, executor or administrator of any such Person (each, a "<u>D&O Indemnified Party</u>" and collectively, the "<u>D&O Indemnified Parties</u>"), and (ii) any and all indemnification agreements between the Target Group Entities and any D&O Indemnified Parties, in each case, solely with respect to the period prior to the Closing.

(b)    Buyer shall, or shall cause the Target Group Entities to, obtain and fully pay for, at Buyer's expense (<u>provided</u> that, if the premium for any such policy exceeds 250% of the current annual premium under the D&O Insurance presently maintained by the Target Group Entities, Principal Sellers shall bear the cost of such excess as a Transaction Expense), "tail" insurance policies with respect to the current directors' and officers' liability insurance and

48

fiduciary liability insurance (the "D&O Insurance") coverage with a claims period of at least six (6) years after the Closing Date for the Persons who are covered by the existing D&O Insurance of the Target Group Entities with respect to claims or other matters arising out of or relating to acts or omissions which occurred or existed (or alleged to have occurred or existed) at or prior to the Closing in connection with a director's or officer's service as such (including in connection with the transactions contemplated hereby and by the Ancillary Agreements), which "tail" policies shall provide substantially the same or better levels of coverage under, and with other terms, conditions and retentions at least as favorable as, the D&O Insurance presently maintained by the Company and its Subsidiaries; provided that, if the premium for any such policy exceeds 250% of the current annual premium under the D&O Insurance presently maintained by the Target Group Entities, Buyer may, or may cause the Target Group Entities to, instead obtain a policy with the greatest coverage available for a cost not exceeding 250% of the current annual premium under the D&O Insurance presently maintained by the Target Group Entities.

(c)    The provisions of this Section 5.6 shall survive the Closing and (i) are intended to be for the benefit of, and shall be enforceable by, each D&O Indemnified Party and his or her estates, heirs, successors, assigns, legatees, executors, personal representatives, guardians, custodians, administrators and conservators, each of whom is an intended third-party beneficiary of this Section 5.6 and (ii) are in addition to, and not in substitution for, any other rights to indemnification or contribution that any such Person may have by Contract or otherwise.

Section 5.7    280G Matters.  If and to the extent that the Sellers determine that any payments and/or benefits as a result of or in connection with the Transactions would be deemed to constitute "parachute payments" (within the meaning of Section 280G(b) of the Code), prior to the Closing, the Target Group Entities shall use commercially reasonable efforts to request, from each "disqualified individual" (within the meaning of Section 280G(c) of the Code) of the Target Group Entities who has a right to such payments and/or benefits, a waiver (each, a "280G Waiver") of such individual's right to some or all of such payments and/or benefits (the "Waived 280G Payments") so that all of such remaining payments and/or benefits due to such individual shall not be deemed to be "excess parachute payments" under Section 280G of the Code.  Prior to the Closing, the Target Group Entities shall submit to a stockholder vote, in a manner that satisfies the approval requirements under Section 280G(b)(5)(B) of the Code and regulations thereunder (a "280G Stockholder Vote"), the right of any such "disqualified individual" who has executed a 280G Waiver to receive any and all Waived 280G Payments so that no payment received by, or benefit provided to, such "disqualified individual" would be a "parachute payment."  The Target Group Entities shall provide Buyer or its counsel disclosure materials prepared in connection with the 280G Stockholder Vote for Buyer's review at least three (3) Business Days prior to the distribution thereof; provided that if any compensatory arrangement is entered into (or proposed to be entered into) between Buyer (or any of its respective Affiliates) and a "disqualified individual" before the Closing, Buyer shall provide a copy of such arrangement or a summary of its material terms to the Target Group Entities at least fifteen (15) Business Days before the Closing, and shall cooperate with the Target Group Entities and its advisers in good faith to determine the value for the purposes of Section 280G of the Code of any payments and/or benefits contemplated therein (and, if Buyer does not comply with its obligations under this sentence, the Target Group Entities' failure to include such Buyer

49

arrangements in the voting materials described herein will not result in a breach of this <u>Section 5.7</u>).

Section 5.8    <u>Pre-Closing Restructuring</u>.  No later than the Business Day immediately preceding the Closing Date, the Sellers shall have taken all actions necessary to consummate the Pre-Closing Restructuring.

Section 5.9    <u>Termination of Affiliate Arrangements</u>.  At or prior to the Closing, except as set forth in <u>Section 5.9</u> of the Seller Disclosure Letter, all rights, liabilities and obligations between any Target Group Entity or Target Project Company, on the one hand, and one or more of its Affiliates (including the Sellers or any of their respective owners or Affiliates but not including any other Target Group Entity or Target Project Company), on the other hand, including any and all Contracts (other than this Agreement and any Ancillary Agreement) between any Target Group Entity or Target Project Company, on the one hand, and one or more of its Affiliates (including the Sellers or any of their respective owners or Affiliates but not including any other Target Group Entity or Target Project Company), on the other hand, shall be terminated in full, without any consideration or any further liability to any Target Group Entity, Target Project Company or Buyer.

Section 5.10    <u>Exclusivity</u>.  From and after the date hereof and prior to the Closing or, if applicable, the date on which this Agreement is earlier terminated in accordance with <u>Section 8.1</u>, the Sellers shall not, and shall cause the Target Group Entities and their respective Representatives (and any equity holder of any seller that is not a natural person) not to, directly or indirectly, (a) accept, continue, respond to, solicit, initiate, or knowingly encourage any inquiry, proposal or offer with respect to any Acquisition Proposal, (b) participate in any discussions or negotiations regarding an Acquisition Proposal with any Person (other than the Buyer Group Entities and their Representatives), or furnish any information to any Person (other than the Buyer Group Entities and their Representatives), in connection with or in respect of an Acquisition Proposal, or (c) enter into, or authorize the entry into, any binding letter of intent, binding agreement in principle, or definitive agreement or other Contract, arrangement or understanding with, or otherwise cooperate with any Person in connection with, any Acquisition Proposal.  The Sellers shall promptly (and in any event within forty-eight (48) hours after receipt thereof by the Sellers or a Target Group Entity) advise Buyer of any Acquisition Proposal received by the Sellers or a Target Group Entity, including the material terms of, and the identity of, the Person making, such Acquisition Proposal, and, subject to any confidentiality obligations of Sellers or such Target Group Entity, furnish to Buyer the material terms of any such Acquisition Proposal.

Section 5.11    <u>Notice of Certain Developments</u>.  During the period from the date hereof through the Closing, the Principal Sellers shall give prompt written notice to Buyer of any Target Group Entity or any of its directors, officers, partners, members or control persons becoming (a) disqualified pursuant to Rule 506(d) of Regulation D under the Securities Act from making an offering of securities in reliance on Rule 506 of Regulation D under the Securities Act; or (b) subject to any "bad actor" event specified in Rule 506(d)(1).

Section 5.12    <u>Employee Matters</u>.

50

(a)    Except as otherwise expressly provided in any agreements with individual Continuing Employees, Buyer shall, or shall cause its applicable Affiliates to, for a period of one (1) year following the Closing Date, provide to each Continuing Employee, for so long as he or she remains employed or engaged by Buyer (or its applicable Affiliates) and its Subsidiaries during such period: (i) annual base salary and base wages, and target incentive opportunity (subject to achievement of the applicable performance conditions), that, in the aggregate, are not less favorable than those provided to such Continuing Employee immediately prior to the Closing, and (ii) employee benefits (excluding carried interest, deferred compensation, retention, long-term incentive and change-in-control or transaction-based bonus plans or arrangements) that, as determined in Buyer good faith discretion, (A) are not less favorable, in the aggregate, than those provided to such Continuing Employee under the Target Benefit Plans immediately prior to the Closing, (B) are no less favorable, in the aggregate, than those provided to similarly situated employees of Buyer or its Affiliates (excluding the Company) or (C) constitute any combination of the foregoing.

(b)    For purposes of eligibility, vesting and level and entitlement to benefits under the employee benefit plans, programs and arrangements established or maintained by the Buyer Group Entities or any of their respective Subsidiaries in which Continuing Employees are eligible to participate following the Closing (excluding, for the avoidance of doubt, with respect to any allocations by Mr. Carlson of the earn-out consideration described in Section 1.5) (the "Parent Plans"), the Buyer Group Entities or any of their respective Subsidiaries shall credit each Continuing Employee with his or her service with the Target Group Entities or their predecessors, to the same extent as such Continuing Employee was entitled immediately prior to the Closing to credit for such service under any similar Target Benefit Plan or, if no such Target Benefit Plan was in effect, to the extent permitted under the applicable Parent Plan; provided, however, that no such service shall be credited to the extent that it would result in a duplication of benefits with respect to the same period of service or for purposes of defined benefits, pension benefits or retiree, medical and life insurance benefits.  In addition, for purposes of each Parent Plan providing medical, dental, pharmaceutical or vision benefits to any Continuing Employee and his or her covered dependents, Buyer or its Affiliates shall cause (i) each Continuing Employee eligible to participate in the substantially comparable Target Benefit Plan to be immediately eligible to participate, without any waiting period, in the corresponding Parent Plan, (ii) any eligibility requirements or pre-existing condition limitations to be waived, subject to the terms of the applicable plans, to the same extent waived under corresponding plans of the Target Group Entities and (iii) each Parent Plan to give each Continuing Employee credit for the year in which the Closing occurs for any co-payments, deductibles and out-of-pocket expenses paid by such Continuing Employees with respect to similar plans maintained by the Target Group Entities.

(c)    Notwithstanding the foregoing, the parties hereto acknowledge and agree that all provisions contained in this Section 5.12 with respect to persons providing services to the Target Group Entities, including the Continuing Employees, are included for the sole benefit of the respective parties hereto and nothing contained herein shall obligate any Buyer Group Entity (including the Target Group Entities following the Closing) and shall not create any right (i) in any other person, including any Continuing Employees, other service providers, former employees or service providers, any participant or any beneficiary thereof in any Target Benefit Plan, or (ii) to continue in employment or service with the Buyer Group (including the Target

51

Group Entities).  Notwithstanding the foregoing, no provision of this <u>Section 5.12</u> shall interfere with the right of the Buyer Group Entities (including the Target Group Entities) to amend or modify or terminate any Benefit Plan, including any Parent Plan (subject, in each case, to the provisions of <u>Section 5.12(a)</u> and <u>Section 5.12(a)</u> above), or terminate the employment or service of any employee or other service provider of the Target Group Entities for any reason.

ARTICLE VI

<u>CONDITIONS TO CLOSING</u>

Section 6.1    <u>Conditions to the Obligations of Buyer and the Sellers</u>.  The obligations of the parties hereto to effect the Closing are subject to satisfaction at or prior to the Closing of the following conditions, any or all of which may be waived, in whole or in part, by both Buyer and all Sellers in writing:

(a)    <u>Governmental Consents</u>.  The Governmental Approvals set forth on <u>Section 6.1(a)</u> of the Seller Disclosure Letter shall have been obtained and shall remain in full force and effect as of the Closing Date.

(b)    <u>No Restraints</u>.  There shall be no Order or other legal restraint or prohibition on the consummation of the Transactions or Law (whether temporary, preliminary or permanent) that has been enacted by any Governmental Authority that prohibits or makes illegal the consummation of the Transactions.

(c)    <u>Project Company Consents</u>. All Project Company Consents shall have been obtained (whether by affirmative vote or by deemed consent, to the extent permitted by Law and the Target Project Company Operative Documents).

Section 6.2    <u>Conditions to the Obligations of Buyer</u>.  The obligation of Buyer to effect the Closing is subject to satisfaction at or prior to the Closing of the following conditions, any or all of which may be waived, in whole or in part, by Buyer in writing:

(a)    <u>Representations and Warranties</u>.  Each of the representations and warranties of the Sellers contained in this Agreement, other than the Fundamental Representations, shall be true and correct (without giving effect to any limitation as to "materiality" or any derivative thereof or "Target Material Adverse Effect" qualification set forth therein (except in the case of the reference to Target Material Adverse Effect in <u>Section 3.14</u> (*Absence of Changes*))) as of the Closing Date (except for such representations and warranties that are made as of a specific date, which shall speak only as of such date), except for any failures to be so true and correct that, individually or in the aggregate, would not have a Target Material Adverse Effect.  The Fundamental Representations of the Sellers shall be true and correct in all respects as of the Closing Date (except for such representations and warranties that are made as of a specific date, which shall speak only as of such date) other than de minimis inaccuracies.

(b)    <u>Covenants</u>.  Each of the covenants, agreements and obligations of the Sellers under this Agreement to be performed or complied with at or prior to the Closing shall have been performed, waived or complied with in all material respects.

52

(c)    Certificate.  Buyer shall have received a certificate of the Sellers, signed by an authorized officer of the Company and dated the Closing Date, certifying that the conditions set forth in Section 6.2(a), Section 6.2(b), Section 6.2(d) and Section 6.2(e) have been satisfied.

(d)    No Target MAE.  Since the date of the Agreement, no Target Material Adverse Effect shall have occurred.

(e)    Key Member Event.  (i) No Effect has occurred that causes or gives rise to any "Key Member Event" (or similarly defined event) under any Target Project Company's Organizational Documents and (ii) at least five (5) of the individuals listed on Annex III hereto continue to be an active employee in good standing and have not given notice of an intention to terminate their employment with the Target Group Entities.

(f)    Pre-Closing Restructuring.  The Sellers shall take all actions necessary to consummate the Pre-Closing Restructuring.

(g)    Project Company Consents.  All Project Company Consents shall have been obtained (whether by affirmative vote or by deemed consent, to the extent permitted by Law and the Target Project Company Operative Documents).

Section 6.3    Conditions to the Obligations of the Sellers.  The obligations of the Sellers to effect the Closing are subject to satisfaction at or prior to the Closing of the following conditions, any or all of which may be waived, in whole or in part, by all Sellers in writing:

(a)    Representations and Warranties.  Each of the representations and warranties of Buyer contained in this Agreement, other than the Fundamental Representations, shall be true and correct (without giving effect to any limitation as to "materiality" or any derivative thereof or "Buyer Material Adverse Effect" qualification set forth therein) as of the Closing Date (except for such representations and warranties that are made as of a specific date, which shall speak only as of such date), except for any failures to be so true and correct that, individually or in the aggregate, would not have a Buyer Material Adverse Effect.  The Fundamental Representations of Buyer shall be true and correct in all respects as of the Closing Date (except for such representations and warranties that are made as of a specific date, which shall speak only as of such date) other than *de minimis* inaccuracies.

(b)    Covenants.  Each of the covenants, agreements and obligations of Buyer under this Agreement to be performed, waived or complied with at or prior to the Closing shall have been performed or complied with in all material respects.

(c)    Certificate.  The Sellers shall have received a certificate of Buyer, signed by an authorized officer of Buyer and dated the Closing Date, certifying that the conditions set forth in Section 6.3(a) and Section 6.3(b) have been satisfied.

ARTICLE VII

INDEMNIFICATION AND SURVIVAL

Section 7.1    Survival.  The representations and warranties of the Sellers and Buyer, and the covenants of the Sellers and Buyer that contemplate performance prior to the Closing, contained in this Agreement and the Ancillary Agreements shall not be deemed waived, modified or otherwise affected by any investigation made or any knowledge acquired with respect thereto and shall survive for a period of eighteen (18) months after the Closing Date; provided that (a) any Indemnification Claim based on Fraud shall survive the Closing for a period ending on the later of (x) five (5) years following the Closing and (y) five (5) years following the discovery of any such Fraud, but in no event more than eight (8) years following the Closing, (b) the Fundamental Representations shall survive for a period of sixty (60) months after the Closing Date, (c) the representations and warranties contained in Section 3.7 shall survive for the statute of limitations applicable to such matters plus 60 days.  The applicable survival period pursuant to this Section 7.1 is referred to as the "Survival Period."  All covenants and agreements contained in this Agreement that contemplate performance thereof following the Closing or otherwise expressly by their terms survive the Closing will survive the Closing in accordance with their terms. Nothing in this Section 7.1 shall preclude any Liability for or remedy in respect of Fraud.

Section 7.2    Indemnification by the Sellers:

(a)    From and after the Effective Time, subject to the limitations set forth in this Article VII, each Seller shall, severally, but not jointly, and in accordance with their Pro Rata Percentages, indemnify and hold Buyer Indemnified Parties harmless from and against, and shall reimburse the Buyer Indemnified Parties for, any and all losses, damages, debts, liabilities, obligations, judgments, orders, settlement payments, awards, writs, injunctions, decrees, fines, penalties, Taxes, costs and expenses (including legal and accounting fees and expenses), whether absolute, accrued, conditional or otherwise including resulting from a Third Party Claim (collectively, "Losses"), as incurred, arising out of:

(i)    any breach of any representation or warranty of such Seller set forth in Article II of this Agreement, or any certificate delivered by such Seller pursuant hereto;

(ii)    any breach by such Seller of any covenant or other obligation of such Seller contained in this Agreement or any certificate delivered by such Seller pursuant hereto which by its terms contemplates performance prior to the Closing; and

(iii)    any Fraud by such Seller.

(b)    From and after the Effective Time, subject to the limitations set forth in this Article VII, the Principal Sellers shall, severally, but not jointly, and in accordance with their Pro Rata Percentages, indemnify and hold Buyer Indemnified Parties harmless from and against, and shall reimburse the Buyer Indemnified Parties for, any and all Losses, as incurred, arising out of:

54

(i)    any breach of any representation or warranty of such Principal Seller set forth in Article III of this Agreement, or any certificate delivered by such Principal Seller or the Company pursuant hereto; and

(ii)    any breach by the Company of any covenant or other obligation contained in this Agreement or any certificate delivered by the Company pursuant hereto which by its terms contemplates performance prior to the Closing;

(iii)    any Taxes imposed upon or with respect to the Sellers in connection with the sale of the Company Interests or the Transferred Residential Interests to Buyer, any Taxes attributable to the Pre-Closing Restructuring and any Taxes of the Target Group Entities relating to any Pre-Closing Tax Period (other than any such Taxes accounted for in the calculation of Debt or Working Capital or that were treated as Transaction Expenses); and

(iv)    any amounts required to be paid to each Seller in excess of amounts set forth in the Closing Statement due to inaccuracies in the Estimated Closing Statement.

(c)    From and after the Closing, Mr. Carlson shall indemnify the Buyer Indemnified Parties from and against any Losses incurred or arising out of Taxes (excluding the employer portion of any employment Taxes (but not interest or penalties on such employment Taxes)) that are attributable to the Earn-Out Payments being treated as compensation for services rendered.

Section 7.3    Indemnification by Buyer.    Subject to the limitations set forth in this Article VII, Buyer shall indemnify and hold the each indemnify and hold Seller Indemnified Parties harmless from and against, and shall reimburse the Seller Indemnified Parties for, any for, any and all Losses, as incurred, arising out of: (a) any breach of any representation, warranty or certification made by Buyer in this Agreement or in any other Ancillary Agreement, (b) any breach by Buyer of any covenant or other obligation contained in this Agreement or any certificate delivered by Buyer pursuant hereto, in each case, which by its term contemplates performance prior to the Closing, or (c) any Fraud by Buyer.

Section 7.4    Limitations

(a)    Except for Losses based on Fraud, or arising out of breach of any of the Fundamental Representations, the liability of the TriPost Seller pursuant to Section 7.2(a)(i) and Section 7.2(a)(ii) connection with any Indemnification Claim shall be limited to $1,470,000.

(b)    Except for Losses based on Fraud, or arising out of breach of any of the Fundamental Representations, the liability of any individual Principal Seller pursuant to Section 7.2(b)(i) and Section 7.2(b)(iii) in connection with any Indemnification Claim shall be limited to $1,530,000.

(c)    Except for Losses based on Fraud, or arising out of breach of any of the Fundamental Representations, the aggregate liability of all Sellers pursuant to Section 7.2(a), Section 7.2(b)(i) and Section 7.2(b)(iii) in connection with any Indemnification Claim shall be limited to $3,000,000 in the aggregate.

55

(d)     The aggregate liability of Mr. Carlson pursuant to Section 7.2(c) shall be limited to $6,000,000.

(e)     Except for Losses based on Fraud, the aggregate liability of each Seller for any Indemnification Claim for breach of the Fundamental Representations shall be several and not joint and shall be limited to the aggregate proceeds actually received by such Seller.

(f)     The aggregate liability of each Seller which may be recovered by a Buyer Indemnified Party arising out of Losses based on Fraud of such Seller shall not be subject to any limitation with respect to such Seller.

(g)     Notwithstanding anything to the contrary in this Article VII, an Indemnifying Party shall have no obligation to indemnify or hold harmless an Indemnified Party with respect to any Losses arising in connection with any Indemnification Claims based on Section 7.2(b) Section 7.2(b)(i) or Section 7.3, as applicable, unless the aggregate Losses incurred by such Indemnified Party for which it is entitled to indemnification from such Indemnifying Party collectively equal or exceed an amount equal to such indemnifying Party's Pro Rata Percentage of $500,000 (the "Basket").  An Indemnified Party will not be entitled to recover under Section 7.2(b) Section 7.2(b)(i) or Section 7.3, as applicable, for an individual Indemnification Claim unless the amount of Losses that otherwise would be payable under this Article VII with respect to such Indemnification Claim exceeds $50,000 (the "Per Claim Threshold").  If such Losses exceed the Basket of such Indemnifying Party, then such Indemnifying Party shall be responsible to indemnify the Indemnified Party for all Losses without regard to the Basket, subject to the limitations set forth in this Article VII. Notwithstanding the foregoing, this Section 7.4(f) shall in no way limit, and the Basket and the Per Claim Threshold shall not apply to, an Indemnified Party's right to indemnification for Losses arising in connection with any Indemnification Claim based on Fraud, a breach of any of the Fundamental Representations or the representations and warranties in Section 3.7 or any Indemnification Claim pursuant to Section 7.2(b)(iii).

(h)     Any Person against whom an Indemnification Claim is asserted (an "Indemnifying Party") shall not be obligated to indemnify and hold harmless any Person claiming indemnification under this Article VII (an "Indemnified Party") after the expiration of any applicable Survival Period unless a Claim Notice with respect to such Indemnification Claim shall have been given by the Indemnified Party prior to the expiration of the applicable Survival Period.

(i)     The obligations of the Sellers under Section 7.2 shall be satisfied from assets of the Sellers, including by offset of amounts not yet paid by Buyer under this Agreement or any Ancillary Agreements.  No Claim for contribution or other Claim shall be made by the Sellers against the Company or any other Buyer Entity for Losses for which a Buyer Indemnified Party makes an Indemnification Claim.

(j)     For purposes of determining whether a breach has occurred and the amount of Losses under Section 7.2 or Section 7.2(c), all qualifications and limitations as to materiality and words of similar import set forth in this Agreement shall be disregarded, except

56

for the references to Target Material Adverse Effect in Section 3.14 (*Absence of Changes*) and references to "Material Contracts".

(k)     The amount of Losses related to any Indemnification Claim shall be made in full, without any set off, counterclaim, restriction or condition and without any deduction or withholding (save as may be required by Law or as otherwise agreed).

(l)     Buyer will consider in good faith whether to seek recovery under its insurance policies relating to any indemnifiable event for which it is seeking indemnification pursuant to Article VII. In the event that an insurance recovery is actually made by the Indemnified Party with respect to the same Losses for which a Buyer Indemnified Party has previously been indemnified under this Agreement, then a refund equal to the aggregate amount of the recovery shall be made as promptly as practicable to the applicable Seller or Sellers.

(m)     Losses to be paid pursuant to this Article VII shall not include punitive, incidental, consequential, special, or direct damages except to the extent such damages are actually paid to a third party.

Section 7.5     Procedure for Indemnification.

(a)     An Indemnified Party shall notify the Indemnified Party of the claim in writing promptly after receiving notice of any action, lawsuit, proceeding, investigation, demand or other claim against the Indemnified Party by a third party (excluding any Relevant Target Tax Dispute) (a "Third Party Claim"), describing the Third Party Claim, the amount thereof (if known and quantifiable) and the basis thereof in reasonable detail; provided that the failure to so notify an Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder except to the extent that (and only to the extent that) such failure shall have caused the indemnifiable Losses to be greater than such Losses would have been had the Indemnified Party given the Indemnifying Party prompt notice hereunder.

(b)     Any Indemnifying Party shall be entitled to participate in the defense of such Third Party Claim at such Indemnifying Party's expense, and at its option shall be entitled to assume the defense thereof; provided that (i) the Indemnifying Party acknowledges in writing its obligation to indemnify the Indemnified Party for all Losses related to such Third Party Claim and (ii) the Indemnified Party shall be entitled to participate in the defense of such Third Party Claim and to employ counsel of its choice for such purpose (provided that the fees and expenses of such separate counsel shall be borne by the Indemnified Party and shall not be recoverable from such Indemnifying Party under this Article VII).  Notwithstanding the foregoing, if the Indemnified Party shall have determined in good faith and upon advice of counsel that (x) an actual or likely conflict of interest makes representation of the Indemnifying Party and the Indemnified Party by the same counsel inappropriate or (y) the defendants in, or targets of, any such action or proceeding include both the Indemnified Party and an Indemnifying Party, and the Indemnified Party's counsel shall have reasonably concluded that there may be legal defenses available to it or to other Indemnified Parties which are different from or additional to those available to the Indemnifying Party (in which case the Indemnifying Party shall not have the right to direct the defense of such action or proceeding on behalf of the Indemnified Party), then, in each case, the Indemnified Party may, upon notice to the Indemnifying Party, engage one (1)

57

separate counsel, and the reasonable fees and expenses of such separate counsel shall be borne by the Indemnifying Party to the extent the Third Party Claim is indemnifiable hereunder.

(c)    Upon assumption of the defense of any such Third Party Claim by the Indemnifying Party, the Indemnified Party will not pay, or permit to be paid, any part of the Third Party Claim, unless the Indemnifying Party consents in writing (such consent not to be unreasonably withheld or delayed) to such payment or unless a final judgment from which no appeal may be taken by or on behalf of the Indemnified Party is entered against the Indemnified Party for such Liability.  Notwithstanding anything to the contrary herein, the Indemnifying Party shall not compromise or settle, or admit any Liability with respect to, any Third Party Claim without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed), unless (x) the relief consists solely of money damages (all of which the Indemnifying Party shall pay), (y) such settlement or compromise includes a provision whereby the plaintiff or claimant in the matter releases the Indemnified Party from all Liability with respect thereto and (z) such settlement or compromise does not include any admission of fault or wrongdoing on the part of the Indemnified Party.

(d)    In all cases with respect to Third Party Claims, the Parties shall provide reasonable cooperation to each other in defense of such Third Party Claims, including by making employees, information and documentation reasonably available (including for purposes of fact finding, consultation, interviews, depositions and, if required, as witnesses) and providing such information, testimony and access to their books and records, during normal business hours and upon reasonable notice, in each case as shall be reasonably necessary in connection with the contest or defense.

(e)    If the Indemnifying Party shall not reasonably assume the defense of any such Third Party Claim, or fails to prosecute or withdraws from the defense of any such Third Party Claim, the Indemnified Party may defend against such matter, at the Indemnifying Party's expense, in a manner consistent with the above provisions regarding conduct of the defense by the Indemnified Party.

(f)    In the event that any Buyer Indemnified Party alleges that it is entitled to indemnification hereunder, and that its claim is covered under more than one provision of this Article VII, such party or Affiliates shall be entitled to elect the provision or provisions under which it may bring a claim for indemnification.

(g)    A claim for indemnification for any matter not involving a Third Party Claim may be asserted by notice to the party from whom indemnification is sought.

(h)    To the extent of any conflict between this Section 7.5 and Section 5.4(b), Section 5.4(b) shall control.

Section 7.6    Payment.

If uncontested, or once resolved either by agreement or receipt of an order or determination of a court of competent jurisdiction in accordance with Section 9.8, the amount of Losses (subject to the limitations set forth in Section 7.3) related to any Indemnification Claim

58

shall be paid to the respective Indemnified Party by the Indemnifying Party by wire transfer of immediately available funds within three Business Days.

Section 7.7    Remedies Exclusive.

From and after the Effective Time, except as provided in Section 9.10, the rights and remedies of the parties under this Article VII are exclusive and in lieu of any and all other rights and remedies which the parties may have under this Agreement and the other Ancillary Agreements against each other with respect to the Transactions, other than those which are as a result of Fraud, covenants and agreements contained in this Agreement that contemplate performance thereof following the Closing and rights and remedies of specific performance, injunctive relief or other non-monetary equitable relief, and each party expressly waives any and all other rights or causes of action it or its Affiliates, officers, directors and stockholders may have against the other party now or in the future under any Law with respect thereto.

Section 7.8    Tax Treatment of Indemnification Payments.

Any indemnification payment made pursuant to this Article VII shall be treated for all Tax purposes as an adjustment to the purchase price, except as otherwise required by applicable Tax Law.

ARTICLE VIII

TERMINATION

Section 8.1    Termination.  This Agreement may be terminated at any time prior to the Closing (by delivering written notice of such termination to the other parties hereto):

(a)    by mutual written consent of Buyer and the Sellers;

(b)    by either Buyer or the Sellers, if the Closing shall not have occurred on or prior to 5:00 p.m. (Eastern Time) on September 30, 2022 (the "Termination Date"); provided that this Section 8.1(b) shall not be available to (x) Buyer if a material breach of an obligation of any member of the Buyer Group, or (y) the Sellers' if a material breach of an obligation of any Sellers or any of their respective Affiliates, in each case, under this Agreement that primarily caused the failure of the Closing to be consummated by such time;

(c)    by either Buyer or the Sellers, if consummation of the Transactions would violate any final non-appealable Order or other legal restraint or prohibition on the consummation of the Transactions or if any Law shall have been enacted or promulgated by any Governmental Authority that prohibits or makes illegal the consummation of the Transactions;

(d)    by the Sellers if any of the conditions set forth in Section 6.1 or Section 6.3 cannot be satisfied and have not been waived pursuant to Section 9.3 and such inability is not capable of being cured prior to the Termination Date or has not been cured within thirty (30) days after the receipt of written notice thereof from the Sellers; provided that none of the Sellers or any of their respective Affiliates is in material breach of its obligations under this Agreement at the time of such termination; or

59

(e)    by Buyer if any of the conditions set forth in <u>Section 6.1</u> or <u>Section 6.1(c)</u> cannot be satisfied and have not been waived pursuant to <u>Section 9.3</u> and such inability is not capable of being cured prior to the Termination Date or has not been cured within thirty (30) days after the receipt of written notice thereof from Buyer; <u>provided</u> that Buyer is not in material breach of its obligations under this Agreement at the time of such termination.

