# EXHIBIT 3

<u>**EXECUTION VERSION**</u>

**EMPLOYMENT AGREEMENT**

This Employment Agreement ("<u>Agreement</u>") is made between Exeter Property Group, LLC, a Delaware limited liability company (the "<u>Company</u>"), and David Carlson (the "<u>Executive</u>"). Capitalized terms used but not otherwise defined in this Agreement have the respective meanings assigned to such terms in the Securities Purchase Agreement, dated as of the date hereof (the "<u>Purchase Agreement</u>"), by and among EQT Exeter Holdings US, Inc., a Delaware corporation ("<u>Purchaser</u>"), the Executive and the other parties named therein, at the Closing (as defined in the Purchase Agreement). This Agreement is entered into on May 11, 2022 and is effective on the Effective Date (as defined below).

WHEREAS, the Executive entered into an Employment Agreement dated May 24, 2016, with Redwood Capital Group, LLC (the "<u>Prior Employment Agreement</u>");

WHEREAS, as a condition and inducement to Purchaser entering into the Purchase Agreement and consummating the transactions contemplated thereby, the Executive and the Company are entering into this Agreement contemporaneously with the execution of the Purchase Agreement which shall supersede and replace the Prior Employment Agreement as of the Effective Date; and

WHEREAS, following the Closing, the Company desires to continue to employ the Executive and the Executive desires to continue to be employed by the Company on the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    <u>Employment</u>.

(a)    <u>Term</u>.  This Agreement shall be effective as of the Closing (the date of such Closing the "<u>Effective Date</u>").  If the Purchase Agreement is terminated without the Closing occurring, this Agreement shall be null and void and the Prior Employment Agreement shall remain in effect.  The term of this Agreement shall commence on the Effective Date and continue for a three (3) year period, unless sooner terminated pursuant to the terms of this Agreement (the "<u>Term</u>").  Subject to termination pursuant to the terms of this Agreement, the Term shall be extended automatically for one (1) additional year upon its expiration, and each subsequent anniversary of such expiration thereafter.

(b)    <u>Position and Duties</u>. During the Term, the Executive shall serve as Head of EQT Exeter Residential and shall have such powers and duties as may from time to time be prescribed by the Company that are consistent with his role.

(c)    <u>Outside Activities</u>.  During the Term, the Executive may serve as general partner or manager of any Target Project Company or any constituent owner of a Target Project Company existing on the date hereof or which may be formed in connection with the acquisition and ownership of the real property located at 400 South Randall Road, West Dundee, Illinois (collectively, the "<u>Legacy Entities</u>").  Additionally, the Executive may (i) engage in charitable, educational and civic activities and other non-business activities (including serving as a member of the board of directors or board of trustees of a charitable, educational or other non-profit entity) and (ii) serve as a member of the board of directors or board of trustees of any for-profit Person, in each case with the prior written consent of the

1007906684v5

Company, which shall not be unreasonably withheld, and so long as such activities do not give rise to any conflicts of interest with the Company (or otherwise violate any then existing policies of the applicable entity relating thereto), do not in the aggregate interfere with the performance of the Executive's duties hereunder (including his time commitments set forth in Section 1(b)), and do not otherwise constitute a violation of this Agreement.

(d)    Allocation of Incentive.  During the Executive's employment hereunder, but subject to any contractual commitment entered in with Mark Issacson, the Executive shall have the authority to allocate (and reallocate in the case of forfeiture by leavers) to eligible employees up to one-third of any promote generated by each of the first newly formed (i) Core/Core+ Multifamily Fund I and/or (ii) Workforce Housing Value Fund ((subject to changes in the names of such funds as may be determined, from time to time, by the Company, the "New Funds") that has its initial closing at any time following, but on or prior to the second anniversary of, the Closing under the Purchase Agreement; provided that such allocation to eligible employees shall be subject to the Company's consent, which will not be unreasonably withheld.  Notwithstanding the foregoing, any employee's entitlement to any promote shall be subject to the terms and conditions set forth in the governing agreements of the New Funds, including but not limited to the employee's commitment to make any required capital contributions in respect of their pro rata share of the general partner and co-investment commitments applicable to such New Fund.

2.    Compensation and Related Matters.

(a)    Base Salary. The Executive's initial base salary shall be paid at the rate of $450,000 per year.  The Executive's base salary shall be reviewed no less frequently than annually by the Company, and may be increased or decreased by the Company in its discretion, except that it may not be decreased below the initial base salary rate.  The base salary in effect at any given time is referred to herein as "Base Salary." The Base Salary shall be payable in a manner that is consistent with the Company's usual payroll practices for executive officers.

(b)    Incentive Compensation.  During the Term, at the sole discretion of the Chief Executive Officer of the Company (the "CEO"), the Executive shall be eligible to receive cash incentive compensation, with the amount actually payable in respect to any year determined at the CEO's s discretion (the "Annual Bonus").  Except as otherwise specifically provided in this Agreement, to earn an Annual Bonus, the Executive must be employed by the Company on the day such Annual Bonus is paid.

(c)    Incentive Plan Participation.  The Executive shall be designated as a participant in the Incentive Plan to be established under the Purchase Agreement with such allocation as shall be set forth on the Executive's Incentive Plan award notice. As a participant in the Incentive Plan, the Executive shall, as a condition to participation in such Incentive Plan, execute both a share forfeiture letter and a lock-up letter, in the form established for purposes of the Incentive Plan.

