# EXHIBIT 4

**EXECUTION VERSION**

June 10, 2022

**To:**

EQT AB (the "**Company**")

1.  On May 11, 2022, Exeter Property Group, LLC, a Delaware limited liability company ("**Buyer**"), and the Sellers thereunder, entered into an agreement pursuant to which the Buyer will acquire from the Sellers 100% of the issued and outstanding Company Interests of Redwood Capital Group Holdings, LLC, a Delaware limited liability company, in consideration for (i) the Purchase Price and (ii) subject to the terms and conditions set forth therein, the right, in favour of Mr. Carlson pursuant to Section 1.5 of the Transaction Agreement, to receive certain Earn-Out Payments (the "**Transaction Agreement**"). Unless otherwise stated, defined terms used in this letter (this "**Share Forfeiture Letter**") shall have the meaning given to them in the Transaction Agreement.

2.  Under and subject to the terms and conditions of Section 1.5 of the Transaction Agreement, 50% of any Earn-Out Payment is to be used to acquire EQT Shares ("**Earn-Out Shares**"). In connection with the undersigned's obligation to acquire the Earn-Out Shares, the undersigned hereby agrees and acknowledges that any such Earn-Out Shares or any securities in the Company received in exchange therefor ("**Shares**") shall be and remain subject to forfeiture for the period specified and in accordance with the terms and conditions set forth in this Share Forfeiture Letter:

3.  Receipt of Shares.

3.1  The undersigned hereby acknowledges and agrees with the Company that Shares may become receivable by the undersigned in accordance with the terms and conditions of Section 1.5 of the Transaction Agreement.

3.2  Each occasion upon which Shares are acquired by the undersigned in accordance with Section 1.5 of the Transaction Agreement shall be referred to as an "**Earn-Out Share Acquisition.**"

3.3  The provisions of this Share Forfeiture Letter shall apply separately to Shares acquired upon each Earn-Out Share Acquisition by the undersigned in accordance with the terms of Section 1.5 of the Transaction Agreement.

3.4  100% of the aggregate number of Shares received or receivable at any Earn-Out Share Acquisition shall be subject to the Leaver Put Option (as described in Section 5.2) until the first anniversary of such Earn-Out Share Acquisition, at which time 33.33% of the aggregate number of Shares received at such Earn-Out Share Acquisition shall become vested and no longer subject to the Leaver Put Option.

1007959126v2

3.5     66.66% of the aggregate number of Shares received or receivable at any Earn-Out Share Acquisition shall be subject to the Leaver Put Option from the first anniversary of such Earn-Out Share Acquisition until the second anniversary of such Earn-Out Share Acquisition, at which time 66.66% of the aggregate number of Shares received at such Earn-Out Share Acquisition shall become vested and no longer subject to the Leaver Put Option.

3.6     33.33% of the aggregate number of Shares received or receivable at any Earn-Out Share Acquisition shall be subject to the Leaver Put Option from the second anniversary of such Earn-Out Share Acquisition until the third anniversary of such Earn-Out Share Acquisition, at which time 100% of the aggregate number of Shares received at such Earn-Out Share Acquisition shall become vested and no longer subject to the Leaver Put Option.

**4.**     Put Option.

4.1     The undersigned hereby acknowledges and agrees with the Company that the specified percentages of the Shares received upon any Earn-Out Share Acquisition shall be subject to the Leaver Put Option for the periods set forth in (and shall be subject to vesting as set out in) Section 3.4, 3.5 and 3.6, as applicable.

**5.**     Leaver Put Option

5.1     The undersigned hereby acknowledges and agrees with the Company that: any Shares that, at the time of determination, remain (or upon the applicable Earn-Out Share Acquisition would have been) subject to the Leaver Put Option shall be referred to as the "**Leaver Put Option Shares**".

5.2     If the undersigned (for the purpose of this Section 5, the "**Transferor**") becomes a Bad Leaver at any time that all or a portion of the Shares acquired or that would otherwise be acquired at any Earn-Out Share Acquisition remain or would be Leaver Put Option Shares, the Transferor shall immediately require the Company (or such other person or entity nominated by the Company (at the Company's sole election and cost)) (the "**Beneficiary**") to acquire such Leaver Put Option Shares at the undersigned's Leaver Date (as defined below) or, if later, at the applicable Earn-Out Share Acquisition in accordance with this Section 5 (the "**Leaver Put Option**").   Any Shares that become subject to the Leaver Put Option at the undersigned's Leaver Date shall be referred to as the "**Leaver Put Shares.**"

5.3     The Transferor shall exercise the Leaver Put Option with respect to any Leaver Put Shares by providing written notice to the Beneficiary (the "**Leaver Put Notice**") and such Leaver Put Notice shall set out the number of Leaver Put Shares to be transferred to the Beneficiary upon each or any such exercise of the Leave Put Option.

2

5.4    On receipt by the Beneficiary of a Leaver Put Notice in accordance with Section 5.3 (the date of such receipt being the "**Leaver Put Date**"), the Leaver Put Shares shall be automatically deemed to be transferred to the Beneficiary with effect from the Leaver Put Date and the Transferor and the Beneficiary shall take all actions and steps that are reasonably required to complete such transfer pursuant to this Section 5.

5.5    The aggregate consideration payable by the Beneficiary to the Transferor in respect of the Leaver Put Shares shall always be nil.

5.6    For the purpose of this Section 5, the following definitions shall apply:

5.6.1    "**Bad Leaver**" shall mean where the undersigned is a Leaver as a result of:

(a)    voluntary resignation or termination by the undersigned of its employment, engagement or appointment for the provision of services with the Company or its Affiliates without "Good Reason" as defined under the terms of and in accordance with the undersigned's employment agreement with Exeter Property Group, LLC, a Delaware limited liability company (the "**Employment Agreement**"), and other than as a result of the undersigned's disability or death; or

(b)    termination of the undersigned's employment in a termination for "Cause" as defined in the Employment Agreement..

5.6.2    "**Leaver**" shall mean the undersigned, in the event that the undersigned ceases to be and is no longer employed, engaged or appointed for the provision of services by the Company or any of its Affiliates;

5.6.3    "**Leaver Date**" shall mean the date on which the undersigned becomes a Leaver; or

6.    The undersigned understands that this Share Forfeiture Letter is irrevocable and shall be binding upon the undersigned's heirs, legal representatives, successors and assigns.

7.    In the event of breach of this Share Forfeiture Letter, the undersigned agrees to compensate the Company by paying to the Company in cash a sum equal to the product of (i) the volume weighted average of the trading prices for ordinary shares of the Company as reported for composite transactions on the NASDAQ OMX Stockholm Stock Exchange (or other primary exchange or market for such securities) during the 30 consecutive trading days preceding the trading day immediately prior to the date of such breach and (ii) the number of Shares retained or disposed of in breach of this Share Forfeiture Letter (subject to

3

1007959126v2

appropriate adjustment for stock splits, stock dividends, combinations, and other recapitalizations).

8.  This Share Forfeiture Letter shall be construed under and be governed in all respects by the laws of the State of Illinois, without giving effect to the conflict of laws principles. With respect to any disputes concerning federal law, such disputes shall be determined in accordance with the law as it would be interpreted and applied by the United States Court of Appeals for the Seventh Circuit. The undersigned consents to the jurisdiction of the state and federal courts of the State of Illinois and the United States District Courts in the State of Illinois.   Accordingly, with respect to any such court action, the undersigned (a) submits to the personal jurisdiction of such courts; (b) consents to service of process; and (c) waives any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process.

4

1007959126v2

Very truly yours,

Name: David Carlson

Place, date: June 10, 2022