# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DAVID CARLSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | C.A. No. 25-cv-0503-CFC |
| EXETER PROPERTY GROUP, LLC | ) | |
| and EQT AB, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' OPENING BRIEF
## IN SUPPORT OF THEIR PARTIAL MOTION TO DISMISS

OF COUNSEL:

Shannon Rose Selden
Barrett J. Greenwell
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
(212) 909-6000
srselden@debevoise.com
bjgreenwell@debevoise.com

A. Thompson Bayliss (#4379)
Christopher Fitzpatrick Cannataro (#6621)
ABRAMS & BAYLISS LLP
20 Montchanin Rd., Suite 200
Wilmington, DE 19807
(302) 778-1000
bayliss@abramsbayliss.com
cannataro@abramsbayliss.com

*Attorneys for Exeter Property Group, LLC and EQT AB*

Date: July 15, 2025

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ..................................................................................................4

I.     The Parties. ............................................................................................................4

II.    Exeter's Acquisition of Redwood, and the Terms of the Purchase
       Agreement...............................................................................................................5

III.   Carlson's Employment at Exeter, Unsuccessful Fundraising, and
       Termination............................................................................................................10

ARGUMENT ...................................................................................................................12

I.     The Complaint Should Be Dismissed In Its Entirety as to EQT AB for
       Lack of Jurisdiction and Failure to State a Claim. ...........................................12

       A.     This Court Lacks Personal Jurisdiction Over EQT AB. .....................12

       B.     The Complaint Fails to State a Claim for Breach of Contract or
              of the Implied Covenant Against EQT AB. ........................................18

       C.     The Remaining Claims Against EQT AB Also Fail. ..........................21

II.    The Complaint Fails to State a Claim for Fraudulent Inducement, with
       Particularity or Otherwise.................................................................................21

III.   The Claim for Negligent Misrepresentation Is Foreclosed by the
       Terms of the Purchase Agreement....................................................................26

IV.    The Complaint Fails to Plead a Viable Unjust Enrichment Claim. .............28

V.     The Complaint Fails to Identify Any Gap in the Purchase Agreement
       That Needs to Be Filled by the Implied Covenant of Good Faith and
       Fair Dealing. ......................................................................................................29

CONCLUSION................................................................................................................31

# TABLE OF AUTHORITIES

**Cases**

*Abry Partners V, L.P. v. F & W Acquisition LLC*,
891 A.2d 1032 (Del. Ch. 2006) ...........................................................................27

*Ajay Endeavors, Inc. v. Divvymed, LLC*,
2022 WL 605695 (D. Del. Jan. 10, 2022) ...........................................................25

*Akzo Nobel Coatings Inc. v. The Dow Chem. Co.*,
2015 WL 3536151 (Del. Ch. June 5, 2015)..........................................................28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................................................................19

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .........................................................................................18, 19

*Carson v. HP Inc.*,
750 F. Supp. 3d 376 (D. Del. 2024).....................................................................29

*Cavi v. Evolving Sys. NC, Inc.*,
2018 WL 2372673 (D. Del. May 24, 2018) .........................................................29

*Diaz v. FCA US LLC*,
693 F. Supp. 3d 425 (D. Del. 2023)......................................................................22

*E.E.O.C. v. Waffle House, Inc.*,
534 U.S. 279 (2002)..............................................................................................19

*E.I. du Pont de Nemours & Co. v. Agfa-Gavaert NV*,
335 F. Supp. 3d 657 (D. Del. 2018)......................................................................12

*Eastman Chem. Co. v. AlphaPet Inc.*,
2011 WL 6004079 (D. Del. Nov. 4, 2011).............................................................14

*Edinburgh Hldgs., Inc. v. Educ. Affiliates, Inc.*,
2018 WL 2727542 (Del. Ch. June 6, 2018).............................................24, 26, 30

*Emerson v. Mezzion Int'l, LLC*,
2021 WL 765765 (D. Del. Feb. 26, 2021)............................................................20

*Express Scripts, Inc. v. Bracket Hldgs. Corp.*,
    248 A.3d 824 (Del. 2021) ..................................................................27

*Fortis Advisors LLC v. Dialog Semiconductor PLC*,
    2015 WL 401371 (Del. Ch. Jan. 30, 2015).................................30, 31

*Glob. Recycling Sols., LLC v. Greenstar New Jersey, LLC*,
    2011 WL 4501165 (D. Del. Sept. 28, 2011)......................................20

*Great Lakes Chem. Corp. v. Pharmacia Corp.*,
    788 A.2d 544 (Del. Ch. 2001) ...........................................................23

*Highway to Health, Inc. v. Bohn*,
    2020 WL 1868013 (Del. Ch. Apr. 15, 2020).....................................16

*Hydrogen Master Rts., Ltd. v. Weston*,
    228 F. Supp. 3d 320 (D. Del. 2017)...................................................29

*In re Student Fin. Corp.*,
    2004 WL 609329 (D. Del. Mar. 23, 2004) ........................................23

*Infomedia Grp., Inc. v. Orange Health Sols., Inc.*,
    2020 WL 4384087 (Del. Super. Ct. July 31, 2020)...........................27

*Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. &*
    *Placement*,
    326 U.S. 310 (1945).........................................................................13

*Klein v. Gen. Nutrition Companies, Inc.*,
    186 F.3d 338 (3d Cir. 1999) .............................................................23

*Koloni Reklam, Sanayi, Ticaret LTD/STI v. Viacom, Inc.*,
    2017 WL 726660 (D. Del. Feb. 23, 2017)........................................20

*Kuroda v. SPJS Hldgs., L.L.C.*,
    971 A.2d 872 (Del. Ch. 2009) ..........................................................28

*MarkDutchCo 1 B.V. v. Zeta Interactive Corp.*,
    411 F. Supp. 3d 316 (D. Del. 2019), *aff'd*, 2021 WL 3503805 (3d
    Cir. Aug. 10, 2021) ..........................................................................22

*McCrone v. Acme Markets*,
    561 F. App'x 169 (3d Cir. 2014) ...............................................18, 21

iv

*MDNet, Inc. v. Pharmacia Corp.*,
  147 F. App'x 239 (3d Cir. 2005) ...................................................................23

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*,
  854 A.2d 121 (Del. Ch. 2004) ......................................................................24

*Mills v. Polar Molecular Corp.*,
  12 F.3d 1170 (2d Cir. 1993) .........................................................................23

*Mobile Diagnostic Grp. Hldgs., LLC v. Suer*,
  972 A.2d 799 (Del. Ch. 2009) ................................................................13, 16

*Monsanto Co. v. Syngenta Seeds, Inc.*,
  443 F. Supp. 2d 636 (D. Del. 2006)..............................................................17

