# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| David Carlson, | ) Civil Action No. 25-cv-0503-SB |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Exeter Property Group, LLC and | ) |
| EQT AB, | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**
Kate Harmon (DE # 5343)
Noelle Torrice (DE #5957)
1313 North Market Street, Suite 1201
Wilmington, DE 19801
Telephone: (302) 442-7056
Email: kharmon@beneschlaw.com
ntorrice@beneschlaw.com

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**
Charles Leuin (admitted *pro hac vice*)
William Walsh (admitted *Pro hac vice*)
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Telephone: (312) 624-6344
Email: cleuin@beneschlaw.com
Email: wwalsh@beneschlaw.com

*Attorneys for Plaintiff David Carlson*

**Dated:** August 22, 2025

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT...............................................................................1

LEGAL STANDARD ..........................................................................................4

ARGUMENT ......................................................................................................5

  I.   This Court Has Personal Jurisdiction Over EQT AB. ...................................5

     A. EQT Is Bound by the Forum Selection Clause in the Purchase Agreement.....................................................................................................6

     B. EQT AB Also Is Subject to Personal Jurisdiction in Delaware Under 10 Del. C. § 3104(c)(1) and the United States Constitution Because of Its Role Negotiating the Purchase Agreement. .......................................9

     C. In the Alternative, The Court Should Grant Carlson Leave to Conduct Jurisdictional Discovery................................................................16

  II. The Complaint States Claims Against EQT AB For Breach Of Contract And The Implied Covenant. ..........................................................17

 III. The Complaint States a Claim for Fraudulent Inducement. .........................19

     A. The Fraudulent Inducement Claim is Adequately Pleaded. ......................19

     B. The Purchase Agreement does not contradict or negate Defendants' misrepresentations. ...................................................................................24

 IV. The Complaint States a Claim for Negligent Misrepresentation...................26

  V.  The Complaint States a Claim for Unjust Enrichment. ...............................27

     A. The Unjust Enrichment claim is not precluded as a matter of law...........27

 VI. The Complaint States a Claim for Implied Covenant of Good Faith and Fair Dealing......................................................................................29

CONCLUSION..................................................................................................31

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acorda Therapeutics, Inc. v. Mylan Pharms. Inc.*,
  78 F. Supp. 3d 572 (D. Del. 2015)..........................................................................13

*Airborne Health, Inc. v. Squid Soap, LP*,
  984 A.2d 126 (Del. Ch. 2009) ...............................................................................26

*AstraZeneca AB v. Mylan Pharm., Inc.*,
  72 F. Supp. 3d 549 (D. Del. 2014)..........................................................................14

*Baldwin v. New Wood Res. LLC*,
  283 A.3d 1099 (Del. 2022) ....................................................................................30

*Bench Walk Lighting LLC v. LG Innotek Co.*,
  530 F. Supp. 3d 468 (D. Del. 2021)..........................................................................9

*Brit. Telecommunications PLC v. IAC/InteractiveCorp*,
  356 F. Supp. 3d 405 (D. Del. 2019)........................................................................18

*Capano v. Ecofibre Ltd.*,
  2025 WL 419494 (Del. Ch. 2025).............................................................................28

*CC Invs. Corp. v. Raytheon Co.*,
  219 F.R.D. 328 (D. Del. 2003) ...............................................................................18

*In re Chocolate Confectionary Antitrust Litig.*,
  602 F. Supp. 2d 538 (M.D. Pa. 2009)........................................................................9

*Compagnie des Grands Hotels d'Afrique S.A. v. Starwood Cap. Grp.
  Glob. I LLC*,
  2024 WL 4249723 (3d Cir. 2024) ...........................................................................17

*Dunlap v. State Farm Fire & Cas. Co.*,
  878 A.2d 434 (Del. 2005)........................................................................................30

*Eagle Force Holdings, LLC v. Campbell*,
  187 A.3d 1209 (Del. 2018) .......................................................................................5

*Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*,
 2018 WL 2727542 (Del. Ch. June 6, 2018)........................................................23

*Fla. Chem. Co., LLC v. Flotek Indus., Inc.*,
 262 A.3d 1066 (Del. Ch. Aug. 17, 2021) ...........................................................6

*Forest Lab'ys, Inc. v. Amneal Pharms. LLC*,
 2015 WL 880599 (D. Del. Feb. 26, 2015)..........................................................14

*Fortis Advisors LLC v. Johnson & Johnson*,
 2021 WL 5893997 (Del. Ch. 2021)...............................................................26, 27

*In re Fruehauf Trailer Corp.*,
 250 B.R. 168 (D. Del. 2000).......................................................................20, 21

*G & G LLC v. White*,
 535 F. Supp. 2d 452 (D. Del. 2008)....................................................................15

*Hadley v. Shaffer*,
 2003 WL 21960406 (D. Del. 2003)..............................................................*passim*

*Kahn v. Lynch Communication Systems, Inc.*,
 1989 WL 99800 (Del. Ch. 1989) .......................................................................14

*Kronfeld v. First Jersey Bank*,
 638 F. Supp. 1454 (D.N.J.1986)..........................................................................20

*Levine v. Metal Recovery Techs., Inc.*,
 182 F.R.D. 112 (D. Del. 1998) ...........................................................................19

*LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*,
 2018 WL 1559936 (Del. Ch. Mar. 28, 2018) ...............................................28, 29

*Marnavi SpA v. Keehan*,
 2010 WL 1499583 (D. Del. Apr. 14, 2010) .......................................................16

*In re Med. Wind Down Holdings III, Inc.*,
 332 B.R. 98 (Bankr. D. Del. 2005).....................................................................27

*Mellon Bank (E) PSFS, Nat'l Ass'n v. Farino*,
 960 F.2d 1217 (3d Cir. 1992) ...............................................................................4

iii

*Miller Yacht Sales, Inc. v. Smith*,
  384 F.3d 93 (3d Cir. 2004) ..................................................................10

*In re ML-Lee Acquisition Fund II, L.P. & ML-Lee Acquisition Fund*
  *(Ret. Accts.) II, L.P. Sec. Litig.*,
  848 F. Supp. 527 (D. Del. 1994)..................................................20, 21

*Monsanto Co. v. Syngenta Seeds, Inc.*,
  443 F. Supp. 2d 636 (D. Del. 2006)......................................................4

*In re Nice Sys., Ltd. Sec. Litig.*,
  135 F. Supp. 2d 551 (D.N.J. 2001)......................................................20

*O'Connor v. Sandy Lane Hotel Co.*,
  496 F.3d 312 (3d Cir. 2007) ................................................................4

*Papendick v. Bosch*,
  410 A.2d 148 (Del. 1979) ..................................................................10

*Phillips v. Cnty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ................................................................4

*Phoenix Canada Oil Co., Ltd. v. Texaco, Inc.*,
  842 F.2d 1466 (3d Cir. 1988) ............................................................18

