IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DAVID CARLSON,

       *Plaintiff,*

      v.

                                No. 25-cv-0503

EXETER PROPERTY GROUP, LLC
and EQT AB,

       *Defendants.*

---

Kate Hodges Harmon, Noelle Briana Torrice, BENESCH FRIEDLANDER COPLAN & ARONOFF LLP, Wilmington, Delaware; Charles Leuin, William Walsh, BENESCH FRIEDLANDER COPLAN & ARONOFF LLP, Chicago, Illinois.

                                  *Counsel for Plaintiff*

Shannon Rose Selden, Barrett J. Greenwell, DEBEVOISE & PLIMPTON LLP, New York, New York; A. Thompson Bayliss, Christopher Fitzpatrick Cannataro, ABRAMS & BAYLISS LLP, Wilmington, Delaware.

                                *Counsel for Defendants*

---

### MEMORANDUM OPINION

March 25, 2026

BIBAS, *Circuit Judge*, sitting by designation.

Jargon can deceive: Two people may use the same words yet leave with different deals. One real-estate investor (Carlson) sold his business to another (Exeter). In exchange for a lower upfront sale price, Carlson negotiated an employment contract promising the chance to earn millions more—if he could close on certain types of real-

estate funds. One fund, he believed, was close to triggering his first payout. But Exeter disagreed, insisting that fund never qualified. Carlson never met the other benchmarks needed to unlock additional payments. He walked away with little, and Exeter got a bargain.

Carlson sued Exeter and its parent corporation, EQT AB, for fraudulent inducement, negligent misrepresentation, unjust enrichment, and breach of implied covenants. He claims that he is entitled to one of the payouts based on the terms of his contract. I let his fraud claim proceed but dismiss the others because they are foreclosed by the deal Carlson and Exeter made.

## I. CARLSON THINKS HE HAS MADE A GREAT DEAL

On this motion to dismiss, I take the complaint's factual allegations as true. *See Bd. of Trs. of Bricklayers & Allied Craftsmen Loc. 6 of N.J. Welfare Fund v. Wettlin Assocs.*, 237 F.3d 270, 272 (3d Cir. 2001). EQT AB, a Swedish company, wanted to break into the American real-estate market. So it bought Exeter, a residential and commercial real-estate investor with a presence in the United States. Compl. ¶ 48. Looking to expand its investment portfolio, Exeter bought Redwood Capital Group from David Carlson and his business partner. Compl. ¶¶ 49–50. The business partner took the money and ran: He received his share of the purchase price ($10.5 million) upfront and walked away. D.I. 1-1 at 87. Carlson struck a different deal: He took less upfront ($5.25 million) and joined the Exeter team, signing an employment agreement with the company. *See generally* Purchase Agreement (PA), D.I. 1-1. In

2

exchange for the lower upfront payment, Carlson had the chance to earn almost $24 million in payouts tied to company milestones. Compl. ¶ 57; D.I. 1-1 at 12–13.

Some real-estate jargon is (unfortunately) needed to understand the deal Carlson and Exeter reached. Under the employment contract, Carlson could earn up to four payouts. Each corresponded with events tied to two different types of real-estate investment funds: a "Core" fund and a "Workforce Housing Value Fund." PA § 1.5. Both are standard in the industry. Core funds invest in newer buildings in prominent locations, like major cities. Compl. ¶ 55. Those buildings are upscale and attract higher-income tenants, so they are safer investments with less upside. *Id.* Workforce Housing Funds, on the other hand, invest in older properties in less-prominent locations. *Id.* They are riskier. But with great risk comes great reward: Once an investor upgrades those properties, they tend to generate higher returns. Per the contract, Carlson was eligible for payouts once he closed on either type of fund and again once those funds achieved certain fundraising benchmarks. PA § 1.5.

As the parties negotiated, Exeter worked to launch the Exeter Multifamily Value-Add Fund II. Compl. ¶ 16. Exeter viewed the Multifamily fund as a "value-add strategy through which it would acquire properties and then invest additional resources to renovate them." D.I. 16 at 15; *see* Compl. ¶ 16. The fund's goal was to improve housing in medical, education, and technology real-estate submarkets—think neighborhoods near hospitals or universities. EMVF II Launch Letter, D.I. 1-2 at 2.

Carlson thought that the Multifamily fund qualified as a Workforce Housing fund. Compl. ¶ 18. The purchase agreement premises the first payout on closing a

3

"Workforce Housing Value Fund *or similar new investment vehicle.*" PA § 10.1 (emphasis added). Although technically different, Workforce Housing funds and Multifamily funds have several similarities. Both target housing markets where renters make between 60 and 120% of the median income in a particular area. Compl. ¶ 55. Both also involve property rehabilitation and cost less than Core investments, yielding higher profits. *Id.*

In negotiations, Exeter's CFO assured Carlson that the Multifamily fund was "nearly ready to launch." Compl. ¶¶ 60–61. That would position him to get his first payout quickly, adding around $6.7 million to his personal profits from the Exeter-Redwood deal and putting him just past his business partner's deal.