Section 8.2    <u>Effect of Termination</u>.  In the event of the termination of this Agreement in accordance with <u>Section 8.1</u>, this Agreement shall thereafter become void and have no effect, and no party hereto (and, for the avoidance of doubt, none of their Representatives) shall have any Liabilities to any other party hereto (or, for the avoidance of doubt, any of their Representatives) except Liabilities of any party hereto to another party hereto (a) arising after the date of termination under the provisions of <u>Section 5.5</u> (Public Announcements), this <u>Section 8.2</u>, the first sentence of <u>Section 9.2</u> and <u>Article IX</u>, which provisions shall survive such termination of this Agreement, and (b) arising out of its Fraud.

ARTICLE IX

MISCELLANEOUS

Section 9.1    <u>Notices</u>.  All notices and communications hereunder shall be deemed to have been duly given and made if in writing and if served by personal delivery upon the party for whom it is intended or delivered by overnight courier or registered mail, upon confirmation of delivery, or if sent by email, to the Person at the address or email set forth below, or such other address or email as may be designated in writing hereafter, in the same manner, by such Person:

To Buyer:

> Exeter Property Group, LLC
> c/o EQT AB
> Regeringsgatan 25
> Stockholm, 111 53
> Sweden
> Email:    legal@eqtpartners.com;    paul.dali@eqtpartners.com; brian.fogarty@eqtexeter.com
> Attn: Paul Dali and Brian Fogarty

With a copy to (which shall not constitute notice):

> Debevoise & Plimpton LLP
> 919 Third Avenue
> New York, NY 10022
> Email:  wdregner@debevoise.com; gpburges@debevoise.com
> Attention:  William Regner and Geoffrey P. Burgess

To the Principal Sellers:

> As set forth in <u>Annex I</u> hereto.

60

With copies to (which shall not constitute notice):

>
> DLA Piper LLP (US)
> 444 West Lake Street
> Suite 900
> Chicago, IL 60606
> Attention: Jesse Criz; Dan Cole; Emily Snyder
> Email: jesse.criz@us.dlapiper.com; daniel.cole@us.dlapiper.com;
> emily.snyder@us.dlapiper.com

and

>
> DLA Piper LLP (US)
> 1251 Avenue of the Americas
> New York, NY 10020
> Attention: Jon Venick
> Email: jon.venick@us.dlapiper.com

To the TriPost Seller:

>
> TriPost Capital RCG Investments LP
> c/o TriPost Capital Partners LLC
> 654 Madison Avenue, 4th Floor
> New York, NY  10065
> Attention:  Todd D. Silverman; Bradley H. Carroll
> Email: tsilverman@tripost.com; bcarroll@tripost.com

With a copy to (which shall not constitute notice):

>
> Hunton Andrews Kurth LLP
> 951 East Byrd Street
> Richmond, VA 23219
> Attention: James S. Seevers, Jr.; Wyatt A. Deal
> Email: jseevers@hunton.com; wdeal@hunton.com

or to such other Person or address as any party shall specify by notice in writing to the other parties in accordance with this Section 9.1.  All notices and other communications will be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day.  Otherwise, any notice or communication will be deemed not to have been received until the next succeeding Business Day.

Section 9.2    Fees and Expenses.  Except as otherwise expressly provided in this Agreement, whether or not the Transactions are consummated, all costs and expenses incurred in connection with this Agreement and the Transactions shall be borne by the party incurring such costs and expenses.  Without limitation to the foregoing, the Principal Sellers shall bear: (a) all fees and expenses of the Sellers and the Target Group Entities relating to (i) the negotiation, preparation and execution of this Agreement and the Ancillary Agreements and all other documents relating to the Transactions, (ii) the transactions contemplated with other potential

61

acquirers of any of the Target Group Entities or the businesses or material assets thereof and (iii) any transaction, incentive, retention, severance or similar payments payable to any employee or other individual service provider by or on behalf of any Target Group Entity in connection with the consummation of the Transactions (whether prior to or upon such consummation, and whether or not in connection with another event, but excluding a termination of employment following the Closing), together with the employer's portion of any payroll, social security, unemployment or other similar Taxes associated with such payments; (b) all fees and expenses of the Seller and any employee of any Target Group Entity (including with respect to employment arrangements) that any of the Target Group Entities has agreed, or is otherwise obligated, to pay; (c) all fees, costs, and expenses associated with obtaining the Project Company Consents other than the fees expressly set forth on Schedule 9.2, (d) in accordance with Section 5.4(a), fifty percent (50%) of the Transfer Taxes payable in connection with the Transactions other than the Pre-Closing Restructuring and one hundred percent (100%) of the Transfer Taxes imposed on the Pre-Closing Restructuring, (e) one hundred percent (100%) of the fees and expenses payable to The CenterCap Group, LLC in connection with the Transactions and (f) all other fees and expenses of the Seller or the Target Group Entities borne by the Seller or the Target Group entities unless expressly agreed otherwise in this Agreement or any Ancillary Agreement (collectively, the "Transaction Expenses"). Without limitation to the foregoing, Buyer shall bear: (w) in accordance with Section 5.4(a), fifty percent (50%) of the Transfer Taxes payable in connection with the Transactions other the Pre-Closing Restructuring; (x) all fees, costs, and expenses payable in connection with obtaining the D&O Insurance, up to a maximum amount equal to 250% of the premiums currently paid for such insurance policies on an annualized basis (and any amount in excess of 250% of the premiums currently paid for such insurance policies on an annualized basis shall be a Transaction Expense); and (y) all fees associated with obtaining the Project Company Consents expressly set forth on Schedule 9.2.

Section 9.3    Amendment; Waiver.  Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed by Buyer and all Sellers; provided, however, that all Sellers may waive in writing the performance by Buyer of its representations, warranties, covenants or other agreements and that Buyer may waive in writing the performance by the Sellers of their representations, warranties, covenants or other agreements.  No waiver by any party of any breach or violation of, default under or inaccuracy in any representation, warranty, covenant or agreement hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent breach, violation, default of or inaccuracy in any such representation, warranty, covenant or agreement hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.  Except as set forth in Article IX, no failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

Section 9.4    No Assignment or Benefit to Third Parties.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Neither the Sellers nor Buyer may assign any of its rights or delegate any of its obligations under this Agreement, by operation of Law or otherwise (other than, in respect of a Seller, an assignment by operation of Law pursuant to testamentary disposition, the laws of descent and distribution or otherwise upon a party's death or disability), without the prior written consent of Buyer or the Sellers, as applicable; provided, however, that Buyer may assign any of

its rights or obligations under this Agreement to an Affiliate; provided, further, that any such assignment shall not relieve Buyer from any of its or obligations under this Agreement. Except as expressly set forth in Section 5.6, nothing in this Agreement, express or implied, is intended to confer upon any Person other than Buyer, the Sellers and their respective successors and permitted assigns any rights or remedies under or by reason of this Agreement.

Section 9.5    Entire Agreement. This Agreement (including all Schedules, the Seller Disclosure Letters and Exhibits hereto and the other documents and instruments referred to herein) and the Ancillary Agreements (once executed) constitute the entire agreement among the parties hereto with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, oral or written, with respect to such matters, except for the Confidentiality Agreement, which shall remain in full force and effect until the Closing.

Section 9.6    Confidentiality. Subject in all respects to Section 5.5 (Public Announcements) and except for disclosures by a party on a "need to know" basis to its Representatives, Investors and prospective Investors that are bound by customary confidentiality obligations, from and after the Closing, the parties shall, and shall cause their Representatives, Investors and prospective Investors to, keep confidential and not disclose any of the contents hereof and of the Ancillary Agreements; provided that this Section 9.6 shall not apply to (x) information that is or becomes publicly available other than as a result of a disclosure by Buyer or the Sellers, as applicable, in breach of this Section 9.6 (a) in performance of a Seller's duties under employment or consulting arrangements with Buyer or any of its Subsidiaries, or (b) in connection with disclosure to the applicable tribunal in any dispute relating to this Agreement or the Ancillary Agreements and the Transactions. Nothing contained herein shall prohibit any party, following notification to the other parties if practicable, from making any disclosure required by Law (including stock exchange or SEC rules) or requested by any applicable Governmental Authority or advisable to be made to any applicable Governmental Authority; provided that if a party (a "Disclosing Party") is requested or required to disclose all or any part of any of the contents hereof or of the Ancillary Agreements, the Disclosing Party shall: (i) provide Buyer, if a Seller is the Disclosing Party, or the Sellers, if a Buyer is the Disclosing Party (the "Non-Disclosing Party") with prompt written notice, to the extent permitted by Law, of any such request or requirement, including the details of such request and requirement, so that the Non-Disclosing Party or its Representatives may seek an appropriate protective order or other appropriate remedy or waive compliance with the provisions of this Agreement; (ii) reasonably consult and cooperate with the Non-Disclosing Party or its Representatives regarding the content, timing and manner of any such disclosure and take into account all reasonable requests of the Non-Disclosing Party or its Representatives in relation thereto; (iii) reasonably consult and cooperate with the Non-Disclosing Party or its Representatives as to the advisability of taking legally available steps to resist or narrow such request or requirement; and (iv) reasonably cooperate with the Non-Disclosing Party or its Representatives regarding any other action which the Non-Disclosing Party or its Representatives may reasonably elect to take or request the Disclosing Party and its Representatives or a relevant Third Party to take to challenge the validity of such request or requirement. Notwithstanding the foregoing, each party may make any disclosures to any Governmental Authorities having supervision over such party. For the avoidance of doubt, if the Non-Disclosing Party or its Representatives elect to seek a protective order or otherwise challenge the disclosure request, the Disclosing Party and its Representatives shall reasonably cooperate with the Non-Disclosing Party in obtaining such an order or other

63

remedy.  In the event that such protective order or other remedy is not obtained or the Non-Disclosing Party waives compliance with the provisions hereof, the Disclosing Party will disclose only that portion of the contents hereof and of the Ancillary Agreements which its legal counsel advises is legally required or requested to be disclosed; provided that the Disclosing Party shall use its reasonable best efforts to obtain reasonable assurances that strict confidential treatment will be accorded to such disclosed contents hereof and of the Ancillary Agreements. The parties agree that the Confidentiality Agreement shall remain in full force and effect from and after the date hereof but shall terminate upon the Closing.

Section 9.7    Disclosure Letter.   The disclosure of any matter in any section or subsection of the Seller Disclosure Letter to this Agreement shall be deemed to be a disclosure for all purposes of this Agreement with respect to any other section or subsection to which such disclosure is reasonably apparent on its face.  Neither the specification of any dollar amount in any representation, warranty or covenant contained in this Agreement nor the disclosure of any item or matter in the Seller Disclosure Letter (a) shall be construed as an admission, representation or indication that such item or other matter is "material," (b) is or is not in the ordinary course, (c) would reasonably be expected, individually or in the aggregate, to have a Target Material Adverse Effect, (d) that such item will in fact exceed any applicable threshold limitation set forth in this Agreement, (e) be material to the Sellers or the Target Group Entities (either individually or taken as a whole), or (f) prohibit or materially impair the Sellers' ability to consummate the Transactions or perform their obligations hereunder on a timely basis or that such item or other matter is required to be referred to or disclosed in the Seller Disclosure Letter. The disclosure of any item or matter relating to any possible breach or violation of any Law, Order, or Contract shall not be construed as an admission or indication that any breach or violation exists or has actually occurred or is outside the ordinary course of business. Neither Sellers nor the Target Group Entities shall be prejudiced in any manner whatsoever, and no presumptions shall be created, by virtue of the disclosure of any matter in the Seller Disclosure Letter which otherwise is not required to be disclosed by this Agreement. Nothing in the Seller Disclosure Letter shall broaden the scope of any representation, warranty or covenant of Sellers or the Target Group Entities contained in this Agreement.

Section 9.8    Governing Law; Jurisdiction.

(a)    This Agreement and any dispute shall be governed and construed in accordance with the Laws of the State of Delaware without regard to principles of conflicts of law.

(b)    Each of the parties irrevocably agrees that any legal action or proceeding arising out of, in connection with, or relating to this Agreement brought by any other party or its successors or assigns shall be brought and determined exclusively by the Court of Chancery of the State of Delaware (or if such court will not accept jurisdiction, any federal court, or if such courts will not accept jurisdiction, any state court, in each case in the State of Delaware), and each of the parties (on behalf of itself and any Person claiming by, through or on behalf of such party) hereby irrevocably submits to the exclusive jurisdiction of the aforesaid court for itself and with respect to its property, generally and unconditionally, with regard to any such action or proceeding arising out of or relating to this Agreement and the Transactions (and agrees not to commence any action, suit or proceeding relating thereto except in such courts).  Each of the

64

1007814448v22

parties further agrees to accept service of process in any manner permitted by such court.  Each of the parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any action or proceeding arising out of or relating to this Agreement or the Transactions, (a) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure lawfully to serve process, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such court (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by Law, that (i) the suit, action or proceeding in any such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.  A final judgment in any such action or proceeding will be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

Section 9.9    Waiver of Trial by Jury.  EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN), ACTIONS OR OMISSIONS OF ANY PARTY IN CONNECTION WITH ANY OF SUCH AGREEMENTS.

Section 9.10    Specific Performance.    Notwithstanding anything to the contrary contained in this Agreement, the parties to this Agreement each acknowledge that each party would not have an adequate remedy at law for money damages in the event that any of the covenants, agreements or obligations hereunder have not been performed in accordance with their terms, and therefore agree that the other parties shall be entitled to seek specific performance of the terms hereof with respect to any breach of this Agreement and any other equitable remedy to which such parties may be entitled (without any requirement for posting of a bond) and the parties expressly waive the defense that a remedy in damages will be adequate or that an award of specific performance is not an appropriate remedy for any reason at law or in equity.

Section 9.11    Counterparts.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same Agreement.  This Agreement shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered to the other parties hereto, it being understood that all parties hereto need not sign the same counterpart.  This Agreement may be executed by electronic or .pdf signature by any party hereto and such signature shall be deemed binding for all purposes hereof without delivery of an original signature being thereafter required.

1007814448v22

Section 9.12    Construction.

(a)    Unless otherwise indicated, "Articles," "Sections," "Exhibits," "Schedules" or "Seller Disclosure Letter" mean and refer to designated Articles, Sections, Subsections, Exhibits, Schedules or the Seller Disclosure Letter of this Agreement.  The heading references herein and the table of contents hereof are for convenience purposes only, and shall not be deemed to limit or affect any of the provisions hereof.

(b)    Common nouns and pronouns and any variations thereof shall be deemed to refer to masculine, feminine or neuter, singular or plural, as the identity of the Person, Persons or other reference in the context requires.  Any reference to the Code or other statutes or Laws, forms or schedules shall include the amendments, modifications or replacements thereof. Whenever used herein, "or" shall include both the conjunctive and disjunctive and "any" shall mean "one or more."  Unless the express context otherwise requires:

(i)    the words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement;

(ii)    the terms defined in the singular have a comparable meaning when used in the plural, and vice versa;

(iii)    the terms "Dollars" and "$" mean United States Dollars;

(iv)    wherever the word "include," "includes," or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation";

(v)    the use of the word "or" will not be exclusive; and

(vi)    the phrase "to the extent" means the extent to which something extends or exists, and not simply "if"; and references herein to any gender include each other gender.

(c)    Each of the parties has participated in the drafting and negotiation of this Agreement; in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if it is drafted jointly by both parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the involvement of the parties hereto in the drafting of any of the provisions of this Agreement.

(d)    The word "party" is to be deemed to refer to a party hereto, unless the context requires otherwise.  The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(e)    References to "ordinary course" and "past practice" shall, solely when referring to periods prior to the date hereof, be deemed to take into account the circumstances, including any responses to the occurrence, continuation or worsening of COVID-19.

66

Section 9.13    <u>Severability</u>.  The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

ARTICLE X

DEFINITIONS AND TERMS

Section 10.1    <u>Certain Definitions</u>.  As used in this Agreement, the following terms have the meanings set forth below:

"<u>Acceleration Event</u>" means a direct or indirect sale or transfer (in a single transaction or through a series of related transactions, pursuant to a merger, equity sale or otherwise) to any third party of: (A) securities representing greater than 50% of the outstanding voting power, or economic interest in (whether by way of a sale of securities, merger or otherwise) the Company; or (B) all or substantially all of the assets of the Target Group Entities, taken as a whole.

"<u>Accounting Firm</u>" means any "big four" accounting firm mutually agreed by Buyer and the Principal Sellers in good faith or, if each such accounting firm is conflicted or unable or unwilling to act,  such other independent and nationally prominent accounting firm with expertise in disputes of the type contemplated by <u>Section 1.4</u> and which is mutually acceptable to the Principal Sellers and Buyer.

"<u>Accounting Principles</u>" means the accounting principles, policies and procedures set forth on <u>Exhibit A</u>.

"<u>Acquisition Coordinator</u>" means a third-party bank or other third-party institution managing and coordinating the acquisition of EQT Shares on behalf of the Mr. Carlson and the Incentive Plan Participants pursuant to <u>Section 1.5(c)</u>, appointed jointly by Buyer and Mr. Carlson (each acting reasonably and in good faith), the costs of which shall be borne by Buyer.

"<u>Acquisition Proposal</u>" means any inquiry, proposal or offer (in each case, other than from Buyer and its Representatives) relating to the direct or indirect acquisition, whether structured as a sale of equity, merger, recapitalization, business combination, liquidation, dissolution, reorganization or otherwise, by any Person or "group" (as defined under Section 13(d) of the Exchange Act) of (a) twenty percent (20%) or more of the Company Interests or (b) any material portion of the assets or properties of the Target Group Entities.

"<u>Advisers Act</u>" means the Investment Advisers Act of 1940, as amended.

67

"Affiliate" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with, such other Person; provided that (i) none of the Target Project Companies or any Portfolio Investments shall be deemed Affiliates of the Target Group Entities or Sellers, (ii) none of the Target Group Entities nor the Sellers shall be deemed Affiliates of the Target Project Companies or any Portfolio Investments and (iii) none of the investment funds, investment vehicles or investment accounts affiliated with or managed or advised by Buyer or any of its Affiliates (or any portfolio companies or investments thereof) shall be deemed Affiliates of Buyer. For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities or by Contract or otherwise.

"Agreement" means this Purchase Agreement, as the same may be amended or supplemented from time to time in accordance with the terms hereof.

"Ancillary Agreements" means the Escrow Agreement and A&R Residential LLC Agreement.

"Base Purchase Price" means $34,250,000.

"Benefit Plans" means each "employee benefit plan" (within the meaning of Section 3(3) of ERISA, including multiemployer plans within the meaning of Section 3(37) of ERISA), any welfare plans within the meaning of Section 3(1) of ERISA, all pension plans within the meaning of Section 3(2) of ERISA and all equity or equity-based, employment, change-in-control, fringe benefit, bonus, incentive, deferred compensation, retirement, profit sharing, manager's incentive fee sharing, retention, employee loan or advance and all other employee, partner, member or individual independent contractor benefit plans, agreements, policies or other arrangements, whether or not subject to ERISA (including any funding mechanism therefor now in effect or required in the future as a result of the Transactions or otherwise).

"Business" means the business activities and operations of the Target Group Entities as conducted during the twelve (12) month period prior to the date hereof.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks in New York City or Stockholm, Sweden are authorized or obligated by Law to close.

"Buyer Group" means Buyer and its Affiliates.

"Buyer Group Entity" means any member of the Buyer Group.

"Buyer Indemnified Party" means Buyer and its Affiliates and their respective officers, directors, agents and employees, successors and assigns of each of the foregoing.

"Buyer Material Adverse Effect" means any change, effect or circumstance that has had or would reasonably be expected to have a material adverse effect on the ability of Buyer to consummate the Transactions.

1007814448v22

"Capital Commitment" means, with respect to any Person and any Target Project Company or Target Group Entity, the nominal amount of funds that have been committed to be contributed by such Person to such Target Project Company or Target Group Entity, as evidenced by an obligation to do so under applicable Organizational Documents, a subscription agreement or other customary form of commitment.

"CARES Act" means the Coronavirus Aid, Relief, and Economic Security Act (Public Law 116-136).

"Cash" means all cash, cash equivalents and marketable securities. "Cash" shall: (a) include (i) the amount of all received but uncleared checks and wires received by a Person at or prior to the Determination Time, (ii) any receivable under any interest rate, currency or other similar hedging arrangement or Contract, (iii) cash deposited with landlords as security, (iv) earnest money deposits made during property acquisition negotiations, and (v) any receivable attributable to the Eleven85 project (or related entities), located in Atlanta, Georgia; and (b) exclude (i) the amount of all issued but uncleared checks and wires issued by such Person prior to the Determination Time and (ii) cash equivalents and marketable securities and short term investments not convertible to cash within thirty (30) days.

"Closing Cash" means all Cash of the Target Group Entities calculated as of the Determination Time.

"Closing Debt" means all outstanding Debt of the Target Group Entities calculated as of the Determination Time; provided that items consisting of Taxes shall be calculated as of the end of the day on the Closing Date.

"Closing Working Capital" means Working Capital calculated as of the Determination Time; provided that items consisting of Taxes shall be calculated as of the end of the day on the Closing Date.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Interests" means the issued and outstanding limited liability company interests in the Company and all other Equity Interests in the Company.

"Company LLC Agreement" means that certain Second Amended and Restated Limited Liability Company Agreement, dated as of November 10, 2020, of the Company, as amended from time to time.

"Confidentiality Agreement" means the Confidentiality Agreement between Redwood Capital Group, LLC and Exeter MF Ventures, LLC, dated June 19, 2020.

"Consent" means all consents, notices, authorizations, novations, orders, waivers, approvals, accreditations, certificates, declarations or expirations or terminations of waiting periods.

"Continuing Employee" means an individual providing personal services directly to the Target Group Entities, whether as an employee, partner or member, immediately prior to

69

1007814448v22

the Closing who continues his or her services with Buyer (or its applicable Affiliates) and its Subsidiaries immediately following the Closing.

"Contracts" means all legally binding agreements, contracts, deeds, indentures, notes, mortgages, bonds, leases and subleases, purchase orders, arrangements, commitments, undertakings, instruments, understandings, promises, obligations and licenses (other than this Agreement), whether written or oral.

"Controlled Group" means any trade or business (whether or not incorporated) (i) under common control within the meaning of Section 4001(b)(1) of ERISA with the Target Group Entities or (ii) which together with the Target Group Entities is treated as a single employer under Section 414(t) of the Code.

"COVID-19" means the pandemic caused by SARS-CoV-2 or COVID-19, and any evolutions, variants or mutations thereof.

"Debt" means, with respect to any Person, all obligations of such Person (a) for borrowed money or in respect of loans or advances (including the Outstanding Facilities, in the case of the Target Group Entities), (b) evidenced by notes, bonds, debentures or similar Contracts, (c) under any interest rate, currency or other similar hedging arrangement or Contract (with the amount of such obligation, if any, determined in accordance with the Accounting Principles as if such arrangement or Contract were terminated in accordance with its terms at the Closing), including all liabilities and deferred revenue thereunder, for (A) defined benefit pension liabilities, deferred compensation, unpaid incentive compensation, earned but not recorded personnel bonuses and unpaid severance obligations, (B) accrued but unpaid employee bonuses or guaranteed payments to partners or members and (C) employee bonuses or other enhanced compensation payable in connection with the consummation of the Transactions, in each case, together with the employer's portion of any payroll, security, unemployment or other similar Taxes associated with such obligations (computed as though all such amounts were payable as of the Closing), (d) under any performance bond, surety bond, bankers' acceptance or letter of credit, but in each case only to the extent actually drawn and outstanding, (e) for the deferred purchase price for property or services, except for current liabilities or other trade payables in each case included in the calculation of Working Capital, (f) in the nature of guarantees or other similar obligations for any of the items described in clauses (a) through (e) above, (g) for accrued but unpaid interest, expenses, premiums, penalties, breakage costs and other obligations arising with respect to any of the items described in clauses (a) and (b) above that are required to be paid at Closing, (h) for any and all accrued and unpaid Income Taxes of the Target Group Entities for any Pre-Closing Tax Period, which Taxes shall (A) not be less than zero, (B) exclude any deferred Tax assets or liabilities, (C) take into account any estimated payments or prepayments of Tax, (D) treat any Transaction Expenses as allocable to the Pre-Closing Tax Period, except as otherwise required by applicable Tax Law, (E) be calculated in accordance with the past practice of the Target Group Entities to the extent consistent with applicable Law, and (F) exclude any Taxes arising as a result of any action taken by Buyer after the Closing on the Closing Date, (i) for any payroll Taxes deferred under the CARES Act and not paid prior to the Closing Date, (j) for any accrued placement fees, (k) for the amount of any negative cash balance resulting from the operations of the Target Group Entities and (l) for balances due to short-term financing for earnest money deposits and short-term accruals made at

70

the sale of a property to cover post-sale fees.  Notwithstanding the foregoing, no item included in Transaction Expenses or in Working Capital shall be included in Debt.  An example of the calculation to determine "Debt" is attached hereto as Exhibit G.

"Determination Time" means 11:59 p.m. Eastern Time on the Business Day immediately prior to the Closing Date.

"Encumbrance" means any lien, pledge, license, charge, security interest, mortgage, deed of trust, easement, license, option, title imperfection or defect, hypothecation, encroachment or encumbrance of any kind.

"Enforceability Limitations" means (a) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and (b) general equitable principles governing specific performance, injunctive relief and other equitable remedies (including principles of reasonableness, good faith and fair dealing) regardless of whether enforcement is sought in equity or at law.

"Equity Interests" means, with respect to any Person, capital stock of, partnership interests, membership interests, beneficial interests or other equity or ownership interests in such Person.

"EQT" means EQT AB, a public limited company incorporated in Sweden with registered number 556849-4180 whose registered office is at Box 16409, 103, 27 Stockholm, Sweden.

"EQT Shares" means the ordinary shares of EQT.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" means Acquiom Clearinghouse LLC or its Affiliate.

"Escrow Agreement" means an escrow agreement to be entered into by and among Buyer, the Principal Sellers and the Escrow Agent.

"Escrow Amount" means $500,000.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

"Final Partnership Income Tax Return" means the U.S. income Tax Return of a Relevant Target Group Entity (and related Schedule K-1s) for the Tax period ending on the Closing Date.

"Fraud" means, with respect to a Person, actual and intentional fraud under Delaware common law by such Person.

71

"Fundamental Representations" means, with respect to the Sellers, those representations contained in Section 2.2 (*Authorization*), Section 2.4(a) (*Non-Contravention*), Section 2.5 (*Binding Effect*), Section 2.6 (*Ownership of Company Interests*), 0 (*Organization; Qualification*), Section 2.12 (*Finders' Fees*), Section 3.2(a) (*Capitalization*), and Section 3.3(a) (*Non-Contravention*), and, with respect to Buyer, those representations contained in Section 4.2(a) (*Authorization*), 0 (*Non-Contravention*), 0 (*Binding Effect*) and Section 4.9 (*Finders' Fees*).

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time.

"Governmental Approvals" means all Consents of Governmental Authorities that are required in order to consummate the Transactions.

"Governmental Authority" means any federal, national, supranational, transnational, domestic, foreign, state, provincial, local, county, municipal or other government, any governmental, regulatory or administrative authority, agency, department, bureau, board, commission or official or any quasi-governmental or private body, including any political subdivision thereof or any self-regulatory organization, exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority or powers, or any court tribunal, judicial or arbitral body.

"Income Tax" means any Tax that is imposed on net income (however denominated) and any franchise Tax, gross receipts Tax or any other similar tax imposed in lieu thereof.

"Initial Core Fund" shall have the meaning ascribed thereto in the definition of Initial Core Triggering Event.

"Initial Core Triggering Event" means the first closing (if any) by the Company or an Affiliate thereof of a newly formed Core, Core+ Multifamily Fund I or similar new investment vehicle at any time within twelve (12) months of such investment vehicle's launch and, in any event, within thirty (30) months of the Closing, if the Initial WH Triggering Event has occurred prior to twelve (12) months of such investment vehicle's launch date, then prior to the second anniversary of the Closing Date (such fund or vehicle, the "Initial Core Fund").

"Initial WH Fund" shall have the meaning ascribed thereto in the definition of Initial WH Triggering Event.

"Initial WH Triggering Event" means the first closing (if any) by the Company or an Affiliate thereof of a newly formed Workforce Housing Value Fund or similar new investment vehicle at any time within twelve (12) months of such investment vehicle's launch and, in any event, within thirty (30) months of the Closing (such fund or vehicle, the "Initial WH Fund").

"Intellectual Property" means, to the extent protectable by applicable Law, worldwide, all intellectual property rights, title and interest associated with or arising out of intellectual property, including: (a) trademarks, service marks, domain names, logos, acronyms,

72

1007814448v22

tag-lines, slogans, trade names, trade dress, corporate names and other identifiers of source or origin of goods and services, including applications and registrations for the foregoing and including the goodwill of the business and symbolized thereby or associated therewith and all common-law rights related thereto; (b) patents and patent applications, divisions, revisions, renewals, extensions, continuations, continuations-in-part, re-examinations, provisionals, re-issues and foreign counterparts; (c) copyrights, copyrightable works, database and design rights and rights in copyrightable subject matter in published and unpublished works of authorship, including all data collections, "moral" rights and copyright registrations and applications thereof; (d) trade secrets, know-how, methods, inventions, processes and all corresponding rights in confidential information and other non-public or proprietary information ("Trade Secrets"); and (e) all other intellectual property rights.

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"Investor" means any Person to which any Target Group Entity provides investment management services in connection with the operation of the Business; provided that in the case of a Target Project Company, the definition of Investor includes each investor in respect of its investment in such Target Project Company, but not the Target Project Company itself.

"IT Assets" means all computers, hardware, software, workstations, routers, hubs, switches, circuits, databases, data communication lines, websites, applications, systems, networks and other information technology and telecommunications assets.

"Knowledge" or any similar phrase means (a) in the case of the Principal Sellers, the knowledge of the individuals listed on Annex IV after reasonable inquiry as of the date hereof, (b) in the case of the TriPost Seller, the knowledge of each of Bradley H. Carroll and Todd D. Silverman after reasonable inquiry as of the date hereof, and (c) in the case of Buyer, the knowledge of the officers of Buyer after reasonable inquiry as of the date hereof.

"Law" means any law, statute, ordinance, rule, regulation, code, Order or decree enacted, issued, promulgated, enforced or entered by a Governmental Authority.

"Liabilities" means any and all debts, liabilities, commitments and obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including whether arising out of any contract or tort, based on negligence or strict liability) and whether or not the same would be required by GAAP to be reflected in financial statements or disclosed in the notes thereto.