(d)    Expenses. The Executive shall be entitled to receive prompt reimbursement for all reasonable expenses incurred by him during the Term in performing services hereunder, in accordance with the policies and procedures then in effect and established by the Company for its employees

(e)    Other Benefits.  During the Term, the Executive shall be eligible to participate in or receive benefits under the Company's policies and employee benefit plans in effect from time to time, including with respect to paid time off, subject to the terms of such policies and plans and to the Company's right in its sole discretion to amend, modify, replace or terminate such plans and programs; provided, however, that the Executive shall be eligible for no less than twenty (20) days of paid vacation

2

1007906684v5

annually.

3.    Termination.  During the Term, the Executive's employment under this Agreement may be terminated only under the following circumstances:

(a)    Death.  The Executive's employment hereunder shall terminate upon his death.

(b)    Disability.  The Company may terminate the Executive's employment if the Executive has a Disability. For purposes of this Agreement, 'Disability' means that the Executive is unable, by reason of bona fide physical or mental injury, illness or other similar cause to perform his or her primary duties for a period of 270 consecutive days, and where such injury, illness or other similar cause would prevent the Executive from operating or functioning in a similar capacity in the future. The foregoing determination shall be made by a licensed independent physician reasonably agreed by the Executive (or his or her authorized representative) and the Purchaser. Nothing in this Section 3(b) shall be construed to waive the Executive's rights, if any, under existing law including, without limitation, the Family and Medical Leave Act of 1993, 29 U.S.C. §2601 *et seq.* and the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq* or other applicable laws.

(c)    Termination by Company for Cause.  The Company may terminate the Executive's employment hereunder for "Cause."  For purposes of this Agreement, "Cause" shall mean any of the following:

(i)    a material violation by the Executive of any agreement with the Company or any of its affiliates, including partnership agreements, and such violation is not cured within ten business (10) days after written demand by the Company or any of its affiliates

(ii)    failure by the Executive to comply with a material provision of the Company's policies, and such failure is not cured within ten business (10) days after written demand by the Company or any of its affiliates;

(iii)    the Executive becomes, in the reasonable opinion of the Purchaser, as determined in good faith, addicted or dependent on intoxicants or drugs of any nature;

(iv)    the Executive's conviction of any misdemeanour involving theft or deception or any felony; or

(v)    the Executive's engagement in illegal or dishonest conduct or gross misconduct that is materially and demonstrably injurious to the Purchaser or its affiliates.

(d)    Termination by the Company Without Cause. The Company may terminate the Executive's employment hereunder at any time without Cause.

(e)    Termination by the Executive for Good Reason.  The Executive may terminate the Executive's employment hereunder at any time for "Good Reason."  For purposes of this Agreement, "Good Reason" shall mean any of the following:

(i)    a material diminution of the Executive's material duties that results in a material change in the Executive's authority, duties, or responsibilities as previously in effect, provided that a change in title and/or reporting relationship do not, in and of themselves, constitute Good Reason;

1007906684v5

(ii)    a violation by the Company of any material term of this Agreement; or

(iii)    a material change in the geographic location at which the Executive must perform his services.

In order for an event to qualify as Good Reason, the Executive must not terminate employment with the Company without first providing the Company with written notice of the acts or omissions constituting the grounds for Good Reason within ninety (90) days of the initial existence of such grounds and a reasonable cure period of not less than twenty days following the date of written notice, and such grounds must not have been cured during such time.

(f)    Termination by the Executive Without Good Reason.  The Executive may terminate the Executive's employment hereunder at any time without Good Reason.

(g)    Termination upon Expiration of the Term.  Unless otherwise agreed by the Company and Executive, upon the expiration of the Term (for the avoidance of doubt, taking into account any renewal thereof in accordance with Section 1(a)), the Executive's employment shall terminate.

4.    Notice and Date of Termination.

(a)    Notice of Termination.  Except for termination as specified in Section 3(a) or Section 3(g), any termination of the Executive's employment by the Company or any such termination by the Executive shall be communicated by written Notice of Termination to the other party hereto. For purposes of this Agreement, a "Notice of Termination" shall mean a notice which shall indicate the specific termination provision in this Agreement relied upon.

(b)    Date of Termination. "Date of Termination" shall mean: (i) if the Executive's employment is terminated by his death, the date of his death; (ii) if the Executive's employment is terminated on account of Disability under Section 3(b) or by the Company for Cause under Section 3(c), the date on which Notice of Termination is given; (iii) if the Executive's employment is terminated by the Company without Cause under Section 3(d), a date that is specified by the Company that is not less than sixty (60) days following the date on which a Notice of Termination is given; (iv) if the Executive's employment is terminated by the Executive without Good Reason under Section 3(f), a date that is specified by the Executive that is not less than sixty (60) days following the date on which a Notice of Termination is given or (v) upon expiration of the Term, the close of business on the date the Term lapses. Notwithstanding the foregoing, in the event that the Executive gives a Notice of Termination to the Company pursuant to Section 4(b)(iv), the Company may unilaterally accelerate the Date of Termination and such acceleration shall not result in a termination by the Company for purposes of this Agreement, provided that the Company shall provide the Executive his Base Salary during the period covered by such acceleration.

(c)    Resignation as Officer or Director. Upon the termination of the Executive's services to the Company for any reason, the Executive shall resign from any position of director, trustee, manager or member of the investment committee of the Company or its affiliates (or in any similar capacity for) and any funds or accounts sponsored, managed or advised by any of the foregoing.