*Nami v. Fauver*,
  82 F.3d 63 (3d Cir. 1996) .............................................................................18

*Nespresso USA, Inc. v. Ethical Coffee Co. SA*,
  263 F. Supp. 3d 498 (D. Del. 2017)........................................................13, 17

*Osborn ex rel. Osborn v. Kemp*,
  991 A.2d 1153 (Del. 2010) ...........................................................................19

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*,
  998 F.2d 1192 (3d Cir. 1993) .......................................................................19

*Perlmutter v. Russell Hobbs, Inc.*,
  450 F. App'x 161 (3d Cir. 2011) ..................................................................19

*Phunware, Inc. v. Excelmind Grp. Ltd.*,
  117 F. Supp. 3d 613 (D. Del. 2015)...........................................15, 17, 19, 30

*Registered Agents, Ltd. v. Registered Agent, Inc.*,
  880 F. Supp. 2d 541 (D. Del. 2012)..............................................................14

*S'holder Representative Servs. LLC v. Albertsons Companies, Inc.*,
  2021 WL 2311455 (Del. Ch. June 7, 2021)..................................................26

*Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*,
  906 A.2d 168 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig.
  Tr. v. Billett*, 931 A.2d 438 (Del. 2007)........................................................24

v

*Veloric v. J.G. Wentworth, Inc.*,
   2014 WL 4639217 (Del. Ch. Sept. 18, 2014).......................................................28

*Vorchheimer v. Philadelphian Owners Ass'n*,
   903 F.3d 100 (3d Cir. 2018) ...........................................................14, 15

*VoterLabs, Inc. v. Ethos Grp. Consulting Servs., LLC*,
   2021 WL 3403932 (D. Del. Aug. 4, 2021).......................................................17

*Walden v. Allstate Ins. Co.*,
   388 F. App'x 223 (3d Cir. 2010) ...........................................................18, 22

*Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*,
   752 A.2d 1175 (Del. Ch. 1999) ...........................................................19

*Zweigenhaft v. PharMerica Corp.*,
   2020 WL 5258345 (D. Del. Sept. 3, 2020).......................................................20

## Statutes

10 Del. C. § 3104 .......................................................13

10 Del. C. § 3104(c)(1) .......................................................16

## Other Authorities

Rule 9(b).......................................................21, 22, 23, 29

Rule 12(b)(2).......................................................1, 12, 31

Rule 12(b)(6).......................................................1, 2, 18, 21, 31

Defendants Exeter Property Group, LLC ("Exeter") and EQT AB (collectively, "Defendants") submit this opening brief in support of their partial motion to dismiss the Complaint.

## PRELIMINARY STATEMENT

Plaintiff's action overreaches in targeting an incorrect party that is not subject to jurisdiction in this Court and in asserting a grab bag of untenable claims against it and its co-defendant. The Court should not countenance Plaintiff's scattershot approach. It should dismiss EQT AB from the action entirely for lack of personal jurisdiction under Rule 12(b)(2) and for failure to state a claim under Rule 12(b)(6), and should dismiss nearly every claim against Exeter for failure to state a claim under Rule 12(b)(6).

In May 2022, Plaintiff David Carlson ("Plaintiff" or "Carlson") and his business partner sold their real estate investment company, Redwood Capital Group LLC ("Redwood"), to Exeter, itself a major investor in residential and commercial real estate. Carlson received substantial upfront cash consideration with the chance to earn significantly more if he was able to raise billions of dollars in investments for new funds in each of two investment categories specified in the Purchase Agreement. Carlson failed. His fundraising efforts fell far short of the contractual milestones, and he received no earnout payments. Now dissatisfied with the bargain he struck, Carlson blames Exeter and its ultimate shareholder EQT AB and claims

he understood the deal to be different than what the Purchase Agreement provided. His claims are implausible, fail to state a claim, and should be dismissed with prejudice.

*First*, as to EQT AB, the claims fail at their core: EQT AB is not subject to personal jurisdiction in Delaware.  Rather, EQT AB is a Swedish entity based in Stockholm, and the Complaint's conclusory allegation that it "was a party" to any agreement with Carlson and consented to jurisdiction in Delaware is flatly contradicted by the Purchase Agreement's plain text.  EQT AB is *not a party* to that Agreement and did not consent to jurisdiction under it.

The Complaint also fails to plead any, let alone sufficient, facts to support this Court's exercise of jurisdiction over EQT AB.  It does not identify any action in Delaware by any party in connection with this transaction other than Carlson's and Exeter's contractual consent to Delaware jurisdiction in the Purchase Agreement. But Carlson fails to allege any legal or factual basis to impute Exeter's consent to jurisdiction to EQT AB.  This Court must assess its jurisdiction as to each defendant independently and, as to EQT AB, it has none.

*Second*, the Court should dismiss Carlson's contractual claims against EQT AB under Rule 12(b)(6) because EQT AB lacks contractual privity with or any obligation to Plaintiff.  Without an obligation, there can be no claim for breach of contract – or its implied covenants.  Plaintiff's breach-of-contract and implied-

2

covenant claims thus fail because EQT AB is not a party to that contract and has no obligations under it.

*Third*, Carlson's claims of fraud are deficient and should be dismissed as to both Exeter and EQT AB. Instead of pleading fraud with particularity, the Complaint rests on a combination of generalized allegations that impermissibly lump EQT AB and Exeter together and generic, optimistic statements about the future prospects of the post-acquisition business. Statements like these cannot serve as the basis for fraud claims as a matter of law. They are far too general to constitute material misrepresentations of fact or to give rise to any reasonable reliance – especially since any reliance is contractually precluded by the express terms in the Purchase Agreement. Having expressly agreed and represented that he would not rely on any statements other than the representations set forth in that Agreement, Plaintiff cannot plausibly allege that he relied on vague statements made during negotiations that are at odds with the contract's terms.

*Fourth*, the claim for negligent misrepresentation is barred by the Purchase Agreement. The non-reliance and integration clauses in the Purchase Agreement disclaim reliance on any external representations and warranties – and make clear that the Purchase Agreement is the parties' entire agreement. Its narrow exception to permit claims based on actual and intentional fraud does not include a claim for negligent misrepresentation.

*Fifth*, Carlson's unjust enrichment claim fails because that claim is not available when the parties' rights are governed by contract. Even if this claim were available to him, Carlson failed to plead that EQT AB received any benefit from him, much less an unjust one.

*Sixth*, Carlson's implied-covenant claim fails because he has not pleaded any gap in the Purchase Agreement that needs to be filled, nor what specific contractual obligation would fill that supposed gap. To the contrary, Carlson's and Exeter's rights and obligations with respect to the earnout are governed by the Purchase Agreement's detailed and carefully negotiated earnout clause.