*Phunware, Inc. v. Excelmind Grp. Ltd.*
  117 F. Supp. 3d 613 (D. Del. 2015)..................................................7, 8

*Sheehan v. AssuredPartners, Inc.*,
  2020 WL 2838575 (Del. Ch. 2020)....................................................30

*Simon Prop. Grp., L.P. v. Brighton Collectibles, LLC*,
  2021 WL 6058522, (Del. Super. Dec. 21, 2021)................................23

*Sustainable Energy Generation Grp., LLC v. Photon Energy Projects*
  *B.V.*,
  2014 WL 2433096 (Del. Ch. May 30, 2014)......................................13

*Thibault v. Delaware Tech. & Cmty. Coll.*,
  2012 WL 2073847 (D. Del. 2012)........................................................5

*Toys 'R' Us, Inc. v. Step Two, S.A.*,
  318 F.3d 446 (3d Cir. 2003) ..............................................................16

iv

*Traynor v. Liu,*
   495 F. Supp. 2d 444 (D. Del. 2007).............................................................9

*Valley Joist BD Holdings, LLC v. EBSCO Indus., Inc.,*
   269 A.3d 984 (Del. 2021) .........................................................................20

*Wright v. Am. Home Prods. Cop.,*
   768 A.2d 518 (Del. Super. Ct. 2000)...........................................................6

**Statutes**

10 Del. C. § 3104(c)(1) ...................................................................................9

**Other Authorities**

Fed. R. Civ. P. 9(b) .........................................................................4, 19, 20, 23

Fed. R. Civ. P. 12(b)(2)....................................................................................4

Fed. R. Civ. P. 12(b)(6)................................................................................4, 24

United States Constitution ...............................................................................9

Plaintiff David Carlson ("Carlson" or "Plaintiff") hereby opposes Defendants Exeter Property Group, LLC ("EQT Exeter") and EQT AB's (together, "EQT" or "Defendants") Partial Motion to Dismiss (D.I. 16) as follows:

## **PRELIMINARY STATEMENT**

Defendants' partial motion to dismiss exists in an alternate reality, divorced from the actual allegations in the Complaint. Those actual allegations set forth in detail both EQT Exeter's and EQT AB's wrongful actions in connection with the purchase of Redwood (the "Transaction" reflected in the "Purchase Agreement"). In contrast, Defendants' motion is responsive only to an imagined interpretation of the Complaint that Defendants find easier to disclaim. This approach parallels Defendants' conduct underlying this lawsuit, in which they misrepresented the truth to obtain Carlson's agreement to sell his company to EQT, and later tried to rewrite history to avoid their contractual obligations to Carlson.

As an example, Defendants attempt to sidestep Carlson's fraud claims by declaring that the Complaint only alleges "generic, optimistic statements about the future prospects of the post-acquisition business." (Defendants' Opening Brief in Support of Their Partial Motion to Dismiss (D.I. 16) ("Mot.") at 3). While it may be typical for a fraud defendant to characterize allegations this way, Defendants' protests here do not reflect Carlson's actual allegations. In reality, the Complaint addresses how Defendants made certain **factual representations**, including the

1

critical promise that the first fund contemplated by the Purchase Agreement was ready to launch. (*Infra.* at III(a), addressing fraud claims). That promise, which purported to describe the factual state of affairs—not forward-looking aspirations—was fundamental to obtaining Carlson's agreement to enter the Purchase Agreement, and has no resemblance to the "generic, optimistic statements" Defendants describe in their motion.

Similarly, Defendants advance a narrative in which EQT AB had little connection to the Transaction, leaning on EQT AB's identity as a "Swedish entity based in Stockholm" who is not a signatory to the Purchase Agreement. (Mot. at 2). In reality, EQT AB management played a significant and direct role in the negotiations with Carlson that culminated in the Transaction. (Compl., ¶ 35). EQT AB was also substantially involved in the management of EQT Exeter after the Transaction, and controlled the decision to breach the Purchase Agreement. (*Id.* at ¶ 122, 123, 129, 182). EQT AB's centrality to the Transaction is reflected in the Purchase Agreement: EQT AB received specific, identified benefits under the Share Forfeiture Letter and Lock-Up Agreement, which were explicitly incorporated into the Purchase Agreement. (Compl., ¶ 76-77; Compl. Exs. 4 and 5). Because EQT AB accepted all of these benefits under the Purchase Agreement, EQT AB is subject to its forum selection clause, and to Delaware's long-arm jurisprudence—meaning that

2

EQT AB is subject to personal jurisdiction in Delaware for Carlson's claims arising out of the Purchase Agreement.

Defendants assign epithets to the Complaint, calling it a "grab bag" of "scattershot" claims, (Mot. at 1), but in reality, each of the enumerated claims follows directly from the misconduct identified in the Complaint—which, at its core, involves Defendants' efforts to obtain Carlson's consent to the Transaction through deceit, and their subsequent efforts to evade their obligations under the Purchase Agreement. (Compl., ¶ 96-101). Defendants breached agreements with Carlson (including implied covenants thereto), made misrepresentations, were unjustly enriched, and violated the Illinois employment statute. Each claim is supported by the allegations in the Complaint.

By moving to dismiss only certain claims, Defendants have conceded that Carlson's claims for breach of the Purchase Agreement are well-pleaded. But the Court should not countenance their feeble efforts to evade the remaining claims, and should deny the motion in its entirety, particularly given the presumption of truth conferred on the Complaint's allegations. Both Defendants are responsible for the harm their lies inflicted on Carlson, and their other misconduct surrounding the Transaction. They must be held accountable through this lawsuit.

3

## LEGAL STANDARD

Defendants first move to dismiss Carlson's claims against EQT AB under Rule 12(b)(2) for lack of personal jurisdiction. "When reviewing a motion to dismiss pursuant to Rule 12(b)(2), a court must accept as true all allegations of jurisdictional fact made by [the nonmoving party] and resolve all factual disputes in the [nonmoving party's] favor." *Monsanto Co. v. Syngenta Seeds, Inc.*, 443 F. Supp. 2d 636, 642 (D. Del. 2006). If no evidentiary hearing is held, a plaintiff "need only establish a prima facie case of personal jurisdiction." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007). A plaintiff "presents a prima facie case for the exercise of personal jurisdiction by establishing with reasonable particularity sufficient contacts between the defendant and the forum state." *Mellon Bank (E) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992) (internal quotation marks and citation omitted).

Defendants also move to dismiss several of Carlson's claims against EQT AB and EQT Exeter under Rules 9(b) and 12(b)(6). In ruling on such a motion, the Court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n. 7 (3d Cir. 2002)). "The issue is not whether a plaintiff will ultimately

4

prevail, but whether the claimant is entitled to offer evidence to support the claims." *Thibault v. Delaware Tech. & Cmty. Coll.*, No. 11-1080-MPT, 2012 WL 2073847, at *1 (D. Del. 2012) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114. F.3d 1410, 1420 (3d Cir. 1997)).