But when push came to shove, Exeter said that Carlson's work on the EMVF II fund, which closed during his employment, did not qualify. *See* D.I. 20 at 17 ("If the parties had intended for EMVF II to be earnout eligible, the Purchase Agreement simply would have said so."). In three years, Carlson raised substantial cash but could not raise the billions of dollars in investments he needed to earn any additional payouts. *See* Compl. at ¶¶ 50–54, 56, 66; D.I. 19 at 37. He got none.

Carlson now sues Exeter and its parent company, EQT AB, claiming that he would not have entered the purchase agreement if he had understood that Exeter was raising a third fund that did not qualify for payouts. Compl. ¶¶ 145, 150, 159. He proceeds against EQT AB by arguing it was a third-party beneficiary of the contract and thus subject to Delaware jurisdiction. He then relies on agency theory to impute Exeter's actions to EQT AB. Against Exeter, he claims breach of contract, fraud, negligent

misrepresentation, and unjust enrichment. Only one claim—fraud, against Exeter—survives the motion to dismiss.

## II. EQT AB IS BEYOND DELAWARE LAW'S REACH

EQT AB has moved to dismiss for lack of personal jurisdiction. *See* D.I. 16 at 18. I will grant such a motion if, taking the allegations in the complaint "as true" and resolving "all factual disputes … in [Carlson's] favor," the complaint fails to "establish a prima facie case of personal jurisdiction." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007); Fed. R. Civ. P. 12(b)(2).

### A. EQT AB is not bound by the Agreement's forum-selection clause

When a party consents to the jurisdiction of a particular court by contract, as through a forum-selection clause, we need not analyze "minimum contacts" to establish personal jurisdiction. *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1228 (Del. 2018). Delaware courts will instead respect the parties' choice of jurisdiction. *Id.*

But EQT AB was not a party to the contract. *See generally* PA; Compl. ¶ 76–77. So it can be bound by the contract's forum-selection clause only if it is a third-party beneficiary or closely related to the Purchase Agreement. *Hadley v. Shaffer*, 2003 WL 21960406, at *4 (D. Del. Aug. 12, 2003); *see Phunware, Inc. v. Excelmind Grp. Ltd.*, 117 F. Supp. 3d 613, 629 (D. Del. 2015). But it is neither. *First*, the purchase agreement makes clear that EQT AB is not a third-party beneficiary: Under the heading "No Assignment or Benefit to Third Parties," it says that nothing in the agreement, express or implied, is meant to designate a third-party beneficiary. *See* PA § 9.4. Delaware courts enforce these "no third-party beneficiary" provisions, especially when

sophisticated parties negotiate the agreement. *See Loc. Home Care Partners, LLC v. Home Care and Staffing Sols., LLC*, 2025 WL 2393084, at *11 (Del. Super. Ct. Aug. 18, 2025); *Crispo v. Musk*, 304 A.3d 567, 575 (Del. Ch. 2023) (customized provision shows "the parties knew how to confer third-party beneficiary status and deliberately chose not to do so with respect to any unlisted groups"). Plus, EQT AB's purported "benefits" from the contract—restrictions on Carlson's use of unrealized EQT AB shares—are governed by Swedish and Illinois, not Delaware, law. D.I. 16 at 21; *see also* D.I. 1-4 at 5; D.I. 1-5 at 3. Carlson cannot rewrite the terms.

*Second*, EQT AB is not "closely related" to the purchase agreement, despite Carlson's attempt to argue as much in a footnote. D.I. 19 at 14 n.1. For a non-party to be so "closely related" that it is bound by a contract's forum selection clause, it must get a direct benefit and reasonably foresee its being bound. *Sustainability Partners LLC v. Jacobs*, 2020 WL 3119034, at *6 (Del. Ch. June 11, 2020). For the same reasons EQT AB was not a third-party beneficiary, it does not satisfy that standard. It got no benefit, and if it had, issues related to that benefit would have relied on Illinois or Swedish law. *See id.* at *6 (non-party must "actually receive a benefit[;] the mere contemplation of a benefit" is insufficient (cleaned up)); *Fla. Chem. Co. v. Flotek Indus., Inc.*, 262 A.3d 1066, 1090 (Del. Ch. 2021) (grounding "close relationship" exception in equitable estoppel).

**B. The Court lacks an alternative basis for jurisdiction**

Carlson invokes Delaware's long-arm statute as an alternative basis for jurisdiction. The statute provides jurisdiction over a non-resident corporation when it "[t]ransacts any business or performs any character of work or service in the State." 10 Del.