"Litigation" means any action, cause of action, arbitration, hearing, claim, demand, subpoena, suit, proceeding, audit, inquiry or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, in law or in equity.

"Malware" means any virus, Trojan horse, time bomb, key-lock, spyware, worm, malicious code or other software program designed to or able to, without the knowledge and

73

authorization of the Target Group Entities, disrupt, disable, harm, interfere with the operation of or install itself within or on any software, computer data, network memory or hardware.

"Off-the-Shelf IT Assets" means tangible IT Assets leased or licensed to a Target Group Entity from a Third Party on terms generally available to the public for annual and one-time fees less than $125,000.

"Off-the-Shelf Software" means software non-exclusively licensed to a Target Group Entity from a Third Party on terms generally available to the public for annual and one-time fees less than $125,000.

"Order" means any order, writ, judgment, injunction, decree, rule, ruling, directive, stipulation, determination or award made, issued or entered by or with any Governmental Authority, whether preliminary, interlocutory or final.

"ordinary course of business" or "ordinary course" with respect to any Person means the ordinary course of business consistent with past practice of such Person.

"Organizational Documents" means, with respect to any Person that is a corporation, its articles or certificate of incorporation or memorandum and articles of association, as the case may be, and bylaws; with respect to any Person that is a limited liability partnership, its certificate of partnership and limited liability partnership agreement together with any side letters thereof; with respect to any Person that is a partnership, its certificate of partnership and partnership agreement; with respect to any Person that is a limited liability company, its certificate of formation and limited liability company or operating agreement; with respect to any Person that is a trust or other entity, its declaration or agreement of trust or constituent document; and with respect to any other Person, its comparable organizational documents, in each case, as have been amended or restated.

"Outstanding Facilities" means the Business Loan Agreement, dated as of June 18, 2021, by and between Redwood Capital Group, LLC and CIBC Bank USA and the note payable with respect thereto.

"Payoff Letters" means, in respect of all amounts owing under the Outstanding Facilities, a customary payoff letter, in form and substance reasonably acceptable to Buyer, duly executed by the applicable lender or secured party thereof, that (i) reflects the amounts required in order to pay in full all amounts owing under the Outstanding Facilities as of the Closing and (ii) provides that, upon payment in full of the amounts indicated, all related Encumbrances with respect to the assets of the Target Group Entities and the Target Project Companies shall be terminated and of no further force and effect.

"Permits" means, with respect to any Person, any licenses, permits, Consents or other similar authorizations issued by or obtained from a Governmental Authority (including under the Advisers Act) in connection with owning, leasing, conducting, managing or operating the business or assets of such Person.

"Permitted Encumbrances" means: (a) Encumbrances for Taxes, assessments or other claims by a Tax Authority (i) not yet due and payable or (ii) the amount or validity of

74

which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP; (b) mechanics', materialmen's, carriers', workers', repairers' and similar Encumbrances arising or incurred in the ordinary course of business, for which (i) payment of which is not past due or (ii) the amount or validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP; (c) zoning codes, building codes and other land use Laws of any Governmental Authority, in each case which are not violated in any material respect by the current use of the affected asset; (d) purchase money Encumbrances and Encumbrances securing rental payments under capitalized or operating lease arrangements; (e) Encumbrances arising under workers' compensation, unemployment insurance, social security, retirement and other similar employment Laws; (f) restrictions on transfer under applicable securities Laws; (g) Encumbrances identified in Section 10.1 of the Seller Disclosure Letter; (h) except with respect to Intellectual Property, Encumbrances that will be released or terminated at or prior to Closing; or (i) Encumbrances imposed by Buyer or any of its Subsidiaries.

"Person" means an individual, a corporation, a partnership, an association, a limited liability company, a Governmental Authority, a trust or other entity or organization.

"Personal Information" means any information that alone or in combination with other information identifies or can be used to identify individuals.

"Portfolio Investment" means any Person in which any Target Project Company makes an investment, directly or indirectly, from time to time (other than another Target Project Company) or which is an underlier or reference asset of any derivative security or other financial instrument in which any Target Project Company is invested, directly or indirectly, at any time (other than another Target Project Company).

"Pre-Closing Tax Period" means any taxable period (or portion thereof) ending on or before the Closing Date and the portion ending on the Closing Date of any taxable period that includes but does not end on the Closing Date.

"Pro Rata Percentage" means (i) for purposes of Section 7.2(a) with regards to any obligation hereunder of an individual Seller (e.g., the representations and warranties given by such Seller contained in Article II), 100%, (ii) for purposes of Section 7.2(b), 50% for each Principal Seller, and (iii) for purposes of Section 7.4(g) and any other obligation hereunder of all of the Sellers, 49% for the TriPost Seller and 25.5% for each Principal Seller.

"Purchase Price" means an amount equal to (a) the Base Purchase Price, *plus* (b) Closing Cash, *minus* (c) Closing Debt, *plus* (d) the amount, if any, by which Closing Working Capital is greater than Target Working Capital, *minus* (e) the amount, if any, by which Target Working Capital is greater than Closing Working Capital *minus* (f) Transaction Expenses.

"Representatives" means, with respect to a Person, such Person's Affiliates and its and their Affiliates' respective officers, directors, employees, counsel, partners, members, advisors (including financial advisors), auditors, agents and other representatives.

"SEC" means the United States Securities and Exchange Commission.

75

"Second Core Triggering Event" means the closing of the Initial Core Fund, if any, at which such Initial Core Fund shall have received fee-paying capital commitments of at least seven hundred and fifty million dollars ($750,000,000) in the aggregate (inclusive of all fee-paying capital commitments from prior closings for the Initial Core Fund), and in any event no later than the final closing of such fund (including any extensions to the initial fundraising period for the Initial Core Fund whether provided in the fund documents or otherwise approved or effected by Buyer).

"Second WH Triggering Event" means the closing of the Initial WH Fund, if any, at which such Initial WH Fund shall have received fee-paying capital commitments of at least seven hundred and fifty million dollars ($750,000,000) in the aggregate (inclusive of all fee-paying capital commitments from prior closings for the Initial WH Fund), and in any event no later than the final closing of such fund (including any extensions to the initial fundraising period for the Initial WH Fund whether provided in the fund documents or otherwise approved or effected by Buyer).

"Securities Act" means the United States Securities Act of 1933, as amended, and the rules and regulations thereunder.

"Security Incident" means any unauthorized access, disclosure, use, corruption, destruction or loss of any Personal Information, any unauthorized access to or use of the IT Assets, any successful denial-of-service attacks on any IT Assets or any incident that requires notification to any Person, Governmental Authority or any other entity under applicable data privacy or data security Laws.

"Seller Disclosure Letter" means the disclosure letter delivered by the Sellers to Buyer on the date hereof contemporaneously with the execution and delivery of this Agreement.

"Seller Indemnified Party" means Seller and its Affiliates (excluding, following the Closing, the Target Group Entities) and their respective officers, directors, agents and employees, successors and assigns of each of the foregoing.

"Subsidiary" means, with respect to any Person, any entity of which more than fifty percent (50%) of the outstanding Equity Interests or voting securities, or other voting ownership or voting partnership interests of which is sufficient to elect a majority of the board of directors (or comparable body) of such entity, are owned, directly or indirectly, through one or more intermediaries, by such Person; provided that for purposes of this Agreement, no Target Project Company or Portfolio Investment shall be deemed a Subsidiary of the Sellers or any Target Group Entity, and none of the investment funds, investment vehicles or investment accounts affiliated with or managed or advised by Buyer or any of its Affiliates (or any portfolio companies or investments thereof) shall be deemed Subsidiaries of Buyer or any of its Affiliates.

"Target Benefit Plans" means each Benefit Plan under which (i) any current or former employee, director, partner, member or individual independent contractor (or the eligible dependents or beneficiaries thereof) of the Target Group Entities has any present or future right to benefits and which are contributed to, sponsored by or maintained by the Target Group

76

Entities or (ii) the Target Group Entities have any present or future liability, whether contingent or otherwise.

"Target Group Entity" means the Company and its Subsidiaries.  For the avoidance of doubt, no Target Project Company (including any alternative investment vehicles or similar vehicles in respect of a Target Project Company or intermediate investment entities in respect of a Target Project Company or such other vehicles) and no Portfolio Investment shall be deemed a Target Group Entity.

"Target Management Contract" means a Contract (including all amendments, side letters and other similar agreements entered into in connection therewith) under which a Target Group Entity provides asset, construction, or property management services to a Target Project Company.

"Target Material Adverse Effect" means any change, effect, development, fact, condition, occurrence or circumstance that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on (a) the properties, assets, business, condition (financial or otherwise) or results of operations of the Target Group Entities, taken as a whole or (b) the ability of the Sellers to perform their obligations under this Agreement; provided that, in the case of the foregoing clause (a), any change, effect, development, fact, condition, occurrence or circumstance that results or arises from, directly or indirectly, any of the following, whether alone or in combination, shall be deemed to not constitute, and shall not be taken into account in determining whether there has been, or will be, any such material adverse effect: (i) factors generally affecting the economic, financial market, capital market, credit market, political, social, regulatory or business conditions in the United States or other jurisdictions; (ii) conditions generally affecting any of the industries in which any Target Group Entity operates; (iii) natural disasters, diseases, outbreaks, epidemics or pandemics (including COVID-19), or any worsening thereof, or any action taken by any Governmental Authority or quasi-governmental organization, including the Centers for Disease Control and Prevention, the World Health Organization and the Occupational Safety and Health Administration, in each case, in connection with or in response to the foregoing; (iv) hostilities, acts of war, sabotage or terrorism, military actions, protests or social unrest (whether or not violent) or any escalation or worsening of any such hostilities, acts of war, sabotage, terrorism, military actions, protests or social unrest (whether or not violent); (v) any stoppage, shutdown, or changes in operating practices of any Governmental Authority; (vi) any failure by the Business to meet business plans, expectations, budgets, forecasts or projections (financial or otherwise) (provided that this clause (vii) shall not prevent a determination that any change, effect, development, fact, condition, occurrence or circumstance underlying such failure to meet such business plans, expectations, budgets, forecasts or projections has resulted in a Target Material Adverse Effect unless any such change, effect, development, fact, condition, occurrence or circumstance is otherwise included in the exceptions set forth in this definition); (viii) changes in Law or accounting standards or interpretations thereof or the enforcement thereof applicable to the Target Group Entities; (ix) the execution of this Agreement and the Ancillary Agreements, the announcement of this Agreement and the Transactions and the performance or pendency of the Transactions (including any action or inaction as a result thereof by the employees, Investors or competitors of the Target Group Entities), the identity of Buyer or any facts or circumstances relating to Buyer or the announcement or other disclosure of Buyer's plans or intentions with respect to the conduct of

77

the Target Group Entities' business after the Closing; (x) any action required to be taken hereunder or in connection herewith, including any actions required to be taken in order to obtain any approvals pursuant to or to otherwise comply with any applicable antitrust Laws; and (xi) compliance by any Seller or Target Group Entity with the express requirements of this Agreement or any breach of this Agreement by Buyer, except, in the case of clauses (i), (ii), (iii), (iv) and (v), to the extent that such change, effect, event, matter, occurrence or state of facts has a materially disproportionate effect on the Target Group Entities, taken as a whole, relative to Persons in the industries in which the Target Group Entities operate generally.

"Target Project Company" means: (a) any investment vehicle, including a general or limited partnership, a limited liability company, a trust, a company or a commingled fund, organized in any jurisdiction, and any alternative investment vehicles, co-investment vehicles and parallel funds formed in connection with any of such entities (i) sponsored by any Target Group Entity, (ii) for which any Target Group Entity acts as a general partner, trustee or managing member (or in a similar capacity) or (iii) for which a Target Group Entity acts as an investment adviser, investment manager or otherwise provides investment advisory or sub-advisory services, including the Target Project Companies listed in Section 3.4(a) of the Seller Disclosure Letter; (b) any managed account or other investment vehicle through which any Target Group Entity manages any client capital (whether directly or indirectly), as listed in Section 3.4(a) of the Seller Disclosure Letter; or (c) any intermediate holding entity or vehicle through which any Person described in clauses (a) of (b) holds any interest, directly or indirectly, in any Portfolio Investment.

"Target Project Company Client" means, with respect to any Target Project Company, each Person that is an investor in such Target Project Company, with respect to its investment in such Target Project Company.

"Target Project Company Operative Documents" means, with respect to each Target Project Company, all Organizational Documents, Target Management Contracts, managed account agreements, subscription documents, investor side letters, memoranda and other advisory agreements and governing documentation with respect to any Target Project Company.

"Target Working Capital" means $150,000.

"Tax" or "Taxes" means all federal, state, local and non-U.S. income, alternative minimum, accumulated earnings, personal holding company, capital stock, gross receipts, sales, use, ad valorem, value-added, transfer, production, franchise, registration, profits, license, lease, service, service use, withholding, social security, payroll, employment, unemployment, disability, workers' compensation, estimated, excise, severance, environmental, stamp, occupation, occupancy, premium, property (real or personal), real property gains, windfall profits, customs, customs duties, or other similar taxes, charges, fees, levies, duties, deficiencies or other assessments, together with any interest, additions to tax and penalties with respect thereto (whether or not disputed).

1007814448v22

"Tax Authority" means any revenue, customs, fiscal governmental, statutory, state or provincial authority, body or person, taxation or other authority (whether within or outside the United States) involved in the administration or collection of Tax.

"Tax Returns" means any and all returns, reports, documents, declarations, forms, claims for refund, statement or other documents required to be supplied to any Governmental Authority or jurisdiction (foreign or domestic) with respect to Taxes together with all schedules or attachments thereto, including information returns where required, any documents with respect to or accompanying payments of estimated Taxes, or any documents with respect to or accompanying requests for the extension of time in which to file any such report, return, document, declaration or other information, and including any amendments of any of the foregoing.

"Third Party" means, with respect to any Person, any other Person (other than an Affiliate of such first Person).

"Transactions" means the transactions contemplated by this Agreement and the Ancillary Agreements, including the Pre-Closing Restructuring.

"Treasury Regulations" means the Treasury Regulations (including Temporary Regulations) promulgated by the United States Department of the Treasury with respect to the Code or other federal tax statutes.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988 or any similar applicable state or local Law.

"Working Capital" means the current assets of the Target Group Entities *minus* the current liabilities of the Target Group Entities, in each case, calculated in accordance with the Accounting Principles. Notwithstanding the foregoing, no item included in Cash, Transaction Expenses or in Debt shall be included in Working Capital. See Exhibit H attached hereto for an example of the calculation of Working Capital.

Section 10.2    Table of Defined Terms. In addition to the foregoing definitions, the following terms shall have the definitions specified on the page of this Agreement listed in the following table:

Defined Term  Page

280G Stockholder Vote.................................................................................................. 49
280G Waiver.................................................................................................................. 49
A&R Residential LLC Agreement................................................................................ 7
Actions ........................................................................................................................ 22
Adjusted Purchase Price ............................................................................................. 10
AML Laws ................................................................................................................... 17
Anti-Corruption Laws................................................................................................. 17
Basket.......................................................................................................................... 56
Buyer............................................................................................................................. 5
Buyer Prepared Returns .............................................................................................. 47

Client Consents ................................................................................................................ 44
Closing ............................................................................................................................... 6
Closing Date........................................................................................................................ 6
Closing Ownership Notice.................................................................................................. 8
Closing Statement .............................................................................................................. 8
Company ............................................................................................................................. 5
Current Service Provider.................................................................................................. 26
D&O Indemnified Parties ................................................................................................ 48
D&O Indemnified Party.................................................................................................... 48
D&O Insurance ................................................................................................................. 49
Disclosing Party ............................................................................................................... 63
Downward Adjustment ..................................................................................................... 10
Earn-Out Payments .......................................................................................................... 11
Earn-Out Period ............................................................................................................... 13
Employment Agreement ..................................................................................................... 5
Escrow Account .................................................................................................................. 6
Estimated Closing Statement ............................................................................................. 8
Estimated Purchase Price ................................................................................................... 8
Financial Statements ........................................................................................................ 21
Foreign Plan...................................................................................................................... 25
Incentive Plan Participant ................................................................................................ 12
Indemnified Party.............................................................................................................. 56
Indemnifying Party ........................................................................................................... 56
Leased Property ................................................................................................................ 34
Losses................................................................................................................................ 54
Material Contract .............................................................................................................. 31
Maximum Second Core Payment ..................................................................................... 11
Maximum Second WH Payment ...................................................................................... 12
Most Recent Balance Sheet .............................................................................................. 21
Most Recent Balance Sheet Date...................................................................................... 21
Most Recent Unaudited Financial Statements ................................................................. 21
Mr. Carlson ........................................................................................................................ 5
Mr. Isaacson....................................................................................................................... 5
Non-Disclosing Party........................................................................................................ 63
Notice of Disagreement ...................................................................................................... 9
Parent Plans....................................................................................................................... 51
Passive Investment............................................................................................................ 16
Per Claim Threshold ......................................................................................................... 56
Pre-Closing Restructuring.................................................................................................. 5
Principal Seller.................................................................................................................... 5
Privacy Statement ............................................................................................................. 31
Redwood Residential .......................................................................................................... 5
Registered Investment Company ...................................................................................... 29
Relevant Target Group Entity .......................................................................................... 46
Relevant Target Tax Dispute ........................................................................................... 46
Representative Body .......................................................................................................... 26

Sale ................................................................................................................................. 5

Sanctioned Countries ..................................................................................................... 16

Sanctions ....................................................................................................................... 16

Seller .............................................................................................................................. 5

Seller Prepared Returns ................................................................................................. 46

Sellers ............................................................................................................................. 5

Sellers Account .............................................................................................................. 6

Straddle Period .............................................................................................................. 47

Survival Period .............................................................................................................. 54

Target Owned IP ............................................................................................................ 30

Target Project Company Schedule ................................................................................. 20

Target Registered IP ...................................................................................................... 30

Tax Allocation ............................................................................................................... 47

Tax Refunds ................................................................................................................... 48

Termination Date ........................................................................................................... 59

Third Party Claim .......................................................................................................... 57

Transaction Expenses ..................................................................................................... 62

Transfer Taxes ............................................................................................................... 45

Transferred Residential Interests ................................................................................... 5

TriPost Seller ................................................................................................................. 5

Unaudited Financial Statements .................................................................................... 21

Undisputed Item ............................................................................................................. 9

Use ................................................................................................................................. 30

Waived 280G Payments ................................................................................................. 49

IN WITNESS WHEREOF, the parties hereto have executed or caused this Agreement to be executed as of the date first written above.

BUYER:

EXETER PROPERTY GROUP, LLC

By: _____
Name: J Peter Lloyd
Title: Vice Manager

TRIPOST SELLER:

TRIPOST CAPITAL RCG INVESTMENTS, LP

By:  TriPost Capital RCG Investments GP, LLC,
its General Partner

By: _____

Name:  Bradley H. Carroll
Title:  Managing Partner

By: _____

Name:  Todd D. Silverman
Title:  Managing Partner

[*Signature Page to Purchase Agreement*]

PRINCIPAL SELLERS:

_____

MARK ISAACSON

_____

DAVID CARLSON

*Acknowledged and agreed*:

REDWOOD EMPLOYEE MEMBER LLC

By:    _____
         Name:
         Title:

[*Signature Page to Purchase Agreement*]

PRINCIPAL SELLERS:

_____
MARK ISAACSON

_____
DAVID CARLSON

*Acknowledged and agreed*:

REDWOOD EMPLOYEE MEMBER LLC

By:    _____

    Name:    Mark Isaacson
    Title:    Authorized Signatory

[*Signature Page to Purchase Agreement*]

## ANNEX I
## SELLERS AND COMPANY INTERESTS[1]

| Seller | Company Interests | Allocable Portion of Purchase Price which, for the avoidance of doubt, will not be subject to adjustment |
|---|---|---|
| TriPost Seller | 49.0% | First $18,000,000 |
| Mr. Carlson | 25.5% | After taking into account the payment to the TriPost Seller (i) $5,250,000, less (ii) 50% of the Downward Adjustment, if any<br><br>100% of the Earn-Out Payments |
| Mr. Isaacson | 25.5% | After taking into account the payment to the TriPost Seller (i) $10,500,000, less (ii) 50% of the Downward Adjustment, if any |

---

[1] Prior to the Closing, the limited liability company agreement of the Company shall be amended to reflect the sharing of the Purchase Price proceeds (including any Earn-Out Payments) as reflected in this Annex I. A copy of such executed amendment shall be provided to Buyer prior to Closing.

1007814448v21

**ANNEX II**
**PRE-CLOSING RESTRUCTRING**

(See attached.)

1007814448v21

**Annex II**

Step #1: Redwood Residential, LLC distributes all of the membership interests in Redwood Construction, LLC to Redwood Capital Group, LLC



* Includes a $40,000 equity interest Redwood Capital Group, LLC owns in CS Briarbrook Investors, LLC



Step #2: Redwood Capital Group, LLC contributes to [NewCo] all of its interest in (i) the RCG Real Property Assets (excluding its interest in CS Briarbrook Investors, LLC and all fee streams other than exit fees) and (ii) the Treehouse Fund (excluding asset management fees)

* Includes a $40,000 equity interest Redwood Capital Group, LLC owns in CS Briarbrook Investors, LLC

2

Step #3: Redwood Capital, LLC distributes (i) all of its interest in [NewCo], (ii) a 29.4118% interest in Redwood Residential, LLC, and (iii) all of its interest in CS Briarbrook Investors, LLC, to Redwood Capital Group Holdings, LLC



3

Step #4: Redwood Capital Group Holdings, LLC distributes (i) all of its interest in [NewCo] and a 29.4118% interest in Redwood Residential, LLC to its members pro rata in accordance with the operating agreement of Redwood Capital Group Holdings, LLC and (ii) its interest in CS Briarbrook Investors, LLC to Mark Isaacson and David Carlson

**TriPost Capital RCG Investments, LP**
(DE LP)

**Mark Isaacson**

**David Carlson**

49% Member

25.5% Member and Manager

25.5% Member and Manager

**Redwood Capital Group Holdings, LLC**
(DE LLC)

29.4118%

100%

**Redwood Capital Group, LLC**
(IL LLC)

$40K Equity Interest

70.5882%

**CS Briarbrook Investors, LLC (DE LLC)**

**[NewCo]**

Existing fee streams

**Redwood Residential, LLC (IL LLC)**

0.01% Class A Managing Member

[Promote and 0.01% Equity Interest]

Asset Management Fee

**[Treehouse Fund]**

100%

Property Management Contracts

**Redwood Construction, LLC (IL LLC)**

RCG Real Property Assets

Existing Real Property Fee Streams

TF Real Property Assets:

4

## <u>ANNEX III</u>
## EMPLOYMENT AGREEMENT PARTIES

1. David Carlson
2. Mark Isaacson
3. Robert Flannery
4. Field Stern
5. Bill McDougall
6. Tammy Kelly
7. Delight Merrill

1007814448v21

## <u>ANNEX IV</u>
### KNOWLEDGE PARTIES

1. David Carlson
2. Mark Isaacson
3. Bob Flannery

1007814448v21

## EXHIBIT A
## ACCOUNTING PRINCIPLES

The Closing Statement and the Estimated Closing Statement shall be prepared in accordance with:

1.1     the accounting principles, policies and procedures set forth in paragraph 2 below;

1.2     to the extent not inconsistent with paragraph 1.1 above, the same accounting principles, policies and procedures applied in the Unaudited Financial Statements for the year fiscal ended December 31, 2021, solely to the extent consistent with GAAP; and

1.3     to the extent not otherwise addressed in paragraphs 1.1 and 1.2 above, GAAP.

For the avoidance of doubt, paragraph 1.1 shall take precedence over paragraph 1.2 and paragraph 1.3, and paragraph 1.2 shall take precedence over paragraph 1.3.

2.1     To exclude any receivable or other current assets in respect of Eleven85 or Tree House Investment (any receivable attributable to Eleven85 will be included in the definition of Cash, as provided above).

2.2     To exclude from working capital any Seasons property.

An illustrative calculation of Working Capital is attached as Annex I to this Exhibit A.

1007814448v21

**EXHIBIT B**
**Initial Allocation**

| Name | Allocation |
|---|---|
| Field Stern | $400,000 in total potential Earn-Out Payments (1.6% of total) |
| Bill McDougall | $250,000 in total potential Earn-Out Payments (1.0% of total) |
| Tammy Kelly | $250,000 in total potential Earn-Out Payments (1.0% of total) |
| Bob Flannery | $125,000 in total potential Earn-Out Payments (0.5% of total) |

1007814448v21

<u>Attachment 1</u>
Form of Lock-Up Letter

(See attached.)

1007814448v21

EQT

May 11, 2022

**To:**

EQT AB (the "**Company**")

1.  On May 11, 2022, Exeter Property Group, LLC, a Delaware limited liability company ("**Buyer**"), and the Sellers thereunder, entered into an agreement pursuant to which the Buyer will acquire from the Sellers 100% of the issued and outstanding Company Interests of Redwood Capital Group Holdings, LLC, a Delaware limited liability company, in consideration for (i) the Purchase Price and (ii) subject to the terms and conditions set forth therein, the right, in favour of Mr. Carlson pursuant to Section 1.5 of the Transaction Agreement, to receive certain Earn-Out Payments (the "**Transaction Agreement**"). Unless otherwise stated, defined terms used in this letter (this "**Lock-Up Letter**") shall have the meaning given to them in the Transaction Agreement.

2.  Under and subject to the terms and conditions of Section 1.5 of the Transaction Agreement, 50% of any Earn-Out Payment is to be used to acquire EQT Shares ("**Earn-Out Shares**"). In connection with the undersigned's obligation to acquire the Earn-Out Shares, the undersigned hereby agrees and acknowledges that, during the period (the "**Lock-Up Period**") from the date such Earn-Out Shares are acquired and continuing until any such Earn-Out Shares or any securities in the Company received in exchange therefor ("**Shares**") become vested in accordance with Section 3.4, Section 3.5 and Section 3.6 of that certain Share Forfeiture Letter delivered by the undersigned on the date hereof, the undersigned shall not, directly or indirectly, without the prior written consent of the Company**:**

    a)  offer, sell, pledge, contract to offer, sell or pledge, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any Shares;

    b)  enter into any swap, hedge or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Shares; or

    c)  publicly disclose the intention to enter into any transaction or perform any action referred to in a) or b) above, whether any such transaction described in a) or b) above is to be settled by delivery of Shares, in cash or otherwise.

3.  Notwithstanding this, section 2 (a-c) shall not apply to:

    a)  any transaction between the undersigned and a holding company which is wholly owned by the undersigned, provided that such company has signed and delivered a lock-up letter substantially in the form of this lock-up letter before the transaction is effectuated;

    b)  any acceptance of, or any undertaking to accept, a public takeover offer made to all (or substantially all) of the holders of shares of the Company and made on terms that treat all holders of shares of EQT alike by a person who is not acting in concert with the undersigned;



    c) any transfer of Shares in connection with a redemption of shares in the Company or an offer by the Company to purchase its own shares which is made on identical terms to all holders of shares in the Company;

    d) any transfer (including donations) of Shares to the EQT Foundation;

    e) any rights derived from the Shares in connection with an offering by the Company with preferential rights for its shareholders; and

    f) any transaction required by law or regulation, including pursuant to an order or ruling by a court or competent judicial body or public authority, outside of the control of the undersigned.

4. Each occasion upon which Earn-Out Shares are acquired by the undersigned in accordance with the terms of Section 1.5 of the Transaction Agreement shall be referred to as an "Earn-Out Share Acquisition."  The provisions of this Lock-Up Letter shall apply separately to Shares acquired upon each Earn-Out Share Acquisition by the undersigned in accordance with the terms of Section 1.5 of the Transaction Agreement.

5. The undersigned understands that this Lock-Up Letter is irrevocable and shall be binding upon the undersigned's heirs, legal representatives, successors and assigns.

6. In the event of breach of this Lock-Up Letter, the undersigned agrees to compensate the Company by paying to the Company in cash a sum equal to the product of (i) the volume weighted average of the trading prices for ordinary shares of the Company as reported for composite transactions on the NASDAQ OMX Stockholm Stock Exchange (or other primary exchange or market for such securities) during the 30 consecutive trading days preceding the trading day immediately prior to the date of such breach and (ii) the number of Shares retained or disposed of in breach of this Lock-Up Letter (subject to appropriate adjustment for stock splits, stock dividends, combinations, and other recapitalizations).

7. This Lock-Up Letter shall be governed by and construed in accordance with the laws of the Kingdom of Sweden. Any dispute, controversy or claim arising out of or in connection with this Lock-Up Letter, or the breach, termination or invalidity thereof, shall be finally settled by arbitration in accordance with the rules of the Arbitration Institute of the Stockholm Chamber of Commerce in Stockholm, Sweden. The number of arbitrators shall be three. The arbitration shall take place in Stockholm.

Very truly yours,

_____

Name:
Place, date:

Attachment 2
Share Forfeiture Letter

(See attached.)

1007814448v21

May 11, 2022

**To:**

EQT AB (the "**Company**")

1.     On May 11, 2022, Exeter Property Group, LLC, a Delaware limited liability company ("**Buyer**"), and the Sellers thereunder, entered into an agreement pursuant to which the Buyer will acquire from the Sellers 100% of the issued and outstanding Company Interests of Redwood Capital Group Holdings, LLC, a Delaware limited liability company, in consideration for (i) the Purchase Price and (ii) subject to the terms and conditions set forth therein, the right, in favour of Mr. Carlson pursuant to Section 1.5 of the Transaction Agreement, to receive certain Earn-Out Payments (the "**Transaction Agreement**"). Unless otherwise stated, defined terms used in this letter (this "**Share Forfeiture Letter**") shall have the meaning given to them in the Transaction Agreement.

2.     Under and subject to the terms and conditions of Section 1.5 of the Transaction Agreement, 50% of any Earn-Out Payment is to be used to acquire EQT Shares ("**Earn-Out Shares**"). In connection with the undersigned's obligation to acquire the Earn-Out Shares, the undersigned hereby agrees and acknowledges that any such Earn-Out Shares or any securities in the Company received in exchange therefor ("**Shares**") shall be and remain subject to forfeiture for the period specified and in accordance with the terms and conditions set forth in this Share Forfeiture Letter:

3.     Receipt of Shares.

3.1    The undersigned hereby acknowledges and agrees with the Company that Shares may become receivable by the undersigned in accordance with the terms and conditions of Section 1.5 of the Transaction Agreement.