5.    Compensation Upon Termination.

(a)    Termination Generally.  If the Executive's employment with the Company is terminated for any reason, the Company shall pay or provide to the Executive (or to his authorized representative or estate) (i) any Base Salary earned through the Date of Termination, unpaid expense reimbursements (subject to, and in accordance with, Section 2(c) of this Agreement) and unused vacation

4

that accrued through the Date of Termination on or before the time required by law but in no event more than 30 days after the Executive's Date of Termination; and (ii) any vested benefits the Executive may have under any employee benefit plan of the Company through the Date of Termination, which vested benefits shall be paid and/or provided in accordance with the terms of such employee benefit plans (collectively, the "Accrued Benefit").

(b)    Termination by the Company Without Cause or by the Executive for Good Reason. During the Term, if the Executive's employment is terminated by the Company without Cause as provided in Section 3(d), or by the Executive for Good Reason as provided in Section 3(e), then in addition to his Accrued Benefit under Section 5(a), subject to the Executive signing a general release of claims with respect to claims that the Executive has or may have in connection with his employment with the Company and that expressly preserves the Executive's rights under the Preserved Agreements (as defined below) and any other agreements related to the Executive's equity interests, indemnification rights or vested benefits (the "Separation Agreement") and the Separation Agreement becoming fully effective, all within the time frame set forth in the Separation Agreement but in no event later than 60 days after the Date of Termination:

(i)    the Company shall pay the Executive an amount equal to (x) the Executive's Base Salary at the time of termination of the Executive's employment, provided that that such Base Salary amount shall not be less than the Base Salary set forth in Section 2(a) (the "Severance Amount"); and (y) continuation on the same terms as an active employee (including, where applicable, coverage for the Executive and the Executive's dependents) of medical insurance benefits that the Executive would otherwise be eligible to receive as an active employee of the Company ("Medical Benefit Continuation") until the Executive's death (the "Medical Benefit Continuation Period"). Notwithstanding the foregoing, if the Executive breaches any of the Continuing Obligations and such breach is not cured by the Executive after written notice and a reasonable opportunity to cure, all payments of the Severance Amount and the Medical Benefit Continuation shall immediately cease from and after the time of such breach.

(ii)    The Severance Amount shall be paid out in substantially equal installments in  accordance with  the Company's payroll practice over twenty-four (24) months commencing within 60 days after the Date of Termination; *provided*, however, that if the Severance Amount is deemed deferred compensation and the 60-day period begins in one calendar year and ends in a second calendar year, then the Severance Amount shall begin to be paid in the second calendar year by the last day of such 60-day period; *provided*, further, that the initial payment shall include a catch-up payment to cover amounts retroactive to the day immediately following the Date of Termination.  Each payment pursuant to this Agreement is intended to constitute a separate payment for purposes of Treasury Regulation Section 1.409A-2(b)(2).

(iii)    If, after the Company has taken reasonable actions, the Executive is not permitted to continue his participation in the Company's group medical insurance plan pursuant to the terms of such plan or pursuant to a determination by the Company's medical insurance providers, or if applicable rules and regulations under Federal or state law prohibit the Company from providing Executive with post-termination group health or other benefits coverage (either directly or through COBRA), or if continued participation post-employment in the Company's group medical insurance plans would result in the imposition of an excise tax on the Company pursuant to Section 4980D of the Internal Revenue Code of 1986 (the "Code"), then the Company shall instead pay to the Executive monthly during the Medical Benefit Continuation Period an amount equal to the full monthly premium amount applicable to the Executive had the Executive been able to continue participation in the Company's medical plan.

1007906684v5

(c)    Expiration of the Term. In addition to the amounts payable in accordance with Section 3(a), in the event that the Executive's employment terminates upon the expiration of the Term in accordance with Section 3(g), then notwithstanding the otherwise applicable terms of the Incentive Plan, if any payment becomes due under such Incentive Plan (i) on or before the date that is six months after the date of the Executive's termination, the Executive shall receive an amount equal to the payment he would have received under such Incentive Plan had he still been employed on the date such payment becomes due and (ii) following the date that is six months after, but on or before the first anniversary, of the date of the Executive's termination, the Executive shall receive an amount equal to fifty percent (50%) of the payment he would have received under such Incentive Plan had he still been employed on the date such payment becomes due.

6.    Section 409A.

(a)    Anything in this Agreement to the contrary notwithstanding, if at the time of the Executive's separation from service within the meaning of Section 409A of the Code, the Company determines that the Executive is a "specified employee" within the meaning of Section 409A(a)(2)(B)(i) of the Code, then to the extent any payment or benefit that the Executive becomes entitled to under this Agreement on account of the Executive's separation from service would be considered deferred compensation otherwise subject to the 20 percent additional tax imposed pursuant to Section 409A(a) of the Code as a result of the application of Section 409A(a)(2)(B)(i) of the Code, such payment shall not be payable and such benefit shall not be provided until the date that is the earlier of (A) six months and one day after the Executive's separation from service, or (B) the Executive's death.  If any such delayed cash payment is otherwise payable on an installment basis, the first payment shall include a catch-up payment covering amounts that would otherwise have been paid during the six-month period but for the application of this provision, and the balance of the installments shall be payable in accordance with their original schedule.

(b)    All in-kind benefits provided and expenses eligible for reimbursement under this Agreement shall be provided by the Company or incurred by the Executive during the time periods set forth in this Agreement.  All reimbursements shall be paid as soon as administratively practicable, but in no event shall any reimbursement be paid after the last day of the taxable year following the taxable year in which the expense was incurred.  The amount of in-kind benefits provided or reimbursable expenses incurred in one taxable year shall not affect the in-kind benefits to be provided or the expenses eligible for reimbursement in any other taxable year (except for any lifetime or other aggregate limitation applicable to medical expenses).  Such right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit.