At bottom, this action reflects a dispute between Exeter and Carlson over the terms of Exeter's acquisition of Redwood and Carlson's subsequent failure as an employee of the post-closing entity. None of these claims have merit – or anything to do with EQT AB – and the vast majority should be dismissed with prejudice.

## STATEMENT OF FACTS[1]

### I.    The Parties.

Plaintiff David Carlson is a resident of Illinois, a co-founder of Redwood Capital Group LLC, and a former employee of Exeter Property Group, LLC. Compl. ¶¶ 9, 31-32.

---

[1] The facts here refer to the allegations of the Complaint, without conceding their accuracy.

Defendant Exeter is a limited liability company organized in Delaware. Compl. ¶ 32. Defendant EQT AB is a public limited company organized under the laws of Sweden and headquartered in Stockholm, Sweden. Compl. ¶ 35. EQT AB trades on the Swedish stock exchange (Nasdaq Stockholm) and has no offices or personnel in Delaware.[2] Through an acquisition holding vehicle, EQT AB acquired Exeter, a multi-billion-dollar real estate investment manager, in January 2021. Compl. ¶ 48. Plaintiff refers to EQT AB and Exeter together as "EQT" or "Defendants," *see e.g.*, Compl. ¶¶ 63, 82, 101, misleadingly conflating these two separate entities throughout his Complaint.

## II. Exeter's Acquisition of Redwood, and the Terms of the Purchase Agreement.

This dispute relates to an agreement by Exeter to purchase Redwood, a real estate investment business, from Carlson and his business partner, Mark Isaacson ("Isaacson"). Compl. ¶¶ 49-50. Discussions regarding this deal began in 2021, and, on November 17, 2021, Exeter's then-CEO Ward Fitzgerald sent an indication of interest letter to the Redwood team outlining Exeter's proposed terms for its acquisition of Redwood. Dkt. No. 1-6. Following months of further negotiations and diligence, Exeter entered into a Purchase Agreement (the "Purchase Agreement" or "PA") on May 11, 2022 with Carlson, Isaacson, and Tripost Capital RCG

---

[2] Nasdaq Stockholm, *EQT*, https://www.nasdaq.com/european-market-activity/shares/eqt?id=SSE180864.

Investments, L.P. ("Tripost"). Dkt. No. 1-1. That same day, Exeter entered an Employment Agreement with Carlson. Dkt. No. 1-3. EQT AB is not a party to either agreement.

The Purchase Agreement provided that Exeter would pay a Base Purchase Price of $34,250,000 to the Redwood sellers. PA p. 5, § 1.1, p. 68, Annex I. Carlson's partner, Isaacson, received his share of the purchase price in cash (up to $10.5 million), while Carlson opted to receive less cash up front (up to $5.25 million) in exchange for the opportunity to earn up to $23.975 million more in earnout payments if the post-closing entity achieved contractually specified milestones. Compl. ¶ 57; PA § 1.5, Annex I.

These potential earnout payments lie at the heart of Carlson's claims. Section 1.5 of the Purchase Agreement provides for up to $23.975 million in earnout payments, spread across four separate categories that each required satisfaction of contractually-specified conditions before any earnout would become due and payable. These payments are contingent upon, among other things, an "Initial Core Triggering Event" and an "Initial WH Triggering Event," which are defined terms in the Purchase Agreement that refer respectively to events tied to two categories of real estate investment funds: (1) "a newly formed Core, Core+ Multifamily Fund I" (the "Initial Core Fund"); and (2) "a newly formed Workforce Housing Value Fund" (the "Initial WH Fund"). PA § 1.5, p. 72. Section 1.5 specifies what triggers are

6

required for Carlson to achieve four potential earnout payments across four categories, including:

- A first closing of an Initial Core Fund, for a potential $6,713,000 payment;

- The raising and closing of at least $750 million and up to $1 billion in fee-paying capital commitments for an Initial Core Fund, for a potential payment of up to $5,754,000;

- A first closing of an Initial WH Fund, for a potential payment of $6,713,000;

- Specified milestones in both an Initial Core Fund and an Initial WH Fund, including the raising and closing of up to $2 billion in fee-paying capital commitments in the Core and WH Funds, for a potential payment of up to $4,795,000.

The maximum potential earnout would be available only if all four benchmarks were achieved, and Carlson and Exeter successfully launched and raised at least $2 billion in capital for the two defined types of real estate investment funds. *See* PA § 1.5(a)(i)-(v). The Purchase Agreement expressly addressed Exeter's role, providing that Exeter shall not "take any action with the primary intent of interfering with Mr. Carlson's ability to achieve the maximum Earn-Out Payments," PA § 1.5(d)(i), and imposing no affirmative obligations on Exeter to meet the specified criteria or to otherwise ensure the earnouts were realized.

The Complaint alleges that the two funds that are the subject of the earnout provisions – the Initial Core Fund and the Initial WH Fund – are funds raised to make particular types of investments, in just two of the many investment categories widely recognized and used in the real estate investing community. A Core fund,

7

like the Initial Core Fund relevant to Section 1.5(a)(i)-(ii)(iv), focuses its investments on newer buildings in prominent locations, such as New York, Washington DC, and other major cities. Compl. ¶ 55. These buildings are upscale, with significant amenities, are well-located, and attract higher income tenants that provide steady and consistent rent revenues; they are thus less risky investments. Compl. ¶ 55. A Workforce Housing Fund, like the Initial WH Fund relevant to Section 1.5(a)(iii)-(iv), invests in older properties based in less prominent locations and that resultantly attract lower income residents. Compl. ¶ 55. Such investments are therefore considered riskier than Core investments. Compl. ¶ 55.

Carlson alleges that he understood during the course of his pre-signing negotiations that the post-closing entity would raise just "two funds" – Core- and Workforce-focused funds of the type that might generate the earnout payments he hoped to receive. Compl. ¶¶ 56-57. He points to no such representation or limitation within the four corners of the Purchase Agreement, however, relying instead on allegations that Exeter's CEO at the time told him during negotiations that the company was interested in working with him to develop two funds in the residential real estate space. Compl. ¶ 50. Carlson claims he was told by Exeter employees that a Workforce Housing Value Fund was "nearly ready to go," while another fund, the "Core+ Fund would require additional work" to "get off the ground running." Compl. ¶ 59. Carlson alleges that another representative of Exeter, its CFO,

8

informed him that the first fund would soon "be ready to launch" and would be subject to the earnout provisions of the Purchase Agreement. Compl. ¶¶ 60-61. Carlson claims that had he understood that Exeter was raising a "third fund" that did not fall into either of the two Core or Workforce Housing categories defined in the Purchase Agreement, he would have negotiated a different deal or refused to enter into the Purchase and Employment Agreements altogether. Compl. ¶¶ 145, 150, 159.