## ARGUMENT

### I.    This Court Has Personal Jurisdiction Over EQT AB.

EQT AB is subject to personal jurisdiction in this court for at least two independent reasons. First, as a beneficiary to the Purchase Agreement through the Share Forfeiture Letter and Lock-Up Agreement, EQT AB consented to jurisdiction in Delaware, obviating the need to conduct any analysis under the Delaware long-arm statute or "minimum contacts" sufficient for Due Process. *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1228 (Del. 2018) ("Where a party commits to the jurisdiction of a particular court or forum by contract, such as through a forum selection clause, a 'minimum contacts' analysis is not required as it should clearly anticipate being required to litigate in that forum."). (Compl., ¶ 76-77; Compl. Exs. 4 and 5). As discussed further below, EQT AB need not be a "signatory" to the Purchase Agreement to be bound by its forum selection clause.

Separately, EQT AB is subject to jurisdiction because (1) the requirements of the Delaware long-arm statute are met, and (2) exercising personal jurisdiction is

consistent with the requirements of due process. *Wright v. Am. Home Prods. Cop.*, 768 A.2d 518, 527 (Del. Super. Ct. 2000).

### A.    EQT Is Bound by the Forum Selection Clause in the Purchase Agreement.

"When a party is bound by a forum selection clause, the party is considered to have expressly consented to personal jurisdiction." *Hadley v. Shaffer*, No. CIV.A. 99-144-JJF, 2003 WL 21960406, at *3 (D. Del. 2003). A party need not be a signatory to a contract containing a forum selection clause to be bound by that clause—rather, under the three-part test established in *Hadley*, the Court must consider: (1) whether the forum selection clause in the Purchase Agreement is valid; (2) whether EQT AB is either a third-party beneficiary, or closely related to, the Purchase Agreement; and (3) whether the present claim arises from EQT AB's standing relating to the Purchase Agreement. *Id.* at *4. *See also Fla. Chem. Co., LLC v. Flotek Indus., Inc.*, No. CV 2021-0288-JTL, 262 A.3d 1066, 1074 (Del. Ch. Aug. 17, 2021) ("Equitable estoppel supports enforcement of a forum selection provision against a non-signatory if the non-signatory accepted a direct benefit under the agreement.")

All three elements of the *Hadley* test are met here. First, Defendants have not contested the validity of the forum selection clause. The second element is also satisfied, because EQT AB is a third-party beneficiary to the Purchase Agreement via the Share Forfeiture Letter and Lock-Up Agreement—components of the

6

Purchase Agreement under which EQT AB received benefits. (Compl., ¶ 76-77; Compl. Exs. 4 and 5). Under the Lock-Up Agreement, Carlson agreed to use fifty percent of any prospective Earn-Out payments to purchase shares of EQT AB. (Compl. Ex. 5 at ¶ 2). **This obligation to purchase company shares is itself a direct benefit to EQT AB**, but the Lock-Up Agreement doesn't stop there: it also gives EQT AB (referred to as "the 'Company'" in the Lock-Up Agreement) (1) the right to withhold consent from Carlson in the event he seeks to dispose of shares, and (2) the right to receive cash compensation from Carlson in the event of a breach. (*Id*. at ¶ 6). The Share Forfeiture Letter contains similar provisions. (Compl. Ex. 4 at ¶ 2, 7). Through these documents, incorporated in the Purchase Agreement, EQT AB is a "third party beneficiary" of the Purchase Agreement—satisfying the second element of the *Hadley* analysis. *Hadley*, 2003 WL 21960406 at *6.

Finally, Defendants cannot credibly contest that the third *Hadley* element is met, because the present claims arise out of the Purchase Agreement to which EQT AB is a third-party beneficiary. *See Hadley*, 2003 WL 21960406 at *6-7. Therefore, EQT is bound by the forum selection clause in the Purchase Agreement.

In attempting to undermine the significance of the Share Forfeiture Letter and Lock-Up Agreement, Defendants cite *Phunware, Inc. v. Excelmind Grp. Ltd*. for the supposed principle that "no personal jurisdiction [exists] over a non-signatory to that contract." 117 F. Supp. 3d 613, 629 (D. Del. 2015) (Mot. at 15). However,

7

Defendants ignore *Phunware*'s explicit invocation of the *Hadley* test: "[w]hen personal jurisdiction over a party is alleged to exist as a result of a forum selection clause in a contract to which the party is a non-signatory, the court follows the three-step analysis developed in *Hadley v. Shaffer*." *Phunware*, 117 F. Supp. 3d at 629.

The facts of *Phunware* are instructive: there, the plaintiff conceded that the non-signatory third party defendant was not a beneficiary to the subject agreement, and the court rejected plaintiff's alternative argument that the third party was "closely related" to the agreement, finding that the third party was "entirely excluded" from the agreement and received no direct benefits from it. *Id*. at 629-30. Therefore, the *Phunware* court held, the non-signatory was not subject to the agreement's forum-selection clause. *Id.* at 630. The present case stands in stark contrast to *Phunware*: here, EQT AB is explicitly named as a beneficiary in the Share Forfeiture Letter and Lock-Up Agreement.[1] And setting aside the contrasting facts at issue in *Phunware*, what's critical is that the court there recognized the *Hadley*

---

[1] Even if EQT were not a direct beneficiary under the Purchase Agreement, the second *Hadley* element can also be satisfied if the Court finds that EQT AB is "closely related" to the Purchase Agreement. *Hadley*, 2003 WL 21960406 at *6 ("Forum selection clauses bind nonsignatories that are **closely related** to the contractual relation or that should have foreseen governance by the clause.") (citation omitted); *see also Phunware*, 117 F. Supp. 3d at 629-630. For the same reasons discussed in the "minimum contacts" analysis and throughout the Complaint, EQT AB is "closely related" to the Purchase Agreement and the Court should also find it subject to the forum selection clause on that basis.

analysis as the correct framework. This Court should do the same. EQT AB was a beneficiary of the Purchase Agreement and is therefore subject to its forum selection clause.

### B.    EQT AB Also Is Subject to Personal Jurisdiction in Delaware Under 10 Del. C. § 3104(c)(1) and the United States Constitution Because of Its Role Negotiating the Purchase Agreement.

Under Delaware's long-arm statute a Court may exercise personal jurisdiction over a nonresident who: "(1) transacts any business or performs any character of work or service in the State…" 10 Del. C. § 3104(c)(1). This provision has been construed "liberally so as to provide jurisdiction to the maximum extent possible…." *Traynor v. Liu,* 495 F. Supp. 2d 444, 449 (D. Del. 2007) (quoting *Boone v. Oy Partek Ab*, 724 A.2d 1150, 1156-57 (Del. Super. 1997)). A plaintiff "does not have to disprove all factual possibilities that might weigh against a finding of personal jurisdiction. It just has to set out *its case* for jurisdiction with reasonable particularity." *Bench Walk Lighting LLC v. LG Innotek Co.*, 530 F. Supp. 3d 468, 487 (D. Del. 2021) (emphasis in original).