C. § 3104(c)(1). But for the long-arm to apply, "some act must actually have occurred in Delaware." *Phunware*, 117 F. Supp. 3d at 630. And Exeter's acts alone do not count. *Cf. Nespresso USA, Inc. v. Ethical Coffee Co. SA*, 263 F. Supp. 3d 498, 504 (D. Del. 2017) (due process not satisfied for parent company absent showing of contact with Delaware beyond "mere ownership of a subsidiary"). EQT AB deriving revenue from Exeter, without more, does not either. *See Monsanto Co. v. Syngenta Seeds, Inc.*, 443 F. Supp. 2d 636, 646–47 (D. Del. 2006).

Carlson alleges only two "in-state" contacts: Zoom meetings attended by EQT AB employees from Sweden while the purchase agreement was negotiated. Compl. ¶¶ 61–62; 135. But Carlson is based in Illinois. *Id.* ¶ 9. To the extent that EQT AB was negotiating with him, those negotiations were not in *Delaware.*

Nor can Carlson show that EQT AB "purposefully directed [its] activities" at Delaware residents, or that his injuries "arise out of or relate to" Delaware activities, since he alleges only those Zoom calls as contacts. *Nespresso*, 263 F. Supp. 3d at 503 (cleaned up); *see also VoterLabs, Inc. v. Ethos Grp. Consulting Servs., LLC*, 2021 WL 3403932, at *10 (D. Del. Aug. 4, 2021). So Carlson has failed to make out a prima facie case of personal jurisdiction over EQT AB, and I dismiss his claims against it.

**C. Carlson does not meet the bar for jurisdictional discovery**

In a last-ditch effort, Carlson asks for jurisdictional discovery, which he claims will reveal EQT AB's Delaware contacts and any extra-contractual benefits. But he does not meet the standard for such discovery. To be entitled to jurisdictional discovery, Carlson must offer factual allegations that show with reasonable particularity that the necessary contacts might exist. *Phunware*, 117 F. Supp. 3d at 631. He has

7

not. *See Registered Agents, Ltd. v. Registered Agent, Inc.*, 880 F. Supp. 2d 541, 548 (D. Del. 2012) (no discovery where the plaintiff "presented no evidence indicating that defendant conducts business within Delaware"); *Nespresso,* 263 F. Supp. 3d at 508 ("bare assertions" of control insufficient to warrant jurisdictional discovery). Plus, the "closely related" third-party-beneficiary inquiry (which would prove jurisdiction) looks at express contractual terms absent specific allegations of extra-contractual benefits. *Ruggiero v. FuturaGene, plc.*, 948 A.2d 1124, 1139 (Del. Ch. 2008); *see also Phunware,* 117 F. Supp. 3d at 632 (no jurisdictional discovery given lack of "factual allegations" regarding "what benefits [defendant] stood to derive from the [agreement]"). Carlson alleges no extra-contractual benefits, so I deny his request for jurisdictional discovery.

### III. ONLY CARLSON'S FRAUD CLAIM STANDS AGAINST EXETER

Carlson also brings fraud, negligent-misrepresentation, unjust-enrichment, and breach-of-implied-covenant claims against Exeter, all under Delaware law. *See* PA § 9.8(a) (choice-of-law provision). There is no personal jurisdiction issue, since Exeter is a Delaware LLC. Compl. ¶ 32; *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 924 (2011). Instead, Exeter has moved to dismiss those counts for failing to state a claim. I will grant the motion if, "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to the plaintiff," he is still not entitled to relief. *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). I need not credit unsupported conclusions. *Walden v. Allstate Ins. Co.*, 388 F. App'x

223, 224 (3d Cir. 2010) (per curiam). And I must dismiss if there are not enough facts to support a "reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A. Carlson successfully pleads fraud

In Delaware, a plaintiff pleading fraud must allege: (1) "a false representation"; (2) "the defendant's knowledge or belief that the representation was false" or "made with reckless indifference to the truth"; (3) "an intent to induce the plaintiff to act or to refrain from acting"; (4) "the plaintiff's action or inaction taken in justifiable reliance upon the representation"; and (5) damages. *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

Carlson alleges that Exeter falsely told him before he signed the deal that "the EMVF II fund was the same Workforce Housing Value Fund contemplated under the agreement," and was therefore "eligible for an Earn-Out" payment. D.I. 19 at 27. And he says he relied on this representation in agreeing to the purchase agreement: If the Multifamily fund was not payout-eligible, he would not have signed. Compl. ¶¶ 14, 15, 17, 22, 23, 58, 59, 63, 64.