3.2    Each occasion upon which Shares are acquired by the undersigned in accordance with Section 1.5 of the Transaction Agreement shall be referred to as an "**Earn-Out Share Acquisition.**"

3.3    The provisions of this Share Forfeiture Letter shall apply separately to Shares acquired upon each Earn-Out Share Acquisition by the undersigned in accordance with the terms of Section 1.5 of the Transaction Agreement.

3.4    100% of the aggregate number of Shares received or receivable at any Earn-Out Share Acquisition shall be subject to the Leaver Put Option (as described in Section 5.2) until the first anniversary of such Earn-Out Share Acquisition, at which time 33.33% of the aggregate number of Shares received at such Earn-Out Share Acquisition shall become vested and no longer subject to the Leaver Put Option.

3.5    66.66% of the aggregate number of Shares received or receivable at any Earn-Out Share Acquisition shall be subject to the Leaver Put Option from the first anniversary of such Earn-Out Share Acquisition until the second anniversary of such Earn-Out Share Acquisition, at which time 66.66% of the aggregate number of Shares received at such Earn-Out Share Acquisition shall become vested and no longer subject to the Leaver Put Option.

3.6    33.33% of the aggregate number of Shares received or receivable at any Earn-Out Share Acquisition shall be subject to the Leaver Put Option from the second anniversary of such Earn-Out Share Acquisition until the third anniversary of such Earn-Out Share Acquisition, at which time 100% of the aggregate number of Shares received at such Earn-Out Share Acquisition shall become vested and no longer subject to the Leaver Put Option.

**4.**    Put Option.

4.1    The undersigned hereby acknowledges and agrees with the Company that the specified percentages of the Shares received upon any Earn-Out Share Acquisition shall be subject to the Leaver Put Option for the periods set forth in (and shall be subject to vesting as set out in) Section 3.4, 3.5 and 3.6, as applicable.

**5.**    Leaver Put Option

5.1    The undersigned hereby acknowledges and agrees with the Company that: any Shares that, at the time of determination, remain (or upon the applicable Earn-Out Share Acquisition would have been) subject to the Leaver Put Option shall be referred to as the "**Leaver Put Option Shares**".

5.2    If the undersigned (for the purpose of this Section 5, the "**Transferor**") becomes a Bad Leaver at any time that all or a portion of the Shares acquired or that would otherwise be acquired at any Earn-Out Share Acquisition remain or would be Leaver Put Option Shares, the Transferor shall immediately require the Company (or such other person or entity nominated by the Company (at the Company's sole election and cost)) (the "**Beneficiary**") to acquire such Leaver Put Option Shares at the undersigned's Leaver Date (as defined below) or, if later, at the applicable Earn-Out Share Acquisition in accordance with this Section 5  (the "**Leaver Put Option**").   Any Shares that become subject to the Leaver Put Option at the undersigned's Leaver Date shall be referred to as the "**Leaver Put Shares.**"

5.3    The Transferor shall exercise the Leaver Put Option with respect to any Leaver Put Shares by providing written notice to the Beneficiary (the "**Leaver Put Notice**") and such Leaver Put Notice shall set out the number of Leaver Put Shares to be transferred to the Beneficiary upon each or any such exercise of the Leave Put Option.

1007877728v6

5.4    On receipt by the Beneficiary of a Leaver Put Notice in accordance with Section 5.3 (the date of such receipt being the "**Leaver Put Date**"), the Leaver Put Shares shall be automatically deemed to be transferred to the Beneficiary with effect from the Leaver Put Date and the Transferor and the Beneficiary shall take all actions and steps that are reasonably required to complete such transfer pursuant to this Section 5.

5.5    The aggregate consideration payable by the Beneficiary to the Transferor in respect of the Leaver Put Shares shall always be nil.

5.6    For the purpose of this Section 5, the following definitions shall apply:

5.6.1    "**Bad Leaver**" shall mean where the undersigned is a Leaver as a result of:

(a)    voluntary resignation or termination by the undersigned of its employment, engagement or appointment for the provision of services with the Company or its Affiliates without "Good Reason" as defined under the terms of and in accordance with the undersigned's employment agreement with Exeter Property Group, LLC, a Delaware limited liability company (the "**Employment Agreement**"), and other than as a result of the undersigned's disability or death; or

(b)    termination of the undersigned's employment in a termination for "Cause" as defined in the Employment Agreement..

5.6.2    "**Leaver**" shall mean the undersigned, in the event that the undersigned ceases to be and is no longer employed, engaged or appointed for the provision of services by the Company or any of its Affiliates;

5.6.3    "**Leaver Date**" shall mean the date on which the undersigned becomes a Leaver; or

6.    The undersigned understands that this Share Forfeiture Letter is irrevocable and shall be binding upon the undersigned's heirs, legal representatives, successors and assigns.

7.    In the event of breach of this Share Forfeiture Letter, the undersigned agrees to compensate the Company by paying to the Company in cash a sum equal to the product of (i) the volume weighted average of the trading prices for ordinary shares of the Company as reported for composite transactions on the NASDAQ OMX Stockholm Stock Exchange (or other primary exchange or market for such securities) during the 30 consecutive trading days preceding the trading day immediately prior to the date of such breach and (ii) the number of Shares retained or disposed of in breach of this Share Forfeiture Letter (subject to

3

appropriate adjustment for stock splits, stock dividends, combinations, and other recapitalizations).

**8.**     This Share Forfeiture Letter shall be construed under and be governed in all respects by the laws of the State of Illinois, without giving effect to the conflict of laws principles. With respect to any disputes concerning federal law, such disputes shall be determined in accordance with the law as it would be interpreted and applied by the United States Court of Appeals for the Seventh Circuit. The undersigned consents to the jurisdiction of the state and federal courts of the State of Illinois and the United States District Courts in the State of Illinois.  Accordingly, with respect to any such court action, the undersigned (a) submits to the personal jurisdiction of such courts; (b) consents to service of process; and (c) waives any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process.

Very truly yours,

_____
Name:
Place, date:

4

1007877728v6

## **EXHIBIT C**
## **FORM OF EMPLOYMENT AGREEMENT**

(See attached.)

1007814448v21

**Exhibit C-1**

**EMPLOYMENT AGREEMENT**

This Employment Agreement ("Agreement") is made between Exeter Property Group, LLC, a Delaware limited liability company (the "Company"), and Robert Flannery (the "Executive"). Capitalized terms used but not otherwise defined in this Agreement have the respective meanings assigned to such terms in the Securities Purchase Agreement, dated as of the date hereof (the "Purchase Agreement"), by and among EQT Exeter Holdings US, Inc., a Delaware corporation ("Purchaser"), and the sellers named therein, at the Closing (as defined in the Purchase Agreement). This Agreement is entered into on [___], 2022 and is effective on the Effective Date (as defined below).

WHEREAS, the Executive entered into an Employment Agreement dated November 10, 2020, Redwood Capital Group, LLC (the "Prior Employment Agreement");

WHEREAS, the Executive and the Company are entering into this Agreement contemporaneously with the execution of the Purchase Agreement which shall supersede and replace the Prior Agreement as of the Effective Date; and

WHEREAS, following the Closing, the Company desires to continue to employ the Executive and the Executive desires to continue to be employed by the Company on the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Employment.

(a)      Term. This Agreement shall be effective as of the Closing (the date of such Closing the "Effective Date"). If the Purchase Agreement is terminated without the Closing occurring, this Agreement shall be null and void and the Prior Agreement shall remain in effect. The term of this Agreement shall commence on the Effective Date and continue for a three (3) year period, unless sooner terminated pursuant to the terms of this Agreement (the "Term"). Subject to termination pursuant to the terms of this Agreement, the Term shall be extended automatically for one (1) additional year upon its expiration, and each subsequent anniversary of such expiration thereafter.

(b)      Position and Duties. During the Term, the Executive shall serve as President, Redwood Residential, and shall have such powers and duties as may from time to time be prescribed by the Company that are consistent with his role.

(c)      Outside Activities. During the Term, the Executive may (i) engage in charitable, educational and civic activities and other non-business activities (including serving as a member of the board of directors or board of trustees of a charitable, educational or other non-profit entity) and (ii) serve as a member of the board of directors or board of trustees of any for-profit Person with the prior written consent of the Company, provided such consent shall not be unreasonably withheld and so long as, in each case, such outside activities do not give rise to any conflicts of interest with the Company (or otherwise violate any then existing policies of the applicable entity relating thereto), do not in the aggregate interfere with the performance of the Executive's duties hereunder (including his time commitments set forth in Section 1(b)), and do not otherwise constitute a violation of this Agreement.

1

**Exhibit C-1**

2.    Compensation and Related Matters.

(a)    Base Salary. The Executive's initial base salary shall be paid at the rate of $350,000 per year.  The Executive's base salary shall be reviewed no less frequently than annually by the Company, and may be increased or decreased by the Company in its discretion, except that it may not be decreased for a period of two years from the Effective Date.  The base salary in effect at any given time is referred to herein as "Base Salary." The Base Salary shall be payable in a manner that is consistent with the Company's usual payroll practices for executive officers.

(b)    Incentive Compensation. During the Term, the Executive shall be eligible to receive cash incentive compensation, with a target bonus opportunity equal to 50% of the Executive's Base Salary (the "Target Bonus"), with the amount actually payable in respect to any year determined by the Company in its discretion based on such factors as it shall determine (the "Annual Bonus").  Except as otherwise specifically provided in this Agreement, to earn an Annual Bonus, the Executive must be employed by the Company on the day such Annual Bonus is paid.  The Target Bonus may be increased or decreased by the Company in its discretion, except that the Target Bonus shall not be decreased for prior to calendar year 2024.

(c)    Incentive Plan Participation.  The Executive shall be designated as a participant in the Incentive Plan to be established under the Purchase Agreement with such allocation as shall be set forth on the Executive's Incentive Plan award notice. As a participant in the Incentive Plan, the Executive shall, as a condition to participation in such Incentive Plan, execute both a share forfeiture letter and a lock-up letter, in the form established for purposes of the Incentive Plan.

(d)    Satisfaction of Interests in Redwood Employee Member LLC.  In accordance with the terms of the Prior Employment Agreement, Executive was granted certain profits interests (the "Tracking Units") in Redwood Employee Member LLC ("Employee Member") that afforded Executive an indirect economic interest in five percent (5%) of the profits and losses of Redwood Capital Group Holdings, LLC ("Holdings"), on the terms and conditions set forth in a Tracking Units Grant Agreement, dated November 10, 2020 by and among Executive, Employee Member and Holdings. Executive agrees and acknowledges that, in connection with the closing of the Purchase Agreement, the Tracking Units shall be extinguished, and that, in full settlement of all of Executive's rights and entitlements with respect thereto, Executive shall be entitled to receive a payment in the aggregate amount of $1,000,000 at or about the time of the Closing of the Purchase Agreement.

(e)    Expenses. The Executive shall be entitled to receive prompt reimbursement for all reasonable expenses incurred by him during the Term in performing services hereunder, in accordance with the policies and procedures then in effect and established by the Company for its employees

(f)    Other Benefits.  During the Term, the Executive shall be eligible to participate in or receive benefits under the Company's policies and employee benefit plans in effect from time to time, including with respect to paid time off, subject to the terms of such policies and plans and to the Company's right in its sole discretion to amend, modify, replace or terminate such plans and programs; provided, however, that the Executive shall be eligible for no less than twenty (20) days of paid vacation annually.

3.    Termination.  During the Term, the Executive's employment under this Agreement may be terminated only under the following circumstances:

2

1007915707v2

**Exhibit C-1**

    (a)    <u>Death</u>.  The Executive's employment hereunder shall terminate upon his death.

    (b)    <u>Disability</u>.  The Company may terminate the Executive's employment if the Executive has a Disability. For purposes of this Agreement, 'Disability' means that the Executive is unable, by reason of bona fide physical or mental injury, illness or other similar cause to perform his or her primary duties for a period of 270 consecutive days, and where such injury, illness or other similar cause would prevent the Executive from operating or functioning in a similar capacity in the future. The foregoing determination shall be made by a licensed independent physician reasonably agreed by the Executive (or his or her authorized representative) and the Purchaser. Nothing in this Section 3(b) shall be construed to waive the Executive's rights, if any, under existing law including, without limitation, the Family and Medical Leave Act of 1993, 29 U.S.C. §2601 *et seq*. and the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq* or other applicable laws.

    (c)    <u>Termination by Company for Cause</u>.  The Company may terminate the Executive's employment hereunder for "<u>Cause.</u>"  For purposes of this Agreement, "<u>Cause</u>" shall mean any of the following:

    (i)    a material violation by the Executive of any agreement with the Company or any of its affiliates, including partnership agreements, and such violation is not cured within ten (10) days after written demand by the Company or any of its affiliates

    (ii)    failure by the Executive to comply with a material provision of the Company's policies, and such failure is not cured within ten (10) days after written demand by the Company or any of its affiliates;

    (iii)    the Executive become, in the reasonable opinion of the Purchaser, as determined in good faith, addicted or dependent on intoxicants or drugs of any nature;

    (iv)    the Executive's conviction of any misdemeanor involving theft or deception or any felony; or

    (v)    the Executive's engagement in illegal or dishonest conduct or gross misconduct that is materially and demonstrably injurious to the Purchaser or its affiliates.

    (d)    <u>Termination by the Company Without Cause</u>. The Company may terminate the Executive's employment hereunder at any time without Cause.

    (e)    <u>Termination by the Executive.</u>  The Executive may terminate the Executive's employment hereunder at any time.

    4.    <u>Notice and Date of Termination</u>.

    (a)    <u>Notice of Termination</u>.  Except for termination as specified in Section 3(a), any termination of the Executive's employment by the Company or any such termination by the Executive shall be communicated by written Notice of Termination to the other party hereto.  For purposes of this Agreement, a "<u>Notice of Termination</u>" shall mean a notice which shall indicate the specific termination provision in this Agreement relied upon.

    (b)    <u>Date of Termination</u>. "<u>Date of Termination</u>" shall mean:  (i) if the Executive's employment is terminated by his death, the date of his death; (ii) if the Executive's employment is terminated on account of Disability under Section 3(b) or by the Company for Cause under Section 3(c),

3

1007915707v2

**Exhibit C-1**

the date on which Notice of Termination is given; (iii) if the Executive's employment is terminated by the Company without Cause under Section 3(d), the date on which a Notice of Termination is given and (iv) if the Executive's employment is terminated by the Executive under Section 3(e), a date selected by the Executive that is not less than sixty (60) days after the date on which a Notice of Termination is given. Notwithstanding the foregoing, in the event that the Executive gives a Notice of Termination to the Company, the Company may unilaterally accelerate the Date of Termination and such acceleration shall not result in a termination by the Company for purposes of this Agreement; provided that the Company shall provide the Executive his Base Salary during the period covered by such acceleration.

(c)     Resignation as Officer or Director.  Upon the termination of the Executive's services to the Company for any reason, the Executive shall resign from any position of director, trustee, manager or member of the investment committee of the Company or its affiliates (or in any similar capacity for) and any funds or accounts sponsored, managed or advised by any of the foregoing.

5.     Compensation Upon Termination.

(a)     Termination Generally.  If the Executive's employment with the Company is terminated for any reason, the Company shall pay or provide to the Executive (or to his authorized representative or estate) (i) any Base Salary earned through the Date of Termination, unpaid expense reimbursements (subject to, and in accordance with, Section 2(c) of this Agreement) and unused vacation that accrued through the Date of Termination on or before the time required by law but in no event more than 30 days after the Executive's Date of Termination; and (ii) any vested benefits the Executive may have under any employee benefit plan of the Company through the Date of Termination, which vested benefits shall be paid and/or provided in accordance with the terms of such employee benefit plans (collectively, the "Accrued Benefit").

(b)     Termination by the Company Without Cause. During the Term, if the Executive's employment is terminated by the Company without Cause as provided in Section 3(d) then in addition to his Accrued Benefit under Section 5(a), subject to the Executive signing a general release of claims with respect to claims that the Executive has or may have in connection with his employment with the Company and that expressly preserves the Executive's rights under the Preserved Agreements (as defined below) and any other agreements related to the Executive's equity interests, indemnification rights or vested benefits (the "Separation Agreement") and the Separation Agreement becoming fully effective, all within the time frame set forth in the Separation Agreement but in no event later than 60 days after the Date of Termination:

(i)     the Company shall pay the Executive an amount equal to (x) the Executive's Base Salary at the time of termination of the Executive's employment, provided that that such Base Salary amount shall not be less than the Base Salary set forth in Section 2(a) (the "Severance Amount"); and (y) continuation on the same terms as an active employee (including, where applicable, coverage for the Executive and the Executive's dependents) of medical insurance benefits that the Executive would otherwise be eligible to receive as an active employee of the Company ("Medical Benefit Continuation") until the Executive's death (the "Medical Benefit Continuation Period"). Notwithstanding the foregoing, if the Executive breaches any of the Continuing Obligations and such breach is not cured by the Executive after written notice and a reasonable opportunity to cure, all payments of the Severance Amount and the Medical Benefit Continuation shall immediately cease from and after the time of such breach.

(ii)     The Severance Amount shall be paid out in substantially equal installments in accordance with the Company's payroll practice over twenty-four (24) months commencing within 60 days after the Date of Termination; *provided*, however, that if the

4

1007915707v2

**Exhibit C-1**

Severance Amount is deemed deferred compensation and the 60-day period begins in one calendar year and ends in a second calendar year, the Severance Amount shall begin to be paid in the second calendar year by the last day of such 60-day period; *provided*, further, that the initial payment shall include a catch-up payment to cover amounts retroactive to the day immediately following the Date of Termination.  Each payment pursuant to this Agreement is intended to constitute a separate payment for purposes of Treasury Regulation Section 1.409A-2(b)(2).

(iii)     If, after the Company has taken reasonable actions, the Executive is not permitted to continue his participation in the Company's group medical insurance plan pursuant to the terms of such plan or pursuant to a determination by the Company's medical insurance providers, or if applicable rules and regulations under Federal or state law prohibit the Company from providing Executive with post-termination group health or other benefits coverage (either directly or through COBRA), or if continued participation post-employment in the Company's group medical insurance plans would result in the imposition of an excise tax on the Company pursuant to Section 4980D of the Internal Revenue Code of 1986 (the "Code"), then the Company shall instead pay to the Executive monthly during the Medical Benefit Continuation Period an amount equal to the full monthly premium amount applicable to the Executive had the Executive been able to continue participation in the Company's medical plan.

6.      Section 409A.

(a)     Anything in this Agreement to the contrary notwithstanding, if at the time of the Executive's separation from service within the meaning of Section 409A of the Code, the Company determines that the Executive is a "specified employee" within the meaning of Section 409A(a)(2)(B)(i) of the Code, then to the extent any payment or benefit that the Executive becomes entitled to under this Agreement on account of the Executive's separation from service would be considered deferred compensation otherwise subject to the 20 percent additional tax imposed pursuant to Section 409A(a) of the Code as a result of the application of Section 409A(a)(2)(B)(i) of the Code, such payment shall not be payable and such benefit shall not be provided until the date that is the earlier of (A) six months and one day after the Executive's separation from service, or (B) the Executive's death.  If any such delayed cash payment is otherwise payable on an installment basis, the first payment shall include a catch-up payment covering amounts that would otherwise have been paid during the six-month period but for the application of this provision, and the balance of the installments shall be payable in accordance with their original schedule.

(b)     All in-kind benefits provided and expenses eligible for reimbursement under this Agreement shall be provided by the Company or incurred by the Executive during the time periods set forth in this Agreement.  All reimbursements shall be paid as soon as administratively practicable, but in no event shall any reimbursement be paid after the last day of the taxable year following the taxable year in which the expense was incurred.  The amount of in-kind benefits provided or reimbursable expenses incurred in one taxable year shall not affect the in-kind benefits to be provided or the expenses eligible for reimbursement in any other taxable year (except for any lifetime or other aggregate limitation applicable to medical expenses).  Such right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit.

(c)     To the extent that any payment or benefit described in this Agreement constitutes "non-qualified deferred compensation" under Section 409A of the Code, and to the extent that such payment or benefit is payable upon the Executive's termination of employment, then such payments or benefits shall be payable only upon the Executive's "separation from service."  The determination of whether and when a separation from service has occurred shall be made in accordance with the presumptions set forth in Treasury Regulation Section 1.409A-1(h).

5

1007915707v2

**Exhibit C-1**

(d)    The parties intend that this Agreement will be administered in accordance with Section 409A of the Code.  To the extent that any provision of this Agreement is ambiguous as to its compliance with Section 409A of the Code, the provision shall be read in such a manner so that all payments hereunder comply with Section 409A of the Code.  Each payment pursuant to this Agreement is intended to constitute a separate payment for purposes of Treasury Regulation Section 1.409A-2(b)(2).  The parties agree that this Agreement may be amended, as reasonably requested by either party, and as may be necessary to fully comply with Section 409A of the Code and all related rules and regulations in order to preserve the payments and benefits provided hereunder without additional cost to either party.

(e)    The Company makes no representation or warranty and shall have no liability to the Executive or any other person if any provisions of this Agreement are determined to constitute deferred compensation subject to Section 409A of the Code but do not satisfy an exemption from, or the conditions of, such Section.

7.    Continuing Obligations.

(a)    Executive Covenants and Continuing Obligations.    The Employee Confidentiality, Assignment, Nonsolicitation and Noncompetition Agreement between the Company and the Executive, attached hereto as Exhibit A (the "Employee Noncompetition Agreement"), is incorporated by reference, the terms of which are material terms of this Agreement.  For purposes of this Agreement, the obligations of Executive in this Section 7 shall collectively be referred to as the "Continuing Obligations." The Company has advised the Executive to consult with counsel of his choosing regarding the terms of the Employee Noncompetition Agreement prior to entering into this Agreement.  The Executive agrees and acknowledges that the Company has provided him a period of not less than 14 calendar days to review the Employee Noncompetition Agreement prior to the execution of this Agreement and the Employee Noncompetition Agreement.

(b)    Third-Party Agreements and Rights.  The Executive hereby confirms that the Executive is not bound by the terms of any agreement with any previous employer or other party which restricts in any way the Executive's use or disclosure of information or the Executive's engagement in any business. The Executive represents to the Company that the Executive's execution of this Agreement, the Executive's employment with the Company and the performance of the Executive's proposed duties for the Company will not violate any obligations the Executive may have to any such previous employer or other party.  In the Executive's work for the Company, the Executive will not disclose or make use of any information in violation of any agreements with or rights of any such previous employer or other party, and the Executive will not bring to the premises of the Company any copies or other tangible embodiments of non-public information belonging to or obtained from any such previous employment or other party.

(c)    Cooperation.  During and for a period of two years after the Executive's employment, upon the reasonable request from the Company, the Executive shall use reasonable efforts to respond and provide information, to the extent of the Executive's knowledge, with respect to (i) the defense or prosecution of any claims or actions now in existence or which may be brought in the future against or on behalf of the Company or (ii) an internal or third-party investigation or review, including investigation or review of any federal, state or local regulatory authority, which in each case relate to events or occurrences that transpired while the Executive was employed by the Company (a "Cooperation Matter"). In addition, upon the reasonable request from the Company, in connection with a Cooperation Matter the Executive shall be available to meet with counsel to prepare for discovery or trial and to act as a witness on behalf of the Company at mutually convenient times. The Company shall reimburse the Executive for any reasonable out-of-pocket expenses incurred in connection with the Executive's performance of obligations pursuant to this  Section 7(c).

6

1007915707v2

**Exhibit C-1**

8.      Consent to Jurisdiction.  The parties hereby consent to the jurisdiction of the state and federal courts of the State of Illinois and the United States District Courts in the State of Illinois. Accordingly, with respect to any such court action, the Executive (a) submits to the personal jurisdiction of such courts; (b) consents to service of process; and (c) waives any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process.

9.      Integration. This Agreement together with the Employee Noncompetition Agreement, the agreements related to the Executive's promote, capital contributions and accounts, the Purchase Agreement and the other documents entered into in connection therewith (the "Preserved Agreements") constitute the entire agreement between the parties with respect to compensation, severance pay, benefits and vesting and supersedes in all respects all prior agreements between the parties concerning such the subject matter hereof, including without limitation any offer letter, employment agreement or severance agreement relating to the Executive's employment (or business or service) relationship with the Company and/or the ending of that employment (or business or service) relationship.

10.      Withholding.  All payments made by the Company to the Executive under this Agreement shall be net of any tax or other amounts required to be withheld by the Company under applicable law.

11.      Successor to the Executive.  This Agreement shall inure to the benefit of and be enforceable by the Executive's personal representatives, executors, administrators, heirs, distributees, devisees and legatees.  In the event of the Executive's death after his termination of employment but prior to the completion by the Company of all payments due him under this Agreement, the Company shall continue such payments to the Executive's beneficiary designated in writing to the Company prior to his death (or to his estate, if the Executive fails to make such designation).  Nothing in this Agreement shall confer any rights or remedies upon any Person other than the parties hereto.

12.      Enforceability.  If any portion or provision of this Agreement (including, without limitation, any portion or provision of any section of this Agreement) shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

7

1007915707v2

**Exhibit C-1**

13.    Survival.    The provisions of this Agreement shall survive the termination of this Agreement and/or the termination of the Executive's employment to the extent necessary to effectuate the terms contained herein.

14.    Notices.  Any notices, requests, demands and other communications provided for by this Agreement shall be sufficient if in writing and delivered in person or sent by a nationally recognized overnight courier service or by registered or certified mail, postage prepaid, return receipt requested, to the Executive at the last address the Executive has filed in writing with the Company or, in the case of the Company, at its main offices, attention of the directors.

15.    Waiver.  No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving party.  The failure of any party to require the performance of any term or obligation of this Agreement, or the waiver by any party of any breach of this Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

16.    Amendment.  This Agreement may be amended or modified only by a written instrument signed by the Executive and by a duly authorized representative of the Company.

17.    Effect on Other Plans and Agreements.  Nothing in this Agreement shall be construed to limit the rights of the Executive under the Company's benefit plans, programs or policies except as otherwise provided in Section 7 hereof, and except that the Executive shall have no rights to any severance benefits under any Company severance pay plan, offer letter or otherwise.  In the event that the Executive is party to an agreement with the Company providing for payments or benefits under such agreement and this Agreement, the terms of this Agreement shall govern and the Executive may receive payment under this Agreement only and not both.

18.    Remedies Upon Breach.  If a party breaches, or proposes to breach, any portion of this Agreement, the other party shall be entitled to exercise all legal and equitable remedies, including to specifically enforce this Agreement.

19.    Governing Law.  This Agreement shall be construed under and be governed in all respects by the laws of the State of Illinois, without giving effect to the conflict of laws principles.  With respect to any disputes concerning federal law, such disputes shall be determined in accordance with the law as it would be interpreted and applied by the United States Court of Appeals for the Seventh Circuit.

20.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be taken to be an original; but such counterparts shall together constitute one and the same document.

1007915707v2

**Exhibit C-1**

21.     <u>Assignment and Transfer by the Company; Successors</u>.  Purchaser may assign its rights (but not its obligations) under this Agreement to any of its controlled affiliates, and otherwise, neither party may assign this Agreement, or any of the rights or obligations of such party hereunder, without the prior written consent of the other party. This Agreement shall be binding upon and inure to the benefit of and be enforceable by and against the successors, assigns and permitted transferees of the parties.

22.     <u>Gender Neutral</u>.  Wherever used herein, a pronoun in the masculine gender shall be considered as including the feminine gender unless the context clearly indicates otherwise.

[*Remainder of Page Intentionally Left Blank*]

1007915707v2

**Exhibit C-1**

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first set forth above.

**EXETER PROPERTY GROUP, LLC**

_____
By:
Its:

**EXECUTIVE**

_____
Name:  [  ]

10

1007915707v2

**Exhibit C-1**

**Exhibit A**

**Employee Confidentiality, Assignment, Nonsolicitation and Noncompetition Agreement**

As a condition of my employment by Exeter Property Group, LLC pursuant to the terms of, and in consideration of the Company's obligations set forth in, the Employment Agreement between Exeter Property Group, LLC and me of even date herewith (the "Employment Agreement"), which I acknowledge and agree provides consideration that I would not otherwise be  entitled  to  absent  me entering    into    this    Employee    Confidentiality,    Assignment,    Nonsolicitation,    and Noncompetition Agreement (the "Agreement") and is sufficient consideration in addition to my employment. With those understandings, I agree as follows: The term "Company" as used in this Agreement means each of the Exeter Group Companies (Exeter US Advisor, LLC, Exeter Property Group, LLC, Exeter Property Group Advisors, LLC and each of the Exeter GPs, as well as their subsidiaries), EQT AB and each of its subsidiaries and other affiliates, except where the context requires otherwise (and the term "Companies" shall be construed accordingly).

1.      **Proprietary Information.** I agree that all information, whether or not in writing, concerning the Company's business, technology, business relationships or financial affairs that the Company has not released to the general public (collectively, "Proprietary Information") and all tangible embodiments thereof are and will be the exclusive property of the Company. By way of illustration, Proprietary Information may include information  or material that has not been made generally available to the public, such as: (a) *corporate information,* including plans, strategies, methods, policies, resolutions, negotiations or litigation; (b) *information regarding advisory activities,* including strategies, methods, client, investor, business partner or prospect identities  or  other  information about clients, investors, business partners,  or  prospects, information relating to the track record or investment performance of any client of the Company, or market analyses or projections; (c) *financial information,* including investment, financing or capital-raising sources, pricing information and methods, cost and performance data, debt arrangements, equity structure, investors and holdings, purchasing and sales data and price lists; (d) *operational and technological information,* including plans, specifications, manuals, forms, templates, software, testing data and strategies, research and development strategies, designs, methods, procedures, formulae, data, reports, discoveries, inventions, improvements, concepts, ideas, and other Developments (as defined below), know-how and trade secrets; and (e) *personnel information,* including personnel lists, reporting or organizational structure, resumes, personnel   data,   performance   evaluations   and   termination   arrangements   or   documents. Proprietary Information also includes information received in confidence by the Company from any member of the Company or any of its clients, investors, business partners, prospects or other third parties.

2.      **Recognition of Company's Rights.** I will not, at any time, without the Company's prior written permission, either during or after my employment, disclose any Proprietary Information to anyone outside of the Company, or use or permit to be used any Proprietary Information for any purpose other than the performance of my duties as an employee of the Company. I will reasonably cooperate with the Company and use my commercially reasonable best efforts to prevent the unauthorized disclosure of all Proprietary Information. I will deliver to the Company all copies  and other tangible embodiments of Proprietary Information in my possession or control upon the earlier of a request by the Company or termination of my employment; provided that nothing in this Agreement or elsewhere shall prevent me from retaining and utilizing: documents relating to my personal benefits, entitlements and obligations; documents relating to my personal tax obligations; my desk calendar, personal contacts and the like; and such other records and documents as may reasonably be approved by the Company.