(c)    To the extent that any payment or benefit described in this Agreement constitutes "non-qualified deferred compensation" under Section 409A of the Code, and to the extent that such payment or benefit is payable upon the Executive's termination of employment, then such payments or benefits shall be payable only upon the Executive's "separation from service."  The determination of whether and when a separation from service has occurred shall be made in accordance with the presumptions set forth in Treasury Regulation Section 1.409A-1(h).

(d)    The parties intend that this Agreement will be administered in accordance with Section 409A of the Code.  To the extent that any provision of this Agreement is ambiguous as to its compliance with Section 409A of the Code, the provision shall be read in such a manner so that all payments hereunder comply with Section 409A of the Code. Each payment pursuant to this Agreement is intended to constitute a separate payment for purposes of Treasury Regulation Section 1.409A-2(b)(2). The parties agree that this Agreement may be amended, as reasonably requested by either party, and as

6

may be necessary to fully comply with Section 409A of the Code and all related rules and regulations in order to preserve the payments and benefits provided hereunder without additional cost to either party.

(e)    The Company makes no representation or warranty and shall have no liability to the Executive or any other person if any provisions of this Agreement are determined to constitute deferred compensation subject to Section 409A of the Code but do not satisfy an exemption from, or the conditions of, such Section.

7.    Continuing Obligations.

(a)    Executive Covenants and Continuing Obligations.    The Employee Confidentiality, Assignment, Nonsolicitation and Noncompetition Agreement between the Company and the Executive, attached hereto as Exhibit A (the "Employee Noncompetition Agreement"), is incorporated by reference, the terms of which are material terms of this Agreement.  For purposes of this Agreement, the obligations of Executive in this Section 7 shall collectively be referred to as the "Continuing Obligations." The Company has advised the Executive to consult with counsel of his choosing regarding the terms of the Employee Noncompetition Agreement prior to entering into this Agreement.  The Executive agrees and acknowledges that the Company has provided him a period of not less than 14 calendar days to review the Employee Noncompetition Agreement prior to the execution of this Agreement and the Employee Noncompetition Agreement.

(b)    Third-Party Agreements and Rights.  The Executive hereby confirms that the Executive is not bound by the terms of any agreement with any previous employer or other party which restricts in any way the Executive's use or disclosure of information or the Executive's engagement in any business. The Executive represents to the Company that the Executive's execution of this Agreement, the Executive's employment with the Company and the performance of the Executive's proposed duties for the Company will not violate any obligations the Executive may have to any such previous employer or other party.  In the Executive's work for the Company, the Executive will not disclose or make use of any information in violation of any agreements with or rights of any such previous employer or other party, other than Redwood Capital Group, LLC, and the Executive will not bring to the premises of the Company any copies or other tangible embodiments of non-public information belonging to or obtained from any such previous employment or other party other than Redwood Capital Group, LLC.

(c)    Cooperation.  During and for a period of two years after the Executive's employment, upon the reasonable request from the Company, the Executive shall use reasonable efforts to respond and provide information, to the extent of the Executive's knowledge, with respect to (i) the defense or prosecution of any claims or actions now in existence or which may be brought in the future against or on behalf of the Company or (ii) an internal or third-party investigation or review, including investigation or review of any federal, state or local regulatory authority, which in each case relate to events or occurrences that transpired while the Executive was employed by the Company (a "Cooperation Matter"). In addition, upon the reasonable request from the Company, in connection with a Cooperation Matter the Executive shall be available to meet with counsel to prepare for discovery or trial and to act as a witness on behalf of the Company at mutually convenient times. The Company shall reimburse the Executive for any reasonable out-of-pocket expenses incurred in connection with the Executive's performance of obligations pursuant to this Section 7(c).

8.    Consent to Jurisdiction.  The parties hereby consent to the jurisdiction of the state and federal courts of the State of Illinois and the United States District Courts in the State of Illinois. Accordingly, with respect to any such court action, the Executive (a) submits to the personal jurisdiction of such courts; (b) consents to service of process; and (c) waives any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process.

7

1007906684v5

9.     <u>Integration</u>. This Agreement together with the Employee Noncompetition Agreement, the agreements related to the Executive's promote, capital contributions and accounts, the Purchase Agreement and the other documents entered into in connection therewith (the "Preserved Agreements") constitute the entire agreement between the parties with respect to compensation, severance pay, benefits and vesting and supersedes in all respects all prior agreements between the parties concerning such the subject matter hereof, including without limitation any offer letter, employment agreement or severance agreement relating to the Executive's employment (or business or service) relationship with the Company and/or the ending of that employment (or business or service) relationship.  For the avoidance of doubt, the Prior Employment Agreement shall be superseded and replaced by this Agreement on the Effective Date.

10.     <u>Withholding</u>.  All payments made by the Company to the Executive under this Agreement shall be net of any tax or other amounts required to be withheld by the Company under applicable law.

11.     <u>Successor to the Executive</u>.  This Agreement shall inure to the benefit of and be enforceable by the Executive's personal representatives, executors, administrators, heirs, distributees, devisees and legatees.  In the event of the Executive's death after his termination of employment but prior to the completion by the Company of all payments due him under this Agreement, the Company shall continue such payments to the Executive's beneficiary designated in writing to the Company prior to his death (or to his estate, if the Executive fails to make such designation).  Nothing in this Agreement shall confer any rights or remedies upon any Person other than the parties hereto.

12.     <u>Enforceability</u>.  If any portion or provision of this Agreement (including, without limitation, any portion or provision of any section of this Agreement shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

13.     <u>Survival</u>.  The provisions of this Agreement shall survive the termination of this Agreement and/or the termination of the Executive's employment to the extent necessary to effectuate the terms contained herein.