Yet Carlson admits that he was aware prior to signing that Exeter was, in fact, working to launch the Exeter Multifamily Value Fund II ("EMVF II"). Compl. ¶ 16. The "Multifamily Value Fund" had a different focus than a Core or Workforce Housing Fund; EMVF II was specifically designed to invest in medical, education, and technology real estate submarkets, such as housing markets close to hospitals, universities, or research institutions. Dkt. No. 1-2, EMVF II Launch Letter, p. 1. Exeter intended EMVF II to pursue a value-add strategy through which it would acquire properties and then invest additional resources to renovate them. Dkt. No. 1-2, p. 1. The redeveloped apartments would thereafter be attractive to tenants due to their "amenities," "high quality finishes" and "proximity to burgeoning Meds, Eds & Tech employment clusters." Dkt. No. 1-2, p. 1. Even though EMVF II is not referenced in the earnout clause (or anywhere else in the Purchase Agreement) and

9

even though it is not a Core or Workforce Housing Fund, Carlson nonetheless now insists he understood the earnout clause to identify EMVF II.  Compl. ¶ 18.

Carlson claims he relied on the extracontractual statements above for his understanding of the funds referenced in the earnout provisions of the contract, despite his express representations to the contrary in the Purchase Agreement itself. The Purchase Agreement is unambiguous on this point: it includes non-reliance clauses by which Exeter and the Sellers – including Carlson – all acknowledged that they relied on no other representations or warranties except for those included in the Purchase Agreement.  *See* PA §§ 2.13, 3.19, 4.11.  The Purchase Agreement also includes an integration clause in which the parties agreed that the Purchase Agreement's text encompassed their entire agreement regarding the transaction.  PA § 9.5.  The parties "retain[] all . . . rights and remedies with respect to claims based on Fraud," which is defined in the agreement to mean "actual and intentional fraud under Delaware common law[.]"  PA § 2.13, 3.19, 4.11(d), p. 71.

### III.  Carlson's Employment at Exeter, Unsuccessful Fundraising, and Termination.

After the transaction closed, Carlson became the Head of the U.S. Multifamily group of Exeter and was compensated with a base salary of $450,000, an annual bonus, and with participation in Exeter's incentive plan.  Compl. ¶ 31; Dkt. No. 1-3, Employment Agreement, §§ 1(b), 2.  Carlson's Employment Agreement provided

10

that he would have certain "powers and duties as may from time to time be prescribed by the Company." Employment Agreement § 1(b).

One of Carlson's initial duties as prescribed by Exeter was to raise capital for EMVF II, the Exeter multifamily fund that was in progress pre-acquisition and seeded with investments purchased by Exeter. Compl. ¶ 89-90. Despite pitching EMVF II to dozens of potential investors, Carlson and his team secured only $63.5 million in capital commitments for the fund, far short of its $1.5 billion goal. Compl. ¶¶ 92, 94; Dkt. No. 1-2, p. 1. In September 2024, Exeter announced that it would suspend its fundraising efforts and return the EMVF II commitments to the investors. Compl. ¶ 112. During his three years at Exeter, Carlson and his team failed to launch either an Initial Core Fund or an Initial WH Fund, achieving a total of $0 in capital commitments for those funds. Compl. ¶¶ 99-101. To be clear, the funds were *$2 billion short* of the total required for Carlson to have achieved the full earnout payment of $23,975,000 that he now demands.

After years of Carlson's failed attempts at fundraising and otherwise unsatisfactory job performance, Exeter terminated his employment on December 2, 2024. Compl. ¶ 115. Carlson thereafter initiated this litigation.

11

**ARGUMENT**

**I.**     **The Complaint Should Be Dismissed In Its Entirety as to EQT AB for Lack of Jurisdiction and Failure to State a Claim.**

    **A.**     **This Court Lacks Personal Jurisdiction Over EQT AB.**

EQT AB is an investment manager based in Stockholm, Sweden. It is not a party to any agreements at issue in this litigation, and it did not consent to jurisdiction in Delaware. Plaintiff does not allege that EQT AB transacted any business in Delaware – in connection with this dispute or otherwise – and does not allege any contact at all between EQT AB and Delaware. The Complaint has thus failed to establish any basis for personal jurisdiction over EQT AB, and the claims against it should be dismissed in their entirety without discovery or delay.

The standard is clear. Under Rule 12(b)(2), a defendant must be dismissed for lack of personal jurisdiction at the outset of the litigation when the plaintiff fails to show "with reasonable particularity that sufficient minimum contacts have occurred between the defendant and the forum state to support jurisdiction." *E.I. du Pont de Nemours & Co. v. Agfa-Gavaert NV*, 335 F. Supp. 3d 657, 665 (D. Del. 2018) (citation omitted). To meet this burden, the plaintiff must come forward "with actual proof" to show jurisdiction, not just "mere allegations." *Id.* at 665-66.

When assessing whether the plaintiff has adequately established jurisdiction over a nonresident defendant, a court conducts a two-pronged analysis: ***first*** "whether there is a basis for jurisdiction under Delaware's long-arm statute, 10 *Del.*

C. § 3104," *Mobile Diagnostic Grp. Hldgs., LLC v. Suer*, 972 A.2d 799, 803 (Del. Ch. 2009), and **second** "whether subjecting the nonresident to jurisdiction in Delaware violates the Due Process Clause of the Fourteenth Amendment[.]" *Id.* (citation omitted).  Under each prong, a connection to the forum state is essential. Delaware's long-arm statute, *10 Del. C.* § 3104, requires the plaintiff to show that the case arises out of some action that occurs "in the State" (*i.e.* Delaware), while due process requires the plaintiff to show that the defendant has "continuous and systematic" contacts with Delaware "as to render it essentially at home" there, or has "purposefully directed [its] activities at residents of" Delaware where the plaintiff's injuries "arise out of or relate to those activities." *Nespresso USA, Inc. v. Ethical Coffee Co. SA*, 263 F. Supp. 3d 498, 503 (D. Del. 2017) (cleaned up).

Nonresident defendants are not subject to jurisdiction in Delaware unless they "have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (quotation marks omitted).  And although a court may permit jurisdictional discovery when the complaint presents actual "factual allegations" that indicate with "reasonable particularity" the possible existence of the defendant's required contacts with Delaware, jurisdictional discovery should be denied and the defendant dismissed promptly when jurisdictional discovery would be nothing more than "a

13

fishing expedition based only upon bare allegations[.]" *Registered Agents, Ltd. v. Registered Agent, Inc.*, 880 F. Supp. 2d 541, 548 (D. Del. 2012) (quotation marks omitted).