Where the party challenging personal jurisdiction "fails to submit evidence contravening the allegations of the complaint, the court is bound to accept plaintiff's allegations regardless of whether plaintiff presents further evidence in support thereof." *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 556 n. 13 (M.D. Pa. 2009); *see also Bench Walk Lighting*, 530 F. Supp. 3d at 481. EQT AB

9

has put forth <u>no evidence</u> (via affidavit or otherwise) in support of its motion, and has therefore failed to controvert—in any way—the extensive facts included in the complaint that show the basis for jurisdiction. Carlson's factual allegations in support of jurisdiction must be accepted as true. *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004) ("when the court does not hold an evidentiary hearing on the motion to dismiss … plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor.").

There is plentiful evidence of EQT AB's involvement in the underlying Transaction and its direct and active role in the negotiation of the Purchase Agreement naming Delaware as the situs for resolving disputes. As an initial matter, EQT AB purchased Exeter Property Group to establish its presence in the United States real estate market. (Compl., ¶ 5). In doing so, EQT AB chose to create EQT Exeter, a Delaware Limited Liability Company whose ownership flows directly and wholly to EQT AB (*see* Compl., ¶ 36), to obtain the benefits and advantages of being a Delaware corporation. *Papendick v. Bosch*, 410 A.2d 148, 152 (Del. 1979) (finding it was "reasonable to assume that [parent corporation] saw benefits and advantages in purposefully selecting the State of Delaware and utilizing its laws, above all others, for the creation of [subsidiary] in the execution of [the at-issue] agreement").

EQT AB management also played a significant role in the negotiations with Carlson that culminated in the Transaction and Purchase Agreement. (Compl., ¶ 35).

10

For example, numerous executives and other employees of EQT AB attended a May 7, 2022 Zoom call where Carlson negotiated the timeline for the two-fund concept, and where he was told that the first fund, which would be subject to the Earn-Out provisions in the Purchase Agreement, was ready to launch. (Compl., ¶¶ 61-62). Those employees included Filip Mark, Viktor Leisnert, Sandra Nordin, Paul Dali, and Isac Sigfridsson—who attended along with lawyers who represented EQT. (*Id.* at ¶ 61, fn. 1). Even more EQT AB personnel attended the May 8, 2022 Zoom call, where again they reassured Carlson that the first fund under the Purchase Agreement was ready to go. (*Id.* at ¶ 135, fn. 2). The May 8, 2022 Zoom meeting included the same individuals from the May 7, 2022 call, adding Eric Gunnarson and Jacob Tegner. Defendants have offered no evidence to deny the attendance of these individuals, nor to deny the subjects covered at these meetings. These uncontroverted facts are themselves enough to demonstrate grounds for the exercise of personal jurisdiction over EQT AB.

Further, Section 1.5 of the Purchase Agreement explicitly contemplates Carlson receiving a portion of his Earn-Out payment via EQT AB stock (Compl., Ex. 1), and the Purchase Agreement even expressly requires that EQT AB be provided all notices under that agreement (Compl. Ex. 2 at 60). To restrict Carlson's ability to exercise his rights as to the EQT AB stock that was made part of the transaction, Carlson and EQT AB entered into two agreements: a Share Forfeiture

11

Letter and Lock-Up Agreement. (Compl., ¶ 77, Exs. 4 and 5).[2] EQT AB also controlled EQT Exeter with respect to whether to pay the amounts owed to Carlson under the Purchase Agreement. (Compl., ¶ 182). All of these things show EQT AB was intimately involved in the Transaction and Purchase Agreement, and secured specific direct rights for itself through the incorporated Share Forfeiture Letter and Lock-Up Agreement.

Following the Transaction and execution of the Purchase Agreement, EQT AB remained heavily involved with EQT Exeter and the circumstances giving rise to the Complaint. Among other things, it was EQT AB who decided to characterize the EMVF II as a "third fund" not contemplated under the Purchase Agreement. (Compl., ¶ 182). After Carlson was denied his earnout payment, he engaged in discussion with EQT AB about extending the timeline for achieving his Earn-Out Payments and otherwise adjusting the process. (Compl., ¶¶ 102-103). For example, Carlson had a Zoom meeting with Gustav Segerberg, EQT AB's Head of Business Development. (Compl., ¶ 103). In that meeting, Segerberg acknowledged the previous discussions among Carlson and EQT AB in which EQT had ensured

_____

[2] Defendants take the position that the Share Forfeiture Letter and Lock Up Agreement are merely "one-sided" letters that impose obligations on Carlson only, and do not directly call for jurisdiction over EQT AB in Delaware. Defendants' position is a misdirection, however: these letters demonstrate EQT's involvement in the Purchase Agreement because they are incorporated into the Purchase Agreement, and as discussed *supra*, they directly benefit EQT AB.

Carlson that he would receive the Earn-Out Payments. (*Id*.). Around this same time, EQT AB also became increasingly concerned with Ward Fitzgerald's management of EQT Exeter's residential real estate portfolio. (Compl., ¶ 104). Eventually, EQT AB management forced Fitzgerald out of EQT in mid-2024. (Compl., ¶ 27). EQT AB cannot deny its direct involvement in its management of EQT Exeter, including its decision to withhold Carlson's Earn-Out payment and its own role in the gross mismanagement of EQT Exeter.

To be clear, Carlson is not arguing that that EQT AB is subject to this Court's jurisdiction merely because its wholly owned subsidiary is a Delaware LLC. (*See* Mot. at 17-18). Rather, EQT AB is subject to this Court's jurisdiction because it was substantially involved in the events giving rise to this litigation—including the negotiation of an agreement that named Delaware as the jurisdiction for resolving disputes. *See Hadley* 2003 WL 21960406, at *8 (finding governing law provision calling for application of Delaware law to be a factor in holding that a "transact[ion] of business" in Delaware has occurred); *Acorda Therapeutics, Inc. v. Mylan Pharms. Inc.*, 78 F. Supp. 3d 572, 593 (D. Del. 2015) (in interacting with plaintiff Delaware corporation, defendant knew or should have known that related lawsuit would take place in Delaware).