That was reasonable. "Justifiable reliance requires that the representation relied upon involve a matter which a reasonable person would consider important in determining his choice of action in the transaction in question, i.e., that the matter misrepresented is material." *Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *12 (Del. Ch. June 6, 2018). To make out justifiable reliance, a plaintiff must show that he did not have either the awareness or opportunity to discover the accurate information. *Id.*

9

As a seasoned real-estate investor, Carlson was a sophisticated party represented by counsel, and the parties negotiated over a long time. Plus, the contract had an anti-reliance clause that disclaimed reliance on extra-contractual representations. D.I. 16 at 27; *see* PA §§ 2.13, 3.19. Those considerations would usually cut against him. *See AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 178–79 (3d Cir. 2003) (sophistication matters); *Ajay Endeavors, Inc. v. Divvymed, LLC*, 2022 WL 605695, at *2 (D. Del. Jan. 10, 2022) (highly negotiated agreements and opportunity to seek counsel weigh against reliance).

Even so, Carlson was justified in relying on statements about the Multifamily fund qualifying for payouts. The contractual language did not contradict the oral promises. *Cf. Carrow v. Arnold*, 2006 WL 3289582, at *8 (Del. Ch. Oct. 31, 2006) (reasoning that when the written contract contradicts oral promises, no reasonable reliance), *aff'd,* 933 A.2d 1249 (Del. 2007). The Multifamily fund could very well qualify as a Workforce Housing Fund or similar, given the funds' shared qualities. The contract captures that: It covers Workforce Housing funds "or similar" funds. PA § 10.1.

Exeter points out that one cannot reasonably rely on future predictions alone. D.I. 16 at 27, 29–30. That is true. *See Carrow*, 2006 WL 3289582, at *8. But the main contention is not that the Multifamily fund was in worse shape than promised, though it purportedly was. Compl. ¶¶ 59, 60, 61, 63. It is that the Multifamily fund did not count toward payouts *at all. Id.*; D.I. 19 at 28. That is a present fact, and it supports Carlson's fraud claim.

### B. But Carlson fails to allege negligent misrepresentation, unjust enrichment, or breach of implied covenants

Carlson's other claims fail, though. Start with negligent misrepresentation. The purchase agreement disclaimed future claims other than "actual and intentional fraud." PA § 10.1; *see also* PA §§ 2.13, 3.19, 9.5. Carlson now distorts the contractual language, arguing that negligent misrepresentation is "essentially a fraud claim with a reduced state of mind requirement" and thus falls in that category. *Fortis Advisors LLC v. Johnson & Johnson*, 2021 WL 5893997, at *14 (Del. Ch. Dec. 13, 2021). But the reduced state-of-mind requirement is precisely why the negligent-misrepresentation claim does not count. Fraud looks at one's knowledge or belief that a representation was false. *Infab Holdco, Inc. v. Cusick*, 2025 WL 1430771, at *4 (Del. Ch. May 19, 2025) (citation omitted). Negligent misrepresentation, as the name suggests, looks only at whether one was negligent. *Corp. Prop. Assocs. 14 Inc. v. CHR Holding Corp.*, 2008 WL 963048, at *8 (Del. Ch. Apr. 10, 2008). The claims, though related, are different. Carlson's negligent-misrepresentation claim is thus foreclosed by his own bargain. So I dismiss the negligent-misrepresentation claim with prejudice.

Carlson also sues for unjust enrichment. He says that Exeter profited at his expense by misleading him. But that claim fails because "a contract already governs the parties' relationship." *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 58 (Del. Ch. 2012). Delaware plaintiffs can sue for unjust enrichment only if they lack an adequate remedy at law. *Tornetta v. Musk*, 250 A.3d 793, 813 (Del. Ch. 2019). But Carlson signed a contract that supplies exactly that: express legal remedies. And Carlson nowhere pleads that the contract is void or unenforceable. I dismiss this claim

11

without prejudice, in the event that the fraud claim ends up reviving some alternative unjust-enrichment theory.

Finally, Carlson's claim for breach of the implied covenant of good faith and fair dealing fails, too. This implied covenant attaches to every contract. *Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 442 (Del. 2005). But it is a gap-filler—it steps in only when the contract is silent as to the matter at hand. *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006). Carlson claims only that his fundraising for the Multifamily fund distracted him from fundraising payout-eligible funds, not that the contract was silent somewhere. D.I. 19 at 37. Because there are express terms to deal with, the implied covenant claim fails. *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *18 (Del. Ch. 2013) ("[E]xpress contractual provisions 'always supersede' the implied covenant."). So I dismiss that claim with prejudice.

\* \* \* \* \*

For better or worse, parties to a contract are stuck with the deals they make. That leaves only one path ahead for Carlson. Because he signed the purchase agreement, I dismiss all the challenged claims except the one that the contract preserves: fraud.

12