11

1007915707v2

**Exhibit C-1**

3.      **Rights of Others.** I understand that the Company is now and may hereafter be subject to nondisclosure or confidentiality agreements with third persons that require the Company to protect or refrain from use or disclosure of proprietary information. I agree to be bound by the terms of such agreements in the event I have access to such proprietary information. I understand that the Company strictly prohibits me from using or disclosing confidential or proprietary information belonging to any other person or entity (including any employer or former employer), in connection with my employment. In addition, I agree not to bring any confidential information belonging to any other person or entity, other than Redwood Capital Group LLC onto Company premises or into Company workspaces.

4.      **Commitment to Company; Avoidance of Conflict of Interest.** While an employee of the Company, I will devote my full-time efforts to the Company's business and I will not, directly or indirectly, engage in any other business activity, except as expressly authorized in writing and in advance by a duly authorized representative of the Company. I will advise an authorized officer of the Company or his or her designee at such time as any activity of either the Company or another business presents me with a conflict of interest or the appearance of a conflict of interest as an employee of the Company. I will take whatever reasonable action is requested of me by the Company to resolve any conflict or appearance of conflict which it finds to exist.

5.      **Developments.** I will make full and prompt disclosure to the Company of all inventions, discoveries, designs, developments, methods, modifications, improvements, processes, algorithms, data, databases, computer programs, research, formulae, techniques, trade secrets, graphics or images, and audio or visual works and other works of authorship, and other intellectual property, including works-in-process (collectively "Developments") whether or not patentable or copyrightable, that are created, made, conceived or reduced to practice by me (alone or jointly with others) or under my direction during the period of my employment. I acknowledge that all work performed by me is on a "work for hire" basis, and I hereby do assign and transfer and, to the extent any such assignment cannot be made at present, will assign and transfer, to the Company and its successors and assigns all my right, title and interest in and to all Developments that (a) relate to the business of the Company or any investor or business partner of the Company or any of the products or services being researched, developed, manufactured or sold by the Company or which may be used with such products or services; or (b) result from tasks assigned to me by the Company; or (c) result from the use of premises or personal property (whether tangible or intangible) owned, leased or contracted for by the Company ("Company- Related Developments"), and all related patents, patent applications, trademarks and trademark applications, copyrights and copyright applications, *sui generis* database rights and other intellectual property rights in all countries and territories worldwide and under any international conventions ("Intellectual Property Rights").

To preclude any possible uncertainty, I confirm that there are no Developments that I have, alone or jointly with others, conceived, developed or reduced to practice prior to the commencement of my employment with the Company that I consider to be my property or the property of third parties and that I wish to have excluded from the scope of this Agreement.

This Agreement does not obligate me to assign to the Company any Development that is developed entirely on my own time and does not relate to the business efforts or research and development efforts in which, during the period of my employment, the Company actually is engaged or reasonably would be engaged, and does not result from the use of premises or equipment owned or leased by the Company. However, I will also promptly disclose to the Company any such Developments for the purpose of determining whether they qualify for such exclusion. I understand that to the extent this Agreement is required to be construed in accordance with the laws of any state which precludes a requirement in an employee agreement to assign certain classes of inventions made by an employee, this

12

1007915707v2

**Exhibit C-1**

Section 5 will be interpreted not to apply to any invention that a court rules and/or the Company agrees falls within such classes. I also hereby waive all claims to any moral rights or other special rights that I may have or accrue in any Company-Related Developments.

6.     **Documents and Other Materials.** I will keep and maintain adequate and current records of all Proprietary Information and Company-Related Developments developed by me during my employment, which records will be available to and remain the sole property of the Company at all times.

All files, letters, notes, memoranda, reports, records, data, sketches, drawings, notebooks, layouts, charts, quotations and proposals, specification sheets, blueprints, models, prototypes, or other written, photographic or other tangible material containing Proprietary Information, whether created by me or others, which come into my custody or possession, are the exclusive property of the Company to be used by me only in the performance of my duties for the Company. Any property situated on the Company's premises and owned by the Company, including without limitation computers, disks and other storage media, filing cabinets or other work areas, is subject to inspection by the Company at any time with or without notice. In the event of the termination of my employment for any reason, I will deliver to the Company all Company property and equipment in my possession, custody or control, including all files, letters, notes, memoranda, reports, records, data, sketches, drawings, notebooks, layouts, charts, quotations and proposals, specification sheets, blueprints, models, prototypes, or other written, photographic or other tangible material containing Proprietary Information, and other materials of any nature pertaining to the Proprietary Information of the Company and to my work, and will not take or keep in my possession any  of the foregoing or any  copies; provided that  nothing in this Agreement or elsewhere shall prevent me from retaining and utilizing: documents relating to my personal benefits, entitlements and obligations; documents relating to my personal tax obligations; my desk calendar, personal contacts and the like; and such other records and documents as may reasonably be approved by the Company.

7.     **Enforcement of Intellectual Property Rights.** I will cooperate fully with the Company, both during and after my employment with the Company, with respect to the procurement, maintenance and enforcement of Intellectual Property Rights in Company-Related Developments. I will sign, both during and after my employment, all papers, including without limitation copyright applications, patent applications, declarations, oaths, assignments of priority rights, and powers of attorney, which the Company may deem necessary or desirable in order to protect its rights and interests in any Company-Related Development or Intellectual Property Rights therein. If the Company is unable, after reasonable effort, to secure my signature on any such papers, I hereby irrevocably designate and appoint each officer of the Company as my agent and attorney-in-fact to execute any such papers on my behalf, and to take any and all actions as the Company may deem necessary or desirable in order to protect its rights and interests in any Company-Related Development, including any Intellectual Property Rights therein.

8.     **Noncompetition and Nonsolicitation.** In order to protect the Company's Proprietary Information and goodwill, during my employment and for a period of one (1) year following the date of the cessation of my employment  (the "Restricted Period"), I irrevocably undertake and agree that I shall not:

(a)     whether individually or as owner, part owner, shareholder, partner, member, director, officer, trustee, employee, agent, consultant or in any other capacity, on behalf of myself or any Person, engage or prepare to engage in a Competing Business (as defined below); or

13

**Exhibit C-1**

(b)    (i) be or become an owner, part owner, shareholder, partner, member, director, officer, trustee, employee, consultant, bondholder, creditor, agent or representative of, or (ii) in any manner give financial, strategic, operational, technical or other assistance to, whether in a competitive capacity or any other capacity, any Person engaged in a Competing Business; provided, that nothing in this Agreement shall prevent or restrict me from (i) owning a passive investment that, when aggregated with the holdings of the members of my immediate family and their respective Affiliates, constitutes less than five percent (5%) of the outstanding shares or comparable interests in a publicly traded entity, so long as I do not have, or exercise, any rights to manage or operate the business of such issuer other than rights as a shareholder thereof; or (ii) being employed by an entity that engages in a Competing Business, so long as (A) the entity has more than one discrete and readily distinguishable line of business and my duties are not at or involving the part of the entity's business that is engaged in a Competing Business or (B) such employment will not require me to engage in any type of executive, managerial, strategic, technical, or business development activities or any other activities similar to the types of activities or functions I performed for or on behalf of the Company during my employment or engagement;

(c)    solicit, divert or take away, or attempt to solicit, divert or take away, any Clients or Prospects or cause any Clients or Prospects to reduce or adversely alter their business with the Company;

(d)    (i) solicit or entice, or attempt to solicit or entice, any employee, agent or consultant of the Company to terminate his, her or its employment or engagement with the Company, or (ii) hire or engage or facilitate the hiring or engagement of any person who is then employed or engaged by the Company or who was employed or engaged by the Company within the two (2) year period immediately preceding such action by me; provided, that Section 8(d)(i) does not apply to advertising through mass media or communications that are not specifically directed at employees, agents or consultants of the Company;

(e)    work or prepare to work in any enterprise involving a Competing Business with any employee, agent or consultant or former employee, agent or consultant of the Company who was employed by or acted as an agent or consultant to the Company at any time during the two (2) year period preceding such action by me; or

(f)    in connection with any Competing Business, solicit for business any person or entity doing business with the Company or any fund, managed account, joint venture or other Person sponsored, managed or advised by the Company (including vendors, suppliers, developers, managers or lenders), or attempt in any way to interfere with the business relationship existing between the Company, on the one hand, and any such person or entity, on the other hand.

For purposes of this Section 8:

"Client" means any fund, managed account, joint venture or other Person sponsored, managed or advised by any of the Exeter Group Companies and any investor, investee company, supplier, vendor, customer, licensee, distributor, contractor or any fund in which a member of the EQT Firm acts or acted as general partner, manager, investment advisor or investment sub- advisor in any such fund, managed account joint venture or other Person;

"Competing Business" means any business activity in any country or territory in which any of the Exeter Group Companies market any of their respective services as of the first day of the cessation of my employment with the Company that involves the performance of any services that are competitive with the services of any of the Exeter Group Companies, or that are the subject of active planning at the time of the cessation of my employment with the Company;

1007915707v2

**Exhibit C-1**

"EQT Firm" means EQT AB and/or any one or more of its direct or indirect subsidiaries, and/or any other entity that EQT AB, in its reasonable discretion, may deem to be part of the EQT Firm and of which I have actual notice; and

"Prospect" means any Person who: (i) has, either orally or in writing, expressed an interest in becoming a Client; or (ii) is, either orally or in writing, being actively solicited to become a Client within the most recent six months of employment (such time to be measured as of the date of any conduct alleged to be in violation of this Agreement).

9.      **Government Contracts.** I acknowledge that the Company may have from time to time agreements with other persons or with the United States Government or its agencies that impose obligations or restrictions on the Company regarding inventions made during the course of work under such agreements or regarding the confidential nature of such work. I agree to comply with any such obligations or restrictions upon the direction of the Company. In addition to the rights assigned under paragraph 5,1 also assign to the Company (or any of its nominees) all rights that I have or acquired in any Developments, full title to which is required to be in the United States under any contract between the Company and the United States or any of its agencies.

10.      **Non-Disparagement**. At all times I shall not (i) commit any act in bad faith which is seriously detrimental to the business of a member of the EQT Firm or any fund in which a member of the EQT Firm acts or acted as the general partner, manager, investment advisor or investment sub-advisor including without limitation any conduct detrimental to the name or reputation of a member of the EQT Firm, or (ii) willfully make any derogatory statement or communication about the EQT Firm or any of its businesses, products, services, personnel or activities; provided, however, that nothing in this Section 10 or elsewhere prohibits myself from (a) communicating with government agencies about possible violations of federal, state, or local laws or otherwise providing information to government agencies, filing a complaint with government agencies or participating in government agency investigations or proceedings or (b) exercising or enforcing any of my rights under this Agreement.

11.      **Prior Agreements.** I hereby represent that, except as I have fully disclosed previously in writing to the Company, I am not bound by the terms of any agreement with any previous or current employer or other party to refrain from using or disclosing any trade secret or confidential or proprietary information in the course of my employment with the Company or to refrain from competing, directly or indirectly, with the business of such employer or any other party. I further represent that my performance of all the terms of this Agreement as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me in confidence or in trust prior to my employment with the Company. I will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employer or others.

12.      **Remedies Upon Breach.** I understand that the restrictions contained in this Agreement are necessary for the protection of the business and goodwill of the Company and I consider them to be reasonable for such purpose. Any breach of this Agreement is likely to cause the Company substantial and irrevocable damage and therefore, in the event of such breach, the Company, in addition to such other remedies which may be available, will be entitled to specific performance and other injunctive relief, without the posting of a bond. I further acknowledge that a court may render an award extending the Restricted Period as one of the remedies in the event of my violation of this Agreement.

13.      **Use of Voice, Image and Likeness.** I give the Company permission to use any and all of my voice, image and likeness, with or without using my name, in connection with the products and/or services of the Company, for the purposes of advertising and promoting such products and/or

1007915707v2

**Exhibit C-1**

services and/or the Company, and/or for other purposes deemed appropriate by the Company in its reasonable discretion, except to the extent prohibited by law.

14.    **No Employment Obligation.** I understand that this Agreement does not create an obligation on the Company or any other person to continue my employment. I acknowledge that, unless otherwise agreed in a formal written employment agreement signed on behalf of the Company by an authorized officer, my employment with the Company is at will and therefore may be terminated by the Company or me at any time and for any reason, with or without cause.

15.    **Survival and Assignment by the Company.** I understand that my obligations under this Agreement will continue in accordance with its express terms regardless of any changes in my title, position, duties, salary, compensation or benefits or other terms and conditions of employment. I further understand that my obligations under this Agreement will continue following the termination of my employment regardless of the manner of such termination and will be binding upon my heirs, executors and administrators. The Company will have the right to assign this Agreement to its affiliates, successors and assigns. I expressly consent to be bound by the provisions of this Agreement for the benefit of the Company or any parent, subsidiary or affiliate to whose employ I may be transferred without the necessity that this Agreement be resigned at the time of such transfer.

16.    **Post-Employment Notifications.** During the Restricted Period, I will notify the Company of any change in my address and of each subsequent employment or business activity, including the name and address of my employer or other post-Company employment plans and the nature of my activities.

17.    **Disclosures During Restricted Period.** I will provide a copy of this Agreement to any person or entity with whom I may enter into a business relationship, whether as an employee, consultant, partner, coventurer or otherwise, prior to entering into such business relationship during the Restricted Period.

18.    **Severability.** In case any provisions (or portions thereof) contained in this Agreement shall, for any reason, be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. If, moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

19.    **Waiver.** I acknowledge and agree that no waiver of any of my obligations under this Agreement shall be effective unless made in writing by the Company. The failure of the Company to require my performance of any term or obligation of this Agreement, or the waiver of any breach of this Agreement, shall not prevent the Company's subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

20.    **Choice of Law and Jurisdiction.** This Agreement will be deemed to be made and entered into in the State of Illinois, and will in all respects be interpreted, enforced and governed under the laws of the State of Illinois. I hereby consent to personal jurisdiction of the state and federal courts situated within Illinois for purposes of enforcing this Agreement, and waive any objection that I might have to personal jurisdiction or venue in those courts.

21.    **Independence of Obligations.** My obligations under this Agreement are

16

1007915707v2

**Exhibit C-1**

independent of any obligation, contractual or otherwise, the Company has to me. The Company's breach of any such obligation shall not be a defense against the enforcement of this Agreement or otherwise limit my obligations under this Agreement.

22. **Protected Disclosures.** I understand that nothing contained in this Agreement limits my ability to communicate with any federal, state or local governmental agency or commission, including to provide documents or other information, without notice to the Company. I also understand that nothing in this Agreement limits my ability to share compensation information concerning myself or others, except that this does not permit me to disclose compensation information concerning others that I obtain because my job responsibilities require or allow access to such information.

23. **Defend Trade Secrets Act of 2016.** I understand that pursuant to the federal Defend Trade Secrets Act of 2016 I shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

24. **Entire Agreement; Amendment.** This Agreement together with the Employment Agreement the Securities Purchase Agreement of even date hereof and the other documents entered into in  connection therewith constitute the entire agreement between the Company and me with respect to the subject matter hereof, and supersedes all prior agreements or understandings, both written and oral, between the Company and me with respect to the subject matter hereof, but does not in any way merge with or supersede any other confidentiality, assignment of inventions or other restrictive covenant agreement or obligation entered into by the Company and me, which agreements and obligations shall supplement, and shall not limit or be limited by, this Agreement. This Agreement may be amended only in a written agreement executed by a duly authorized officer of the Company and me.

*[Remainder of Page Intentionally Left Blank]*

17

1007915707v2

**Exhibit C-1**

**I UNDERSTAND THAT THIS AGREEMENT AFFECTS IMPORTANT RIGHTS. BY SIGNING BELOW, I CERTIFY THAT I HAVE READ IT CAREFULLY AND AM SATISFIED THAT I UNDERSTAND IT COMPLETELY.**

IN WITNESS WHEREOF, the undersigned has executed this agreement as a sealed instrument as of the date set forth below.

Signed: _____

Type or print name: _____

Date: _____

18

1007915707v2

**Exhibit C-2**

**EMPLOYMENT AGREEMENT**

This Employment Agreement ("Agreement") is made between Exeter Property Group, LLC, a Delaware limited liability company (the "Company"), and [_____] (the "Executive"). Capitalized terms used but not otherwise defined in this Agreement have the respective meanings assigned to such terms in the Securities Purchase Agreement, dated as of the date hereof (the "Purchase Agreement"), by and among EQT Exeter Holdings US, Inc., a Delaware corporation ("Purchaser"), and the sellers named therein, at the Closing (as defined in the Purchase Agreement). This Agreement is entered into on May [__], 2022 and is effective on the Effective Date (as defined below).

[WHEREAS, the Executive entered into an Employment Agreement dated [_____ __, 20__], Redwood Capital Group, LLC (the "Prior Employment Agreement")];[1] and

WHEREAS, following the Closing, the Company desires to continue to employ the Executive and the Executive desires to continue to be employed by the Company on the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Employment.

(a)      Term.  This Agreement shall be effective as of the Closing (the date of such Closing the "Effective Date").  If the Purchase Agreement is terminated without the Closing occurring, this Agreement shall be null and void and the Prior Agreement shall remain in effect.  The term of this Agreement shall commence on the Effective Date and continue for a three (3) year period, unless sooner terminated pursuant to the terms of this Agreement (the "Term").  Subject to termination pursuant to the terms of this Agreement, the Term shall be extended automatically for one (1) additional year upon its expiration, and each subsequent anniversary of such expiration thereafter.

(b)      Position and Duties. During the Term, the Executive shall serve as [_____] and shall have such powers and duties as may from time to time be prescribed by the Company that are consistent with his role.

(c)      Outside Activities.  During the Term, the Executive may (i) engage in charitable, educational and civic activities and other non-business activities (including serving as a member of the board of directors or board of trustees of a charitable, educational or other non-profit entity) and (ii) serve as a member of the board of directors or board of trustees of any for-profit Person with the prior written consent of the Company, provided such consent shall not be unreasonably withheld and so long as, in each case, such outside activities do not give rise to any conflicts of interest with the Company (or otherwise violate any then existing policies  of the applicable entity relating thereto), do not in the aggregate interfere with the performance of the Executive's duties hereunder (including his time commitments set forth in Section 1(b)), and do not otherwise constitute a violation of this Agreement.

---

[1] References to prior agreement to apply, if applicable

1

**Exhibit C-2**

2.      Compensation and Related Matters.

(a)      Base Salary.[2] The Executive's initial base salary shall be paid at the rate of $[___] per year.  The Executive's base salary shall be reviewed no less frequently than annually by the Company, and may be increased or decreased by the Company in its discretion, except that it may not be decreased for a period of two years from the Effective Date.  The base salary in effect at any given time is referred to herein as "Base Salary." The Base Salary shall be payable in a manner that is consistent with the Company's usual payroll practices for executive officers.

(b)      Incentive Compensation. During the Term, the Executive shall be eligible to receive cash incentive compensation, with a target bonus opportunity equal to [___%] of the Executive's Base Salary (the "Target Bonus"), with the amount actually payable in respect to any year determined by the Company in its discretion based on such factors as it shall determine (the "Annual Bonus").  Except as otherwise specifically provided in this Agreement, to earn an Annual Bonus, the Executive must be employed by the Company on the day such Annual Bonus is paid.  The Target Bonus may be increased or decreased by the Company in its discretion, except that the Target Bonus shall not be decreased for prior to calendar year 2024.

(c)      Expenses. The Executive shall be entitled to receive prompt reimbursement for all reasonable expenses incurred by him during the Term in performing services hereunder, in accordance with the policies and procedures then in effect and established by the Company for its employees

(d)      Other Benefits.  During the Term, the Executive shall be eligible to participate in or receive benefits under the Company's policies and employee benefit plans in effect from time to time, including with respect to paid time off, subject to the terms of such policies and plans and to the Company's right in its sole discretion to amend, modify, replace or terminate such plans and programs; provided, however, that the Executive shall be eligible for no less than twenty (20) days of paid vacation annually.

3.      Termination.  During the Term, the Executive's employment under this Agreement may be terminated only under the following circumstances:

(a)      Death.  The Executive's employment hereunder shall terminate upon his death.

(b)      Disability.  The Company may terminate the Executive's employment if the Executive has a Disability. For purposes of this Agreement, 'Disability' means that the Executive is unable, by reason of bona fide physical or mental injury, illness or other similar cause to perform his or her primary duties for a period of 270 consecutive days, and where such injury, illness or other similar cause would prevent the Executive from operating or functioning in a similar capacity in the future. The foregoing determination shall be made by a licensed independent physician reasonably agreed by the Executive (or his or her authorized representative) and the Purchaser. Nothing in this Section 3(b) shall be construed to waive the Executive's rights, if any, under existing law including, without limitation, the Family and Medical Leave Act of 1993, 29 U.S.C. §2601 *et seq*. and the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq* or other applicable laws.

(c)      Termination by Company for Cause.  The Company may terminate the Executive's employment hereunder for "Cause."  For purposes of this Agreement, "Cause" shall mean any of the following:

---

[2] Base salary to be the same as is currently provided.

2

1007867847v11

**Exhibit C-2**

(i)      a material violation by the Executive of any agreement with the Company or any of its affiliates, including partnership agreements, and such violation is not cured within ten (10) days after written demand by the Company or any of its affiliates

(ii)      failure by the Executive to comply with a material provision of the Company's policies, and such failure is not cured within ten (10) days after written demand by the Company or any of its affiliates;

(iii)      the Executive become, in the reasonable opinion of the Purchaser, as determined in good faith, addicted or dependent on intoxicants or drugs of any nature;

(iv)      the Executive's conviction of any misdemeanor involving theft or deception or any felony; or

(v)      the Executive's engagement in illegal or dishonest conduct or gross misconduct that is materially and demonstrably injurious to the Purchaser or its affiliates.

(d)      Termination by the Company Without Cause. The Company may terminate the Executive's employment hereunder at any time without Cause.

(e)      Termination by the Executive.  The Executive may terminate the Executive's employment hereunder at any time.

4.      Notice and Date of Termination.

(a)      Notice of Termination.  Except for termination as specified in Section 3(a), any termination of the Executive's employment by the Company or any such termination by the Executive shall be communicated by written Notice of Termination to the other party hereto.  For purposes of this Agreement, a "Notice of Termination" shall mean a notice which shall indicate the specific termination provision in this Agreement relied upon.

(b)      Date of Termination. "Date of Termination" shall mean:  (i) if the Executive's employment is terminated by his death, the date of his death; (ii) if the Executive's employment is terminated on account of Disability under Section 3(b) or by the Company for Cause under Section 3(c), the date on which Notice of Termination is given; (iii) if the Executive's employment is terminated by the Company without Cause under Section 3(d), the date on which a Notice of Termination is given and (iv) if the Executive's employment is terminated by the Executive under Section 3(e), a date selected by the Executive that is not less than thirty (30) days after the date on which a Notice of Termination is given. Notwithstanding the foregoing, in the event that the Executive gives a Notice of Termination to the Company, the Company may unilaterally accelerate the Date of Termination and such acceleration shall not result in a termination by the Company for purposes of this Agreement.

(c)      Resignation as Officer or Director.  Upon the termination of the Executive's services to the Company for any reason, the Executive shall resign from any position of director, trustee, manager or member of the investment committee of the Company or its affiliates (or in any similar capacity for) and any funds or accounts sponsored, managed or advised by any of the foregoing.

5.      Compensation Upon Termination.

(a)      Termination Generally.  If the Executive's employment with the Company is terminated for any reason, the Company shall pay or provide to the Executive (or to his authorized

3

1007867847v11

**Exhibit C-2**

representative or estate) (i) any Base Salary earned through the Date of Termination, unpaid expense reimbursements (subject to, and in accordance with, Section 2(c) of this Agreement) and unused vacation that accrued through the Date of Termination on or before the time required by law but in no event more than 30 days after the Executive's Date of Termination; and (ii) any vested benefits the Executive may have under any employee benefit plan of the Company through the Date of Termination, which vested benefits shall be paid and/or provided in accordance with the terms of such employee benefit plans (collectively, the "Accrued Benefit").

(b)    Termination by the Company Without Cause. During the Term, if the Executive's employment is terminated by the Company without Cause as provided in Section 3(d) then in addition to his Accrued Benefit under Section 5(a), subject to the Executive signing a general release of claims with respect to claims that the Executive has or may have in connection with his employment with the Company and that expressly preserves the Executive's rights under the Preserved Agreements (as defined below) and any other agreements related to the Executive's equity interests, indemnification rights or vested benefits (the "Separation Agreement") and the Separation Agreement becoming fully effective, all within the time frame set forth in the Separation Agreement but in no event later than 60 days after the Date of Termination:

(i)    the Company shall pay the Executive an amount equal to (x) the Executive's Base Salary[3] at the time of termination of the Executive's employment, provided that that such Base Salary amount shall not be less than the Base Salary set forth in Section 2(a) (the "Severance Amount"); and (y) continuation on the same terms as an active employee (including, where applicable, coverage for the Executive and the Executive's dependents) of medical insurance benefits that the Executive would otherwise be eligible to receive as an active employee of the Company ("Medical Benefit Continuation") until the Executive's death (the "Medical Benefit Continuation Period"). Notwithstanding the foregoing, if the Executive breaches any of the Continuing Obligations and such breach is not cured by the Executive after written notice and a reasonable opportunity to cure, all payments of the Severance Amount and the Medical Benefit Continuation shall immediately cease from and after the time of such breach.

(ii)    The Severance Amount shall be paid out in substantially equal installments in   accordance with   the Company's payroll practice over twenty-four (24) months commencing within 60 days after the Date of Termination; *provided*, however, that if the Severance Amount is deemed deferred compensation and the 60-day period begins in one calendar year and ends in a second calendar year, the Severance Amount shall begin to be paid in the second calendar year by the last day of such 60-day period; *provided*, further, that the initial payment shall include a catch-up payment to cover amounts retroactive to the day immediately following the Date of Termination. Each payment pursuant to this Agreement is intended to constitute a separate payment for purposes of Treasury Regulation Section 1.409A-2(b)(2).

(iii)    If, after the Company has taken reasonable actions, the Executive is not permitted to continue his participation in the Company's group medical insurance plan pursuant to the terms of such plan or pursuant to a determination by the Company's medical insurance providers, or if applicable rules and regulations under Federal or state law prohibit the Company from providing Executive with post-termination group health or other benefits coverage (either directly or through COBRA), or if continued participation post-employment in the Company's group medical insurance plans would result in the imposition of an excise tax on the Company pursuant to Section 4980D of the Internal Revenue Code of 1986 (the "Code"), then the Company shall instead pay to the Executive monthly during the Medical Benefit Continuation Period an

---

[3] Stated severance is for senior executives; amounts and timing of payment for other positions may be reduced.

4

1007867847v11

**Exhibit C-2**

amount equal to the full monthly premium amount applicable to the Executive had the Executive been able to continue participation in the Company's medical plan.

6.    Section 409A.

(a)    Anything in this Agreement to the contrary notwithstanding, if at the time of the Executive's separation from service within the meaning of Section 409A of the Code, the Company determines that the Executive is a "specified employee" within the meaning of Section 409A(a)(2)(B)(i) of the Code, then to the extent any payment or benefit that the Executive becomes entitled to under this Agreement on account of the Executive's separation from service would be considered deferred compensation otherwise subject to the 20 percent additional tax imposed pursuant to Section 409A(a) of the Code as a result of the application of Section 409A(a)(2)(B)(i) of the Code, such payment shall not be payable and such benefit shall not be provided until the date that is the earlier of (A) six months and one day after the Executive's separation from service, or (B) the Executive's death.  If any such delayed cash payment is otherwise payable on an installment basis, the first payment shall include a catch-up payment covering amounts that would otherwise have been paid during the six-month period but for the application of this provision, and the balance of the installments shall be payable in accordance with their original schedule.

(b)    All in-kind benefits provided and expenses eligible for reimbursement under this Agreement shall be provided by the Company or incurred by the Executive during the time periods set forth in this Agreement.  All reimbursements shall be paid as soon as administratively practicable, but in no event shall any reimbursement be paid after the last day of the taxable year following the taxable year in which the expense was incurred.  The amount of in-kind benefits provided or reimbursable expenses incurred in one taxable year shall not affect the in-kind benefits to be provided or the expenses eligible for reimbursement in any other taxable year (except for any lifetime or other aggregate limitation applicable to medical expenses).  Such right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit.

(c)    To the extent that any payment or benefit described in this Agreement constitutes "non-qualified deferred compensation" under Section 409A of the Code, and to the extent that such payment or benefit is payable upon the Executive's termination of employment, then such payments or benefits shall be payable only upon the Executive's "separation from service."  The determination of whether and when a separation from service has occurred shall be made in accordance with the presumptions set forth in Treasury Regulation Section 1.409A-1(h).

(d)    The parties intend that this Agreement will be administered in accordance with Section 409A of the Code.  To the extent that any provision of this Agreement is ambiguous as to its compliance with Section 409A of the Code, the provision shall be read in such a manner so that all payments hereunder comply with Section 409A of the Code.  Each payment pursuant to this Agreement is intended to constitute a separate payment for purposes of Treasury Regulation Section 1.409A-2(b)(2). The parties agree that this Agreement may be amended, as reasonably requested by either party, and as may be necessary to fully comply with Section 409A of the Code and all related rules and regulations in order to preserve the payments and benefits provided hereunder without additional cost to either party.

(e)    The Company makes no representation or warranty and shall have no liability to the Executive or any other person if any provisions of this Agreement are determined to constitute deferred compensation subject to Section 409A of the Code but do not satisfy an exemption from, or the conditions of, such Section.

1007867847v11

**Exhibit C-2**

7.    Continuing Obligations.

(a)    Executive Covenants and Continuing Obligations.    The Employee Confidentiality, Assignment, Nonsolicitation and Noncompetition Agreement between the Company and the Executive, attached hereto as Exhibit A (the "Employee Noncompetition Agreement"), is incorporated by reference, the terms of which are material terms of this Agreement.  For purposes of this Agreement, the obligations of Executive in this Section 7 shall collectively be referred to as the "Continuing Obligations." The Company has advised the Executive to consult with counsel of his choosing regarding the terms of the Employee Noncompetition Agreement prior to entering into this Agreement.  The Executive agrees and acknowledges that the Company has provided him a period of not less than 14 calendar days to review the Employee Noncompetition Agreement prior to the execution of this Agreement and the Employee Noncompetition Agreement.