14.     <u>Notices</u>.  Any notices, requests, demands and other communications provided for by this Agreement shall be sufficient if in writing and delivered in person or sent by a nationally recognized overnight courier service or by registered or certified mail, postage prepaid, return receipt requested, to the Executive at the last address the Executive has filed in writing with the Company or, in the case of the Company, at its main offices, attention of the directors.

15.     <u>Waiver</u>.  No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving party.  The failure of any party to require the performance of any term or obligation of this Agreement, or the waiver by any party of any breach of this Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

16.     <u>Amendment</u>.  This Agreement may be amended or modified only by a written instrument signed by the Executive and by a duly authorized representative of the Company.

1007906684v5

17.    Effect on Other Plans and Agreements.  Nothing in this Agreement shall be construed to limit the rights of the Executive under the Company's benefit plans, programs or policies except as otherwise provided in Section 7 hereof, and except that the Executive shall have no rights to any severance benefits under any Company severance pay plan, offer letter or otherwise.  In the event that the Executive is party to an agreement with the Company providing for payments or benefits under such agreement and this Agreement, the terms of this Agreement shall govern and the Executive may receive payment under this Agreement only and not both.

18.    Remedies Upon Breach.  If a party breaches, or proposes to breach, any portion of this Agreement, the other party shall be entitled to exercise all legal and equitable remedies, including to specifically enforce this Agreement.

19.    Governing Law.  This Agreement shall be construed under and be governed in all respects by the laws of the State of Illinois, without giving effect to the conflict of laws principles.  With respect to any disputes concerning federal law, such disputes shall be determined in accordance with the law as it would be interpreted and applied by the United States Court of Appeals for the Seventh Circuit.

20.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be taken to be an original; but such counterparts shall together constitute one and the same document.

21.    Assignment and Transfer by the Company; Successors.  Purchaser may assign its rights (but not its obligations) under this Agreement to any of its controlled affiliates, and otherwise, neither party may assign this Agreement, or any of the rights or obligations of such party hereunder, without the prior written consent of the other party.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by and against the successors, assigns and permitted transferees of the parties.

22.    Gender Neutral.  Wherever used herein, a pronoun in the masculine gender shall be considered as including the feminine gender unless the context clearly indicates otherwise.

[*Remainder of Page Intentionally Left Blank*]

9

1007906684v5

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first set forth above.

EXETER PROPERTY GROUP, LLC

By: _Brian Fogarty_
Its: _Vice President_

EXECUTIVE

_____

Name:  David Carlson

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first set forth above.

**EXETER PROPERTY GROUP, LLC**

_____

By:

Its:

**EXECUTIVE**

_____

Name:  David Carlson

10

**Exhibit A**

**Employee Confidentiality, Assignment, Nonsolcitation and Noncompetition Agreement**

As a condition of my employment by Exeter Property Group, LLC pursuant to the terms of, and in consideration of the Company's obligations set forth in, the Employment Agreement between Exeter Property Group, LLC and me of even date herewith (the "Employment Agreement"), which I acknowledge and agree provides consideration that I would not otherwise be entitled to absent me entering into this Employee Confidentiality, Assignment, Nonsolicitation, and Noncompetition Agreement (the "Agreement") and is sufficient consideration in addition to my employment. With those understandings, I agree as follows: The term "Company" as used in this Agreement means each of the Exeter Group Companies (Exeter US Advisor, LLC, Exeter Property Group, LLC, Exeter Property Group Advisors, LLC and each of the Exeter GPs, as well as their subsidiaries), EQT AB and each of its subsidiaries and other affiliates, except where the context requires otherwise (and the term "Companies" shall be construed accordingly).

1.      **Proprietary Information.**  I agree that all information, whether or not in writing, concerning the Company's business, technology, business relationships or financial affairs that the Company has not released to the general public (collectively, "Proprietary Information") and all tangible embodiments thereof are and will be the exclusive property of the Company. By way of illustration, Proprietary Information may include information or material that has not been made generally available to the public, such as: (a) *corporate information,* including plans, strategies, methods, policies, resolutions, negotiations or litigation; (b) *information regarding advisory activities,* including strategies, methods, client, investor, business partner or prospect identities or other information about clients, investors, business partners, or prospects, information relating to the track record or investment performance of any client of the Company, or market analyses or projections; (c) *financial information,* including investment, financing or capital-raising sources, pricing information and methods, cost and performance data, debt arrangements, equity structure, investors and holdings, purchasing and sales data and price lists; (d) *operational and technological information,* including plans, specifications, manuals, forms, templates, software, testing data and strategies, research and development strategies, designs, methods, procedures, formulae, data, reports, discoveries, inventions, improvements, concepts, ideas, and other Developments (as defined below), know-how and trade secrets; and (e) *personnel information,* including personnel lists, reporting or organizational structure, resumes, personnel data, performance evaluations and termination arrangements or documents. Proprietary Information also includes information received in confidence by the Company from any member of the Company or any of its clients, investors, business partners, prospects or other third parties.

2.      **Recognition of Company's Rights.**  I will not, at any time, without the Company's prior written permission, either during or after my employment, disclose any Proprietary Information to anyone outside of the Company, or use or permit to be used any Proprietary Information for any purpose other than the performance of my duties as an employee of the Company. I will reasonably cooperate with the Company and use my commercially reasonable best efforts to prevent the unauthorized disclosure of all Proprietary Information. I will deliver to the Company all copies and other tangible embodiments of Proprietary Information in my possession or control upon the earlier of a request by the Company or termination of my employment; provided that nothing in this Agreement or elsewhere shall prevent me from retaining and utilizing: documents relating to my personal benefits, entitlements and obligations; documents relating to my personal tax obligations; my desk calendar, personal contacts and the like; and such other records and documents as may reasonably be approved by the Company.