The Complaint's jurisdictional allegations about EQT AB fall short of meeting this standard. They are either contradicted by the documents attached to the Complaint or unsupported by the requisite allegations of fact.

*First*, the Complaint's assertion that EQT AB is "a party to the Purchase Agreement," Compl. ¶ 38, and subject to its jurisdictional consent to Delaware, is at odds with the Agreement itself, which says no such thing. The Purchase Agreement's plain terms specify that it is solely between Tripost, Isaacson, and Carlson as the Sellers and Exeter as the Buyer. PA p. 5. EQT AB is not a party or a signatory to that Agreement, nor is it even named as a third-party beneficiary. Because EQT AB is not a party to the Purchase Agreement, it is not bound by that agreement's contractual consent to jurisdiction in Delaware. *See, e.g., Eastman Chem. Co. v. AlphaPet Inc.*, 2011 WL 6004079, at *4 (D. Del. Nov. 4, 2011) ("[O]nly those parties that have actually signed the agreement-at-issue are bound by its forum selection clause."). And the Court need not credit the Complaint's incorrect allegation to the contrary. *See Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 112 (3d Cir. 2018) ("[I]f her own exhibits contradict her allegations in the complaint, the exhibits control.").

14

The Complaint's allegations that EQT AB still somehow accepted jurisdiction in Delaware via a Share Forfeiture Letter and Lock-Up Letter, Compl. ¶ 38, are likewise contradicted by the letters themselves and should not be credited, *Vorchheimer*, 903 F.3d at 112.  Neither Letter involves consent – by anyone – to jurisdiction in Delaware.  The Share Forfeiture Letter is governed by Illinois law and contains Carlson's consent to jurisdiction in Illinois courts, and the Lock-Up Letter is governed by Swedish law and provides for arbitration in Stockholm, Sweden.  Dkt. 1-4, Share Forfeiture Letter, § 8; Dkt. 1-5, Lock-Up Letter, § 7.  The Letters are, in any event, irrelevant because EQT AB is not a party to them: neither Letter names EQT AB as a party or identifies it as a signatory.  Instead, as Plaintiff admits, the letters are one-sided; they impose "certain ***obligations on Carlson*** with respect to his use of the Earn-Out Payments to be received under Section 1.5 of the Purchase Agreement," including "forfeiture" of the shares ***by Carlson*** "in certain circumstances" and "restrictions on ***Carlson's*** ability to transact in those shares." Compl. ¶ 77 (emphasis added).  Nothing about these letters supports this Court's exercise of personal jurisdiction over EQT AB in Delaware.  *See Phunware, Inc. v. Excelmind Grp. Ltd.*, 117 F. Supp. 3d 613, 629-30 (D. Del. 2015) (no personal jurisdiction over a non-signatory to that contract).

***Second***, Plaintiff's apparent alternate theory that EQT AB is subject to jurisdiction in this Court because it "conducts business through Exeter" and was

15

"involve[d] in EQT Exeter's negotiation, execution, and breach of the Purchase Agreement," Compl. ¶ 38, is also insufficient because it fails to identify any relevant conduct that occurred in the state of Delaware. These allegations cannot give rise to jurisdiction under 10 *Del. C.* § 3104(c)(1) because that provision only applies to one who "[t]ransacts any business or performs any character of work or service ***in the State*.*" *Id.* (emphasis added). This provision requires that the defendant transact business ***"in the State" of Delaware***, not just with a Delaware LLC. In other words, for jurisdiction to exist, "some act ***must actually occur in Delaware*.*" *See Mobile Diagnostic*, 972 A.2d at 804-05 (Section 3104(c)(1) did not apply to a nonresident who entered into a contract with a Delaware entity where the complaint did "not allege that the contract was signed by [the nonresident] in Delaware or that [the nonresident] participated in any negotiations in Delaware" (quotation marks omitted)); *Highway to Health, Inc. v. Bohn*, 2020 WL 1868013, at *5 (Del. Ch. Apr. 15, 2020) (same, where the plaintiff "fail[ed] to demonstrate that ***any act actually occurred in Delaware*** with respect to the dispute in this case" (emphasis in original)).

Carlson pleads no such facts with respect to EQT AB. He does not allege that any aspect of the transaction at issue was negotiated, executed, directed toward, or breached in Delaware – not by EQT AB, and not even by Exeter. Exeter is not alleged to have had any dealings in Delaware in the course of negotiating the

16

transaction; nor is Carlson, who is based in Illinois.  The Complaint simply does not allege *any* facts to tie the transaction or EQT AB to Delaware, much less facts sufficient to show that EQT AB has "purposefully directed its activities at residents of" Delaware or that Plaintiff's alleged injuries "arise out of or relate to" such activities directed toward Delaware.  *Nespresso USA, Inc.*, 263 F. Supp. 3d at 503 (cleaned up); *see also VoterLabs, Inc. v. Ethos Grp. Consulting Servs., LLC*, 2021 WL 3403932, at \*10-11 (D. Del. Aug. 4, 2021) (nonresidents did not "purposefully direct their conduct toward Delaware" where none "signed the Service Agreement" nor "negotiated the Service Agreement" that designated Delaware as the forum for disputes).

Finally, to the extent Plaintiff's theory rests on EQT AB's status as the stockholder of the company that holds Exeter, it fails because "the mere fact that a non-Delaware corporation owns a Delaware subsidiary is not sufficient in itself to justify Delaware's exercise of personal jurisdiction over the non-Delaware parent." *Monsanto Co. v. Syngenta Seeds, Inc.*, 443 F. Supp. 2d 636, 645 (D. Del. 2006) (quotation marks omitted); *c.f. Phunware, Inc.,*117 F. Supp. 3d at 630 ("Absent evidence of continuous and systematic contacts with Delaware . . . transacting business with a Delaware corporation outside of Delaware does not satisfy Delaware's long-arm statute.").

17

Nothing in the Complaint supports this Court's exercise of jurisdiction over EQT AB – a foreign defendant that has no ties to this jurisdiction, that did not consent to litigate here, and that has taken no action here. The claims against EQT AB should be dismissed in their entirety for that reason alone.

**B.** **The Complaint Fails to State a Claim for Breach of Contract or of the Implied Covenant Against EQT AB.**

Even if the Court were to have jurisdiction over EQT AB – which it does not – the claims against it should be dismissed under Rule 12(b)(6). The Complaint's three contract-based claims against EQT AB (Counts I, II, VII) fail because EQT AB is not a party to the contract on which those claims are based.