Delaware's long-arm statute does not strictly require a particular type of action in this state to support jurisdiction. *See Sustainable Energy Generation Grp., LLC v.*

13

*Photon Energy Projects B.V.*, No. 8524-CVP, 2014 WL 2433096, at *7 (Del. Ch. May 30, 2014) (noting that "Delaware courts have arguably taken an expansive view of what constitutes 'transacting business' in Delaware."). At all relevant times, EQT AB was involved in the decision to create EQT Exeter, a Delaware LLC; to acquire Redwood in a transaction calling for dispute resolution in Delaware; to negotiate with and hire Carlson; to evaluate whether Carlson was entitled to receive his contractual Earn-Out payments; to discuss alternatives to the Earn-Out moving forward, and its own serious concerns regarding the mismanagement of EQT Exeter. EQT AB cannot plausibly argue that "it could not 'reasonably anticipate being hailed into court' in Delaware…" when the subject of all of these dealings was an agreement calling for jurisdiction in Delaware. *AstraZeneca AB v. Mylan Pharm., Inc.*, 72 F. Supp. 3d 549, 559 (D. Del. 2014) (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 474 (1985)). EQT AB's actions are sufficient to give this Court personal jurisdiction over EQT AB. *See Kahn v. Lynch Communication Systems, Inc.*, No. 8748, 1989 WL 99800, at *4 (Del. Ch. 1989) ("[Defendant] directly, or through its subsidiary, transacted business in Delaware by negotiating and consummating the merger at issue.").

In order for the Court to exercise jurisdiction over EQT AB pursuant to the long-arm statute, it also must find "that 'minimum contacts' exist between the non-resident defendant and the forum state, 'such that the maintenance of the suit does

14

not offend traditional notions of fair play and substantial justice.'" *Forest Lab'ys, Inc. v. Amneal Pharms. LLC*, No. 14-1509-LPS, 2015 WL 880599, at *3 (D. Del. Feb. 26, 2015) (quoting *Power Integrations Inc. v. BCD Semiconductor Corp.*, 547 F. Supp. 2d 365, 369 (D. Del. 2008)). "A single act…in Delaware will suffice to confer personal jurisdiction over a nonresident defendant if such purposeful activity in Delaware is an integral component of the total transaction to which plaintiff's cause of action relates." *G & G LLC v. White*, 535 F. Supp. 2d 452, 463 (D. Del. 2008) (quoting *Christ v. Cormick*, No. 06-275-GMS, 2007 WL 2022053, at *5 (D. Del. 2007)).

EQT AB participated in the negotiation and execution of the Purchase Agreement, which provides for this Court's jurisdiction. (*See* Compl., ¶¶ 32, 25, 38). It is reasonably foreseeable that EQT AB would be brought into litigation in the Delaware Courts. *See G & G LLC*, 535 F. Supp. 2d at 463 (Delaware court retaining jurisdiction "will not offend traditional notions of fair play and substantial justice" where corporation "transacted business by availing itself intentionally of a Delaware forum" through ancillary agreement).

Because EQT AB is bound by the forum selection clause in the Purchase Agreement, and because it is subject to jurisdiction under Delaware's long-arm statute, Carlson respectfully requests that this Court deny EQT AB's motion to dismiss for lack of personal jurisdiction.

### C.     In the Alternative, The Court Should Grant Carlson Leave to Conduct Jurisdictional Discovery

To the extent the Court determines that Carlson has not established personal jurisdiction over EQT AB in the Complaint, Carlson respectfully requests leave to conduct discovery into jurisdictional facts before any claims against EQT AB are dismissed on that basis. Jurisdictional discovery should be permitted "before the district court dismisses for lack of personal jurisdiction." *Marnavi SpA v. Keehan*, No. CIV. 08-00389-SLRPS, 2010 WL 1499583, at *6 (D. Del. Apr. 14, 2010) (internal quotations omitted), *citing Renner v. Lanard Toys Ltd.*, 33 F.3d 277, 283 (3d Cir. 1994).

Should the Court find that the facts of the Complaint do not establish the existence of jurisdiction, Carlson should be permitted to investigate and demonstrate further facts concerning (1) EQT AB's role in drafting and negotiating the Purchase Agreement; (2) EQT AB's role in managing Carlson following execution of the Purchase Agreement; (3) any additional benefits EQT AB realized under the terms of the Purchase Agreement; (4) EQT AB's management of EQT Exeter; and (5) EQT AB's contacts with Delaware generally (including potential facts presently unknown to Carlson that would demonstrate EQT AB is subject to general jurisdiction in Delaware). "[C]ourts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.'" *Toys 'R' Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) (reversing District Court's denial of request for

16

jurisdictional discovery). Carlson's allegations are more than sufficient to warrant jurisdictional discovery if the Court determines that the Complaint as submitted does not support a finding of personal jurisdiction over EQT AB.

## II.    The Complaint States Claims Against EQT AB For Breach Of Contract And The Implied Covenant.

The Complaint brings the following claims against EQT AB: (1) Breach of the Purchase Agreement (Count I); (2) Breach of the Earn-Out Covenant in the Purchase Agreement (Count II); (3) Fraud Relating to the Purchase Agreement (Count III); (4) Fraud Relating to the Employment Agreement (Count IV); (5) Negligent Misrepresentation (Count V); (6) Unjust Enrichment/Disgorgement (Count VI); and (7) Breach of the Implied Covenant of Good Faith and Fair Dealing (Count VII). Defendants primarily argue the three contract-based claims (Counts I, II, VII) fail because EQT AB is not a party to the contract.[3] The Complaint makes clear, however, that Carlson is proceeding under an agency theory of liability for Counts I, II, and VII. (*See* Compl. ¶ 122, 129, 182).

"When one corporation acts as the agent of a disclosed principal corporation, the latter corporation may be liable on contracts made by the agent." *Compagnie des*

---

[3] Defendants argue that the remaining claims (Counts III, IV, V, and VI) fail for the set forth in Sections II-V of their Motion (i.e. for the same reasons the claims fail against EQT Exeter). Carlson addresses each argument in Sections III-VI of its Opposition.

*Grands Hotels d'Afrique S.A. v. Starwood Cap. Grp. Glob. I LLC*, No. 23-2631, 2024 WL 4249723, at *1 (3d Cir. 2024) (noting this exception to the general rule that only signing parties are liable for breach of contract). To establish liability under an agency theory, a party must show that an "arrangement exists between the two corporations … [and] the arrangement must be relevant to the plaintiff's claim of wrongdoing." *CC Invs. Corp. v. Raytheon Co.*, 219 F.R.D. 328, 330 (D. Del. 2003) (quoting *Phoenix Canada Oil Co., Ltd. v. Texaco, Inc.*, 842 F.2d 1466, 1476-78 (3d Cir. 1988)).