(b)    Third-Party Agreements and Rights.  The Executive hereby confirms that the Executive is not bound by the terms of any agreement with any previous employer or other party which restricts in any way the Executive's use or disclosure of information or the Executive's engagement in any business. The Executive represents to the Company that the Executive's execution of this Agreement, the Executive's employment with the Company and the performance of the Executive's proposed duties for the Company will not violate any obligations the Executive may have to any such previous employer or other party.  In the Executive's work for the Company, the Executive will not disclose or make use of any information in violation of any agreements with or rights of any such previous employer or other party, and the Executive will not bring to the premises of the Company any copies or other tangible embodiments of non-public information belonging to or obtained from any such previous employment or other party.

(c)    Cooperation.  During and for a period of two years after the Executive's employment, upon the reasonable request from the Company, the Executive shall use reasonable efforts to respond and provide information, to the extent of the Executive's knowledge, with respect to (i) the defense or prosecution of any claims or actions now in existence or which may be brought in the future against or on behalf of the Company or (ii) an internal or third-party investigation or review, including investigation or review of any federal, state or local regulatory authority, which in each case relate to events or occurrences that transpired while the Executive was employed by the Company (a "Cooperation Matter"). In addition, upon the reasonable request from the Company, in connection with a Cooperation Matter the Executive shall be available to meet with counsel to prepare for discovery or trial and to act as a witness on behalf of the Company at mutually convenient times. The Company shall reimburse the Executive for any reasonable out-of-pocket expenses incurred in connection with the Executive's performance of obligations pursuant to this  Section 7(c).

8.    Consent to Jurisdiction.  The parties hereby consent to the jurisdiction of the state and federal courts of the State of Illinois and the United States District Courts in the State of Illinois. Accordingly, with respect to any such court action, the Executive (a) submits to the personal jurisdiction of such courts; (b) consents to service of process; and (c) waives any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process.

9.    Integration. This Agreement together with the Employee Noncompetition Agreement, the agreements related to the Executive's promote, capital contributions and accounts, the Purchase Agreement and the other documents entered into in connection therewith (the "Preserved Agreements") constitute the entire agreement between the parties with respect to compensation, severance pay, benefits and vesting and supersedes in all respects all prior agreements between the parties concerning such the subject matter hereof, including without limitation any offer letter, employment agreement

6

**Exhibit C-2**

or severance agreement relating to the Executive's employment (or business or service) relationship with the Company and/or the ending of that employment (or business or service) relationship.

10.     Withholding.   All payments made by the Company to the Executive under this Agreement shall be net of any tax or other amounts required to be withheld by the Company under applicable law.

11.     Successor to the Executive.   This Agreement shall inure to the benefit of and be enforceable by the Executive's personal representatives, executors, administrators, heirs, distributees, devisees and legatees.  In the event of the Executive's death after his termination of employment but prior to the completion by the Company of all payments due him under this Agreement, the Company shall continue such payments to the Executive's beneficiary designated in writing to the Company prior to his death (or to his estate, if the Executive fails to make such designation).  Nothing in this Agreement shall confer any rights or remedies upon any Person other than the parties hereto.

12.     Enforceability.   If any portion or provision of this Agreement (including, without limitation, any portion or provision of any section of this Agreement) shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

13.     Survival.   The provisions of this Agreement shall survive the termination of this Agreement and/or the termination of the Executive's employment to the extent necessary to effectuate the terms contained herein.

14.     Notices.   Any notices, requests, demands and other communications provided for by this Agreement shall be sufficient if in writing and delivered in person or sent by a nationally recognized overnight courier service or by registered or certified mail, postage prepaid, return receipt requested, to the Executive at the last address the Executive has filed in writing with the Company or, in the case of the Company, at its main offices, attention of the directors.

15.     Waiver.   No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving party.  The failure of any party to require the performance of any term or obligation of this Agreement, or the waiver by any party of any breach of this Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

16.     Amendment.   This Agreement may be amended or modified only by a written instrument signed by the Executive and by a duly authorized representative of the Company.

17.     Effect on Other Plans and Agreements.   Nothing in this Agreement shall be construed to limit the rights of the Executive under the Company's benefit plans, programs or policies except as otherwise provided in Section 7 hereof, and except that the Executive shall have no rights to any severance benefits under any Company severance pay plan, offer letter or otherwise.  In the event that the Executive is party to an agreement with the Company providing for payments or benefits under such agreement and this Agreement, the terms of this Agreement shall govern and the Executive may receive payment under this Agreement only and not both.

1007867847v11

**Exhibit C-2**

18.      Remedies Upon Breach.  If a party breaches, or proposes to breach, any portion of this Agreement, the other party shall be entitled to exercise all legal and equitable remedies, including to specifically enforce this Agreement.

19.      Governing Law.  This Agreement shall be construed under and be governed in all respects by the laws of the State of Illinois, without giving effect to the conflict of laws principles.  With respect to any disputes concerning federal law, such disputes shall be determined in accordance with the law as it would be interpreted and applied by the United States Court of Appeals for the Seventh Circuit.

20.      Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be taken to be an original; but such counterparts shall together constitute one and the same document.

21.      Assignment and Transfer by the Company; Successors.  Purchaser may assign its rights (but not its obligations) under this Agreement to any of its controlled affiliates, and otherwise, neither party may assign this Agreement, or any of the rights or obligations of such party hereunder, without the prior written consent of the other party. This Agreement shall be binding upon and inure to the benefit of and be enforceable by and against the successors, assigns and permitted transferees of the parties.

22.      Gender Neutral.  Wherever used herein, a pronoun in the masculine gender shall be considered as including the feminine gender unless the context clearly indicates otherwise.

[*Remainder of Page Intentionally Left Blank*]

8

1007867847v11

**Exhibit C-2**

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first set forth above.

**EXETER PROPERTY GROUP, LLC**

_____

By:
Its:

**EXECUTIVE**

_____

Name:  [  ]

1007867847v11

**Exhibit C-2**

**Exhibit A**

**Employee Confidentiality, Assignment, Nonsolicitation and Noncompetition Agreement**

As a condition of my employment by Exeter Property Group, LLC pursuant to the terms of, and in consideration of the Company's obligations set forth in, the Employment Agreement between Exeter Property Group, LLC and me of even date herewith (the "Employment Agreement"), which I acknowledge and agree provides consideration that I would not otherwise be entitled to absent me entering into this Employee Confidentiality, Assignment, Nonsolicitation, and Noncompetition Agreement (the "Agreement") and is sufficient consideration in addition to my employment. With those understandings, I agree as follows: The term "Company" as used in this Agreement means each of the Exeter Group Companies (Exeter US Advisor, LLC, Exeter Property Group, LLC, Exeter Property Group Advisors, LLC and each of the Exeter GPs, as well as their subsidiaries), EQT AB and each of its subsidiaries and other affiliates, except where the context requires otherwise (and the term "Companies" shall be construed accordingly).

1.      **Proprietary Information.** I agree that all information, whether or not in writing, concerning the Company's business, technology, business relationships or financial affairs that the Company has not released to the general public (collectively, "Proprietary Information") and all tangible embodiments thereof are and will be the exclusive property of the Company. By way of illustration, Proprietary Information may include information or material that has not been made generally available to the public, such as: (a) *corporate information,* including plans, strategies, methods, policies, resolutions, negotiations or litigation; (b) *information regarding advisory activities,* including strategies, methods, client, investor, business partner or prospect identities or other information about clients, investors, business partners, or prospects, information relating to the track record or investment performance of any client of the Company, or market analyses or projections; (c) *financial information,* including investment, financing or capital-raising sources, pricing information and methods, cost and performance data, debt arrangements, equity structure, investors and holdings, purchasing and sales data and price lists; (d) *operational and technological information,* including plans, specifications, manuals, forms, templates, software, testing data and strategies, research and development strategies, designs, methods, procedures, formulae, data, reports, discoveries, inventions, improvements, concepts, ideas, and other Developments (as defined below), know-how and trade secrets; and (e) *personnel information,* including personnel lists, reporting or organizational structure, resumes, personnel data, performance evaluations and termination arrangements or documents. Proprietary Information also includes information received in confidence by the Company from any member of the Company or any of its clients, investors, business partners, prospects or other third parties.

2.      **Recognition of Company's Rights**. I will not, at any time, without the Company's prior written permission, either during or after my employment, disclose any Proprietary Information to anyone outside of the Company, or use or permit to be used any Proprietary Information for any purpose other than the performance of my duties as an employee of the Company. I will reasonably cooperate with the Company and use my commercially reasonable best efforts to prevent the unauthorized disclosure of all Proprietary Information. I will deliver to the Company all copies and other tangible embodiments of Proprietary Information in my possession or control upon the earlier of a request by the Company or termination of my employment; provided that nothing in this Agreement or elsewhere shall prevent me from retaining and utilizing: documents relating to my personal benefits, entitlements and obligations; documents relating to my personal tax obligations; my desk calendar, personal contacts and the like; and such other records and documents as may reasonably be approved by the Company.

10

1007867847v11

**Exhibit C-2**

3.      **Rights of Others.** I understand that the Company is now and may hereafter be subject to nondisclosure or confidentiality agreements with third persons that require the Company to protect or refrain from use or disclosure of proprietary information. I agree to be bound by the terms of such agreements in the event I have access to such proprietary information. I understand that the Company strictly prohibits me from using or disclosing confidential or proprietary information belonging to any other person or entity (including any employer or former employer), in connection with my employment. In addition, I agree not to bring any confidential information belonging to any other person or entity, other than Redwood Capital Group LLC onto Company premises or into Company workspaces.

4.      **Commitment to Company; Avoidance of Conflict of Interest.** While an employee of the Company, I will devote my full-time efforts to the Company's business and I will not, directly or indirectly, engage in any other business activity, except as expressly authorized in writing and in advance by a duly authorized representative of the Company. I will advise an authorized officer of the Company or his or her designee at such time as any activity of either the Company or another business presents me with a conflict of interest or the appearance of a conflict of interest as an employee of the Company. I will take whatever reasonable action is requested of me by the Company to resolve any conflict or appearance of conflict which it finds to exist.

5.      **Developments.** I will make full and prompt disclosure to the Company of all inventions, discoveries, designs, developments, methods, modifications, improvements, processes, algorithms, data, databases, computer programs, research, formulae, techniques, trade secrets, graphics or images, and audio or visual works and other works of authorship, and other intellectual property, including works-in-process (collectively "Developments") whether or not patentable or copyrightable, that are created, made, conceived or reduced to practice by me (alone or jointly with others) or under my direction during the period of my employment. I acknowledge that all work performed by me is on a "work for hire" basis, and I hereby do assign and transfer and, to the extent any such assignment cannot be made at present, will assign and transfer, to the Company and its successors and assigns all my right, title and interest in and to all Developments that (a) relate to the business of the Company or any investor or business partner of the Company or any of the products or services being researched, developed, manufactured or sold by the Company or which may be used with such products or services; or (b) result from tasks assigned to me by the Company; or (c) result from the use of premises or personal property (whether tangible or intangible) owned, leased or contracted for by the Company ("Company- Related Developments"), and all related patents, patent applications, trademarks and trademark applications, copyrights and copyright applications, *sui generis* database rights and other intellectual property rights in all countries and territories worldwide and under any international conventions ("Intellectual Property Rights").

To preclude any possible uncertainty, I confirm that there are no Developments that I have, alone or jointly with others, conceived, developed or reduced to practice prior to the commencement of my employment with the Company that I consider to be my property or the property of third parties and that I wish to have excluded from the scope of this Agreement.

This Agreement does not obligate me to assign to the Company any Development that is developed entirely on my own time and does not relate to the business efforts or research and development efforts in which, during the period of my employment, the Company actually is engaged or reasonably would be engaged, and does not result from the use of premises or equipment owned or leased by the Company. However, I will also promptly disclose to the Company any such Developments for the purpose of determining whether they qualify for such exclusion. I understand that to the extent this Agreement is required to be construed in accordance with the laws of any state which precludes a requirement in an employee agreement to assign certain classes of inventions made by an employee, this

11

**Exhibit C-2**

Section 5 will be interpreted not to apply to any invention that a court rules and/or the Company agrees falls within such classes. I also hereby waive all claims to any moral rights or other special rights that I may have or accrue in any Company-Related Developments.

6.    **Documents and Other Materials.** I will keep and maintain adequate and current records of all Proprietary Information and Company-Related Developments developed by me during my employment, which records will be available to and remain the sole property of the Company at all times.

All files, letters, notes, memoranda, reports, records, data, sketches, drawings, notebooks, layouts, charts, quotations and proposals, specification sheets, blueprints, models, prototypes, or other written, photographic or other tangible material containing Proprietary Information, whether created by me or others, which come into my custody or possession, are the exclusive property of the Company to be used by me only in the performance of my duties for the Company. Any property situated on the Company's premises and owned by the Company, including without limitation computers, disks and other storage media, filing cabinets or other work areas, is subject to inspection by the Company at any time with or without notice. In the event of the termination of my employment for any reason, I will deliver to the Company all Company property and equipment in my possession, custody or control, including all files, letters, notes, memoranda, reports, records, data, sketches, drawings, notebooks, layouts, charts, quotations and proposals, specification sheets, blueprints, models, prototypes, or other written, photographic or other tangible material containing Proprietary Information, and other materials of any nature pertaining to the Proprietary Information of the Company and to my work, and will not take or keep in my possession any  of the foregoing or any  copies; provided that  nothing in this Agreement or elsewhere shall prevent me from retaining and utilizing: documents relating to my personal benefits, entitlements and obligations; documents relating to my personal tax obligations; my desk calendar, personal contacts and the like; and such other records and documents as may reasonably be approved by the Company.

7.    **Enforcement of Intellectual Property Rights.** I will cooperate fully with the Company, both during and after my employment with the Company, with respect to the procurement, maintenance and enforcement of Intellectual Property Rights in Company-Related Developments. I will sign, both during and after my employment, all papers, including without limitation copyright applications, patent applications, declarations, oaths, assignments of priority rights, and powers of attorney, which the Company may deem necessary or desirable in order to protect its rights and interests in any Company-Related Development or Intellectual Property Rights therein. If the Company is unable, after reasonable effort, to secure my signature on any such papers, I hereby irrevocably designate and appoint each officer of the Company as my agent and attorney-in-fact to execute any such papers on my behalf, and to take any and all actions as the Company may deem necessary or desirable in order to protect its rights and interests in any Company-Related Development, including any Intellectual Property Rights therein.

8.    **Noncompetition and Nonsolicitation.** In order to protect the Company's Proprietary Information and goodwill, during my employment and for a period of one (1) year following the date of the cessation of my employment  (the "Restricted Period"), I irrevocably undertake and agree that I shall not:

(a)    whether individually or as owner, part owner, shareholder, partner, member, director, officer, trustee, employee, agent, consultant or in any other capacity, on behalf of myself or any Person, engage or prepare to engage in a Competing Business (as defined below); or

12

**Exhibit C-2**

(b)         (i) be or become an owner, part owner, shareholder, partner, member, director, officer, trustee, employee, consultant, bondholder, creditor, agent or representative of, or (ii) in any manner give financial, strategic, operational, technical or other assistance to, whether in a competitive capacity or any other capacity, any Person engaged in a Competing Business; provided, that nothing in this Agreement shall prevent or restrict me from (i) owning a passive investment that, when aggregated with the holdings of the members of my immediate family and their respective Affiliates, constitutes less than five percent (5%) of the outstanding shares or comparable interests in a publicly traded entity, so long as I do not have, or exercise, any rights to manage or operate the business of such issuer other than rights as a shareholder thereof; or (ii) being employed by an entity that engages in a Competing Business, so long as (A) the entity has more than one discrete and readily distinguishable line of business and my duties are not at or involving the part of the entity's business that is engaged in a Competing Business or (B) such employment will not require me to engage in any type of executive, managerial, strategic, technical, or business development activities or any other activities similar to the types of activities or functions I performed for or on behalf of the Company during my employment or engagement;

(c)         solicit, divert or take away, or attempt to solicit, divert or take away, any Clients or Prospects or cause any Clients or Prospects to reduce or adversely alter their business with the Company;

(d)         (i) solicit or entice, or attempt to solicit or entice, any employee, agent or consultant of the Company to terminate his, her or its employment or engagement with the Company, or (ii) hire or engage or facilitate the hiring or engagement of any person who is then employed or engaged by the Company or who was employed or engaged by the Company within the two (2) year period immediately preceding such action by me; provided, that Section 8(d)(i) does not apply to advertising through mass media or communications that are not specifically directed at employees, agents or consultants of the Company;

(e)         work or prepare to work in any enterprise involving a Competing Business with any employee, agent or consultant or former employee, agent or consultant of the Company who was employed by or acted as an agent or consultant to the Company at any time during the two (2) year period preceding such action by me; or

(f)         in connection with any Competing Business, solicit for business any person or entity doing business with the Company or any fund, managed account, joint venture or other Person sponsored, managed or advised by the Company (including vendors, suppliers, developers, managers or lenders), or attempt in any way to interfere with the business relationship existing between the Company, on the one hand, and any such person or entity, on the other hand.

For purposes of this Section 8:

"Client" means any fund, managed account, joint venture or other Person sponsored, managed or advised by any of the Exeter Group Companies and any investor, investee company, supplier, vendor, customer, licensee, distributor, contractor or any fund in which a member of the EQT Firm acts or acted as general partner, manager, investment advisor or investment sub- advisor in any such fund, managed account joint venture or other Person;

"Competing Business" means any business activity in any country or territory in which any of the Exeter Group Companies market any of their respective services as of the first day of the cessation of my employment with the Company that involves the performance of any services that are competitive with the services of any of the Exeter Group Companies, or that are the subject of active planning at the time of the cessation of my employment with the Company;

13

1007867847v11

**Exhibit C-2**

"EQT Firm" means EQT AB and/or any one or more of its direct or indirect subsidiaries, and/or any other entity that EQT AB, in its reasonable discretion, may deem to be part of the EQT Firm and of which I have actual notice; and

"Prospect" means any Person who: (i) has, either orally or in writing, expressed an interest in becoming a Client; or (ii) is, either orally or in writing, being actively solicited to become a Client within the most recent six months of employment (such time to be measured as of the date of any conduct alleged to be in violation of this Agreement).

9.      **Government Contracts.** I acknowledge that the Company may have from time to time agreements with other persons or with the United States Government or its agencies that impose obligations or restrictions on the Company regarding inventions made during the course of work under such agreements or regarding the confidential nature of such work. I agree to comply with any such obligations or restrictions upon the direction of the Company. In addition to the rights assigned under paragraph 5,1 also assign to the Company (or any of its nominees) all rights that I have or acquired in any Developments, full title to which is required to be in the United States under any contract between the Company and the United States or any of its agencies.

10.      **Non-Disparagement**. At all times I shall not (i) commit any act in bad faith which is seriously detrimental to the business of a member of the EQT Firm or any fund in which a member of the EQT Firm acts or acted as the general partner, manager, investment advisor or investment sub-advisor including without limitation any conduct detrimental to the name or reputation of a member of the EQT Firm, or (ii) willfully make any derogatory statement or communication about the EQT Firm or any of its businesses, products, services, personnel or activities; provided, however, that nothing in this Section 10 or elsewhere prohibits myself from (a) communicating with government agencies about possible violations of federal, state, or local laws or otherwise providing information to government agencies, filing a complaint with government agencies or participating in government agency investigations or proceedings or (b) exercising or enforcing any of my rights under this Agreement.

11.      **Prior Agreements.** I hereby represent that, except as I have fully disclosed previously in writing to the Company, I am not bound by the terms of any agreement with any previous or current employer or other party to refrain from using or disclosing any trade secret or confidential or proprietary information in the course of my employment with the Company or to refrain from competing, directly or indirectly, with the business of such employer or any other party. I further represent that my performance of all the terms of this Agreement as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me in confidence or in trust prior to my employment with the Company. I will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employer or others.

12.      **Remedies Upon Breach.** I understand that the restrictions contained in this Agreement are necessary for the protection of the business and goodwill of the Company and I consider them to be reasonable for such purpose. Any breach of this Agreement is likely to cause the Company substantial and irrevocable damage and therefore, in the event of such breach, the Company, in addition to such other remedies which may be available, will be entitled to specific performance and other injunctive relief, without the posting of a bond. I further acknowledge that a court may render an award extending the Restricted Period as one of the remedies in the event of my violation of this Agreement.

13.      **Use of Voice, Image and Likeness.** I give the Company permission to use any and all of my voice, image and likeness, with or without using my name, in connection with the products and/or services of the Company, for the purposes of advertising and promoting such products and/or

14

1007867847v11

**Exhibit C-2**

services and/or the Company, and/or for other purposes deemed appropriate by the Company in its reasonable discretion, except to the extent prohibited by law.

14.    **No Employment Obligation.** I understand that this Agreement does not create an obligation on the Company or any other person to continue my employment. I acknowledge that, unless otherwise agreed in a formal written employment agreement signed on behalf of the Company by an authorized officer, my employment with the Company is at will and therefore may be terminated by the Company or me at any time and for any reason, with or without cause.

15.    **Survival and Assignment by the Company.** I understand that my obligations under this Agreement will continue in accordance with its express terms regardless of any changes in my title, position, duties, salary, compensation or benefits or other terms and conditions of employment. I further understand that my obligations under this Agreement will continue following the termination of my employment regardless of the manner of such termination and will be binding upon my heirs, executors and administrators. The Company will have the right to assign this Agreement to its affiliates, successors and assigns. I expressly consent to be bound by the provisions of this Agreement for the benefit of the Company or any parent, subsidiary or affiliate to whose employ I may be transferred without the necessity that this Agreement be resigned at the time of such transfer.

16.    **Post-Employment Notifications.** During the Restricted Period, I will notify the Company of any change in my address and of each subsequent employment or business activity, including the name and address of my employer or other post-Company employment plans and the nature of my activities.

17.    **Disclosures During Restricted Period.** I will provide a copy of this Agreement to any person or entity with whom I may enter into a business relationship, whether as an employee, consultant, partner, coventurer or otherwise, prior to entering into such business relationship during the Restricted Period.

18.    **Severability.** In case any provisions (or portions thereof) contained in this Agreement shall, for any reason, be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. If, moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

19.    **Waiver.** I acknowledge and agree that no waiver of any of my obligations under this Agreement shall be effective unless made in writing by the Company. The failure of the Company to require my performance of any term or obligation of this Agreement, or the waiver of any breach of this Agreement, shall not prevent the Company's subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

20.    **Choice of Law and Jurisdiction.** This Agreement will be deemed to be made and entered into in the State of Illinois, and will in all respects be interpreted, enforced and governed under the laws of the State of Illinois. I hereby consent to personal jurisdiction of the state and federal courts situated within Illinois for purposes of enforcing this Agreement, and waive any objection that I might have to personal jurisdiction or venue in those courts.

15

1007867847v11

**Exhibit C-2**

21.     **Independence of Obligations.** My obligations under this Agreement are independent of any obligation, contractual or otherwise, the Company has to me. The Company's breach of any such obligation shall not be a defense against the enforcement of this Agreement or otherwise limit my obligations under this Agreement.

22.     **Protected Disclosures.** I understand that nothing contained in this Agreement limits my ability to communicate with any federal, state or local governmental agency or commission, including to provide documents or other information, without notice to the Company. I also understand that nothing in this Agreement limits my ability to share compensation information concerning myself or others, except that this does not permit me to disclose compensation information concerning others that I obtain because my job responsibilities require or allow access to such information.

23.     **Defend Trade Secrets Act of 2016.** I understand that pursuant to the federal Defend Trade Secrets Act of 2016 I shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

24.     **Entire Agreement; Amendment.** This Agreement together with the Employment Agreement the Securities Purchase Agreement of even date hereof and the other documents entered into in  connection therewith constitute the entire agreement between the Company and me with respect to the subject matter hereof, and supersedes all prior agreements or understandings, both written and oral, between the Company and me with respect to the subject matter hereof, but does not in any way merge with or supersede any other confidentiality, assignment of inventions or other restrictive covenant agreement or obligation entered into by the Company and me, which agreements and obligations shall supplement, and shall not limit or be limited by, this Agreement. This Agreement may be amended only in a written agreement executed by a duly authorized officer of the Company and me.

*[Remainder of Page Intentionally Left Blank]*

1007867847v11

**Exhibit C-2**

**I UNDERSTAND THAT THIS AGREEMENT AFFECTS IMPORTANT RIGHTS. BY SIGNING BELOW, I CERTIFY THAT I HAVE READ IT CAREFULLY AND AM SATISFIED THAT I UNDERSTAND IT COMPLETELY.**

IN WITNESS WHEREOF, the undersigned has executed this agreement as a sealed instrument as of the date set forth below.

Signed:    _____

Type or print name: _____

Date: _____

17

1007867847v11

**EXHIBIT D**
**FORM OF ASSIGNMENT OF COMPANY INTERESTS**

(See attached.)

**ASSIGNMENT OF COMPANY INTERESTS**
**OF**
**REDWOOD CAPITAL GROUP HOLDINGS, LLC**

This ASSIGNMENT OF COMPANY INTERESTS (this "Assignment") is made and entered into as of [●], 2022, by and among the Sellers listed on the signature pages hereto (each, an "Assignor" and, collectively, the "Assignors"), Exeter Property Group, LLC, a Delaware limited liability company ("Assignee"), and, solely for purposes of Section 2, Redwood Capital Group Holdings, LLC (the "Company").

WHEREAS, the Assignors collectively own 100% of the membership interests in the Company; and

WHEREAS, pursuant to Section 1.1 of that certain Purchase Agreement, dated as of May 11, 2022, between the Assignors and Assignee (the "Purchase Agreement"), upon the terms and subject to the conditions of the Purchase Agreement, the Assignors agreed to sell, assign, convey, transfer and deliver to Assignee and Assignee agreed to purchase, accept and acquire from the Assignors all of the Company Interests (the "Purchased Interests") on the date hereof. Capitalized terms used but not defined herein shall have the meaning ascribed thereto in the Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    Assignment of Company Interests.  Effective as of the Closing and upon the terms and subject to the conditions of the Purchase Agreement, each of the Assignors hereby sells, assigns, conveys, transfers and delivers to Assignee and Assignee hereby purchases, accepts and acquires all of the Assignors' right, title and interest in and to the Purchased Interests, in each case, free and clear of all Encumbrances (other than restrictions on transfer arising under applicable securities Laws).

2.    Admission as a Member.  The Company, and each Assignor, acknowledges and agrees that from and after the Closing, (a) Assignee shall be admitted as the sole member of the Company and (b) contemporaneously therewith, the Assignors shall withdraw and cease to be members of the Company and shall have no further rights as members of the Company under the Second Amended and Restated Limited Liability Company Agreement of Redwood Capital Group Holdings, LLC, dated as of November 10, 2020, except as expressly provided in Section 5.6 of the Purchase Agreement.

3.    No Modification of Purchase Agreement.  Neither the making nor the acceptance of this sale, conveyance, assignment and transfer shall enlarge, restrict or otherwise modify the terms of the Purchase Agreement or constitute a waiver or release by any party to the Purchase Agreement of any liabilities, duties or obligations imposed thereby. This instrument does not create or establish rights, liabilities or obligations not otherwise created or existing under or pursuant to the Purchase Agreement. In the event of any conflict or inconsistency between the

1007898494v6

-2-

terms of this Assignment and the terms of the Purchase Agreement, the terms of the Purchase Agreement will control.

4.    <u>Further Assurances</u>.  From time to time following the Closing, at the request of any party hereto and without further consideration, the other parties shall execute and deliver to such requesting party such instruments and documents and take such other action as such requesting party may reasonably request to consummate more fully and effectively the transactions contemplated by this Assignment.

5.    <u>Miscellaneous</u>.  <u>Sections 9.1</u>, <u>9.3</u>, <u>9.4</u>, <u>9.5</u>, <u>9.8</u>, <u>9.9</u>, <u>9.10</u>, <u>9.11</u>, <u>9.12</u> and <u>9.13</u> of the Purchase Agreement shall apply to this Assignment *mutatis mutandis*.

[*Signature Page Follows*]

1007898494v6

IN WITNESS WHEREOF, each Assignor and Assignee has each duly executed this Assignment to be effective as of the date first written above.

**<u>ASSIGNORS:</u>**

TRIPOST CAPITAL RCG INVESTMENTS, LP

By: _____
      Name:
      Title:

_____
MARK ISAACSON

_____
DAVID CARLSON

REDWOOD EMPLOYEE MEMBER LLC

By: _____
      Name:
      Title:

*Acknowledged and agreed as to Section 2*:

REDWOOD CAPITAL GROUP HOLDINGS, LLC

By: _____
      Name:
      Title:

[*Signature Page to Assignment of Company Interests of Redwood Capital Group Holdings, LLC*]

1007898494v6

**ASSIGNEE:**

EXETER PROPERTY GROUP, LLC

By: _____

Name:
Title:

[*Signature Page to Assignment of Company Interests of Redwood Capital Group Holdings, LLC*]

1007898494v6

**ASSIGNMENT OF INTERESTS**
**OF**
**REDWOOD RESIDENTIAL, LLC**

This ASSIGNMENT OF INTERESTS (this "Assignment") is made and entered into as of [●], 2022, by and among the Seller listed on the signature pages hereto (the "Assignor"), Exeter Property Group, LLC, a Delaware limited liability company ("Assignee"), and, solely for purposes of Section 2, Redwood Residential, LLC (the "Company").

WHEREAS, the Assignor owns 14.4118% of the membership interests in the Company; and

WHEREAS, pursuant to Section 1.1 of that certain Purchase Agreement, dated as of May 11, 2022, between the Assignor, the other Sellers thereunder and Assignee (the "Purchase Agreement"), upon the terms and subject to the conditions of the Purchase Agreement, the Assignor agreed to sell, assign, convey, transfer and deliver to Assignee and Assignee agreed to purchase, accept and acquire from the Assignor all of the Transferred Residential Interests (the "Purchased Interests") on the date hereof. Capitalized terms used but not defined herein shall have the meaning ascribed thereto in the Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      Assignment of Company Interests.  Effective as of the Closing and upon the terms and subject to the conditions of the Purchase Agreement, the Assignor hereby sells, assigns, conveys, transfers and delivers to Assignee and Assignee hereby purchases, accepts and acquires all of the Assignor's right, title and interest in and to the Purchased Interests, in each case, free and clear of all Encumbrances (other than restrictions on transfer arising under applicable securities Laws).

2.      Admission as a Member.  The Company, and the Assignor, acknowledges and agrees that from and after the Closing, (a) Assignee shall be admitted as a member of the Company and (b) contemporaneously therewith, the Assignor shall withdraw and cease to be members of the Company and shall have no further rights as a member of the Company under the limited liability company agreement of the Company, except as expressly provided in Section 5.6 of the Purchase Agreement.