11

1007906684v5

3.    **Rights of Others.** I understand that the Company is now and may hereafter be subject to nondisclosure or confidentiality agreements with third persons that require the Company to protect or refrain from use or disclosure of proprietary information. I agree to be bound by the terms of such agreements in the event I have access to such proprietary information. I understand that the Company strictly prohibits me from using or disclosing confidential or proprietary information belonging to any other person or entity (including any employer or former employer), in connection with my employment. In addition, I agree not to bring any confidential information belonging to any other person or entity, other than Redwood Capital Group LLC onto Company premises or into Company workspaces.

4.    **Commitment to Company; Avoidance of Conflict of Interest.** Except as permitted under Section 1(c) of the Employment Agreement, while  an employee of the Company, I will devote my full-time efforts to the Company's business and I will  not, directly or indirectly, engage in any other business activity, except as expressly authorized in writing and in advance by a duly authorized representative of the Company. I will advise an authorized officer of the Company or his or her designee at such time as any activity of either the Company or another business presents me with a conflict of interest or the appearance of a conflict of interest as an employee of the Company. I will take whatever reasonable action is requested of me by the Company to resolve any conflict or appearance of conflict which it finds to exist.

5.    **Developments.** I will make full and prompt disclosure to the Company of all inventions, discoveries, designs, developments, methods, modifications, improvements, processes, algorithms, data, databases, computer programs, research, formulae, techniques, trade secrets, graphics or images, and audio or visual works and other works of authorship, and other intellectual property, including works-in-process (collectively "Developments") whether or not patentable or copyrightable, that are created, made, conceived or reduced to practice by me (alone or jointly with others) or under my direction during the period of my employment. I acknowledge that all work performed by me is on a "work for hire" basis, and I hereby do assign and transfer and, to the extent any such assignment cannot be made at present, will assign and transfer, to the Company and its successors and assigns all my right, title and interest in and to all Developments that (a) relate to the business of the Company or any investor or business partner of the Company or any of the products or services being researched, developed, manufactured or sold by the Company or which may be used with such products or services; or (b) result from tasks assigned to me by the Company; or (c) result from the use of premises or personal property (whether tangible or intangible) owned, leased or contracted for by the Company ("Company- Related Developments"), and all related patents, patent applications, trademarks and trademark applications, copyrights and copyright applications, *sui generis* database rights and other intellectual property rights in all countries and territories worldwide and under any international conventions ("Intellectual Property Rights").

To preclude any possible uncertainty, I confirm that there are no Developments that I have, alone or jointly with others, conceived, developed or reduced to practice prior to the commencement of my employment with the Company that I consider to be my property or the property of third parties and that I wish to have excluded from the scope of this Agreement.

This Agreement does not obligate me to assign to the Company any Development that is developed entirely on my own time and does not relate to the business efforts or research and development efforts in which, during the period of my employment, the Company actually is engaged or reasonably would be engaged, and does not result from the use of premises or equipment owned or leased by the Company. However, I will also promptly disclose to the Company any such Developments for the purpose of determining whether they qualify for such exclusion. I understand that to the extent this Agreement is required to be construed in accordance with the laws of any state which precludes a

12

requirement in an employee agreement to assign certain classes of inventions made by an employee, this Section 5 will be interpreted not to apply to any invention that a court rules and/or the Company agrees falls within such classes. I also hereby waive all claims to any moral rights or other special rights that I may have or accrue in any Company-Related Developments.

6.     **Documents and Other Materials.** I will keep and maintain adequate and current records of all Proprietary Information and Company-Related Developments developed by me during my employment, which records will be available to and remain the sole property of the Company at all times.

All files, letters, notes, memoranda, reports, records, data, sketches, drawings, notebooks, layouts, charts, quotations and proposals, specification sheets, blueprints, models, prototypes, or other written, photographic or other tangible material containing Proprietary Information, whether created by me or others, which come into my custody or possession, are the exclusive property of the Company to be used by me only in the performance of my duties for the Company. Any property situated on the Company's premises and owned by the Company, including without limitation computers, disks and other storage media, filing cabinets or other work areas, is subject to inspection by the Company at any time with or without notice. In the event of the termination of my employment for any reason, I will deliver to the Company all Company property and equipment in my possession, custody or control, including all files, letters, notes, memoranda, reports, records, data, sketches, drawings, notebooks, layouts, charts, quotations and proposals, specification sheets, blueprints, models, prototypes, or other written, photographic or other tangible material containing Proprietary Information, and other materials of any nature pertaining to the Proprietary Information of the Company and to my work, and will not take or keep in my possession any  of the foregoing or any  copies; provided that  nothing in this Agreement or elsewhere shall prevent me from retaining and utilizing: documents relating to my personal benefits, entitlements and obligations; documents relating to my personal tax obligations; my desk calendar, personal contacts and the like; and such other records and documents as may reasonably be approved by the Company.