A motion to dismiss for failure to state a claim under Rule 12(b)(6) should be granted when, even after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *McCrone v. Acme Markets*, 561 F. App'x 169, 172 (3d Cir. 2014) (citation omitted). The facts alleged must be sufficient "to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), but the Court need not credit allegations that are nothing more than "bald assertions and unsupported conclusions," *Walden v. Allstate Ins. Co.*, 388 F. App'x 223, 224 (3d Cir. 2010), nor those that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996). Where the plaintiff fails to plead sufficient facts to support a "reasonable inference that the defendant is liable for the misconduct alleged,"

*Ashcroft v. Iqbal*, 556 U.S. 662, 687 (2009), as to each element of the claim, *Twombly*, 550 U.S. at 555, the claim should be dismissed.

As with all contract claims, to plead a viable claim against EQT AB, Carlson must show "the existence of [a] contract" between him and EQT AB, that EQT AB "breach[ed] an obligation imposed by that contract," and his "resultant damage[.]" *Perlmutter v. Russell Hobbs, Inc.*, 450 F. App'x 161, 165 (3d Cir. 2011) (citation omitted). A valid contract exists under Delaware law only when, among other things, "the parties intended that the contract would bind them[.]" *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010). When the contract is attached to the complaint, the Court may consider it on a motion to dismiss and evaluate its plain and unambiguous terms. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *Phunware, Inc.,* 117 F. Supp. 3d at 625.

As demonstrated above, EQT AB is not a party to the Purchase Agreement, and the Complaint pleads no facts showing EQT AB's intent to be bound by it. Because the Complaint fails to plead that most essential element, the claim for breach of contract against EQT AB should be dismissed. *See E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty."); *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999) ("It is a general principle of contract law that only a party to a contract may be sued for breach of that contract.").

19

Carlson's conclusory allegations that Exeter "acted as EQT's agent in breaching the Purchase Agreement" or was under EQT AB's "control," Compl. ¶¶ 122-23, 129, are insufficient; an underlying contractual obligation is a necessary element of the contract claim, and the Complaint alleges none as to EQT AB, *see Zweigenhaft v. PharMerica Corp.*, 2020 WL 5258345, at *2 (D. Del. Sept. 3, 2020) (dismissing a breach of contract claim against a non-signatory parent company); *Emerson v. Mezzion Int'l, LLC*, 2021 WL 765765, at *1 (D. Del. Feb. 26, 2021) (same, against a non-signatory subsidiary); *Glob. Recycling Sols., LLC v. Greenstar New Jersey, LLC*, 2011 WL 4501165, at *3 (D. Del. Sept. 28, 2011) (same, against a parent who allegedly negotiated the contract).

Carlson's implied-covenant claim against EQT AB (Count VII) fails for the same reason. EQT AB is not a party to any contract with Plaintiff, and the implied-covenant is a covenant ***implied in contract***. Absent a contract between the parties, the claim fails as a matter of law. *See Koloni Reklam, Sanayi, Ticaret LTD/STI v. Viacom, Inc.*, 2017 WL 726660, at *3 (D. Del. Feb. 23, 2017) (dismissing breach of contract and implied covenant claims because the defendant "is not a signatory to that contract"); *Glob. Recycling Sols.*, 2011 WL 4501165, at *5 ("[A] claim for breach of an implied covenant of a contract can only be brought against parties to the contract.").

20

> ### C.  The Remaining Claims Against EQT AB Also Fail.

The remaining claims against EQT AB (and many against Exeter) fail to state a plausible claim for relief under Rule 12(b)(6) for the additional reasons addressed below, and should also be dismissed.

## II.  The Complaint Fails to State a Claim for Fraudulent Inducement, with Particularity or Otherwise.

The Complaint's claims for fraudulent inducement (Counts III and IV) should also be dismissed as to both EQT AB and Exeter because they fail to plead the who, what, when, and where of fraud as required by Rule 9(b), and otherwise fail to state a plausible claim sufficient to satisfy Rule 12(b)(6), even when read in the light most favorable to Plaintiff. *McCrone*, 561 F. App'x at 172.

The Complaint relies on a handful of impermissibly general allegations about a company's potential for future success.  But those expressions of optimism about the future are not the kind of actionable misstatements of present fact on which a claim for fraudulent inducement must rest.  Nor can the Complaint show justifiable reliance on extracontractual statements made during contract negotiations – statements that were not included in and were, in fact, contradicted by the contract itself, which in turn has complete integration and anti-reliance provisions.  There is no plausible claim for fraudulent inducement on these allegations, against either defendant.

21

To state a plausible claim for fraud, a plaintiff must allege (1) defendant made a false representation of material fact; (2) which it knew or believed to be false; (3) with the intent to induce the plaintiff to act; (4) that plaintiff acted in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance. *MarkDutchCo 1 B.V. v. Zeta Interactive Corp.*, 411 F. Supp. 3d 316, 332 (D. Del. 2019) (J. Connolly), *aff'd,* 2021 WL 3503805 (3d Cir. Aug. 10, 2021). Fraud claims are subject to the heightened pleading requirements of Rule 9(b), which requires that the plaintiff "must state with particularity the circumstances constituting fraud," including describing "the time, place, and contents of the false representations or omissions, as well as the identity of the person making the statement and the basis for the statement's falsity." *Diaz v. FCA US LLC*, 693 F. Supp. 3d 425, 429 (D. Del. 2023) (citations omitted). As with any claim, the Court is only to credit factual allegations, not bald assertions or conclusory allegations. *Walden*, 388 F. App'x at 224.

***First***, Carlson fails to plead fraud with particularity. The Complaint impermissibly lumps Exeter and EQT AB together as "EQT" or "Defendants" without specifying which entity made the supposedly false representations. *See, e.g.*, Compl. ¶ 14 ("***EQT*** made promises to Carlson"); ¶ 16 ("***EQT*** made explicit assertions"); ¶ 17 ("***EQT*** represented"); ¶ 135 ("***All parties*** agreed"); ¶ 136 ("***Defendants*** intentionally misled Carlson") (emphasis added). Those allegations

22

cannot serve as a basis for fraud because "[w]hen multiple defendants are involved, the complaint must plead with particularity by specifying the allegations of fraud applying to each defendant." *MDNet, Inc. v. Pharmacia Corp.*, 147 F. App'x 239, 245 (3d Cir. 2005); *see also Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'"). Likewise, these general allegations do not support any claim for fraud because they do not identify the specific time, place, or identity of the speaker. *See Klein v. Gen. Nutrition Companies, Inc.*, 186 F.3d 338, 345 (3d Cir. 1999) (affirming dismissal of a claim premised on fraud where statements were generally attributed to "management"); *In re Student Fin. Corp.*, 2004 WL 609329, at *2 (D. Del. Mar. 23, 2004) (dismissing where the complaint did not "identify the speaker of [the defendant's] alleged misrepresentations").