The allegations in Carlson's Complaint, *i.e.* that EQT Exeter acted as EQT AB's agent in breaching the Purchase Agreement (Compl., ¶ 122), that EQT AB controlled whether or not to pay Carlson his Earn-Out (*Id.* at ¶ 123, 182), and EQT AB controlled the decision to characterize EMVF II as a "third fund" (*Id.* at ¶ 129), sufficiently plead this agency relationship. *CC Investors Corp.*, 219 F.R.D. at 330 (allegation that parent corporation directed assignment that led to litigation sufficiently plead agency relationship); *Brit. Telecommunications PLC v. IAC/InteractiveCorp*, 356 F. Supp. 3d 405, 409 (D. Del. 2019) ("a parent corporation is held liable for the actions of its subsidiary if the parent directed or authorized those actions") (quoting *T-Jat Sys. 2006 Ltd. v. Expedia, Inc. (DE)*, No. 16-581-RGA-MPT, 2017 WL 896988, at *6 (D. Del. 2017)). Because EQT Exeter acted as an agent of EQT AB when entering into the Purchase Agreement, EQT AB is also liable

18

for breach of the Purchase Agreement "even though it is not a party named in the agreement." *Phoenix Canada Oil Co. Ltd.*, 842 F.4d at 1477 (citing Restatement (Second) of Agency §§ 147, 149 (1958)).

Therefore, Carlson respectfully requests that this Court deny EQT AB's motion to dismiss Counts I, II and VII with respect to EQT AB.

## III.   The Complaint States a Claim for Fraudulent Inducement.

### A.   The Fraudulent Inducement Claim is Adequately Pleaded.

Defendants argue that Carlson's claim for fraudulent inducement does not meet the pleading requirements for fraud under Fed. R. Civ. P. 9(b). (Mot. at 22). Defendants' argument is without merit. To support their argument, Defendants mischaracterize the Complaint and ignore Carlson's actual allegations. However, the Complaint is replete with facts supporting the reasonable inference that Defendants fraudulently misrepresented and omitted material facts in order to induce Carlson to enter into the Purchase Agreement and the Employment Agreement, and to cause him to surrender his interests in Redwood Capital for less than their fair market value. As such, it more than meets the pleading requirements for fraudulent inducement.

Rule 9(b) requires a plaintiff to plead (1) a false representation of material fact; (2) knowledge of its falsity by the person who made it; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted

19

upon; and (5) that the plaintiff acted upon it to his detriment. *Levine v. Metal Recovery Techs., Inc.,* 182 F.R.D. 112, 115–16 (D. Del. 1998). *See also Valley Joist BD Holdings, LLC v. EBSCO Indus., Inc*., 269 A.3d 984, 988 (Del. 2021) (setting out the same standard under Delaware law). The Third Circuit courts take a "lenient" and "flexible" approach to the application of Rule 9(b). *See Kronfeld v. First Jersey Bank,* 638 F. Supp. 1454, 1463-65 (D.N.J.1986) (specifically noting how the 3rd Circuit applies Rule 9(b)). While plaintiffs must plead with particularity the circumstances of the alleged fraud, they need not plead the date, place or time of the fraud, "so long as they use an alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 577 (D.N.J. 2001) (quotation omitted); *see also In re Fruehauf Trailer Corp.,* 250 B.R. 168, 198 (D. Del. 2000) (holding plaintiffs need not plead the exact time, place, or verbatim content of the fraudulent statements, as long as the allegations provide sufficient notice to the defendant of the alleged misconduct).

Moreover, as this court has noted previously, the requirement of particularity does not require "an exhaustive cataloging of facts but only sufficient factual specificity to provide assurance that plaintiff has investigated ... the alleged fraud and reasonably believes that a wrong has occurred." *In re ML-Lee Acquisition Fund II, L.P. & ML-Lee Acquisition Fund (Ret. Accts.) II, L.P. Sec. Litig.*, 848 F. Supp.

527, 555 (D. Del. 1994) (quotations omitted). All that is required is that the complaint "place[s] the defendants on notice of the precise misconduct with which they are charged" in order "to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Id.*; *In re Fruehauf Trailer Corp.,* 250 B.R. at 198.

The Complaint meets this pleading standard. Defendants mischaracterize Carlson's fraud allegations as mere "predictions about the future," (*e.g.*, Mot. at 23) ignoring that Carlson's fraud allegations are not premised on Defendants' promises that the EMVF II fund would be successful, but are actually premised upon Defendants' factual representations that the EMVF II fund was the same Workforce Housing Value Fund contemplated under the agreement, was eligible for an Earn-Out, and that it was nearly ready to launch at the time of the Transaction. (Compl., at ¶¶ 133-141). The Complaint repeatedly alleges that throughout the parties' negotiations, and specifically in a call on May 7, 2022, Ward Fitzgerald and Peter Lloyd of EQT told Carlson that there was already a PPM being drafted for the EMVF II fund and, with that in place, the first fund (of two) would be ready to launch after the Transaction closed, allowing the three-year timeline for an Earn-Out to be easily satisfied. (*See, e.g., Id.* ¶¶ 14, 16, 17, 59, 60, 61, 63, 134). These statements were explicit misrepresentations about **present facts** that were material to the

21

negotiations, not mere predictions about Carlson's "earnout goals" (*see* Mot. at 24) or future performance expectations for EMVF II.

The Complaint further alleges that Defendants' representations that EMVF II was already in process were critical to Carlson's acceptance of the deal, particularly because the Earn-Out payments Carlson would be eligible for were subject to a very aggressive three-year deadline. (*Id.* ¶¶ 14, 15, 17, 22, 23, 58, 59, 63, 64). The Complaint alleges that the three-year Earn-Out period was heavily negotiated because Carlson and his advisors were concerned that raising two different $1 billion funds over that specific time period would be a monumental task. (*Id.* ¶¶ 15, 57, 58, 59). Defendants knew that Carlson was concerned about the feasibility of achieving the goal during such a short time period and made material misrepresentations to convince him to move forward anyway. (*Id.* ¶¶ 58, 59). The Complaint alleges that in order to mollify Carlson's concerns and induce him to enter into the Purchase Agreement, Defendants represented to Carlson that **EMVF II was one of the funds that would be eligible for the Earn-Out payment** and that **it was ready to launch**. (*Id.* ¶¶ 59, 60, 61). But Defendants withheld materials that would have shown the lack of progress on EMVF II during negotiations. (*Id.* ¶ 63). Because Defendants hid the truth from Carlson—that the EMVF II fund was not ready to launch and that Defendants had no intention of making Carlson's work on the EMVF II fund eligible for the Earn-Out—Carlson believed, incorrectly, that he was in a position to begin

22

working immediately toward his initial Earn-Out payment. Carlson did not discover until after the close of the Transaction that not only was the EMVF II fund woefully deficient and not ready to launch, but that Defendants did not actually intend that Carlson's fundraising efforts for EMVF II would be Earn-Out eligible.