3.      No Modification of Purchase Agreement.  Neither the making nor the acceptance of this sale, conveyance, assignment and transfer shall enlarge, restrict or otherwise modify the terms of the Purchase Agreement or constitute a waiver or release by any party to the Purchase Agreement of any liabilities, duties or obligations imposed thereby. This instrument does not create or establish rights, liabilities or obligations not otherwise created or existing under or pursuant to the Purchase Agreement. In the event of any conflict or inconsistency between the terms of this Assignment and the terms of the Purchase Agreement, the terms of the Purchase Agreement will control.

1007911940v2

4.    <u>Further Assurances</u>.  From time to time following the Closing, at the request of any party hereto and without further consideration, the other parties shall execute and deliver to such requesting party such instruments and documents and take such other action as such requesting party may reasonably request to consummate more fully and effectively the transactions contemplated by this Assignment.

5.    <u>Miscellaneous</u>.  Sections 9.1, <u>9.3</u>, <u>9.4</u>, <u>9.5</u>, <u>9.8</u>, <u>9.9</u>, <u>9.10</u>, <u>9.11</u>, <u>9.12</u> and <u>9.13</u> of the Purchase Agreement shall apply to this Assignment *mutatis mutandis*.

[*Signature Page Follows*]

-2-

1007911940v2

IN WITNESS WHEREOF, the Assignor and Assignee have each duly executed this Assignment to be effective as of the date first written above.

**<u>ASSIGNOR:</u>**

TRIPOST CAPITAL RCG INVESTMENTS, LP
By:  TriPost Capital RCG Investments GP, LLC, its General Partner

By:  _____
     Name:  Bradley H. Carroll
     Title:  Managing Partner

By:  _____
     Name:  Todd D. Silverman
     Title:  Managing Partner

*Acknowledged and agreed as to Section 2*:

REDWOOD RESIDENTIAL, LLC

By:  _____
     Name:
     Title:

[*Signature Page to Assignment of Interests of Redwood Residential, LLC*]

1007911940v2

**ASSIGNEE:**

EXETER PROPERTY GROUP, LLC


By: _____
      Name:
      Title:


[*Signature Page to Assignment of Interests of Redwood Residential, LLC*]


1007911940v2

## <u>EXHIBIT E</u>
## LIQUIDATED DAMAGES LETTER

(See attached.)

1007814448v21

## LIQUIDATED DAMAGES AGREEMENT

**THIS LIQUIDATED DAMAGES AGREEMENT** (this *"*Agreement"*) is made as of the __th day of May, 2022, by and among Exeter Property Group, LLC, a Delaware limited liability (the "Company") and David Carlson ("Executive").

**WHEREAS**, as of even date herewith, the Company, Executive, Mark Isaacson ("Mr. Isaacson" and, together with Executive, TriPost Capital RCG Investments, LP, a Delaware limited partnership (the "TriPost Seller" and together with Mr. Carlson and Mr. Isaacson, each, a "Seller", and collectively, the "Sellers") have entered into a Purchase Agreement pursuant to which Sellers agreed to sell to Buyer 100% of the issued and outstanding Company Interests of Redwood Capital Group Holdings, LLC, a Delaware limited liability company ("RCG");

**WHEREAS,** Executive has a significant ownership interest in RCG;

**WHEREAS**, in accordance with the terms of the Purchase Agreement, Executive will receive substantial benefits as a result of the completion of the transactions contemplated by the Purchase Agreement;

**WHEREAS**, Executive's commitment to continue to provide services to or for the benefit of the Company or a Related Company (as defined below) with respect to the business and operations of RCG and its affiliates to be acquired pursuant to the Purchase Agreement is a material inducement for the Company to enter into the Purchase Agreement;

**WHEREAS**, as a material inducement for Company to enter into the Purchase Agreement and consummate the transactions contemplated thereby, Executive has agreed to execute and deliver this Agreement.

**NOW, THEREFORE**, the parties hereto, in consideration of the foregoing recitals and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, do hereby agree as follows:

**1.    Agreement to Pay Damages.**  (a)  Establishment of Obligation.  Executive agrees that if (i) Executive voluntarily terminates Executive's employment (a "Triggering Voluntary Termination") for any reason other than for Good Reason (as defined in the Employment Agreement between the Company and Executive, dated of even date herewith (the "Employment Agreement") prior to the third anniversary (the "Third Anniversary Date") of the closing of the Purchase Agreement (the "Closing Date") or (ii) Executive's employment is terminated on or prior to the Third Anniversary Date by the Company for Cause (as defined in the Employment Agreement) arising from the Executive's (x) fraud, willful misconduct or gross negligence in the performance of his duties and that otherwise has resulted in material and demonstrative injury to the Company or any Related Company or (y) intentional and material breach of his contractual obligations to the Company or any Related Company set forth on Annex I hereto (each of (x) and (y), a "Triggering Cause Termination"):  (i) $7,000,000, if the date of termination occurs prior to the second anniversary of the Closing Date, (ii) $6,000,000, if the date of termination occurs on or after the second anniversary of the Closing Date and prior to the 30-month anniversary of the Closing Date, and (iii) $5,000,000, if the date of termination occurs on or after the 30-month

1007911920v7

anniversary of the Closing Date and prior to the Third Anniversary Date (the applicable payment amount, the "Liquidated Damages Amount"), in immediately available funds no later than the Payment Date (defined below). For purposes of this Agreement, the term "Related Company" means any corporation, partnership, joint venture, or other entity in which the Company holds a direct or indirect ownership or proprietary interest of fifty percent (50%) percent or more, or which holds a direct or indirect ownership or proprietary interest of fifty percent (50%) percent or more in the Company.  As used herein, "Conclusively Established" means that a matter has been (a) acknowledged pursuant to a final settlement executed by Executive, or (b) established pursuant to a final unappealable order, judgment, or decree of any court of competent jurisdiction (or if applicable, arbitrator or arbitration panel). The "Payment Date" shall mean the later of thirty (30) days after a Triggering Voluntary Termination or (ii) ten (10) business days following the date on which the basis for the payment in respect of a Triggering Cause Termination has been Conclusively Established.

(b)    Approved Leave of Absence.  The Company and Company agree that Executive's absence from employment with the Company or a Related Company pursuant to a leave authorized under the applicable policies of the Company or a Related Company shall not be deemed a termination of Executive's employment under this Agreement.

(c)    Extinguishment of Liquidated Damages Obligation.  Notwithstanding anything else contained herein to the contrary, so long as he is employed by the Company or a Related Company from the Closing Date to the Third Anniversary Date, Executive shall have no further obligation hereunder to pay the Company the Liquidated Damages Amount.  Notwithstanding anything herein to the contrary, if, after the Closing Date and prior to the Third Anniversary Date, (i) Executive's employment shall be terminated by the Company or a Related Company without Cause or by Executive for Good Reason, (ii) Executive's employment shall terminate due to his death or Disability (as defined in the Employment Agreement) or (iii) a Change in Control shall occur, Executive shall have no further obligation hereunder to pay the Company the Liquidated Damages Amount.  For purposes of this Agreement, a Change in Control shall mean a direct or indirect sale or transfer (in a single transaction or through a series of related transactions, pursuant to a merger, equity sale or otherwise) to any person other than a Related Company of: (A) securities representing greater than 50% of the outstanding voting power, or economic interest in (whether by way of a sale of securities, merger or otherwise) RCG; or (B) all or substantially all of the assets of the RCG and its subsidiaries, taken as a whole.

2.    **Effectiveness of Agreement**.  In the event the Purchase Agreement is terminated without having been consummated, this Agreement shall be rendered null and void *ab initio* and Executive and the Company shall have no further obligations under this Agreement.

3.    **Assignment by the Company**.  The obligations of the Company hereunder shall be the obligations of any and all successors and assigns of the Company. The Company may assign this Agreement to any Related Company or to any company that acquires all or substantially all of the Company's interests in RCG or into which or with which the Company is merged or consolidated. This Agreement may not be assigned by Executive, and no person other than Executive (or Executive's estate) may assert the rights of Executive under this Agreement.

2

1007911920v7

**4**        **Business Discretion of the Company and Employment at Will**.  Nothing in this Agreement is intended to limit the discretion of the Company or any Related Company to take any action with regard to the employment decisions that the Company or any Related Company may consider appropriate.  This Agreement does not entitle Executive to remain in the employ of the Company or any Related Company for any minimum or prescribed period or term.

**5.**        **Waivers and Amendments**.  This Agreement may be amended, superseded, canceled or extended, and the terms hereof may be waived, only by a written instrument signed by the Company and Executive or, in the case of a waiver, by the Company. No delay on the part of any party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party hereto of any such right, power or privilege, nor any single or partial exercise of any such right, power or privilege, preclude any further exercise thereof or the exercise of any other such right, power or privilege.

**6.**        **Entire Agreement**.  This Agreement, together with the Purchase Agreement (and any ancillary agreement entered into in accordance therewith) and the Employment Agreement, sets forth the entire understanding of the Company and Executive, and supersedes all prior agreements and communications, whether oral or written, with respect to the subject matter hereof.

**7.**        **Governing Law**.

        **(a)**        This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to conflict of laws principles thereof.

        **(b)**        All actions and proceedings based upon, arising out of or relating to this Agreement shall be heard and determined in the state courts of the State of Illinois or the United States District Court, in each case, located in the State of Illinois (the "Agreed Courts"), and the parties hereto hereby irrevocably submit to the exclusive jurisdiction of such courts (and, in the case of appeals, appropriate appellate courts therefrom) in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding.  The consents to jurisdiction set forth in this paragraph shall not constitute general consents to service of process in the State of Illinois and shall have no effect for any purpose except as provided in this paragraph and shall not be deemed to confer rights on any Person other than the parties hereto.  The parties hereto agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.  The court shall award to the prevailing party all costs and reasonable attorneys' fees incurred by the prevailing party.

**8.**        **Severability**.  If any provision of this Agreement is held to be invalid, void or unenforceable, the remaining provisions shall nevertheless continue in full force and effect.

**9.**        **Arm's Length Agreement**.  This Agreement has been negotiated and prepared at the request, direction and construction of each of Executive and the Company, at arm's length, with the advice and participation of counsel, and will be interpreted in accordance with its terms without favor to any party.

3

1007911920v7

          **10.**      **Counterparts; Electronic Delivery**.  This Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument, and such counterparts may be delivered electronically.

4

PRIVILEGED AND CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first set forth above.

EXECUTIVE


_____

David Carlson


EQT EXETER HOLDINGS US, INC.


By: _____
    Name:
    Title:

## **Annex I**
## **Contraction Provisions**

- Section 1(c) (*Outside Activities*) of the Employment Agreement

- The following sections of Exhibit A to the Employment Agreement:
  - 1 (*Proprietary Information*)
  - 2 (*Recognition of Company's Rights*)
  - 3 (*Rights of Others*)
  - 5 (*Developments*)
  - 6 (*Documents and Other Materials*)
  - 8 (*Noncompetition and Nonsolicitation*)
  - 9 (*Government Contracts*)
  - 10 (*Non-Disparagement*)

**EXHIBIT F**
**A&R RESIDENTIAL LLC AGREEMENT**

(See attached.)

1007814448v21

## SECOND AMENDED AND RESTATED OPERATING AGREEMENT OF REDWOOD RESIDENTIAL LLC

This Second Amended and Restated Operating Agreement ("Agreement") of Redwood Residential LLC (the "Company") is entered this [●] day of [●], 2022, by Exeter Property Group, LLC, a Delaware limited liability company ("EQT Exeter"), and the persons listed under the heading "Redwood Members" on Exhibit A attached hereto (each a "Redwood Member," and together with such other management employees (or consultants, as applicable) of the Company and its Affiliates who shall become members of the Company and are designated "Redwood Members" after the date hereof in accordance with Section 11.1 or 11.2 of this Agreement, the "Redwood Members").

**WHEREAS**, the original operating agreement of Redwood Residential LLC was entered on May 6, 2017, by Redwood Capital Group, LLC, an Illinois limited liability company ("Redwood Capital") in its capacity as the sole member of the Company, and such operating agreement was amended and restated in its entirety on April 16, 2018 by Redwood Capital in its capacity as the sole member of the Company (as so amended and restated, the "Prior Agreement");

**WHEREAS**, on the date hereof, pursuant to that certain purchase agreement, dated May 11, 2022 (the "Purchase Agreement"), among EQT Exeter, David Carlson, Mark Isaacson and TriPost Capital RCG Investments, LP ("TriPost Seller"), EQT Exeter acquired 100% of the limited liability company interests in Redwood Capital Group Holdings, LLC, a Delaware limited liability company and the owner of 100% of the limited liability company interests in Redwood Capital ("RCG Holdings");

**WHEREAS**, on [●], 2022, Redwood Capital distributed a 29.4118% interest in the Company to RCG Holdings and, immediately thereafter, RCG Holdings distributed all of such interest to David Carlson, Mark Isaacson and the TriPost Seller pro rata, based on their interests in RCG Holdings, as a result of which the TriPost Seller acquired a 14.4118% interest in the Company (the "Transferred Interest");

**WHEREAS**, pursuant to the Purchase Agreement, on the date hereof, EQT Exeter acquired all of the Transferred Interest directly from the TriPost Seller;

**WHEREAS**, on the date hereof, immediately, following the consummation of the transactions contemplated by the Purchase Agreement, Redwood Capital distributed all of its interest in the Company to RCG Holdings and, immediately thereafter, RCG Holdings distributed all of such interest to EQT Exeter; and

**WHEREAS**, EQT Exeter, David Carlson and Mark Isaacson, in their capacities as the Members of the Company, desire to amend and restate the Prior Agreement in its entirety as more specifically set forth herein.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

1007883349v10

ARTICLE I
FORMATION

1.1     Organization.    The Company was organized as an Illinois limited liability company pursuant to the provisions of the Illinois Limited Liability Act, as amended ("Act").

1.2     Agreement, Effect of Inconsistencies with Act.    For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members and the Company hereby agree to amend and restate the Prior Agreement in its entirety.  It is the express intention of the parties that this amended and restated Agreement shall be the sole source of agreement of the parties superseding any and all prior agreements, and, except to the extent a provision of this Agreement expressly incorporates federal income tax rules by reference to sections of the Code, or of the regulations thereunder, or is expressly prohibited or ineffective under the Act, this Agreement shall govern, even when inconsistent with, or different from, the provisions of the Act or any other law or rule.  To the extent any provision of this Agreement is prohibited or ineffective under the Act, this Agreement shall be considered amended to the smallest degree possible in order to make the Agreement effective under the Act.  In the event the Act is subsequently amended or interpreted in such a way to make valid any provision of this Agreement that was formerly invalid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.  The Members shall be entitled to rely on the provisions of this Agreement, and the Members shall not be liable to the Company for any action or refusal to act taken in good faith reliance on the terms of this Agreement.  The Members and the Company hereby agree that the duties and obligations imposed on the Members as such shall be those set forth in this Agreement, which is intended to govern the relationship between the Company and the Members (including the Managing Member), notwithstanding any provision of the Act or common law to the contrary.

1.3     Name.    The name of the Company is REDWOOD RESIDENTIAL LLC and all business of the Company shall be conducted under that name.  The Company was formed on May 7, 2017, the date that the Articles of Organization ("Articles") were filed with the Illinois Secretary of State.

1.4     Term.    The Company duration shall be perpetual unless the Company shall be sooner dissolved, and its affairs wound up in accordance with the Act or this Agreement.

1.5     Principal Office.    The principal office of the Company shall be located at [1 East Wacker Drive, Suite 1600, Chicago, Illinois 60601], unless changed by the Managing Member.

1.6     Registered Office and Registered Agent.    The Company's registered office in Illinois shall be located at 2801 Lakeside Drive, Suite 207, Bannockburn, Illinois 60015, and the name of the Company's registered agent for service of process at such office shall be RFR Registered Agent Services, Inc. The Managing Member may from time to time in accordance with the Act change the Company's registered office and/or registered agent.  The Managing Member shall select and designate a registered office and registered agent for the Company in each state in which the Company is required to maintain or appoint one.

1007883349v10

1.7    Fiscal Year.  The fiscal year of the Company shall end on the 31st day of December in each year (the "Fiscal Year").  Except as otherwise required by law, the Company shall have the same Fiscal Year for income tax and for financial and partnership accounting purposes.

ARTICLE II
DEFINITIONS

For purposes of this Agreement, unless the context clearly indicates otherwise, the following terms shall have the following meanings:

2.1    "Act" has the meaning set forth in Section 1.1.

2.2    "Additional Member" means a member other than the initial Member who has acquired a Membership Interest and been admitted as a Member of the Company in accordance with this Agreement.

2.3    "Adjustment Date" means the last day of each Fiscal Year or any other date that the Managing Member determines to be appropriate for an interim closing of the Company's books.

2.4    "Agreement" has the meaning set forth in the preamble.

2.5    "Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such Person.

2.6    "Agreement" has the meaning set forth in the preamble.

2.7    "Articles" has the meaning set forth in Section 1.3.

2.8    "Capital Account" has the meaning set forth in Section 10.1.

2.9    "Capital Contribution" has the meaning set forth in Section 8.1.

2.10    "Cause", with respect to any Redwood Member, has the meaning set forth in in the employment agreement between such Redwood Member and EQT Exeter or other Affiliate of the EQT Member that employs such individual.

2.11    "Change of Control" means (i) the sale or other disposition of all or substantially all of the assets (in one transaction or a series of related transactions) of the Company to any Person (or group of Persons acting in concert) other than to an Affiliate of EQT Exeter, or (ii) a merger, amalgamation, consolidation or recapitalization of the Company or a sale or other Transfer (in one transaction or a series of related transactions) to a Person (or group of Persons acting in concert) of Membership Interests or voting power in the Company that results in any Person (or group of Persons acting in concert) other than an Affiliate of EQT Exeter owning more than 50% of the Membership Interests or voting power of the Company (or any resulting company after a merger or recapitalization).

1007883349v10

2.12    "Code" means the Internal Revenue Code of 1986 as amended from time to time.

2.13    "Company" has the meaning set forth in the preamble.

2.14    "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or general partnership or managing member interests, by contract or otherwise. "Controlling" and "Controlled" shall have correlative meanings. Without limiting the generality of the foregoing, a Person shall be deemed to Control any other Person in which it owns, directly or indirectly, a majority of the ownership interests.

2.15    "Deemed Capital Contribution" means, with respect to each Member, the fair market value of such Member's interest in the Company as of the date hereof, which shall be equal to the amount set forth on Exhibit A next to such Member's name, which amount may be updated by the EQT Member in accordance with the final Tax Allocation.

2.16    "Distributable Assets" means, with respect to any fiscal year, all cash receipts, retained cash and (if distribution thereof is determined to be necessary by the Managing Member) other assets of the Company from any and all sources, reduced by amounts that the Managing Member reasonably determines to be necessary or appropriate for the payment of the Company's expenses, liabilities and other obligations (whether fixed or contingent, current or future), including the maintenance of adequate working capital for the continued conduct of the Company's activities.

2.17    "EQT Buyer" has the meaning set forth in the recitals.

2.18    "EQT Covered Persons" has the meaning set forth in Section 7.1(d).

2.19    "EQT Exeter" has the meaning set forth in the preamble.

2.20    "EQT Indemnitors" has the meaning set forth in Section 7.1(d).

2.21    "EQT Member" means EQT Exeter.  In the event that at any time EQT Exeter Transfers Membership Interests held by it to one or more of its Affiliates, such Affiliates shall be included in the definition of the "EQT Member" under this Agreement.

2.22    "Family Member" shall mean, with respect to any natural person, a spouse, parent, sibling, child, grandchild, or any lineal ancestors or dependents by birth or adoption, of such natural person.

2.23    "Fiscal Year" has the meaning set forth in Section 1.7.

2.24    "Indemnified Person" has the meaning set forth in Section 7.1(a).

2.25    "Managing Member" has the meaning set forth in Section 6.1.

2.26    "Redwood Member," has the meaning set forth in the preamble.

1007883349v10

2.27    "Member" means the EQT Member and the Redwood Members, any permitted transferee of a Member and any Additional Member.

2.28    "Membership Interest" means all of the rights of a Member including the right to share in profits, losses, and distributions and the right to participate in the management of the Company.  Each Member's Membership Interest shall be expressed as a percentage, and calculated as the aggregate Capital Contributions and Deemed Capital Contributions of such Member divided by the aggregate Capital Contributions and Deemed Capital Contributions of all of the Members, as adjusted from time to time pursuant to the terms of this Agreement.  As of the date hereof, each Member's Membership Interest is set forth on Exhibit A next to such Member's name.

2.29    "Officer" has the meaning set forth in Section 6.3(a).

2.30    "Period" means, for the first Period, the period commencing on the date of this Agreement and ending on the next Adjustment Date; and for each subsequent Period shall mean the period commencing on the day after an Adjustment Date and ending on the next Adjustment Date.

2.31    "Person" means an individual, trust, estate, or any incorporated or unincorporated organization permitted to be a member of a limited liability company under the laws of the State of Illinois.

2.32    "Prior Agreement" has the meaning set forth in the recitals.

2.33    "Purchase Agreement" has the meaning set forth in the recitals.

2.34    "RCG Holdings" has the meaning set forth in the recitals.

2.35    "Redwood Capital" has the meaning set forth in the recitals.

2.36    "Redwood Property" means any multi-family dwelling with respect to which, as of the date hereof, the Company provides property management services.

2.37    "Required Sale" has the meaning set forth in Section 11.3(a).

2.38    "Tag-Along Notice" has the meaning set forth in Section 11.4(b).

2.39    "Tag-Along Sale" has the meaning set forth in Section 11.4(a).

2.40    "Tag Offerees" has the meaning set forth in Section 11.4(a).

2.41    "Tax Allocation" has the meaning set forth in the Purchase Agreement.

2.42    "Tax Distribution" has the meaning set forth in Section 9.4.

2.43    "Tax Representative" has the meaning set forth in Section 10.3.

1007883349v10

2.44    "Transfer" means any sale, transfer, assignment, pledge, hypothecation or other disposition of any Membership Interests or any right, title or interest therein, whether direct or indirect, voluntarily or involuntarily, by operation or effect of applicable law or legal proceedings, or otherwise.

2.45    "Treasury Regulations" means the income tax regulations, including any temporary or proposed regulations, promulgated under the Code, as such regulations may be amended from time to time.

2.46    "TriPost Seller" has the meaning set forth in the recitals.

2.47    "Transferred Interest" has the meaning set forth in the recitals.

Definitions in this Agreement apply equally to both the singular and plural forms of the defined terms. The words "include" and "including" shall be deemed to be followed by the phrase "without limitation." The terms "herein," "hereof," "hereunder," and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. The section titles appear as a matter of convenience only and shall not affect the interpretation of this Agreement. All section, paragraph, clause, Exhibit or schedule references not attributed to a particular document shall be references to such parts of this Agreement.

ARTICLE III
CHARACTER OF THE BUSINESS

3.1    Purpose. The purpose of the Company is to do any and all business and activities permitted to limited liability companies under the Act. The Company shall have the power to do all acts and things necessary or useful in connection with the foregoing.

ARTICLE IV
ACCOUNTING AND RECORDS

4.1    Records to be Maintained. The Officers shall cause the Company at all times to keep at its principal office such information and records as are specified in the Act.

4.2    Reporting. The Officers, in consultation with the Managing Member, shall use commercially reasonable efforts to cause the Company to provide to the Members (i) a quarterly report that includes unaudited balance sheets, an unaudited cash flow statement and an unaudited income statement of the Company as of such quarter-end prepared internally and distributed within sixty (60) days after the end of each of the first three fiscal quarters, and (ii) an annual report that includes a statement of all distributions made to such Member during the previous fiscal year and such Member's Capital Account balance as of the end of the immediately preceding Fiscal Year, a balance sheet and of the Partnership as of the end of the fiscal year and statements of operations, Members' equity and cash flow for such fiscal year, in each case prepared in accordance with generally accepted accounting principles and delivered within ninety (90) days after the end of each fiscal year.

1007883349v10

ARTICLE V
MEMBERS

5.1     Name and Address of the Members.  The name and address of the Members shall be set forth on Exhibit A hereto.  Exhibit A may be updated from time to time by the Managing Member to reflect changes thereto in accordance with this Agreement.

5.2     Forfeiture of Membership Interests upon Termination.

(a)     Termination for Cause.   In the event that a Redwood Member's employment with EQT Exeter or its Affiliate that employs such individual is terminated for Cause, all of the Membership Interests held by such Redwood Member shall be forfeited and reallocated (automatically and for no additional consideration) to the EQT Member (or its designee).

(b)     Termination without Cause.   In the event that a Redwood Member's employment with EQT Exeter or its Affiliate that employs such individual is terminated other than for Cause, the Membership Interests held by such Redwood Member shall be forfeited and reallocated (automatically and for no additional consideration) to the EQT Member (or its designee) as follows:

(i)  on the first anniversary of such termination, 50% of the Membership Interests held by such Redwood Member as of immediately prior to such termination;

(ii)  on the second anniversary of such termination, 25% of the Membership Interests held by such Redwood Member as of immediately prior to such termination; and

(iii)  on the third anniversary of such termination, all of the remaining Membership Interests held by such Redwood Member.

(c)     Reallocated Membership Interests. All distributions in respect of the interests reallocated pursuant to this Section 5.2 shall be made to the EQT Member (or its designee).   The Managing Member may make such adjustments as it determines to be appropriate to give effect to the provisions of this Section 5.2.

5.3     Voting Rights; Written Consent.  The Managing Member and the Members may act by written consent. Except as expressly provided in Section 6.5, Redwood Members shall not have any voting or governance rights in respect of their Membership Interests or otherwise.

5.4     Liability of Member.  Except as otherwise expressly provided by the Act, none of the Managing Member or Members shall be liable in such capacities for the liabilities of the Company.  The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Managing Member or Members for liabilities of the Company.  Any duties (including fiduciary duties) or liabilities of the EQT Member, including in its capacity as Managing Member, to the Company or to any other Member that would otherwise apply at law or in equity are hereby eliminated to the fullest extent permitted under the Act and any other applicable law; *provided* that the foregoing shall not

1007883349v10

eliminate the obligation of the EQT Member to act in compliance with the express terms of this Agreement.

5.5    Other Business.

(a)    The EQT Member and any Affiliate of the EQT Member may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others notwithstanding any provision to the contrary at law or at equity.  The Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

(b)    Notwithstanding the foregoing, the EQT Member hereby covenants and agrees that, with respect to multifamily commercial real estate in the United States and for so long as any Redwood Member holds Membership Interests:

(i)  first acquired on or after the date hereof by any multifamily Core Fund, Core+ Multifamily Fund, Workforce Housing Value Fund or other fund, joint venture or similar multifamily investment vehicle formed by EQT Member or any direct Affiliate of the EQT Member, the EQT Member will use reasonable best efforts to cause the owner of each such property to engage the Company to provide property management services with respect to such property; and

(ii)  owned, under contract, subject to letter of intent or in development as of the date hereof by any asset manager of EQT Exeter Holdings US, Inc. or its subsidiaries, the EQT Member will, in its good faith discretion (including as to timing) and at no cost to EQT Member or any fund or owner (or any their respective equityholders, partners or employees) discuss with the owner of each such property engaging the Company to provide property management services with respect to such property;

in the case of each of subsections (i) and (ii), unless (A) the Company is not capable of providing first-class services at comparable rates in the applicable geographic region, or (B) the EQT Member makes a good faith determination that it is not in the best interests of the applicable fund, investment vehicle or their respective limited partners to engage, or to continue to engage, the Company to provide property management services.

ARTICLE VI
POWERS AND DUTIES; MANAGEMENT OF THE COMPANY

6.1    Powers.  EQT Exeter, so long as it is a Member (and thereafter, any other EQT Member that is a Member), shall be the "managing member" and "manager" of the Company (the "Managing Member").  The business and affairs of the Company shall be managed exclusively by the Managing Member, and no other Member (acting in its, his or her capacity as such) shall have the power, authority or right to bind the Company except as expressly set forth in Section 11.3.  The Managing Member: (i) shall have and exercise all powers necessary, convenient or incidental to accomplish its purposes as set forth in Article III; and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed

1007883349v10

pursuant to the Act; *provided* that the Managing Member may delegate such power to Officers in accordance with Section 6.3.

6.2    Payment to the Managing Member.  The Managing Member shall not be entitled to any fees or other remunerations for its services as Managing Member.

6.3    Officers.

(a)    Officers.  The day-to-day functions of the Company may be performed by a person or persons appointed as officers of the Company (each, an "Officer").  The initial Officers of the Company, as of the date hereof, are David Carlson, as Managing Partner, Mark Isaacson, as Managing Partner, and Robert Flannery, as President. Any number of offices may be held by the same person.  The Managing Member may remove any Officer and appoint new Officers.  The Managing Member may appoint such other Officers and agents as it shall deem necessary or advisable who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Managing Member. The Officers of the Company shall hold office until their successors are chosen and qualified or until their earlier death, disability or resignation.  Any Officer may be removed at any time by the Managing Member, with or without cause.  Any vacancy occurring in any office of the Company may be filled by the Managing Member.

6.4    Delegation of Authority.  Unless otherwise determined by the Managing Member, (i) David Carlson, as President, or Mark Isaacson, as Vice-President (or their respective replacements) may execute and deliver, in the name and on behalf of the Company, any property management agreement and (ii) any Officer may execute and deliver, in the name and on behalf of the Company, any other documents relating to the business of the Company, including agreements, memoranda, estimates, proposals, certificates, directions, declarations, affidavits, instruments and all other documents, as such Officer may deem advisable, in the case of each of the foregoing clauses (i) and (ii), (x) in accordance with the budgets, business plans and policies approved by the Managing Member and (y) so long as any such agreement would not bind the Company for an amount greater than $50,000 without the express authorization of the Managing Member; *provided*, *however*, in no event shall any Officer other than David Carlson, as President, or Mark Isaacson, as Vice-President (or their respective replacements) be authorized to execute any documents that have a term in excess of 12 months.