7.     **Enforcement of Intellectual Property Rights.** I will cooperate fully with the Company, both during and after my employment with the Company, with respect to the procurement, maintenance and enforcement of Intellectual Property Rights in Company-Related Developments. I will sign, both during and after my employment, all papers, including without limitation copyright applications, patent applications, declarations, oaths, assignments of priority rights, and powers of attorney, which the Company may deem necessary or desirable in order to protect its rights and interests in any Company-Related Development or Intellectual Property Rights therein. If the Company is unable, after reasonable effort, to secure my signature on any such papers, I hereby irrevocably designate and appoint each officer of the Company as my agent and attorney-in-fact to execute any such papers on my behalf, and to take any and all actions as the Company may deem necessary or desirable in order to protect its rights and interests in any Company-Related Development, including any Intellectual Property Rights therein.

8.     **Noncompetition and Nonsolicitation.** In order to protect the Company's Proprietary Information and goodwill, during my employment and for a period of one (1) year following the date of the cessation of my employment  (the "Restricted Period"), I irrevocably undertake and agree that I shall not:

(a)     whether individually or as owner, part owner, shareholder, partner, member, director, officer, trustee, employee, agent, consultant or in any other capacity, on behalf of myself or any Person, engage or prepare to engage in a Competing Business (as defined below); or

13

(b)      (i) be or become an owner, part owner, shareholder, partner, member, director, officer, trustee, employee, consultant, bondholder, creditor, agent or representative of, or (ii) in any manner give financial, strategic, operational, technical or other assistance to, whether in a competitive capacity or any other capacity, any Person engaged in a Competing Business; provided, that nothing in this Agreement shall prevent or restrict me from (i) owning a passive investment that, when aggregated with the holdings of the members of my immediate family and their respective Affiliates, constitutes less than five percent (5%) of the outstanding shares or comparable interests in a publicly traded entity, so long as I do not have, or exercise, any rights to manage or operate the business of such issuer other than rights as a shareholder thereof; or (ii) being employed by an entity that engages in a Competing Business, so long as (A) the entity has more than one discrete and readily distinguishable line of business and my duties are not at or involving the part of the entity's business that is engaged in a Competing Business or (B) such employment will not require me to engage in any type of executive, managerial, strategic, technical, or business development activities or any other activities similar to the types of activities or functions I performed for or on behalf of the Company during my employment or engagement;

(c)      solicit, divert or take away, or attempt to solicit, divert or take away, any Clients or Prospects or cause any Clients or Prospects to reduce or adversely alter their business with the Company;

(d)      (i) solicit or entice, or attempt to solicit or entice, any employee, agent or consultant of the Company to terminate his, her or its employment or engagement with the Company, or (ii) hire or engage or facilitate the hiring or engagement of any person who is then employed or engaged by the Company or who was employed or engaged by the Company within the two (2) year period immediately preceding such action by me; provided, that Section 8(d)(i) does not apply to advertising through mass media or communications that are not specifically directed at employees, agents or consultants of the Company;

(e)      work or prepare to work in any enterprise involving a Competing Business with any employee, agent or consultant or former employee, agent or consultant of the Company who was employed by or acted as an agent or consultant to the Company at any time during the two (2) year period preceding such action by me; or

(f)      in connection with any Competing Business, solicit for business any person or entity doing business with the Company or any fund, managed account, joint venture or other Person sponsored, managed or advised by the Company (including vendors, suppliers, developers, managers or lenders), or attempt in any way to interfere with the business relationship existing between the Company, on the one hand, and any such person or entity, on the other hand.

For purposes of this Section 8:

"Client" means any fund, managed account, joint venture or other Person sponsored, managed or advised by any of the Exeter Group Companies and any investor, investee company, supplier, vendor, customer, licensee, distributor, contractor or any fund in which any member of the EQT Firm acts or acted as general partner, manager, investment advisor or investment sub- advisor in any such fund, managed account joint venture or other Person;

"Competing Business" means any business activity in any country or territory in which any of the Exeter Group Companies market any of their respective services as of the first day of the cessation of my employment with the Company that involves the performance of any services that are competitive with the services of any of the Exeter Group Companies, or that are the subject of active planning at the time of the cessation of my employment with the Company, but shall exclude, in any event, any business activity undertaken under Section 1(c) of the Employment Agreement;

14

1007906684v5

"EQT Firm" means EQT AB and/or any one or more of its direct or indirect subsidiaries, and/or any other entity that EQT AB, in its reasonable discretion, may deem to be part of the EQT Firm and of which I have actual notice; and

"Prospect" means any Person who: (i) has, either orally or in writing, expressed an interest in becoming a Client; or (ii) is, either orally or in writing, being actively solicited to become a Client within the most recent six months of employment (such time to be measured as of the date of any conduct alleged to be in violation of this Agreement).

9.      **Government Contracts.** I acknowledge that the Company may have from time to time agreements with other persons or with the United States Government or its agencies that impose obligations or restrictions on the Company regarding inventions made during the course of work under such agreements or regarding the confidential nature of such work. I agree to comply with any such obligations or restrictions upon the direction of the Company. In addition to the rights assigned under paragraph 5,1 also assign to the Company (or any of its nominees) all rights that I have or acquired in any Developments, full title to which is required to be in the United States under any contract between the Company and the United States or any of its agencies.

10.      **Non-Disparagement**. At all times I shall not (i) commit any act in bad faith which is seriously detrimental to the business of a member of the EQT Firm or any fund in which a member of the EQT Firm acts or acted as the general partner, manager, investment advisor or investment sub-advisor including without limitation any conduct detrimental to the name or reputation of a member of the EQT Firm, or (ii) willfully make any derogatory statement or communication about the EQT Firm or any of its businesses, products, services, personnel or activities; provided, however, that nothing in this Section 10 or elsewhere prohibits myself from (a) communicating with government agencies about possible violations of federal, state, or local laws or otherwise providing information to government agencies, filing a complaint with government agencies or participating in government agency investigations or proceedings or (b) exercising or enforcing any of my rights under this Agreement.