*Second*, after disregarding vague and impermissible group allegations, the Complaint's only remaining allegations in support of its fraudulent inducement claims amount to "[p]redictions about the future" or "expressions of opinion" that "cannot give rise to actionable common law fraud." *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del. Ch. 2001). The Complaint pleads that Carlson was told "on multiple occasions during negotiations" that a fund was "nearly ready to go" or "would be ready to launch after the Transaction closed," Compl. ¶¶ 59-60, or that Exeter's CFO reassured him that because the private placement

23

memorandum "for the first fund was 'ready' . . . Carlson would therefore receive his first Earn-Out Payment promptly," Compl. ¶ 134. But these are the kind of classic "expressions of opinion" or future optimism that Delaware courts reject as insufficient to support a fraud claim. Optimism about Exeter's future launch of a fund, its ability to successfully attract independent third-party investors to that fund, and whether Carlson would be able to achieve his earnout milestones are statements about the ***potential future success*** of Exeter, not misstatements of ***present material fact***. *See Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 144 (Del. Ch. 2004) (giving "no credence" to "inadequate statements" that the plaintiff "was assured by various representatives . . . that there was no cause for concern and that . . . business was continuing to develop according to plans").

Exeter could no more predict whether Carlson would achieve his earnout goals than Carlson could, and it therefore could not have made a knowing misrepresentation about whether those events would come to pass. *See Edinburgh Hldgs., Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *12 (Del. Ch. June 6, 2018) (dismissing a fraud claim related to a failure to pay contingent consideration where statements about "the future profitability of the . . . Business Unit and the future performance of its management team" and "[w]hether those revenues would, in fact, be achieved was not knowable at the time [the parties] made the representations"); *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168,

209 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007) (dismissing a fraud claim based on generalized statements that an "acquisition would generate good results" as merely "expectation or opinion about the future of the company and the hoped-for results of business strategies").

*Third*, to the extent the Carlson's fraudulent inducement claims are based on the allegation that Exeter misled him into thinking that EMVF II was actually the earnout-eligible Initial WH Fund referred to in the Purchase Agreement, his "reliance was unreasonable" because it "was contradicted by the . . . language" of the Purchase Agreement. *Ajay Endeavors, Inc. v. Divvymed, LLC*, 2022 WL 605695, at *2 (D. Del. Jan. 10, 2022). The Purchase Agreement was the culmination of nearly a year of negotiations and due diligence, during which all parties were represented by sophisticated advisors and counsel – as Carlson himself put it, the earnout clause in particular was "heavily negotiated" by "Carlson, his advisors, and legal counsel[.]" Compl. ¶ 15. That clause conditioned earnout payments on the successful launch and fundraising of an "Initial Core Fund" and an "Initial WH Fund," both of which were expressly defined in the Agreement. PA § 1.5, p. 72.

If Carlson and Exeter intended, as Carlson now claims, that EMVF II would be the basis for an earnout, as the "Initial WH Fund" or otherwise, then the Purchase Agreement could have and would have said so. It does not. To the contrary, it is unambiguous that only two funds support an earnout payment – the Core Fund and

25

the WH Fund – and neither is EMVF II.  Carlson cannot justifiably rely on alleged "prior misrepresentations or omissions that run expressly counter to the terms of [the] fully integrated contract" with Exeter.  *S'holder Representative Servs. LLC v. Albertsons Companies, Inc.*, 2021 WL 2311455, at \*11 (Del. Ch. June 7, 2021); *see also Edinburgh Hldgs., Inc.*, 2018 WL 2727542, at \*13 ("[T]he pled facts do not allow a reasonable inference that Buyers could have reasonably relied upon the alleged extra-contractual representations made prior to their due diligence that were not included in the final agreement[.]")

**Fourth**, Carlson has pointed to no false statement allegedly made by any employee of EQT AB, as opposed to Exeter, much less a misrepresentation of material fact on which he reasonably relied.  For that additional reason, his fraud claims as to EQT AB must be dismissed.

## III.   The Claim for Negligent Misrepresentation Is Foreclosed by the Terms of the Purchase Agreement.

The Complaint's negligent misrepresentation claim (Count V) is barred by the plain terms of the Purchase Agreement.  The Purchase Agreement includes non-reliance clauses:

> Seller acknowledges and agrees that, on behalf of itself, (a) except for the representations and warranties contained in Article IV or any certificate delivered by Buyer pursuant hereto, neither Buyer nor any of its Affiliates or Representatives makes or has made, nor is such Seller relying on, and expressly disclaims any reliance on, any representation or warranty, either express or implied,

26

> concerning Buyer or any of its businesses, operations, assets, liabilities, results of operations, condition (financial or otherwise), or prospects or the Transactions[.]

PA § 2.13; *see also* PA § 3.19 (same).  While these sections preserve the Sellers' "rights and remedies with respect to claims based on Fraud," Fraud is defined as "actual and intentional fraud under Delaware common law[.]"  PA §§ 2.13, 3.19, p. 71.  The Purchase Agreement also includes a standard integration clause in which the Sellers and Exeter agreed that the Purchase Agreement and related documents encompassed their entire agreement.  PA § 9.5

Given Carlson's disclaimer of reliance on any extracontractual statements and agreement that the Purchase Agreement constituted the parties' entire agreement, he is barred from bringing a claim premised on representations that, as he pleads, were "made negligently, or without due care, by Defendants."  Compl. ¶ 162.  *See Express Scripts, Inc. v. Bracket Hldgs. Corp.*, 248 A.3d 824, 834 (Del. 2021) (enforcing a non-reliance clause to bar a fraud claim premised on recklessness); *Infomedia Grp., Inc. v. Orange Health Sols., Inc.*, 2020 WL 4384087, at *3; 7-9 (Del. Super. Ct. July 31, 2020) (enforcing non-reliance and integration clauses to dismiss fraud and negligent misrepresentation claims); *c.f. Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1057 (Del. Ch. 2006) ("[A] party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and

27

representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those other representations' fraudulent inducement claim.").