Collectively, these allegations are more than sufficient to meet the particularity standard of Rule 9(b) at the pleading stage. *See, e.g., Simon Prop. Grp., L.P. v. Brighton Collectibles, LLC*, No. N21C-01-258-MMJ-CCLD, 2021 WL 6058522, at *8 (Del. Super. Dec. 21, 2021) (concluding allegations that "discussion took place in June 2020" where defendant made false promises with "no intention of performing the promise" and simply to induce plaintiff to act "complied with Rule 9(b) requirements"). And they stand in stark contrast to the "speculative conclusions unsupported by fact" or "entirely vague and general" allegations that failed to pass muster in Defendants' case law. *See, e.g., Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *12 (Del. Ch. June 6, 2018) (holding that representations about future profitability and performance are not actionable because they are not "knowable") (cited in Mot. at 24).

Unlike the cases cited by Defendants, the Complaint is replete with allegations that Defendants knowingly made a series of fraudulent misrepresentations and omissions prior to the execution of the Purchase Agreement with the intent to induce

23

Carlson to consummate the acquisition. As such, the Complaint sufficiently meets the pleading requirements for fraud.

**B.    The Purchase Agreement does not contradict or negate Defendants' misrepresentations.**

Defendants also argue that Carlson's claims for fraudulent inducement fail under Rule 12(b)(6) because any pre-contractual representation that the EMVF II fund would be the basis for an Earn-Out under the agreement is contradicted by the language in the Purchase Agreement limiting Earn-Out eligibility to the successful launch and fundraising of an "Initial Core Fund" and "an Initial WH Fund." (Mot. at 25). This argument is not supported by the language of the Purchase Agreement and Carlson has sufficiently pleaded facts tending to show that EMVF II falls within the definition of a "Workforce Housing Value Fund or similar new investment vehicle."

Not only did Defendants represent that EMVF II was one of the funds contemplated by the agreement, but the Complaint sufficiently alleges EMVF II *is* a workforce housing value fund that falls within the broad definition of the "Initial WH Fund" under the terms of the Purchase Agreement. The "Initial WH Fund" is defined broadly under the agreement as a "Workforce Housing Value Fund or similar investment vehicle." (*See* Compl., Ex. 1 at p. 71). The Complaint alleges that fund terms such as "Workforce" and "Value" represent commonly understood industry terms for categories of real estate investment funds. (Compl., ¶ 13). In real estate

24

parlance, a "Workforce" or "Value" fund targets housing units that are rented by people who make between 60% and 120% of the median income in a particular area. (*Id.* ¶ 55). Such funds are characterized as "Value" funds because of their lower cost basis, higher yielding returns, and need for property rehabilitation. (*Id.*). Not only is the EMVF II fund, by its express terms and name, a "Value" fund, but the characteristics of the fund confirm that it was intended to function as a Workforce Housing Value fund. As alleged in the Complaint, when EMVF II was launched after the transaction closed, Defendants marketed it to investors by described it as targeting housing for "price conscious" residents. (*Id.* ¶ 86, 87). Defendants' "pitch deck" for prospective investors even explicitly referenced the industry-standard income range associated Workforce Housing. (*Id.* ¶ 88). Finally, Defendants seeded the EMVF II fund with "Value" investments that exhibited Workforce Housing demographics and property rehabilitation and renovations. (*Id.* ¶ 89).

In short, everything about EMVF II—from its use of industry-accepted terms that connote a Workforce Housing Value fund, to its stated goals and investments—conformed with the definition of a "Workforce Housing Value Fund or other similar investment vehicle" contemplated by the Purchase Agreement. Carlson, thus, reasonably relied upon Defendants' misrepresentations that EMVF II was the "Initial WH Fund" contemplated under the agreement that would be eligible for an Earn-Out.

25

**IV.    The Complaint States a Claim for Negligent Misrepresentation.**

Defendants next argue that Carlson's claim for negligent misrepresentation is foreclosed by the non-reliance clause in the Purchase Agreement. (Mot. at 26). This argument is meritless because the Purchase Agreement expressly preserves fraud claims, which includes Carlson's claims for negligent misrepresentation here under Delaware law.

"Delaware's public policy is intolerant of fraud." *Fortis Advisors LLC v. Johnson & Johnson*, No. 2020-0881-LWW, 2021 WL 5893997, at *9 (Del. Ch. 2021) (quotation omitted). As such, Delaware courts refuse to "insulate a party from liability for its counterparty's reliance on fraudulent statements made outside of an agreement absent a clear statement by that counterparty—that is, the one who is seeking to rely on extra-contractual statements—disclaiming such reliance." *Id.* Where a non-reliance clause does not expressly disclaim reliance on extra-contractual representations in cases of fraud, courts will not construe the non-reliance clause as precluding fraud claims that are based on pre-contractual misrepresentations. *See Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 140-41 (Del. Ch. 2009).

Here, Sections 2.13 and 3.19 of the Purchase Agreement contain carve-out provisions that permit the parties to generally retain "all rights and remedies with respect to claims based on Fraud." (Compl., Ex. 1 at §§ 2.13, 3.19). This carve-out

26

provision does not purport to preclude fraud-based claims that are based on extra-contractual statements. Defendants argue that this provision does not preserve Carlson's claim for negligent misrepresentation. However, in Delaware, a claim for negligent misrepresentation is treated as a fraud claim, requiring the same elements except the plaintiff need not demonstrate that the misrepresentation was made knowingly or recklessly. *See In re Med. Wind Down Holdings III, Inc*., 332 B.R. 98, 102 (Bankr. D. Del. 2005); *Fortis Advisors LLC*, No. CV-2020-0881-LWW, 2021 WL 5893997 at *14 (holding that a negligent misrepresentation is "essentially a fraud claim with a reduced state of mind requirement"). Nothing in the Purchase Agreement requires a showing of knowing falsity, thus Carlson is not precluded from bringing a negligent misrepresentation claim here.

Because Delaware courts hold that a negligent misrepresentation claim is a creature of fraud, and because the Purchase Agreement expressly preserves fraud claims, Carlson is not precluded from bringing a claim for negligent misrepresentation here.

### V.    The Complaint States a Claim for Unjust Enrichment.

#### A.    The Unjust Enrichment claim is not precluded as a matter of law.

Defendants also assert that Carlson's Unjust Enrichment claim fails as a matter of law, arguing that unjust enrichment is not available where there is a contract that governs the relationship between the parties. (Mot. at 28). Once again,

Defendants mischaracterize the allegations in the Complaint, ignore the basis for Carlson's claims, and misconstrue Delaware law.

Generally, "[a] claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim." *Capano v. Ecofibre Ltd.*, No. CV 2024-0164-MTZ, 2025 WL 419494, at *1 (Del. Ch. 2025) However, when a plaintiff alleges that "it is the [contract], itself, that is the unjust enrichment," the existence of the contract does not bar the unjust enrichment claim. *LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC,* No. CV 12067-VCG, 2018 WL 1559936, at *16 (Del. Ch. Mar. 28, 2018). In other words, "[t]he contract itself is not necessarily the measure of [the] plaintiff's right where the claim is premised on an allegation that the contract arose from wrongdoing (such as breach of fiduciary duty or fraud) or mistake and the [defendant] has been unjustly enriched by the benefits flowing from the contract." *Id.* Thus, an unjust enrichment claim pled in the context of a contract may survive a motion to dismiss where the "factual basis for the unjust enrichment claim [is] independent of the allegations supporting the breach of contract claim." *Capano,* 2025 WL 419494, at *1 (quoting *Stone & Paper Invs., LLC v. Blanch*, 2020 WL 3496694, at *12-13 (Del. Ch. 2009)).