6.5    Rights of the Redwood Members.  Notwithstanding anything to the contrary herein, prior to a Change of Control, the Managing Member and EQT Member shall not permit the Company to take any of the following actions without the prior written consent of a majority-in-interest of the Redwood Members (so long as they holds Membership Interests):

(a)    amend, modify or waive this Section 6.5;

(b)    except pursuant to Section 5.2, amend, modify or waive any provision of Agreement in a manner that would reduce the Redwood Members' right to participate in distributions pursuant to Section 9.1;

1007883349v10

(c)  redeem, purchase or otherwise acquire any Membership Interests held by the EQT Member unless the Redwood Members are permitted to participate pro rata in such redeem, purchase or other acquisition;

(d)  amend, modify or replace any property management agreement with respect to a Redwood Property to provide for the payment of property management fees directly to the EQT Member or to any Affiliate of the EQT Member other than the Company;

(e)  voluntarily liquidate or commence a voluntary case under the Federal Bankruptcy Code;

(f)  cause the Company to engage in any business other than property management and other activities ancillary thereto;

(g)  except to the extent provided in Article XI with respect to a Transfer of Membership Interest, (i) issue additional Membership Interests, voting rights, rights to distributions, warrants, options, securities convertible into Membership Interest or other rights to acquire ownership interests in the Company or any subsidiary of the Company to any third party, and (ii) admit any Person as a Member in the Company or as a holder of equity of any subsidiary of the Company; or

(h)  entering into any contract or agreement between the Company (or a subsidiary of the Company) and EQT Member (or an Affiliate of EQT Member), including, without limitation, any agreement for the performance of any services, except for (i) agreements for the Company to provide property management services in exchange for a fee (and other services ancillary thereto) and (ii) agreements entered into on an arm's length basis and no less favorable, in the aggregate, than those that could be obtained from unaffiliated third parties who the Managing Members determines are qualified to provide such services.

ARTICLE VII
INDEMNIFICATION

7.1  Indemnification of Members and Officers.

(a)  To the fullest extent permitted by law, the Company shall indemnify and hold harmless (i) the Managing Member, the other Members and their respective Affiliates, direct and indirect beneficial owners, officers and directors and (ii) the Officers (each, an "Indemnified Person") against any and all losses, claims, damages, expenses and liabilities (including, but not limited to, any investigation, legal and other reasonable expenses incurred in connection with, and any amounts paid in settlement of, any action, suit, proceeding or claim) of any kind or nature whatsoever that such Indemnified Person may at any time become subject to or liable for by reason of the formation, operation or termination of the Company or a Member, or the Indemnified Person's acting as a member, manager, officer or director of the Company or a Member or other Indemnified Person, or the authorized actions of such Indemnified Person in connection with the conduct of the affairs of the Company, to the extent the Indemnified Person acted in good faith and to the extent such course of conduct did not constitute, in the case of any Officer, bad faith, willful misconduct or gross negligence of the Indemnified Person.  The indemnities provided hereunder shall survive termination of the Company, any such Member and

1007883349v10

this Agreement. Each Indemnified Person shall have a claim against the property and assets of the Company for payment of any indemnity amounts from time to time due hereunder, which amounts shall be paid or properly reserved for prior to the making of distributions by the Company to the Member. Costs and expenses that are subject to indemnification hereunder shall, at the request of any Indemnified Person, be advanced by the Company to or on behalf of such Indemnified Person prior to final resolution of a matter, so long as such Indemnified Person shall have provided the Company with a written undertaking to reimburse the Company for all amounts so advanced if it is ultimately determined that the Indemnified Person is not entitled to indemnification hereunder.

(b)    The contract rights to indemnification and to the advancement of expenses conferred in this Section 7.1 shall not be exclusive of any other right that any person may have or hereafter acquire under any statute, agreement, or otherwise.

(c)    The Company may maintain insurance, at its expense, to protect itself and the Member, the Officers and employees or agents of the Company or another limited liability company, corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under the Act.

(d)    The Company and the Members hereby acknowledge that the EQT Member and its Affiliates and related persons (the "EQT Covered Persons") have certain other rights to indemnification, advancement of expenses and insurance provided by the EQT Member and its Affiliates (collectively, the "EQT Indemnitors"). The Company and the Members agree with respect to any indemnification and expense advancement or reimbursement provision or any other similar obligation pursuant to this Agreement, notwithstanding any rights to indemnification, advancement of expenses or insurance provided by the EQT Indemnitors, the Company is the indemnitor of first resort (i.e., its obligations to the EQT Covered Persons are primary and any obligation of the EQT Indemnitors to advance expenses or to provide indemnification for claims or obligations arising out of the same or similar facts and circumstances suffered by any EQT Covered Person are secondary),

(e)    Limitation on Rights of Others. Except for the rights of an Indemnified Person under Section 7.1, no person or entity other than the Member is, nor is it intended that any such other person or entity be treated as, a direct, indirect, intended or incidental third-party beneficiary of this Agreement for any purpose whatsoever, nor shall any other person or entity have any legal or equitable right, remedy or claim under or in respect of this Agreement.

ARTICLE VIII
CONTRIBUTIONS

8.1    Capital Contributions. Each Member shall make such capital contributions (each, a "Capital Contribution") from time to time as such Member determines in its sole discretion. No interest shall accrue on any Capital Contribution. Exhibit A may be updated from time to time by the Managing Member to reflect Capital Contributions of the Members.

1007883349v10

ARTICLE IX
DISTRIBUTIONS

9.1     General.    The Members hold the Membership Interests in the Company as reflected on Exhibit A attached hereto, in the amounts set forth opposite each Member's name on Exhibit A.    The Managing Member shall have full authority, without the consent of the other Members, to amend Exhibit A to reflect any forfeiture and reallocation of Membership Interests or in connection with the admission of any Additional Members; provided that the Managing Member, in its sole discretion, determines that Company has available cash, distributions shall be made within ninety (90) days after the end of each fiscal year and, subject to Section 9.4, in the aggregate amounts as determined by the Managing Member, to the Members in proportion to Membership Interest held by each Member as of the time of such distribution; provided that in no event shall any such distributions exceed the sum of the Company's available cash.

9.2     Withholding.    Notwithstanding any other provision of this Agreement, each Member hereby authorizes the Company to withhold and to pay over, or otherwise pay, any withholding or other taxes payable or required to be deducted by the Company or any of its Affiliates (pursuant to the Code or any provision of U.S. federal, state or local or non-U.S. tax law) with respect to such Member or as a result of such Member's participation in the Company (including as a result of a distribution in kind to such Member).    If and to the extent that the Company shall be required to withhold or pay any such withholding or other taxes, such Member shall be deemed for all purposes of this Agreement to have received a payment from the Company as of the time that such withholding or other tax is required to be paid, which payment shall be deemed to be a distribution with respect to such Member's Membership Interest to the extent that such Member (or any successor to such Member's Membership Interest) would have received a cash distribution but for such withholding or payment.    In addition, if and to the extent that the Company receives a distribution or payment from or in respect of which tax was withheld, as a result of (or attributable to) such Member's status as a Member hereunder, as determined by the Managing Member, such Member shall be deemed for all purposes of this Agreement to have received a distribution from the Company as of the time such withholding was paid.    Unless the Managing Member determines otherwise, the withholdings by the Company referred to in this Section 9.2 shall be made at the maximum applicable statutory rate under the applicable tax law.

9.3     Method of Accounting.    The records of the Company shall be maintained on the same method of accounting as that of EQT Exeter.

9.4     Tax Distributions.    Notwithstanding anything to the contrary above, if, for any fiscal year other than the fiscal year in which the Company liquidates, the distributions to the Members, if any, plus any amounts previously distributed to the Members under this Section 9.4 and Section 9.1, would be insufficient to enable each Member (and any person whose tax liability is determined by reference to such Member, if applicable) to discharge any U.S. federal, state and local or non-U.S. tax liability arising as a result of the allocation of taxable income to such Member, then, to the extent the Company has sufficient cash on hand to do so, the Company shall make a distribution to the Members on or about the deadline for making federal individual estimated tax payments (a "Tax Distribution") in proportion to Membership Interest held by each Member as of the time of such distribution in an amount of cash sufficient to pay

1007883349v10

each Member's tax liability; provided that in no event shall any such distribution exceed the sum of the Company's Distributable Assets. Each Member's tax liability shall be determined by assuming a tax rate equal to the maximum combined U.S. federal, state and local income tax rates, taking into account the rate of tax imposed under Section 1411 of the Code, applicable to individuals resident in Illinois, with such combined rate determined by taking into account any U.S. federal deduction for state and local taxes (to the extent allowed) and the character of any income or gain and the income tax rates applicable thereto.

## ARTICLE X
## CAPITAL ACCOUNTS; ALLOCATIONS; TAX FILINGS

10.1    Capital Accounts.  There shall be established for each Member on the books and records of the Company a capital account (a "Capital Account"), which shall initially be as set forth in Exhibit B. For the avoidance of doubt, each Member's Capital Account shall take into account the Deemed Capital Contributions of such Member.

(a)    *Adjustments to Capital Accounts*.  As of the last day of each Period, the balance in each Member's Capital Account shall be adjusted by (i) increasing such balance by (x) such Member's allocable share of each item of the Company's income and gain for such Period (allocated in accordance with this Section 10.1) and (y) the Capital Contributions, if any, made by such Member during such Period and (ii) decreasing such balance by (A) the amount of cash or the value of securities or other property distributed to such Member by the Company during such Period and (B) such Member's allocable share of each item of the Company's loss and deduction for such Period (allocated in accordance with this Section 10.1).  Each Member's Capital Account shall be further adjusted with respect to any special allocations or adjustments pursuant to this Agreement.  It is intended that the Capital Accounts of the Members shall be adjusted and maintained in accordance with U.S. tax principles as applied to the maintenance of capital accounts.

(b)    *Allocations to Capital Accounts*.  Each item of income, gain, loss or deduction of the Company (determined in accordance with U.S. tax principles as applied to the maintenance of capital accounts) shall be allocated among the Capital Accounts of the Members with respect to each Period, as of the end of such Period, in proportion the Membership Interests held by each Member.

10.2    Tax Allocations.  The income, gains, losses, deductions and credits of the Company will be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses, deductions and credits among the Members for computing their Capital Accounts; provided that income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and the initial book value of the property using the "traditional method with curative allocations", as described in Regulations Section 1.704-3(c); provided further that the Managing Member may adjust such allocations as long as such adjusted allocations have substantial economic effect or are in accordance with the interests of the Members in the Company, in each case within the meaning of the Code and the Treasury Regulations.  All matters concerning allocations for U.S. federal,

1007883349v10

state and local and non-U.S. income tax purposes, including accounting procedures, not expressly provided for by the terms of this Agreement shall be determined in good faith by the Managing Member.

10.3     Tax Filings.  Federal, state and local income tax returns of the Company shall be prepared and timely filed by or at the direction of the Managing Member.  The Managing Member shall designate a person as the "partnership representative" within the meaning of Section 6223 of the Code ("Tax Representative") for any year in which the Company is treated as a partnership for United States federal income tax purposes, and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's business and affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  Each Member agrees to cooperate with the Tax Representative and to do or refrain from doing any or all things reasonably requested by the Tax Representative with respect to the conduct of such proceedings.  If the Tax Representative makes an election under section 6226 of the Code or any similar provision of any state or local or non-U.S. tax laws with respect to any audit adjustment of any item of the Company's income, gain, loss, deduction or credit (or adjustment of the allocation of any such items among the Members), each Member shall comply with the requirements set forth in section 6226 of the Code or any similar provision of any state or local or non-U.S. tax laws (and any applicable guidance issued by the applicable taxing authority) with respect to such election.  To the extent the Company makes any payments pursuant to section 6225 of the Code, each Member shall bear its share of the payment as determined by the Managing Member (including by making contributions, which such contributions shall not be Capital Contributions for purposes of this Agreement).  At any time, the Managing Member may remove the Tax Representative and designate a new Person as the Tax Representative.  The Company shall not elect to be treated as an association taxable as a corporation for U.S. federal income tax purposes.  No Member shall, to the fullest extent permitted by law, without the consent of the Managing Member (i) file a notice of inconsistent treatment under section 6222(b) of the Code; (ii) file a request for administrative adjustment of Company items; (iii) file a petition with respect to any Company item or other tax matters involving the Company; or (iv) enter into a settlement agreement with the Secretary of the Treasury or any other taxing authority with respect to any Company item.  The cost of any audits or adjustments of a Member's tax return shall be borne solely by the affected Member.  Each Member shall promptly upon request furnish to the Managing Member any information the Managing Member may reasonably request in connection with any election or contemplated election or adjustment under Section 734, 743, 754 or 6226 of the Code or with filing the tax returns of the Company or any Affiliate thereof.

ARTICLE XI
DISPOSITION OF MEMBERSHIP INTEREST AND
ADMISSION OF ASSIGNEES AND ADDITIONAL MEMBERS

11.1     Assignment.  The EQT Member may Transfer its Membership Interest.  Any Transfer by any other Member, including any Redwood Member shall require the prior written consent of the Managing Member (which may be granted, conditioned or withheld in the Managing Member's sole discretion).  Notwithstanding the foregoing, without the consent of the Managing Member, any Redwood Member may assign all or any portion of its economic or

1007883349v10

beneficial interest in the Company to (a) Robert Flannery, or (b) any Family Member or any partnership, trust or similar entity established for the benefit of any Family Member; provided that any such transferee shall have no right to participate in the management of the business and affairs of the Company and shall not be admitted as a Member of the Company without the consent of the Managing Member. [1]  In the event that EQT Member Transfers any of its Membership Interests to a third party, the EQT Member shall have the right to transfer to such third party any or all of its rights hereunder and may designate such transferee as the replacement Managing Member.  Any Transfer shall become effective only upon a transferee adhering to the terms of this Agreement (which shall be limited to the applicable provisions of this Agreement in the case of a transfer of economic interests only).

11.2    Additional Members.  Subject to Section 6.5(g), one or more Additional Members of the Company may be admitted to the Company with the written consent of the Managing Member.

11.3    Drag-Along Rights.

(a)    If the EQT Member desires to cause a Change of Control (a "Required Sale"), then the EQT Member shall have the right to require that each other Member participate in such Required Sale in the manner set forth in this Section 11.3. The EQT Member shall exercise its rights pursuant to this Section 11.3 by delivering to each other Member a written notice of the Required Sale either before or after the consummation of the Required Sale.  Such notice shall make reference to the Members' obligations under this Section 11.3 and include the material terms and conditions of the Required Sale, including (i) the proposed amount and form of consideration and (ii) the proposed Transfer date, if known.

(b)    The obligations of the Members pursuant to this Section 11.3 are subject to the condition that each of the Members shall receive the same proportion of the aggregate economic consideration from such Required Sale that such Member would have received assuming such aggregate economic consideration had been received by the Company and distribute by the Company to the Members pursuant to Section 9.1.

(c)    Subject to the other provisions of this Section 11.3, each Member shall fully cooperate with the Company and the EQT Member in connection with the Required Sale and shall be obligated to take any actions at the request of the EQT Member as may be necessary, reasonably required or advisable to effect the Required Sale, including: (i) to vote, if required, in favor of the Required Sale (and raise no objection thereto) at any meeting of Members called to vote on or approve the Required Sale and/or to consent in writing to the Required Sale, including any meeting or consent to ratify any Managing Member action taken in furtherance of a Required Sale; (ii) to waive all dissenters' or appraisal or similar rights, if any, in connection with the Required Sale under any law, rule, regulation, statute, agreement, organizational document or otherwise in connection with such Required Sale; (iii) to enter into agreements or deliver certificates or instruments in connection with the Required Sale, including executing, acknowledging and delivering consents, assignments, waivers and other documents or

---

[1]    NTD: All documents admitted Robert Flannery as an economic member should be structured as a profits interest for tax purposes, and must be reasonably acceptable to EQT.

instruments, furnishing information and copies of documents, and filing applications, reports, returns and other documents or instruments with governmental authorities; and (iv) to take such other actions as may be reasonably requested by the Company or the EQT Member in connection with the Required Sale and in accordance with the terms of this Section 11.3.

(d)      If the Required Sale is structured as a Transfer of Membership Interests, each Member shall Transfer to the purchaser the same proportion of Membership Interests in such Required Sale as the EQT Member.

(e)      Each Member shall agree (only as to itself) to make to the proposed purchaser the same customary representations, warranties, covenants, indemnities and agreements as the EQT Member agrees to make in connection with the Required Sale, so long as they are made severally and not jointly, and to take or cause to be taken all other actions as may be reasonably necessary to consummate the Required Sale; *provided* that unless otherwise agreed in writing by such Member, (A) no such Member shall be required to make representations, warranties or covenants or provide indemnities as to any other Member (or any Affiliate thereof), (B) no such Member shall be liable for the breach of any representation, warranty or covenant by any other Member (or any Affiliate thereof), (C) any liability relating to representations and warranties and covenants (and related indemnities) and other indemnification obligations regarding the business of the Company and/or its Subsidiaries assumed in connection with the Required Sale shall be shared by all Members pro rata in proportion to the aggregate proceeds received by each Member in the Required Sale, and (D) the aggregate liability of such Member in connection with the Required Sale shall not exceed the aggregate proceeds actually received by such Member in respect of the Required Sale (except with respect to fraud by such Member). Each Member will be responsible for its proportionate share (based on aggregate proceeds received) of the costs of the Required Sale to the extent not paid or reimbursed by the proposed transferee. The EQT Member (or Affiliates thereof) may receive governance rights with respect to any other party to such transaction that are not received by the other Members.

(f)      The EQT Member shall, in its sole discretion, decide whether or not to delay, pursue, consummate, postpone or abandon any Required Sale and the terms and conditions thereof.  Neither the EQT Member nor any of its Affiliates shall have any liability to any other Member or the Company arising from, relating to or in connection with the delay, pursuit, consummation, postponement, abandonment or terms and conditions of any Required Sale.

11.4    Tag-Along Rights.

(a)      If, in connection with a Transfer by the EQT Member that would constitute a Change of Control the EQT Member does not exercise its rights pursuant to Section 11.3 (such Transfer, a "Tag-Along Sale"), the other Members (collectively, the "Tag Offerees") shall be provided the right to include, at the option of each Tag Offeree, in the Transfer to the third party, Membership Interests in accordance with this Section 11.4.

(b)      The EQT Member shall send written notice of its proposed Transfer (the "Tag-Along Notice") to each of the Tag Offerees and the Company, which Tag-Along Notice shall include the material terms and conditions of the proposed Transfer, including the portion of

1007883349v10

the EQT Member's Membership Interests to be sold by the EQT Member (expressed as a percentage of the EQT Member's total Membership Interests).

(c)    Each Tag Offeree shall have the right, exercisable by delivery of an irrevocable written notice to the EQT Member at any time within ten days after receipt of the Tag-Along Notice, to sell pursuant to such proposed Transfer the same percentage of its Membership Interests as the EQT Member.  Each of the EQT Member and the participating Tag Offerees shall receive the same proportion of the aggregate economic consideration proposed to be paid in connection with such Transfer that such Member would have received assuming such aggregate economic consideration had been received by the Company and distribute by the Company to the EQT Member and the participating Tag Offerees pursuant to Section 9.1.  The failure to exercise such right within such ten-day period shall be deemed to constitute an irrevocable waiver of all of such Tag Offeree's rights with respect to such proposed Transfer.

(d)    If the proposed third party transferee is unwilling to purchase all of the Membership Interest proposed to be Transferred by the EQT Member and all exercising Tag Offerees, then the Membership Interests being Transferred by the EQT Member and each exercising Tag Offeree shall be reduced on a pro rata basis so as to permit the EQT Member and each exercising Tag Offeree to sell the Membership Interests that the proposed third party transferee is willing to purchase.

(e)    The Tag Offerees and the EQT Member shall sell to the proposed third party transferee the Membership Interests at the time and place provided for the closing in the Tag-Along Notice, or at such other time and place as agreed by the EQT Member and the proposed third party transferee.  Notwithstanding the foregoing, no Tag Offeree shall be entitled to Transfer Membership Interests if the EQT Member fails to consummate the Transfer of its Membership Interests in the Tag-Along Sale.

(f)    Each Tag Offeree shall agree to make to the proposed purchaser the same representations, warranties, covenants, indemnities and agreements as the EQT Member agrees to make in connection with the Tag-Along Sale.  The EQT Member (or Affiliates thereof) may receive governance rights with respect to any other party to such transaction that are not received by the Tag Offerees. Each Tag Offeree participating in such Transfer will be responsible for its proportionate share (based on aggregate proceeds received) of the costs of the proposed Transfer (including the costs of the EQT Member) to the extent not paid or reimbursed by the proposed third party transferee.

(g)    The EQT Member shall, in its sole discretion, decide whether or not to delay, pursue, consummate, postpone or abandon any Tag-Along Sale and the terms and conditions thereof.  Neither the EQT Member nor any of its Affiliates shall have any liability to any other Member or the Company arising from, relating to or in connection with the delay, pursuit, consummation, postponement, abandonment or terms and conditions of any Tag-Along Sale.

ARTICLE XII
<u>DISSOLUTION AND WINDING UP</u>

12.1    <u>Dissolution</u>.

(a)    The Company shall be dissolved, and its affairs shall be wound up upon the first to occur of the following: (i) the determination of the Managing Member; (ii) the termination of the legal existence or death of the last remaining member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining member of the Company in the Company unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act; or (iii) the entry of a decree of judicial dissolution under the Act.  Upon the occurrence of any event that causes the last remaining member of the Company to cease to be a member of the Company (other than: (A) upon a Transfer by such Member of all of its Membership Interest in the Company and the admission of the transferee pursuant to <u>Sections 11.1</u> and <u>11.2</u>, or (B) the resignation of such Member and the admission of an Additional Member of the Company pursuant to <u>Section 11.2</u>), to the fullest extent permitted by law, the personal representative of such member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such member in the Company, agree in writing: (x) to continue the Company; and (y) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining member of the Company.

(b)    Notwithstanding any other provision of this Agreement, the bankruptcy of a Member shall not cause such Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

(c)    Notwithstanding any other provision of this Agreement, each Member waives any right it might have to agree in writing to dissolve the Company upon the bankruptcy of the Member, or the occurrence of an event that causes the Member to cease to be a member of the Company.

12.2    <u>Effect of Dissolution</u>.  In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority set forth in the Act.

12.3    <u>Winding Up of the Company</u>.

(a)    If the Company is dissolved pursuant to <u>Section 12.1</u>, the Managing Member shall proceed to wind up the business and affairs of the Company in accordance with the requirements of the Act.  A reasonable amount of time shall be allowed for the period of winding up in light of prevailing market conditions and so as to avoid undue loss in connection with any sale of Company assets.  This Agreement shall remain in full force and effect and continue to govern the rights and obligations of the Members and the conduct of the Company during the period of winding up the Company's affairs.  The Managing Member shall liquidate the assets of the Company, and apply and distribute the proceeds of such liquidation in the

1007883349v10

following order of priority, unless otherwise required by mandatory provisions of applicable law: (i) to creditors, including the Members if a creditor to the extent otherwise permitted by law, in satisfaction of the liabilities of the Company (whether by payment, by the establishment of reserves of cash or other assets of the Company or by other reasonable provision for payment), other than liabilities for distributions to the Members; (ii) to the Members in satisfaction of liabilities for distributions under the Act; and (iii) thereafter in accordance with Section 9.1.

(b)    Notwithstanding the provisions of Section 12.3(a) which require the liquidation of the assets of the Company, if on dissolution of the Company the Managing Member determines that a prompt sale of part or all of the Company's assets would be impractical or would cause undue loss to the value of Company assets, the Managing Member may defer for a reasonable time (up to three (3) years) the liquidation of any assets, except those necessary to timely satisfy liabilities of the Company (other than those to the Members), and/or may distribute to the Members, in lieu of cash, such of the Company assets as the Managing Member deems not suitable for liquidation or otherwise determines should be distributed in-kind. Any such in-kind distributions shall be made in accordance with the priorities referenced in Section 12.3(a) as if cash equal to the fair market value of the distributed assets were being distributed. The Managing Member shall determine the fair market value of any property distributed in kind using such methods of valuation as it may adopt.

(c)    Upon the completion of the distribution of the assets of the Company as provided in this Section 12.3, the Company shall be terminated, and the Managing Member shall cause the cancellation of the Articles of Organization and all qualifications of the Company as a foreign limited liability company, if any, and shall take such other actions as may be necessary to terminate the Company.

## ARTICLE XIII
## AMENDMENT

13.1    Agreement May Be Modified. Subject to Section 6.5, this Agreement may be modified, altered, supplemented or amended pursuant to a written agreement executed and delivered by the Managing Member.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

14.1    Entire Agreement. This Agreement constitutes the entire "limited liability company agreement" of the Company within the meaning of the Act and contains the entire understanding, agreement and statement of the Member upon the subject matter of this Agreement.

14.2    Governing Law. This Agreement shall be governed by and construed under the laws of the State of Illinois (without regard to conflict of laws principles), all rights and remedies being governed by said laws.

14.3    Waiver of Partition. Except as may otherwise be provided by law in connection with the winding up, liquidation and dissolution of the Company, each Member hereby

1007883349v10

irrevocably waives any and all rights that it may have to maintain an action for partition of any of the Company's property.

14.4   Limited Power of Attorney.  In the event any Member fails to timely comply with its obligations under Section 5.2 or Section 11.3, then, to the fullest extent permitted by applicable Law, each Member hereby grants a proxy and power of attorney to any nominee of the Managing Member to take all necessary actions and execute and deliver all documents deemed necessary, reasonably required or advisable by such nominee to effectuate the consummation of the forfeiture, Transfer or Required Sale that is in compliance with all requirements of Section 5.2 or Section 11.3, as applicable. Such proxy and power are coupled with an interest, are perpetual and irrevocable, and bestow on such nominee the full power to vote and act for the Managing Member exclusively with respect to the consummation of the Required Sale. Each Member hereby agrees that the irrevocable proxy and power of attorney set forth in this Section 14.4 is given to secure the performance of the obligations of such Member under Section 5.2 and Section 11.3 and shall extend for the term of this Agreement or, if earlier, until the last date permitted by applicable law, and shall be binding upon the successors and assigns of the applicable Member.

14.5   Counterparts.  This Agreement may be executed in a number of identical counterparts.  If so executed, each of such counterparts is to be deemed an original for all purposes, and all such counterparts shall, collectively, constitute one agreement, but, in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.  Fax signatures shall have the same legal effect as original "ink" signatures.

**[Signature Page Follows]**

1007883349v10

**MEMBERS:**

**EXETER PROPERTY GROUP, LLC**,
A Delaware limited liability company

By: _____
    Name:
    Its:

_____
**DAVID CARLSON**

_____
**MARK ISAACSON**

Acknowledged and agreed, as of the date first written above:

**REDWOOD CAPITAL GROUP, LLC**,
An Illinois limited liability company


By: _____
     Name:  Mark Isaacson
     Its:  Managing Partner

## EXHIBIT "A"

## MEMBER; MEMBERSHIP INTERESTS

| Member | Address | Membership Interests | Deemed Capital Contributions |
|---|---|---|---|
| *EQT Member* | | | |
| Exeter Property Group, LLC | | 85.0% | $[  ] |
| *Redwood Members* | | | |
| David Carlson | | 7.5% | $[  ] |
| Mark Isaacson | | 7.5% | $[  ] |

**EXHIBIT "B"**

**INITIAL CAPITAL ACCOUNTS**

| Member | Capital Account |
|---|---|
| *EQT Member* | |
| Exeter Property Group, LLC | |
| *Redwood Members* | |
| David Carlson | |
| Mark Isaacson | |

1007883349v10

**Schedule 5.4(e)**
**TAX ALLOCATION METHODOLOGY**

| Asset Class | Purchase Price Allocation[2] |
|---|---|
| Class I (cash and deposits) | Face amount |
| Class II (actively traded personal property) | GAAP book value |
| Class III (accounts receivable, including costs and earnings in excess of billings) | GAAP book value |
| Class IV (inventory) | GAAP book value |
| Class V (all assets other than Class I, II, III, IV, VI and VII) | GAAP book value |
| Class VI (IRC Section 197 Intangibles other than goodwill and going concern value) | [ ] |
| Class VII (Goodwill and going concern value) | [ ] |

---

[2]    The Purchase Price allocable to the interests in Redwood Residential will be determined in accordance with Section 5.4(e).

1007814448v21

EXHIBIT G

EXAMPLE OF DEBT CALCULATION

| Currency: $ 000 | Dec21A | Feb22A | Apr22 | May22 | Jun22 |
|---|---|---|---|---|---|
| Cash | 1,757 | 936 | 665 | 218 | 539 |
| Accrued payroll | (828) | (828) | (260) | (325) | (390) |
| Due to [other] | (232) | (156) | (122) | (28) | (33) |
| Due to [financing] | - | - | - | - | - |
| Accounts Receivable – Cash like | 110 | 248 | - | - | - |
| Other liabilties | - | - | (39) | (39) | - |
| Greenberg Traurig | - | - | (75) | - | - |
| Earnest money | - | 200 | 39 | 39 | - |
| **Net cash (debt)** | **807** | **400** | **208** | **(135)** | **116** |
| Eleven85 - net adjustment | 245 | 249 | 235 | 235 | 235 |
| Due to Tri-Post | 36 | 36 | n.i. | n.i. | n.i. |
| **Reclassification from NWC** | **280** | **284** | **235** | **235** | **235** |
| Bonus provision 2022 | n.a. | n.a. | n.a. | n.a. | n.a. |
| Transaction costs/bonuses etc. | [ ] | [ ] | [ ] | [ ] | [ ] |
| Tax true-up | [ ] | [ ] | [ ] | [ ] | [ ] |
| **Adjusted Net cash (debt)** | **1,087** | **684** | **443** | **100** | **351** |

1007814448v21

EXHIBIT H

EXAMPLE OF WORKING CAPITAL CALCULATION

| Currency: $ 000 | Dec20A | Dec21A | Feb22A | Apr22 | May22 | Jun22 |
|---|---|---|---|---|---|---|
| Other current assets | 54 | 33 | 92 | 87 | 62 | 37 |
| Accounts Receivable | 3 | 45 | 20 | 18 | 18 | 18 |
| Accounts Receivable – Related Party (JV) | 480 | 689 | 622 | 502 | 506 | 509 |
| Accounts Receivable – Deal Costs | - | 56 | 57 | - | - | - |
| Current liabilities | (122) | (283) | (232) | (173) | (30) | (30) |
| **Reported Net working capital** | **415** | **540** | **560** | **435** | **557** | **535** |
| *Adjustments* | | | | | | |
| Eleven85 – net adjustment | (197) | (245) | (249) | (235) | (235) | (235) |
| Due to Tri-Post Working capital component | (43) | (36) | (36) | n.i. | n.i. | n.i. |
| Adjustments | (240) | (280) | (284) | (235) | (235) | (235) |
| **Adjusted Net working capital** | **175** | **259** | **276** | **200** | **322** | **300** |

1007814448v21