11.      **Prior Agreements.** I hereby represent that, except as I have fully disclosed previously in writing to the Company, I am not bound by the terms of any agreement with any previous or current employer or other party to refrain from using or disclosing any trade secret or confidential or proprietary information in the course of my employment with the Company or to refrain from competing, directly or indirectly, with the business of such employer or any other party. I further represent that my performance of all the terms of this Agreement as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me in confidence or in trust prior to my employment with the Company. I will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employer or others.

12.      **Remedies Upon Breach.** I understand that the restrictions contained in this Agreement are necessary for the protection of the business and goodwill of the Company and I consider them to be reasonable for such purpose. Any breach of this Agreement is likely to cause the Company substantial and irrevocable damage and therefore, in the event of such breach, the Company, in addition to such other remedies which may be available, will be entitled to specific performance and other injunctive relief, without the posting of a bond. I further acknowledge that a court may render an award extending the Restricted Period as one of the remedies in the event of my violation of this Agreement.

13.      **Use of Voice, Image and Likeness.** I give the Company permission to use any and all of my voice, image and likeness, with or without using my name, in connection with the products and/or services of the Company, for the purposes of advertising and promoting such products and/or

15

1007906684v5

services and/or the Company, and/or for other purposes deemed appropriate by the Company in its reasonable discretion, except to the extent prohibited by law.

14. **No Employment Obligation.** I understand that this Agreement does not create an obligation on the Company or any other person to continue my employment. I acknowledge that, unless otherwise agreed in a formal written employment agreement signed on behalf of the Company by an authorized officer, my employment with the Company is at will and therefore may be terminated by the Company or me at any time and for any reason, with or without cause.

15. **Survival and Assignment by the Company.** I understand that my obligations under this Agreement will continue in accordance with its express terms regardless of any changes in my title, position, duties, salary, compensation or benefits or other terms and conditions of employment. I further understand that my obligations under this Agreement will continue following the termination of my employment regardless of the manner of such termination and will be binding upon my heirs, executors and administrators. The Company will have the right to assign this Agreement to its affiliates, successors and assigns. I expressly consent to be bound by the provisions of this Agreement for the benefit of the Company or any parent, subsidiary or affiliate to whose employ I may be transferred without the necessity that this Agreement be resigned at the time of such transfer.

16. **Post-Employment Notifications.** During the Restricted Period, I will notify the Company of any change in my address and of each subsequent employment or business activity, including the name and address of my employer or other post-Company employment plans and the nature of my activities.

17. **Disclosures During Restricted Period.** I will provide a copy of this Agreement to any person or entity with whom I may enter into a business relationship, whether as an employee, consultant, partner, coventurer or otherwise, prior to entering into such business relationship during the Restricted Period.

18. **Severability.** In case any provisions (or portions thereof) contained in this Agreement shall, for any reason, be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. If, moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

19. **Waiver.** I acknowledge and agree that no waiver of any of my obligations under this Agreement shall be effective unless made in writing by the Company. The failure of the Company to require my performance of any term or obligation of this Agreement, or the waiver of any breach of this Agreement, shall not prevent the Company's subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

20. **Choice of Law and Jurisdiction.** This Agreement will be deemed to be made and entered into in the State of Illinois, and will in all respects be interpreted, enforced and governed under the laws of the State of Illinois. I hereby consent to personal jurisdiction of the state and federal courts situated within Illinois for purposes of enforcing this Agreement, and waive any objection that I might have to personal jurisdiction or venue in those courts.

21. **Independence of Obligations.** My obligations under this Agreement are

16

1007906684v5

independent of any obligation, contractual or otherwise, the Company has to me. The Company's breach of any such obligation shall not be a defense against the enforcement of this Agreement or otherwise limit my obligations under this Agreement.

22.    **Protected Disclosures.** I understand that nothing contained in this Agreement limits my ability to communicate with any federal, state or local governmental agency or commission, including to provide documents or other information, without notice to the Company. I also understand that nothing in this Agreement limits my ability to share compensation information concerning myself or others, except that this does not permit me to disclose compensation information concerning others that I obtain because my job responsibilities require or allow access to such information.

23.    **Defend Trade Secrets Act of 2016.** I understand that pursuant to the federal Defend Trade Secrets Act of 2016 I shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

24.    **Entire Agreement; Amendment.** This Agreement together with the Employment Agreement, the Securities Purchase Agreement of even date hereof and the other documents entered into in  connection therewith constitute the entire agreement between the Company and me with respect to the subject matter hereof, and supersedes all prior agreements or understandings, both written and oral, between the Company and me with respect to the subject matter hereof, but does not in any way merge with or supersede any other confidentiality, assignment of inventions or other restrictive covenant agreement or obligation entered into by the Company and me, which agreements and obligations shall supplement, and shall not limit or be limited by, this Agreement. This Agreement may be amended only in a written agreement executed by a duly authorized officer of the Company and me.

*[Remainder of Page Intentionally Left Blank]*

17

1007906684v5

**I UNDERSTAND THAT THIS AGREEMENT AFFECTS IMPORTANT RIGHTS. BY SIGNING BELOW, I CERTIFY THAT I HAVE READ IT CAREFULLY AND AM SATISFIED THAT I UNDERSTAND IT COMPLETELY.**

IN WITNESS WHEREOF, the undersigned has executed this agreement as a sealed instrument as of the date set forth below.

Signed: _____

Type or print name: David Carlson _____

Date: May 11, 2022 _____