## IV.    The Complaint Fails to Plead a Viable Unjust Enrichment Claim.

The Complaint's unjust enrichment claim (Count VI), which is premised on alleged "substantial financial benefits" that "Defendants reaped" under the Purchase Agreement and Employment Agreement, Compl. ¶¶ 175-176, fails because under Delaware law "[a] claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim," *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009).  When a contract exists, as the Complaint acknowledges here, it sets out the parties' respective rights and obligations thereunder such that "there can be no recovery under an unjust enrichment theory independent of it." *Id.*  (citation omitted); *see also Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *19 (Del. Ch. Sept. 18, 2014) ("[T]his Court routinely dismisses unjust enrichment claims that are premised on an 'express, enforceable contract that controls the parties' relationship' because damages is an available remedy at law for breach of contract."); *Akzo Nobel Coatings Inc. v. The Dow Chem. Co.*, 2015 WL 3536151, at *11 (Del. Ch. June 5, 2015) ("Courts developed unjust enrichment, or quasi-contract, as a theory of recovery to remedy the absence of a formal contract" and dismissing an unjust enrichment claim based on conduct governed by the parties' contract).

28

The unjust enrichment claim as to EQT AB should be dismissed for the additional reason that the Complaint fails to allege any "enrichment" by EQT AB. The Complaint alleges that "Defendants" received "greater compensation in exchange for entering" into the Purchase Agreement and Employment Agreement, and that "Defendants" "reaped substantial financial benefits" from those agreements. Compl. ¶¶ 169, 175-76. But, again, EQT AB was not a party to either agreement and received no benefit under either. Because the Complaint fails to explain how EQT AB itself was "enriched" by this transaction, the claim should be dismissed. *See Hydrogen Master Rts., Ltd. v. Weston*, 228 F. Supp. 3d 320, 337 (D. Del. 2017) (dismissing claim that made only conclusory allegations of enrichment).

To the extent the Complaint bases unjust enrichment on fraud, Rule 9(b) applies and warrants dismissal. *See supra* Argument § II; *Carson v. HP Inc.*, 750 F. Supp. 3d 376, 399 (D. Del. 2024) (dismissing claim premised on fraud for failing to "sufficiently plead the 'what' and the 'how' of such claims"); *Cavi v. Evolving Sys. NC, Inc.*, 2018 WL 2372673, at *2 (D. Del. May 24, 2018) (claim was futile for failing to meet "[t]he heightened pleading standard required by Rule 9(b)").

## V. The Complaint Fails to Identify Any Gap in the Purchase Agreement That Needs to Be Filled by the Implied Covenant of Good Faith and Fair Dealing.

The Complaint's claim for breach of an implied covenant as to Exeter (Count VII) fails for the reason that it does not allege any "gap that the implied covenant

might fill" in the Purchase Agreement, *Phunware, Inc.*, 117 F. Supp. 3d at 628, as required to state a claim, nor identify a "specific obligation implied in the contract" that the Court should read in for Plaintiff's benefit, *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *3 (Del. Ch. Jan. 30, 2015).

To the contrary, and as Plaintiff admits, the parties carefully negotiated the earnout provision at the heart of the implied-covenant claim and the earnout provision fully sets out the parties' respective rights and obligations regarding the earnout. Compl. ¶ 57; *see, e.g.*, PA § 1.5(a) (outlining Exeter's obligation to make earnout payments if Carlson meets various earnout milestones); § 1.5(d)(i) (providing that Exeter could not "take any action with the primary intent of interfering with Mr. Carlson's ability to achieve the maximum Earn-out Payments"). Those same contract terms form the basis of Carlson's breach of contract claims in Counts I and II of his Complaint. *See, e.g.*, Compl. ¶ 121 ("Exeter breached Section 1.5 of the Purchase Agreement[.]"); ¶ 127 ("Exeter breached Section 1.5(d) of the Purchase Agreement[.]"). Plaintiff relies on the implied covenant to pursue the same conclusion and identical relief that he seeks through his breach-of-contract claims, and, for that reason, the implied-covenant claim should be dismissed. *See Edinburgh Hldgs., Inc.*, 2018 WL 2727542, at *8-9 (dismissing an implied covenant claim premised on the buyers allegedly "preventing, refusing, or obstructing [the seller's] achievement of the Contingent Purchase Price payment" because the contract

30

"expressly addresses [the seller's] right to the Contingent Purchase Price"); *Fortis Advisors*, 2015 WL 401371, at *4-5 (same, where there was no "contractual gap or term to be implied" because the contract itself "sets a contractual standard by which to evaluate [the buyer's] failure to achieve and pay the earn-out payments").

## CONCLUSION

For the reasons set forth herein, the Court should dismiss EQT AB from this action for lack of personal jurisdiction under Rule 12(b)(2).  If the Court finds that it has personal jurisdiction over EQT AB, it should dismiss the claims against it entirely (Counts I-VII) for failure to state a claim under Rule 12(b)(6).  Finally, the Court should dismiss Counts III-VII against Exeter for failure to state a claim under Rule 12(b)(6).

 /s/ Christopher Fitzpatrick Cannataro
A. Thompson Bayliss (#4379)

OF COUNSEL:                          Christopher Fitzpatrick Cannataro (#6621)
                                     ABRAMS & BAYLISS LLP
Shannon Rose Selden                  20 Montchanin Rd., Suite 200
Barrett J. Greenwell                 Wilmington, DE 19807
DEBEVOISE & PLIMPTON LLP             (302) 778-1000
66 Hudson Boulevard                  bayliss@abramsbayliss.com
New York, NY 10001                   cannataro@abramsbayliss.com
(212) 909-6000
srselden@debevoise.com               *Attorneys for Exeter Property Group, LLC*
bjgreenwell@debevoise.com            *and EQT AB*

Date: July 15, 2025

31

## CERTIFICATION OF COMPLIANCE

Under Chief Judge Connolly's Standing Order Regarding Briefing in All Cases (the "Standing Order"), dated November 10, 2022, I, Christopher Fitzpatrick Cannataro, Esq. hereby certify that:

1.     This brief complies with the word-count requirements of the Standing Order, as amended by the Stipulation and Order Setting Briefing Schedule And Extending Word Limits For Briefing on Defendants' Motion To Dismiss (D.I. 14), because this brief contains 7,374 words, which is less than or equal to the permitted 7,500 words (30 pages x 250 words) for this brief.

2.     This brief complies with the Standing Order's font and type-face requirements because the brief is typed in 14-point Times New Roman font.

3.     The front and back covers of the courtesy copies of this brief provided to chambers comply with the Standing Order because they are printed on blue paper.

 */s/ Christopher Fitzpatrick Cannataro*
Christopher Fitzpatrick Cannataro (#6621)
ABRAMS & BAYLISS LLP
20 Montchanin Rd., Suite 200
Wilmington, DE 19807
(302) 778-1000
cannataro@abramsbayliss.com

*Attorney for Exeter Property Group, LLC
and EQT AB*