Here, the factual basis for Carlson's unjust enrichment claim is independent of the allegations supporting his breach of contract claims. Carlson brings claims for

28

unjust enrichment on the basis that Defendants were unjustly enriched by the value they received by fraudulently inducing Carlson to enter into the agreement and sell his interests in Redwood Capital Group at a bargain. (Compl., ¶¶ 168-179). Because his claim for unjust enrichment does not arise out of the *performance* of the contract, but rather, the *existence* of the contract, which Defendants fraudulently induced him to enter into through their misrepresentations, his claim is not precluded as a matter of law. *See LVI Grp. Invs., LLC,* 2018 WL 1559936, at *17 (declining to dismiss unjust enrichment claim where plaintiff averred that the execution of the agreement between the parties enabled defendants to obtain benefits to which they were not entitled because plaintiffs would have never entered the agreement absent defendants' fraudulent misrepresentations).

## VI.    The Complaint States a Claim for Implied Covenant of Good Faith and Fair Dealing

Defendants' final argument in their partial motion to dismiss is that the Complaint fails to state a cause of action for the Implied Covenant of Good Faith and Fair Dealing because Carlson fails to allege a "gap" that the implied covenant might fill. (Mot. at 29-30). Contrary to Defendants' assertions, the Complaint sufficiently states a cause of action for the Implied Covenant of Good Faith and Fair Dealing by alleging that Defendants intentionally frustrated Carlson's ability to receive the fruits of the contractual rights agreed to by the Parties by hiding their true intentions regarding EMVF II.

29

The implied covenant of good faith and fair dealing attaches to every contract. *Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 442 (Del. 2005); *Sheehan v. AssuredPartners, Inc.*, No. CV 2019-0333-AML, 2020 WL 2838575, at *11 (Del. Ch. 2020). To sufficiently plead a breach of the implied covenant of good faith and fair dealing, a complaint must allege "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1117–18 (Del. 2022). "[T]he implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap,* 878 A2d at 442. *Id.* A party is liable for breaching the implied covenant of good faith and fair dealing when the party's conduct is such that it frustrates the general purpose of the contract "by taking advantage of [its] position to control implementation of the [contract's] terms." *Id*. "The covenant protects an agreement's spirit against underhanded tactics that deny a party the fruits of its bargain." *Sheehan,* 2020 WL 2838575, at *11.

Here, the Complaint alleges an implied contractual obligation: that Carlson would be tasked with raising money for two specific funds during the first three years of the contract: the Core/Core+ fund and the Workforce Housing fund. These are the only funds described in the Purchase Agreement and the only funds that were contemplated during the parties' pre-contractual negotiations. (*See* Compl., at ¶¶ 50-

30

54, 56, 66; Compl. at Ex. 1). Defendants presented EMVF II to Carlson as the same Workforce Housing fund contemplated by the Purchase Agreement, only to pull the carpet out after Carlson had improved the fund's offering, invested significant time and resources soliciting investors, and successfully raised over $60 million in commitments, by which he earned an initial Earn-Out payment. Defendants knew that Carlson had dedicated his time and efforts to raise funds for EMVF II. Carlson's efforts to raise capital for EMVF II necessarily impacted his ability to solicit investments for other funds. By failing to disclose that EMVF II supposedly was a *third* fund that would be inapplicable to the Earn-Out provision, Defendants took advantage of its position, knowingly frustrated the spirit of the Purchase Agreement by preventing Carlson from being able work towards the Earn-Out payments, and breached the implied contractual obligation that Carlson would be working on solely two funds.

As the Complaint alleges the existence of an implied contractual obligation, the Defendants' breach of that obligation, and harm to Carlson, it plausibly states a claim for Implied Covenant of Good Faith and Fair Dealing under Delaware law.

## CONCLUSION

For the reasons set forth above, this Court should deny Defendants' Partial Motion to Dismiss in its entirety. In the alternative, Carlson requests that the Court

31

grant him leave to conduct jurisdictional discovery and/or amend his Complaint, to the extent the Court deems necessary.

*[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]*

**Dated:** August 22, 2025

Respectfully submitted,

/s/ *Noelle Torrice*
Noelle Torrice (#5957)
Kate Harmon (#5343)
**Benesch, Friedlander, Coplan & Aronoff LLP**
1313 North Market Street, Suite 1201
Wilmington, DE 19801-6101
Telephone: (302) 442-7056
Email: ntorrice@beneschlaw.com
Email: kharmon@beneschlaw.com

Charles Leuin (admitted *pro hac vice*)
William Walsh (admitted *pro hac vice*)
**Benesch, Friedlander, Coplan & Aronoff LLP**
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Telephone: (312) 624-6344
Email: cleuin@beneschlaw.com
Email: wwalsh@beneschlaw.com

*Counsel for David Carlson*

33

## CERTIFICATION OF COMPLIANCE

Under Chief Judge Connolly's Standing Order Regarding Briefing in All Cases (the "Standing Order"),[4] dated November 10, 2022, I, Noelle B. Torrice, hereby certify that:

1.      This brief complies with the word-count requirements of the Standing Order, as amended by Stipulation and Order Setting Briefing Schedule And Extending Word Limits For Briefing on Defendants' Motion to Dismiss (D.I. 14), because this brief contains 7,489 words, which is less than or equal to the permitted 7,500 words (30 pages x 250 words) for this brief.

2.      This brief complies with the Stand Order's font and type-face requirements because the brief is typed in 14-point Times New Roman font.

3.      The front and back covers of the courtesy copies of this brief provided to chambers comply with the Standing Order because they are printed on red paper.

/s/ *Noelle Torrice*
Noelle Torrice (#5957)
**Benesch, Friedlander, Coplan & Aronoff LLP**
1313 North Market Street, Suite 1201
Wilmington, DE 19801-6101
Telephone: (302) 442-7056
Email: ntorrice@beneschlaw.com

---

[4] On August 20, 2025, this case was transferred to the Honorable Stephanos Bibas. (D.I. 18). Chief Judge Connolly previously entered the Stipulation and Order Setting Briefing Schedule And Extending Word Limits For Briefing on Defendants' Motion to Dismiss. (D.I. 14). Out of an abundance of caution, Plaintiff ensured that its Opposition complies with both Judge Connolly's Standing Order and any applicable requirements set forth by the Honorable Stephanos Bibas.