# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAVID CARLSON, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) C.A. No. 25-cv-0503-SB |
| EXETER PROPERTY GROUP, LLC | ) |
| and EQT AB | ) |
| | ) |
| Defendants. | ) |
| | ) |

## ANSWER OF EXETER PROPERTY GROUP, LLC
## TO THE COMPLAINT

OF COUNSEL:

Shannon Rose Selden
Barrett J. Greenwell
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
(212) 909-6000
srselden@debevoise.com
bjgreenwell@debevoise.com

A. Thompson Bayliss (#4379)
Christopher Fitzpatrick Cannataro (#6621)
ABRAMS & BAYLISS LLP
20 Montchanin Rd., Suite 200
Wilmington, DE 19807
(302) 778-1000
bayliss@abramsbayliss.com
cannataro@abramsbayliss.com

*Counsel for Exeter Property Group, LLC*

Date: April 29, 2026

Defendant Exeter Property Group, LLC ("Exeter" or "Defendant") by and through its undersigned counsel, answers and asserts additional defenses to the allegations in the Complaint of Plaintiff David Carlson ("Plaintiff" or "Carlson"), as follows:

## GENERAL DENIAL

Except as otherwise expressly admitted herein, Exeter denies each and every allegation in the Complaint.  Exeter states that the titles, headings, and footnotes used throughout the Complaint do not constitute well-pleaded allegations of fact and, therefore, require no response.  To the extent a response is required, the allegations in the titles, headings, and footnotes in the Complaint are denied.  Exeter states that no response is required to the allegations to the extent they relate to Counts V, VI, and VII of the Complaint—alleging respectively negligent misrepresentation, unjust enrichment/disgorgement, and breach of the implied covenant of good faith and fair dealing—because they are no longer applicable following the Court's March 25, 2026 Opinion and Order dismissing those claims.  Likewise, Exeter states that no response is required to the allegations to the extent they relate to EQT AB because it is no longer a defendant in this action following the Court's March 25, 2026 Opinion and Order dismissing all claims against it.  Moreover, to the extent the allegations in the Complaint improperly conflate Exeter and EQT AB, Exeter denies those allegations insofar as they conflate these two entities.

By referring to or admitting the existence of any documents quoted, described, or otherwise referenced in the Complaint, Exeter does not acknowledge or concede that such documents are what they purport to be, are accurate as to their substance, are relevant to Plaintiff's allegations, constitute business records within the meaning of the rules of evidence, or are otherwise admissible on any other basis. By referring to or admitting the existence of any document quoted, described, or otherwise referenced in the Complaint, Exeter does not acknowledge or concede that Exeter has any knowledge or information concerning the document quoted, described, or otherwise referenced at any particular point in time prior to the filing of the Complaint, unless explicitly admitted herein.

For the purposes of the Answers provided below, Exeter refers to Redwood Capital Group Holdings, LLC as "Redwood"; Tripost Capital RCG Investments LP as "Tripost"; Mark Isaacson as "Isaacson"; Edward ("Ward") J. Fitzgerald III as "Fitzgerald"; the Purchase Agreement dated May 11, 2022 as the "Purchase Agreement"; and the Exeter Multifamily Value Fund II as "EMVF II".

Exeter expressly reserves the right to amend and/or supplement its Answer as may be necessary.

## SPECIFIC RESPONSES

Plaintiff David Carlson ("Carlson" or "Plaintiff"), by his undersigned counsel, hereby alleges as follows for his Complaint against Defendants Exeter Property Group, LLC ("EQT Exeter") and EQT AB ("EQT AB") (together, "EQT" or "Defendants"):

ANSWER:  This Paragraph defines terms and does not require a response, except admit that on April 24, 2025 Carlson filed a Complaint against Exeter and EQT AB.

## BACKGROUND

1.   This dispute arises out of the acquisition of real estate investment management business Redwood Capital Group LLC ("Redwood") by EQT AB, through its subsidiary EQT Exeter (the "Transaction").  The Transaction is reflected in the Purchase Agreement (the "Purchase Agreement") dated May 22, 2022.  A true and accurate copy of the Purchase Agreement is attached hereto as **Exhibit 1.**

ANSWER: Paragraph 1 purports to characterize the action and does not require a response.  To the extent Paragraph 1 requires a response, Exeter denies the allegations in Paragraph 1, except admits that the agreement for Exeter to purchase Redwood is embodied in the Purchase Agreement dated May 11, 2022.

2.   David Carlson spent more than sixteen years in the prime of his professional career painstakingly building and nurturing Redwood, creating a

thriving company that Carlson expected would represent his professional legacy, and by which he hoped to secure financial prosperity for himself, his family, and, of equal importance, for his tirelessly dedicated employees.

ANSWER: Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2.

3.      Because of EQT's misrepresentations related to its purchase of Carlson's business and EQT's subsequent mismanagement of that business, Redwood—which was a highly respected and accomplished organization—now is shuttered, decimated by EQT's flagrant misconduct.  This misconduct flowed from the top of EQT Exeter, which was led in the United States by Edward ("Ward") J. Fitzgerald III, whose malign influence was so destructive that EQT sidelined him just months after the Transaction before eventually forcing him out of EQT altogether.

ANSWER: Deny the allegations in Paragraph 3, except admit that in 2024 Exeter began to shift its efforts away from the multifamily sector, and admit Fitzgerald was the global head of Exeter until September 2024.

4.      Adding injury to insult, EQT has failed to provide the compensation it promised to Carlson when it purchased the company.

ANSWER: Deny the allegations in Paragraph 4.

5.      Defendant EQT AB is the largest private equity and fund management firm in Europe, and the third-largest such firm worldwide.  In January 2021, in an

2

effort to establish its presence in the United States real estate market, EQT purchased Exeter Property Group, which EQT publicly touted as "creat[ing] a scaled, global real estate investment platform, adding one of the largest and well performing value-add real estate investment managers in the world to EQT's successful platform."

ANSWER: Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 5, except admit that EQT AB acquired Exeter in January 2021. To the extent Paragraph 5 purports to quote from or characterize unidentified materials, Exeter respectfully refers the Court to those materials for their contents and denies any allegation inconsistent therewith.

6. Following that acquisition, EQT turned its eyes on Redwood—seeing in Redwood an opportunity to substantially enhance its capabilities in the multifamily residential real estate investment sector. Redwood possessed qualities that set it apart from its competitors, such as a 16-year track record encompassing approximately 60 realized investments, totaling over 19,000 units and $2.2 billion in asset value, placing it among the top performers in the multifamily sector.

ANSWER: Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6, except admit that Exeter began exploring an acquisition of Redwood in 2021.

7. In addition, around the time EQT sought to acquire it, Redwood had additional assets under management of approximately 17 unrealized investments in

approximately 5,200 units, totaling over $1.2 billion in asset value.  Redwood had successfully carried out joint ventures with some of the world's leading institutional investors, acquiring almost $3.5 billion in total assets.

ANSWER: Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7, except admit that Exeter began exploring an acquisition of Redwood in 2021.

8.    Redwood possessed a well-known, nationally respected reputation as a result of Carlson's leadership, and was recognized as an organization of the highest ethical and moral standards.  As just one example, in 2021, Redwood was named one of the "Best Places to Work in Multifamily."  Redwood offered an extensive vertically integrated investment platform built on the efforts of Carlson and Redwood's hard-working employees.  The firm embodied expertise in investment management, asset management, and construction management, and had a well-established and effective in-house property management company.

ANSWER: Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8.  To the extent Paragraph 8 purports to characterize unidentified materials, Exeter respectfully refers the Court to those materials for their contents and denies any allegation inconsistent therewith.

9.    Redwood was founded in 2007 by David Carlson and his partner, Mark Isaacson, with both serving as Redwood's managing partners.  At the time of the

acquisition, Carlson and Isaacson had worked together for approximately 16 years to build the company from the ground up, and their hard work had paid off—Redwood was respected, profitable, and was the subject of numerous inquiries by potential acquirors and investors around the time that EQT began to pursue Redwood.

ANSWER: Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9, except admit that Carlson and Isaacson founded Redwood in 2007 and were the managing partners of Redwood at the time Exeter acquired Redwood.

10.    EQT and Redwood began talks about a potential acquisition in the latter half of 2021.  In negotiations with Redwood, EQT represented itself in a 2021 term sheet as a "purpose driven global investment organization" and suggested that EQT was "uniquely positioned to support Redwood's management through the resources of [its] global investment platform."  EQT in turn led Carlson and Redwood to believe that a sale to EQT, and an ensuing partnership with EQT's platform, was an exceptional opportunity for Carlson to leverage both EQT's global organization and massive financial capabilities, in combination with Redwood's existing assets, track record, and dedicated team of professionals, to achieve even greater success.

ANSWER: Deny the allegations in Paragraph 10, except admit that Exeter and Redwood began discussing a potential acquisition in late 2021.  To the extent

5

Paragraph 10 purports to quote from or characterize a 2021 term sheet, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith.

11.    EQT also promised that the sale would reward Carlson's years of hard work via near-term payments reflecting the substantial value that Carlson had built in Redwood, as well as establishing long-term stability for his dedicated and loyal employees—an equally critical reason for his and his partner's decision to sell.  In fact, EQT stated to Carlson and his staff that "EQT is going to inject jet fuel into your organization," catapulting it to long term future success.

ANSWER: Deny the allegations in Paragraph 11, except deny knowledge or information sufficient to form a belief as to the truth of the allegations pertaining to Carlson's and Isaacson's decision to sell.  To the extent Paragraph 11 purports to quote from or characterize unidentified materials, Exeter respectfully refers the Court to those materials for their contents and denies any allegation inconsistent therewith.

12.    From the earliest stages of negotiations between Redwood and EQT, and as reflected in numerous documents including EQT's November 2021 term sheet, EQT explicitly stated two central aspects of the potential deal: (1) *EQT and its established capital raising team would lock arms with the Redwood team to raise two new funds; and (2) EQT's support for Redwood would maximize Carlson's opportunity to earn*

*the maximum amount of his bargained-for acquisition price, some of which was based on considerable "Earn-Out Payments."* More specifically, EQT committed to raise, with the assistance of EQT's capital raising team, more than $2 billion of equity for those two funds. From the beginning of negotiations, a fundamental tenet of the Transaction was that Carlson and Redwood would apply their efforts to work on **_two funds,_** and that those were the funds for which Carlson would be entitled to Earn-Out Payments totaling $23,975,000.

ANSWER: Deny the allegations in Paragraph 12, except admit that the Purchase Agreement contemplated that Carlson could achieve earnout payments upon the satisfaction of contractually-specified milestones. To the extent Paragraph 12 otherwise purports to characterize the Purchase Agreement, a November 2021 term sheet, or other unidentified materials, Exeter respectfully refers the Court to those materials for their contents and denies any allegation inconsistent therewith.

13.    The two funds EQT launched, and on which it based its acquisition of Redwood, reflected two broad types of multi-family investments, and were described in the Purchase Agreement: one was a "Workforce Housing Value Fund or similar new investment vehicle" and the other was a "Core, Core+ Multifamily Fund I or similar new investment vehicle." These fund terms, such as "Core," "Core+", "Workforce" and "Value" represent commonly understood industry terms for categories of real estate investment funds.

ANSWER: Deny the allegations in Paragraph 13.   To the extent Paragraph 13 purports to characterize or quote from the Purchase Agreement, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith.

14.   As the details of the transaction between EQT and Redwood took shape, EQT made promises to Carlson about another critical element of the deal: **that the Workforce Housing Value Fund <u>was already in the process of being prepared and that it would be launched soon after the merger.</u>**

ANSWER: Deny the allegations in Paragraph 14.

15.   On numerous merger conference calls, the discussions between EQT and Carlson focused specifically on the period of time over which Carlson could obtain the Earn-Out Payments.  EQT insisted that Carlson's Earn-Out would be subject to a three-year time limit.  Carlson, his advisors, and legal counsel heavily negotiated this point, indicating that raising two separate $1.0 billion funds was a monumental task—as these funds would be amongst the largest ever raised in the multifamily sector.  Furthermore, each of these funds would be "first time" funds for EQT in the multifamily sector, further raising the challenge to obtain the Earn-Out within the three year period.

ANSWER: Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15, except Exeter admits that the Purchase

8

Agreement defines the Earn-Out Period to be the earlier of (i) payments of all Earn-Out Payments, and (ii) the third anniversary of Closing. To the extent Paragraph 15 otherwise purports to characterize or quote from the Purchase Agreement, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith.

16. On a call in May of 2022, EQT made explicit assertions that the three-year timeline would be easily satisfied since the first fund, EMVF II, already was in process, and the Private Placement Memorandum ("PPM") was almost complete. On that call, EQT explicitly stated that the value fund contemplated in the Purchase Agreement would be launched soon after the merger.

ANSWER: Deny the allegations in Paragraph 16.

17. EQT represented, and Carlson understood, that upon closing the sale of Redwood to EQT, Carlson would immediately begin work raising money for one of the two funds contemplated by the Transaction and be able to begin satisfying the conditions for the Earn-Out Payments. EQT's promises about the value fund (that it was being prepared and close to ready to launch) were critical to Carlson's acceptance of the deal, if not the singularly most important factor causing Carlson to agree to the deal.

ANSWER: Deny the allegations in Paragraph 17, except deny knowledge or information sufficient to form a belief as to Carlson's state of mind or reasons for agreeing to the Transaction.

18.    Immediately after the Transaction closed in June 2022, Carlson was provided the work product that had been prepared for the first fund—called the "Equity Multifamily Value-Add Fund II," or "EMVF II".  Consistent with EQT's express representations to Carlson and his understanding of industry terminology for categorizing fund types, EMVF II was the "Workforce Housing Value Fund or similar new investment vehicle" described in the Purchase Agreement.

ANSWER: Deny the allegations in Paragraph 18, except admit that that the transaction closed on June 10, 2022, and admit that Carlson was provided work materials for EMVF II following the closing of the transaction.

19.    Upon receiving the materials EQT had already prepared for EMVF II, Carlson realized they were woefully deficient: the most important document, the PPM, was sloppy and disorganized, and appeared to Carlson to reflect the work of someone with no experience in drafting such a document.  Recognizing the hole that EQT's poor preparation had created, Carlson set to work with his team getting the pitch materials ready to present to potential investors.  By July of 2022, the materials were completed such that the fund could launch, and Carlson went to work raising money for the first fund by coordinating and participating in meetings with investors

10

around the world. In marketing that fund, EQT relied heavily on Carlson's reputation, track record, vertically integrated company, and his fundraising efforts. *See* **Exhibit 2,** July 19, 2022 EMVF II Launch Letter.

ANSWER: Deny the allegations in Paragraph 19, except deny knowledge or information sufficient to form a belief as to Carlson's state of mind, and admit that on July 19, 2022 Exeter announced the fundraise for EMVF II in a letter to investors. To the extent Paragraph 19 purports to characterize that letter, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith.

20.    Due in significant part to Carlson's efforts, EMVF II quickly gained traction in the marketplace, completing multiple closings of investor commitments as fundraising got underway.  As a result, under the terms of the Purchase Agreement, Carlson was entitled to an initial Earn-Out Payment of $6,713,000, having achieved a "first closing" in EMVF II.

ANSWER: Paragraph 20 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 20 is necessary, Exeter denies them, except admits that EMVF II secured approximately $63.5 million of capital commitments.

21.    Even though Carlson and his team had immediate success in closing commitments in EMVF II, EQT did not fulfill its end of the bargain.  Despite the

11

occurrence of the Initial WH Triggering Event under the Purchase Agreement, and contrary to EQT's extensive earlier representations, EQT for the first time claimed that EMVF II somehow was not one of the funds contemplated by the Purchase Agreement.  EQT had pulled a bait-and-switch: it had previously represented that EMVF II was the first fund for which Carlson would work toward his Earn-Out. Now, EQT said EMVF II was a "third fund," the existence of which had never been contemplated by the Transaction—a fund for which EQT was willing to reap all of the benefits from leveraging Carlson's work and Redwood's reputation, without compensating Carlson as promised.

ANSWER: Deny the allegations in Paragraph 21.

22.    Unequivocally, Carlson never would have agreed to the Transaction if EQT had indicated it did not consider EMVF II to be one of the funds contemplated by the Purchase Agreement.  And in fact, EQT had represented the opposite on multiple occasions, including on conference calls on May 7 and 8, 2022 in which the parties negotiated the terms of the Transaction.

ANSWER: Deny the allegations in Paragraph 22, except deny knowledge or information sufficient to form a belief as to Carlson's state of mind, and admit that Zoom meetings between Exeter and Redwood took place on May 7, 2022 and May 8, 2022.

12

23.    Additionally, Carlson would have vehemently rejected the three-year time limit imposed on his Earn-Out had EQT informed him of a supposed predecessor fund *in addition* to the two contemplated in the Purchase Agreement.

ANSWER: Deny the knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23.

24.    EQT's changed position had concrete, material consequences for Carlson.  By refusing to pay Carlson the $6,713,000 to which he was entitled upon a first closing on EMVF II, EQT breached the Purchase Agreement.

ANSWER: Paragraph 24 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 24 is necessary, Exeter denies them.

25.    Carlson was entitled to more than just this $6,713,000 payment that EQT owes but withheld.  Part of the bargain Carlson struck in selling Redwood was the opportunity to obtain additional Earn-Out Payments totaling $17,262,000, conditioned on reaching additional benchmarks (including completing the first closing of the second fund, and completing more than $1 billion in fundraising for each of the two funds).  However, EQT's extensive wrongful conduct made it essentially impossible for Carlson to earn these amounts—because, if EQT's position were an accurate reflection of the parties' bargain (rather than a contrived scheme to defer or avoid its obligations to Carlson), Carlson would now have to raise

13

a total of three $1.0 billion-dollar funds within the heavily negotiated three-year period during which he thought he was tasked with raising two funds only.

ANSWER: Paragraph 25 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 25 is necessary, Exeter denies them, except admits that the Purchase Agreement contemplated that Carlson could achieve earnout payments upon the satisfaction of contractually-specified milestones.

26.    EQT's goalpost-shifting around EMVF II was not the only wrongful conduct that thwarted Carlson's expectations. Almost immediately after the Transaction closed, Carlson realized that the reality within EQT was not at all what was promised: as described further below, the company was grossly mismanaged, which prevented him from carrying out the work he was hired to do (and for which EQT promised to compensate him).

ANSWER: Deny the allegations in Paragraph 26, except deny knowledge or information sufficient to form a belief as to Carlson's state of mind.

27.    At the time Carlson joined EQT, it was managed in the United States by Ward Fitzgerald. Fitzgerald had been the head of Exeter Property Group before it was acquired by EQT, and he initially took the lead of EQT Exeter after that acquisition. Fitzgerald was an aggressive and capricious manager who fostered a toxic working environment. Eventually, EQT AB management in Sweden took

14

steps to deal with problems with Fitzgerald's leadership, and he was forced out of EQT in mid-2024. However, both before and after Fitzgerald's employment ended, EQT mismanagement made it impossible for Carlson to work effectively, interfering with Carlson's ability to achieve any of the Earn-Out Payments beyond the $6,713,000 earned upon the first closings in EMVF II.

ANSWER: Deny the allegations in Paragraph 27, except admit that Fitzgerald was the global head of Exeter until September 2024.

28.    From the time of the Transaction, Fitzgerald's conduct presented an impediment to Carlson's fundraising efforts. Acknowledging the problem, EQT installed a new head of capital raising, Alok Gaur, in the autumn of 2022. However, the transition to this new leadership took over a year to effectuate, as Fitzgerald repeatedly interfered in fundraising efforts. EQT Exeter associate Rayenne Chen assisted Fitzgerald with his interference. Numerous EQT employees revealed to Carlson their disdain and frustration with Fitzgerald, including concerns related to false statements Fitzgerald made to investors about the status of various EQT Exeter funds. Carlson was clear in communicating his ongoing problems with Fitzgerald to EQT management, including in a lengthy discussion with EQT CEO Christian Sinding in a June 2023 meeting in Stockholm, Sweden.

ANSWER: Deny the allegations in Paragraph 28, except deny knowledge or information sufficient to form a belief as to the truth of the allegations related to

private conversations held with Carlson, and admit that Alok Gaur joined Exeter as Head of Client Relations and Capital Raising in late 2022.

29.    When Carlson agreed to sell Redwood to EQT and continue as an employee of EQT, he thought he was furthering his personal and professional objectives by partnering with a well-known—and to the outside world, largely respected—major global investment firm. Instead, he found himself in a chaotic and impossible situation, thwarted by EQT's deceit and mismanagement.  Carlson brings this lawsuit in an effort to recover a portion of the value of his life's work that was taken through EQT's wrongful conduct.

ANSWER: Deny the allegations in Paragraph 29, except deny knowledge or information sufficient to form a belief as to Carlson's state of mind.

30.    In sum, Carlson seeks to recover from Defendants for (1) breaching the Purchase Agreement by failing to pay Carlson after he fulfilled his contractual promises by earning the first portion of his Earn-Out; (2) further breaching the Purchase Agreement by intentionally interfering with and frustrating Carlson's ability to earn all Earn-Out Payments; (3) fraudulently or negligently inducing Carlson to enter the Purchase Agreement and the Employment Agreement by misrepresenting and/or concealing the fundraising that would lead to the Earn-Out Payments; and (4) violating Carlson's Employment Agreement and the Illinois Wage Payment and Collection Act by failing to provide Carlson with adequate

16

notice of the abrupt, without cause termination of his employment in December of 2024 and by failing to pay him agreed-upon severance.

ANSWER: Paragraph 30 contains legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 30 is necessary, Exeter denies them.

## THE PARTIES

31. Plaintiff David Carlson is an Illinois resident. Carlson is the founder of Redwood Capital Group LLC, a real estate investment management firm that he formed in 2007. At the time of the Transaction, Redwood was a Delaware limited liability company. Following EQT Exeter's acquisition of Redwood, Carlson worked as the Head of US Multifamily, EQT Exeter. EQT Exeter terminated Carlson's employment without cause and by verbal notice on December 2, 2024, with EQT Exeter ceasing to employ Carlson on December 13, 2024.

ANSWER: Paragraph 31 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 31 is necessary, Exeter denies them, except admits that Carlson and Isaacson founded Redwood in 2007, admits that Redwood was a Delaware limited liability company at the time of the Transaction, admits that Carlson worked as the Head of US Multifamily at Exeter following the Transaction, admits that Carlson was notified

17

his employment was being terminated on December 2, 2024, and admits that Exeter ceased to employ Carlson in December 2024.

32.    Defendant Exeter Property Group, LLC is a Delaware limited liability company, wholly owned and controlled by EQT AB.  On May 11, 2022, EQT Exeter entered into a Purchase Agreement with Carlson, Mark Isaacson, and TriPost Capital RCG Investments LP.  That same day, EQT Exeter entered into an Employment Agreement with Carlson. A true and accurate copy of the Employment Agreement is attached hereto as **Exhibit 3.**

ANSWER: Paragraph 32 states legal conclusions to which no response is necessary.   To the extent that any response to the allegations in Paragraph 32 is necessary, Exeter admits that Exeter is a Delaware limited liability company, that Carlson, Issacson, TriPost, and Exeter entered the Purchase Agreement dated May 11, 2022, and that Exeter entered into an Employment Agreement with Carlson on May 11, 2022.

33.    At all relevant times after closing of the Transaction, EQT Exeter was Carlson's "employer" as defined by the Illinois Wage Payment and Collection Act ("IWPCA").

ANSWER: Paragraph 33 states a legal conclusion to which no response is necessary.  To the extent that any response to the allegations in Paragraph 33 is necessary, Exeter denies them.

18

34.    At all relevant times after closing of the Transaction, Carlson was EQT Exeter's "employee" as defined by the IWPCA.

ANSWER: Paragraph 34 states a legal conclusion to which no response is necessary.  To the extent that any response to the allegations in Paragraph 34 is necessary, Exeter denies them.

35.    Defendant EQT AB is a limited company organized under the laws of Sweden, and with its headquarters in Stockholm, Sweden.  EQT AB is a global investment organization that conducts substantial business activities in the United States, including through its wholly owned subsidiary EQT Exeter.  EQT AB management played a significant role in the negotiations with Carlson that culminated in the Transaction, and in management of EQT Exeter after the Transaction.  As part of the Purchase Agreement, Carlson agreed to enter into two related agreements with EQT AB, a Share Forfeiture Letter and Lock-Up Agreement, copies of which are attached hereto as **Exhibit 4** and **Exhibit 5**, respectively.  Carlson executed those agreements on June 10, 2022.

ANSWER: Paragraph 35 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 35 is necessary, Exeter denies them, except admits that EQT is organized under the laws of Sweden and headquartered in Stockholm, and admits that Carlson signed a Share Forfeiture Letter and Lock-Up Agreement on June 10, 2022.  To the extent

19

Paragraph 35 purports to characterize those documents, Exeter respectfully refers the Court to those materials for their contents and denies any allegation inconsistent therewith.

**JURISDICTION AND VENUE**

36.    This Court has subject matter jurisdiction over the Defendants pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and all Defendants are of different citizenship than the Plaintiff.  Plaintiff is a citizen of Illinois.  Defendant EQT Exeter is a Delaware limited liability company, and on information and belief it has no members who are citizens of Illinois, and its ownership flows directly and wholly to EQT AB. Defendant EQT AB is a citizen of Sweden.

ANSWER: Paragraph 36 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 36 is necessary, Exeter denies them, except admits that Exeter is a Delaware limited liability company and that this Court has subject matter jurisdiction over this action.

37.    This Court has personal jurisdiction over Defendant EQT Exeter because it is organized under the laws of Delaware, and it consented to jurisdiction in Delaware state and federal courts under the terms of the Purchase Agreement.

ANSWER: Paragraph 37 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 37 is

20

necessary, Exeter denies them, except admits that Exeter is a Delaware limited liability company, and admits that the Purchase Agreement provides for disputes to be heard in Delaware.

38.    This Court has personal jurisdiction over Defendant EQT AB pursuant to 10 Del. C. § 3104(c)(1) because EQT AB conducts business through EQT Exeter, a Delaware limited liability company, and this lawsuit relates to EQT AB's involvement in EQT Exeter's negotiation, execution, and breach of the Purchase Agreement, and because EQT AB is itself a party to the Purchase Agreement through execution of the Share Forfeiture Letter and Lock-Up Agreement.

ANSWER: Paragraph 38 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 38 is necessary, Exeter denies them and respectfully refers the Court to its March 25, 2026 Opinion and Order in which the Court held it did not have personal jurisdiction over EQT AB.

39.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this Complaint occurred in this District as it relates to the acquisition of one Delaware limited liability company by another, and each of the Defendants are subject to personal jurisdiction in this Court.

21

ANSWER: Paragraph 39 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 39 is necessary, Exeter denies them, except admits that this Court is the proper venue for this action.

**FACTUAL ALLEGATIONS**

**A.    For Over 16 Years, Redwood Was A Highly Successful Independent Real Estate Investment Management Company.**

40.    Carlson is an entrepreneur and investor with over three decades of experience in commercial and multifamily residential real estate investment. After years of working for highly regarded financial institutions at the start of his career, Carlson decided that he wanted to start his own company.

ANSWER: Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40.

41.    Carlson was inspired to create a workplace that fostered a positive and fulfilling culture, enabling empowerment and loyalty while creating opportunities for employees at all levels. Recognizing that starting a company from scratch was no small feat, Carlson teamed up with Mark Isaacson, a trusted partner who shared his business outlook and values, to develop a business plan.

ANSWER: Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41.

42.    In early 2007, Carlson and Isaacson started Redwood, a multifamily residential real estate company that specialized in multifamily real estate investment management.

ANSWER: Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42, except admit that Carlson and Isaacson founded Redwood in 2007.

43.    At the time of the Transaction with EQT, Carlson and Isaacson, together with TriPost Capital RCG Investments, LP ("TriPost"), held 100% ownership interest in Redwood.

ANSWER: Admit the allegations in Paragraph 43.

44.    Redwood quickly began to excel in the residential real estate sector and grew significantly over the 16 years following its founding.  Throughout the company's existence, outside investors would periodically approach Carlson and Isaacson about potential joint ventures and asset acquisitions, recognizing the appeal of its track record to potential investors, and the effectiveness of its team of employees.

ANSWER: Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44.

45.    By the beginning of 2021, Redwood's portfolio was valued at approximately $1.7 billion in apartment assets.  That year, Redwood completed six

23

acquisitions totaling approximately $400 million in value and added 1,706 apartment homes to its holdings.

ANSWER: Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45.

46.    In October 2021, Redwood projected an additional $200 million in deals for the end of 2021 as its pipeline remained active.  Redwood announced a five-year strategic plan to double its portfolio.

ANSWER: Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46.

47.    During this time, investors continued to approach Carlson and Isaacson about potential joint ventures and acquisitions.

ANSWER: Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47.

B.    **EQT Pitches An Acquisition of Redwood Based On A Two-Fund Model.**

48.    EQT AB is the third largest private equity company in the world.  In 2021, EQT AB acquired Exeter Property Group, a real estate investment manager with over $10 billion of assets at the time of EQT's acquisition of Redwood.  Ward Fitzgerald served as Global Chief Executive Officer of EQT Exeter both prior to and following the acquisition.

24

ANSWER: Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48, except admit that EQT AB acquired Exeter in 2021, and admit that Fitzgerald was the global head of Exeter until September 2024.

49.    In the autumn of 2021, EQT indicated its interest in acquiring Redwood. EQT sought this transaction to develop its presence in the residential real estate market, to profit from Redwood's property management function, and to promote Redwood's proven track record to investors.

ANSWER: Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49, except admit that Exeter and Redwood began discussing a potential acquisition in late 2021. To the extent Paragraph 49 purports to characterize the November 2021 indication of interest letter or other unidentified materials, Exeter respectfully refers the Court to those materials for their contents and denies any allegation inconsistent therewith.

50.    On or around September 21, 2021, Fitzgerald informed Carlson, on behalf of EQT, that the firm was interested in working with Carlson and Isaacson to develop two funds in the residential real estate space. In the following months, EQT and Redwood continued to discuss potential terms surrounding an acquisition of Redwood.

25

ANSWER: Deny the allegations in Paragraph 50, except admit that Exeter and Redwood began discussing a potential acquisition in late 2021.

51.    On November 17, 2021, EQT provided its first term sheet to Redwood. **Exhibit 6,** November 17, 2021 Letter of Intent.  This term sheet reflected the two fund concept as well as the three year timeline.

ANSWER: Deny the allegations in Paragraph 51, except admit that Exeter sent an indication of interest letter to Redwood on November 17, 2021.  To the extent Paragraph 51 purports to characterize the November 2021 indication of interest letter, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith.

52.    The parties continued to build out the two-fund concept over the next several months.

ANSWER: Deny the allegations in Paragraph 52.

53.    At all relevant times, EQT expressed that it was crucial to EQT's plans for Carlson to stay involved in the business and become an employee of EQT Exeter following an acquisition.  Carlson was expected to spearhead the US multifamily residential business on behalf of EQT, including efforts to solicit investors for investment in two funds.

26

ANSWER: Deny the allegations in Paragraph 53, except admit that after the transaction closed Carlson was employed at Exeter as Head of EQT Exeter Residential.

54.    As discussions continued, the concept of "two funds" was a foundational element of the potential agreement under discussion.    While the terminology surrounding the two funds was subject to occasional variation, the basic concept of the two funds at issue remained constant. The concept that EQT pitched was to have: (1) a "Core" or "Core+" Fund, and (2) a "Workforce Housing" or "Value" Fund.   The basic meaning of each type of fund is subject to certain common understanding among participants in the multifamily residential real estate business.

ANSWER: Deny the allegations in Paragraph 54, except deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54 relating to the "basic meaning" of the described funds.

55.    In real estate parlance, and in simple terms, a "Core+" fund is a lower-risk investment that tends to focus on high profile, newer buildings that are generally in urban core or prominent suburban locations within top tier metropolitan markets, such as New York, Boston, Washington DC, Atlanta, Dallas, San Francisco, Miami, and similar areas.   These buildings and areas exhibit more appealing and stable growth markets with large populations and employment areas. A "Workforce Housing" or "Value" fund targets somewhat riskier properties, including housing

27

units that are rented by people who make between 60% and 120% of the median income in a particular area. These Workforce Housing investments are characterized as "Value" given their lower cost basis, higher yielding returns, and the need for property rehabilitations.

ANSWER: Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 55, except admit that core funds generally focus on newer properties based in prominent locations and that workforce funds generally invest in older properties based in less prominent locations.

56.    As negotiations around the eventual Transaction moved forward, EQT agreed that Carlson's work post-acquisition would focus on these two funds, as ultimately reflected in the executed Purchase Agreement. In other words, Carlson was hired to exclusively work, from a fundraising perspective, on the Core/Core+ Fund and EMVF II.

ANSWER: Deny the allegations in Paragraph 56. To the extent Paragraph 56 purports to characterize the Purchase Agreement, Exeter respectfully refers the Court to that document for its content and denies any allegation inconsistent therewith.

57.    As part of Carlson's incentive to work on these two funds, and as compensation for the sale of Redwood, he negotiated compensation through Earn-Out Payment based on certain fundraising benchmarks. *See* **Ex. 1,** Section 1.5.

Carlson could achieve the maximum amount of Earn-Out by raising more than $1 billion for each of the two funds within a prescribed time frame.

ANSWER: Deny the allegations in Paragraph 57, except admit that the Purchase Agreement contemplated that Carlson could achieve earnout payments upon the satisfaction of contractually-specified milestones. To the extent Paragraph 57 purports to characterize the Purchase Agreement, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith.

58.    EQT originally proposed a three-year timeline for the closing of both funds. Carlson repeatedly expressed his concerns that this timeline was too short to launch and raise two funds of more than $1 billion each.

ANSWER: Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 58, except admit that the November 2021 indication of interest letter discusses a potential three-year timeline for earnout consideration.

59.    In response to these concerns, on multiple occasions during negotiations, Fitzgerald and others on behalf of EQT told Carlson that the Workforce Housing Value Fund was nearly ready to go, while Core+ Fund would require additional work from Carlson to get off the ground running.

ANSWER: Deny the allegations in Paragraph 59.

29

60.     Specifically, Fitzgerald and Pete Lloyd, Managing Principal and Global Chief Financial Officer of EQT Exeter, repeatedly told Carlson that there was already a PPM being drafted.  With preparations underway, according to Fitzgerald, the first fund would be ready to launch after the Transaction closed.

ANSWER: Deny the allegations in Paragraph 60.

61.     During a negotiation call via Zoom on May 7, 2022, Lloyd also told Carlson that the first fund was nearly ready to launch, and that this first fund would be subject to the Earn-Out provisions in the Purchase Agreement.[1]

ANSWER: Deny the allegations in Paragraph 62, except admit that a Zoom meeting between Exeter and Redwood took place on May 7, 2022.

62.     Others at EQT, including numerous employees and executives of both EQT AB and EQT Exeter, were on the May 7, 2022 Zoom referenced above, participated in the conversations during which these statements were made, and never indicated any intent by EQT to raise more than two multifamily funds during the time period immediately following the Transaction.

---

[1]   The May 7, 2022 Zoom call was attended by the following: Filip Mark – Organizer from EQT Partners; Viktor Leisnert – EQT Partners; Sandra Nordin – EQT Partners; Daniel Cole – DLA Piper (law firm for Carlson); David Iozzi – Debevoise (law firm for EQT); GP Burges – Debevoise; Jesse Criz – DLA Piper; S. Huberfeld – Debevoise; Emily Snyder – DLA Piper; Clayton Culler – DLA Piper; Paul Dali – EQT Partners; Mark Isaacson – Redwood; David Carlson – Redwood; Isac Sigfridsson – EQT Partners; Brian Fogarty – EQT Exeter; Laurann Stepp – EQT Exeter; and Pete Lloyd – EQT Exeter.

ANSWER: Deny the allegations in Paragraph 62, except admit that a Zoom meeting between Exeter and Redwood took place on May 7, 2022.

63.    In short, EQT assured Carlson that three years was a plausible timeline to achieve his maximum Earn-Out Payments because efforts to launch the Workforce Housing Value Fund already were underway, including preparation of the pitch materials.  EQT resisted Carlson's requests to disclose those materials during negotiation of the Transaction, but promised to provide them to Carlson immediately upon closing the Transaction.

ANSWER: Deny the allegations in Paragraph 63.

64.    Relying upon these promises, Carlson agreed to a three-year timeline for the closing of both funds.

ANSWER: Deny knowledge or information sufficient to form a belief as to the allegations in Paragraph 64, including as to Carlson's state of mind, except admit that the Purchase Agreement defines the Earn-Out Period to be the earlier of (i) payments of all Earn-Out Payments, and (ii) the third anniversary of Closing.

C.    **The Transaction Closes And Carlson Begins Working For EQT.**

65.    On May 11, 2022, after months of negotiation, Carlson, Isaacson, and TriPost entered into the Purchase Agreement with EQT Exeter.  *See* **Ex. 1.**

ANSWER: Admit that Carlson, Issacson, TriPost, and Exeter entered into the Purchase Agreement on May 11, 2022.

31

66.    The Purchase Agreement explicitly considered the existence of both funds that Carlson was hired to operate: a "newly formed Workforce Housing Value Fund or similar new investment vehicle" and a "newly formed Core, Core+ Multifamily Fund I or similar new investment vehicle."

ANSWER: Deny the allegations in Paragraph 66.  To the extent Paragraph 66 purports to quote from or characterize Purchase Agreement, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith.

67.    The Purchase Agreement further detailed the Earn-Out Payments to which Carlson was entitled based on reaching certain benchmarks for each of the two funds. For example, as to the Workforce Housing Value Fund, the Purchase Agreement provided the following with respect to the initial payment Carlson would receive after the "first closing" of that Fund:

(a)    From and after the Closing, as additional contingent consideration for the Sale of Mr. Carlson's Company Interests, upon the occurrence of an applicable triggering event described below in this Section 1.5(a), and subject in each instance to Section 1.5(d) and (e), Mr. Carlson (or his heirs, if applicable) shall be entitled to receive from Buyer the following (collectively, the "Earn-Out Payments"):

(i)    **promptly following**, but in no event more than ten (10) Business Days following, **the occurrence of the Initial WH Triggering Event, an additional purchase price payment of six million seven hundred and thirteen thousand dollars ($6,713,000);**

**Ex. 1**, Section 1.5(a)(i) (emphasis added).

32

ANSWER: To the extent Paragraph 67 purports to quote from or characterize the Purchase Agreement, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith, except admits the Purchase Agreement contemplated that Carlson could achieve earnout payments upon the satisfaction of contractually-specified milestones.

68.     The Purchase Agreement in turn defines "Initial WH Triggering Event":

> **"Initial WH Triggering Event" means the first closing** (if any) by the Company or an Affiliate thereof **of a newly formed Workforce Housing Value Fund or similar new investment vehicle** at any time within twelve (12) months of such investment vehicle's launch and, in any event, within thirty (30) months of the Closing (such fund or vehicle, the "Initial WH Fund").

**Ex. 1,** Section 10.1 (emphasis added).

ANSWER: To the extent Paragraph 68 purports to quote from or characterize the Purchase Agreement, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith.

69.     By these provisions, Carlson was entitled to a payment of $6,713,000 upon the "first closing" of the Workforce Housing Value Fund.

ANSWER: To the extent Paragraph 69 purports to quote from or characterize the Purchase Agreement, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith, except admits the

33

Purchase Agreement contemplated that Carlson could achieve earnout payments upon the satisfaction of contractually-specified milestones.

70.    The Purchase Agreement contained a similar provision entitling Carlson to an additional payment of $6,713,000 upon the first closing of the "Core/Core +" fund.

ANSWER: To the extent Paragraph 70 purports to quote from or characterize the Purchase Agreement, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith, except admits the Purchase Agreement contemplated that Carlson could achieve earnout payments upon the satisfaction of contractually-specified milestones.

71.    Accordingly, EQT Exeter is contractually obligated to pay Carlson $6,713,000 within ten business days following the first closing of each of the "Core/Core+" Fund and the Workforce Housing Value Fund, provided that such closings occur within twelve months of the funds' launch.  *Id*. at Sections 1.1, 1.5(a)(i).

ANSWER:  Paragraph 71 states legal conclusions to which no response is necessary.  To the extent Paragraph 71 purports to quote from or characterize the Purchase Agreement, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith.

34

72.    The Purchase Agreement details additional Earn-Out Payments that Carlson had the potential to receive based on reaching additional benchmarks.  In addition to the $6,713,000 he could earn based on achieving initial closing of each fund, he could also earn a maximum of $4,795,000 in additional payments from his efforts for each fund, provided that by the fund's final closing it received commitments of more than $1 billion (with a smaller payout for fundraising that exceeded $750 million in commitments but did not reach $1 billion).

ANSWER: To the extent Paragraph 72 purports to quote from or characterize the Purchase Agreement, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith, except admits the Purchase Agreement contemplated that Carlson could achieve earnout payments upon the satisfaction of contractually-specified milestones.

73.    In addition to the Purchase Agreement, Carlson and EQT Exeter also entered into an Employment Agreement on May 10, 2022.  *See* **Ex. 3.**

ANSWER: Admit that Carlson and Exeter entered into the Employment Agreement on May 11, 2022.

74.    EQT Exeter hired Carlson to serve as the Head of US Multifamily for EQT Exeter.  **Ex. 3**, Section 1(b).  Carlson was specifically tasked with handling, managing, and otherwise carrying out the Core/Core+ Fund and the Workforce Housing Value Fund:

35

Allocation of Incentive. During the Executive's employment hereunder, but subject to any contractual commitment entered in with Mark Isaacson, the Executive shall have the authority to allocate (and reallocate in the case of forfeiture by leavers) to eligible employees up to one third of any promote generated by each of the first newly formed (i) Core/Core+ Multifamily Fund I and/or (ii) Workforce Housing Value Fund (subject to changes in the names of such funds as may be determined, from time to time, by the Company, the "New Funds") that has its initial closing at any time following, but on or prior to the second anniversary of, the Closing under the Purchase Agreement; provided that such allocation to eligible employees shall be subject to the Company's consent, which will not be unreasonably withheld. Notwithstanding the foregoing, any employee's entitlement to any promote shall be subject to the terms and conditions set forth in the governing agreements of the New Funds, including but not limited to the employee's commitment to make any required capital contributions in respect of their pro rata share of the general partner and co-investment commitments applicable to such New Fund.

**Ex. 3**, Section 1(d).

ANSWER: Deny the allegations in Paragraph 74, except admit that under the Employment Agreement Carlson was employed as Head of EQT Exeter Residential. To the extent Paragraph 74 purports to quote from or characterize the Employment Agreement, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith.

75.    The Employment Agreement allowed EQT Exeter to terminate Carlson's employment with or without cause. *See* **Ex. 3,** Section 3. In both situations, EQT Exeter was required to provide a written Notice of Termination. *Id*. at Section 4(a). The Notice of Termination must be provided at least sixty days in advance of the termination. *Id*. at Section 4(b). Upon a termination without cause,

36

EQT Exeter is obligated to pay Carlson one year's salary, among other benefits. *See* **Ex. 3,** Section 5(b)(i).

ANSWER: To the extent Paragraph 75 purports to quote from or characterize the Employment Agreement, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith.

76.    On June 10, 2022, one month after executing the Purchase Agreement and Employment Agreement, the Transaction closed. In connection with closing the Transaction, Carlson also entered into a Share Forfeiture Letter and Lock-Up Agreement with EQT AB. *See* **Exs. 4** and **5.**

ANSWER: Admit that the transaction closed on June 10, 2022, and admit that Carlson signed a Share Forfeiture Letter and Lock-Up Agreement on June 10, 2022. To the extent Paragraph 76 purports to quote from or characterize the Share Forfeiture Letter and the Lock-Up Agreement, Exeter respectfully refers the Court to those documents for their contents and denies any allegation inconsistent therewith.

77.    These agreements with EQT AB, which are incorporated into the Purchase Agreement, impose certain obligations on Carlson with respect to his use of the Earn-Out Payments to be received under Section 1.5 of the Purchase Agreement.  In short, the Share Forfeiture Letter requires Carlson to use 50 percent of any Earn-Out Payment to purchase shares of EQT AB and subjects those shares

to forfeiture in certain circumstances.  The Lock-Up Agreement imposes restrictions on Carlson's ability to transact in those shares.

ANSWER: Paragraph 77 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 77 is necessary, Exeter respectfully refers the Court to the Share Forfeiture Letter and the Lock-Up Agreement cited in Paragraph 77 for their contents and denies any allegation inconsistent therewith.

### D.    Carlson and EQT Launch Fundraising for EMVF II: The Workforce Housing Value Fund.

78.    Shortly after the Transaction closed, EQT provided Carlson with information concerning the fund that was being prepared for launch: EMVF II. Consistent with EQT's statements during negotiations, and the characteristics of the fund, EMVF II is, and Carlson understood it to be, the "Workforce Housing Value Fund" described in the Purchase Agreement.

ANSWER: Deny the allegations in Paragraph 78, except deny knowledge or information sufficient to form a belief as to Carlson's state of mind, and admit Carlson was provided work materials for EMVF II following the closing of the transaction.  To the extent Paragraph 78 purports to quote from or characterize the Purchase Agreement, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith.

38

79.    It was immediately clear that EQT's preparation to launch EMVF II was not as far along as EQT had previously represented.  Various members of the capital raising team acknowledged that the preparation of fund materials was sloppy and disorganized.  People with no experience in the multifamily field had drafted most of the work product.

ANSWER: Deny the allegations in Paragraph 79, except deny knowledge or information sufficient to form a belief as to the truth of the allegations related to private conversations held with Carlson.

80.    The PPM and other pitch-related work product for EMVF II required significant changes from Carlson and his team members before he could begin soliciting investors. Faced with an imminent three-year timeline, Carlson immediately began work overhauling the offering materials so the fund could launch as soon as possible.

ANSWER: Deny the allegations in Paragraph 80.

81.    On July 19, 2022, after more than a month of work revising the underlying documents for the fund, EMVF II officially launched.  **Ex. 2**.

ANSWER: Admit that on July 19, 2022 Exeter announced the fundraise for EMVF II in a letter to investors.  Respectfully refer the Court to the letter cited in Paragraph 81 for its contents and deny any allegation inconsistent therewith.

82.    At all relevant times, EQT knew EMVF II was the Workforce Housing Value Fund contemplated by the Purchase Agreement, and that Carlson understood it to be such—because they had told him during negotiations around the Transaction that this was the case.  And in the months that Carlson was successfully raising initial funds for EMVF II, EQT said nothing different.

ANSWER: Deny the allegations in Paragraph 82, except deny knowledge or information sufficient to form a belief as to Carlson's state of mind.

83.    All of the contemporaneous documentation surrounding the formation and launch of EMVF II support the premise that it was, in fact, the Workforce Housing Value Fund—one of the two funds Carlson was hired to develop and launch.

ANSWER: Deny the allegations in Paragraph 83.  To the extent Paragraph 83 purports to characterize unidentified materials, Exeter respectfully refers the Court to those materials for their contents and denies any allegation inconsistent therewith.

84.    For instance, when Carlson joined EQT, he was provided a PowerPoint deck dated June 9, 2022 that had been used to present two multifamily residential funds to EQT Exeter's fundraising committee.  This deck focused on pre-launch efforts by EQT Exeter's fundraising committee to launch the Core/Core+ Fund and the Workforce Housing Value Fund that Carlson would ultimately spearhead.  It

40

referred to the Core/Core+ Fund as "EMCF II" and the Workforce Housing Value Fund as "EMVF II."

ANSWER: Deny the allegations in Paragraph 84, except admit that Carlson was emailed a PowerPoint deck dated June 9, 2022. To the extent Paragraph 84 purports to quote from or characterize that PowerPoint deck, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith.

85.    Consistent with the two-fund structure of the Transaction, this presentation to the fundraising committee says nothing about a third fund under consideration.

ANSWER:  Deny the allegations in Paragraph 85. To the extent Paragraph 85 purports to characterize the Purchase Agreement or the PowerPoint deck dated June 9, 2022, Exeter respectfully refers the Court to those materials for their contents and denies any allegation inconsistent therewith.

86.    When EMVF II launched, EQT published a letter to investors discussing the launch. **Ex. 2.** This announcement discussed the characteristics of EMVF II in terms of the "value" aspect of the fund's strategy:

41

> Dear Investor,
>
> EQT Exeter is pleased to announce the fundraise for EQT Exeter Multifamily Value Fund II, LP ("EMVF II"), a $1.5 billion real estate private equity fund which will pursue a value-add strategy of acquiring, renovating, repositioning, and developing apartment properties across select U.S. markets. The Fund seeks to achieve a gross leveraged IRR of 16% to 20%, equating to a 13% to 16% net leveraged IRR— targets enhanced by favorable entry pricing due to the current market correction.[1]

ANSWER: Admit that on July 19, 2022 Exeter announced the fundraise for EMVF II in a letter to investors.  To the extent Paragraph 86 purports to quote from or characterize that letter, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith.

87.    The letter to investors goes on to describe the "price-conscious" residents of the prospective housing units, another hallmark of "workforce" housing:

> Drawing on years of experience in leasing to the Fund's targeted renters, EQT Exeter will seek to acquire and develop apartment communities that offer an exciting and rare mix to these price-conscious residents of 1) convenience and proximity to burgeoning Meds, Eds & Tech employment clusters, 2) rental rate value paired with high quality finishes and relevant amenities, and 3) wellness and sustainability features. EQT Exeter believes that these characteristics will distinguish the Fund's properties from undifferentiated assets that merely compete on price alone.

ANSWER: Deny the allegations in Paragraph 87.  To the extent Paragraph 87 purports to quote from or characterize the letter to investors, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith.

88.    EQT prepared a "pitch deck" to show to prospective investors during fundraising meetings.  This deck explicitly referenced the income range associated

42

with "Workforce Housing" (60% to 120% of area median income) and explained how housing acquired or developed within EMVF II would target renters included in that range.

ANSWER: Deny the allegations in Paragraph 88, except admit that Exeter created a pitch deck to assist with fundraising for EMVF II. To the extent Paragraph 88 purports to quote from or characterize a version of that pitch deck, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith.

89.    EQT began to seed the EMVF II fund with two property acquisitions. Both acquisitions were "Value" investments that exhibited workforce housing demographics and property rehabilitations and renovation. After the transaction, many potential acquisitions EQT sourced for EMVF II exhibited the same characteristics.

ANSWER: Deny the allegations in Paragraph 89, except admit that EMVF II was seeded with property acquisitions, and admit that a variety of potential investments for EMVF II were sourced.

90.    Carlson and his team invested a significant amount of time and resources in soliciting investors for the Workforce Housing Value Fund. He traveled to over ten cities and more than five countries. Overall, Carlson presented to dozens of potential investors.

ANSWER: Deny the allegations in Paragraph 90.

91.    Carlson consistently updated Ward Fitzgerald and other EQT executives and team members about his efforts.  During the initial months of fundraising, Carlson was never informed that these efforts were not applicable to the Earn-Out provisions of the Purchase Agreement.

ANSWER: Deny the allegations in Paragraph 91.

**E.    Carlson Earns Initial Earn-out Payment by Closing Over $60 Million in Capital Commitments From Investors For EMVF II.**

92.    Altogether, Carlson and EQT successfully raised over $60 million in commitments for EMVF II (the Workforce Housing Value Fund).  Once the first of these investor commitments occurred, irrespective of the amount, Carlson was entitled to his initial Earn-Out Payment.

ANSWER: Paragraph 92 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 92 is necessary, Exeter denies them, except admits that EMVF II secured approximately $63.5 million of capital commitments.

93.    The Purchase Agreement sets forth that the initial Earn-Out was to be paid on "first closing" of the Workforce Housing Value Fund.

ANSWER:  Admit that the Purchase Agreement contemplated that Carlson could achieve earnout payments upon the satisfaction of contractually-specified milestones.  To the extent Paragraph 93 purports to characterize or quote from the

44

Purchase Agreement, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith.

94.    Through the efforts of Carlson and others on his team, EQT executed numerous closings on investor commitments to EMVF II, totaling more than $60 million in commitments.  For instance, Carlson assisted in the closing of an investment in EMVF II by the Contra Costa County Employees' Retirement Fund on or about June 5, 2023. EQT's own pipeline report for EMVF II, a fundamental document that tracked interest in the Fund, showed "Closed" commitments totaling at least $63.5 million.

ANSWER: Deny the allegations in Paragraph 94, except admit that EMVF II secured approximately $63.5 million of capital commitments, and admit that Contra Costa County Employees' Retirement Association made capital commitments to EMVF II on June 5, 2023.  To the extent Paragraph 94 purports to characterize a pipeline report, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith.

95.    Because the "first closing" of EMVF II occurred, no later than June 5, 2023, Carlson was entitled to an Earn-Out Payment of $6,713,000 under the Purchase Agreement in ten days' time.  But he has never received that payment.

ANSWER: Deny the allegations in Paragraph 95.

45

**F.       EQT Reveals They Do Not Intend to Pay Carlson The Earn-out He is Due.**

96.    Despite the closings in EMVF II, EQT has taken the position that the funds that Carlson raised for EMVF II would not be attributed to the Workforce Housing Value Fund referenced in the Purchase Agreement.  Instead, EQT has taken the position that EMVF II was a previously undisclosed third fund: another value fund, the existence of which Carlson was previously unaware.

ANSWER: Deny the allegations in Paragraph 96, except admit that EMVF II is not an earnout-eligible fund under the Purchase Agreement.  To the extent Paragraph 96 purports to characterize the Purchase Agreement, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith

97.    EQT had never mentioned the existence of a third fund during its contract negotiations with Carlson. Indeed, the Purchase Agreement and Employment Agreement do not contemplate the existence of a third fund.  Nor do contemporaneous EQT documents.

ANSWER: Deny the allegations in Paragraph 97.  To the extent Paragraph 97 purports to characterize the Purchase Agreement, the Employment Agreement, and unidentified materials, Exeter respectfully refers the Court to those materials for their contents and denies any allegation inconsistent therewith.

46

98.    On information and belief, EQT had never disclosed the existence of a third fund to anyone, including EQT Exeter's own fundraising committee.

ANSWER: Deny the allegations in Paragraph 98.

99.    Accordingly, Carlson was blindsided by EQT's assertion that all of the capital he would be raising for EMVF II would be inapplicable to the Earn-Out provisions of the Purchase Agreement.

ANSWER: Deny knowledge or information sufficient to form a belief as to Carlson's state of mind.  To the extent Paragraph 99 purports to characterize the Purchase Agreement, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith.

100.   EQT's position did not just prevent Carlson from receiving his initial Earn-Out Payment.  As egregiously, it put Carlson in an untenable situation with respect to earning his maximum Earn-Out Payments: with the prospect of trying to raise $1 billion for EMVF II, Carlson would find it much more difficult, if not impossible, to mount the resources to raise $1 billion for two additional funds after EMVF II.

ANSWER: Deny the allegations in Paragraph 100.

101.   There appear to be two conceivable explanations for EQT's post-Transaction position that a three-fund structure was intended: either (1) EQT invented the concept of a third fund in order to frustrate Carlson's ability to receive

47

his full earnout, recognizing that raising three funds in this time period would be impossible; or (2) EQT was lying to Carlson from the beginning about the existence of a third fund as a means to induce his agreement to the Transaction. In either scenario, EQT's misconduct renders it liable to Carlson for the initial Earn-Out Payment, as well as other harm caused by its wrongful and deceitful conduct.

ANSWER: Paragraph 101 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 101 is necessary, Exeter denies them.

**G.    Despite EQT's Wrongful Conduct and Mismanagement, Carlson Attempts to Be a "Team Player" – But EQT Terminates Him Without Warning.**

102. After Carlson became entitled to the initial Earn-Out Payment of $6,713,000 upon the first closing of EMVF II, Carlson repeatedly raised the issue with EQT. Instead of immediately paying Carlson the Earn-Out Payment to which he already was entitled, EQT repeatedly told Carlson that it would enable him to obtain the full amount he had bargained for in the Purchase Agreement. In the spirit of collaboration and based on EQT's continuing representations, Carlson engaged in discussions with EQT about extending the timeline for achieving his Earn-Out Payments and otherwise adjusting the process.

ANSWER: Paragraph 102 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 102 is

48

necessary, Exeter denies them, except admits that Exeter and Carlson had discussed potential modifications to the earnout terms of the Purchase Agreement. To the extent Paragraph 102 purports to characterize the Purchase Agreement, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith.

103. As part of those discussions, Carlson had a Zoom meeting with Gustav Segerberg, EQT AB's Head of Business Development. In that meeting, Segerberg acknowledged the discussions in which EQT had ensured that Carlson would receive the Earn-Out Payments. And just a few months later EQT unceremoniously terminated Carlson.

ANSWER: Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 103, except Exeter admits that Carlson was notified his employment was being terminated on December 2, 2024, and admits that Exeter ceased to employ Carlson in December 2024.

104. EQT's refusal to honor its obligation to pay the initial Earn-Out Payment was far from the only problem Carlson faced in his time with EQT. From the time Carlson joined EQT, including during the time he was raising money for EMVF II, personnel within EQT Exeter and management at EQT AB became increasingly concerned with Ward Fitzgerald's management of EQT Exeter's residential real estate portfolio.

49

ANSWER: Paragraph 104 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 104 is necessary, Exeter denies them.

105. Fitzgerald had an aggressive, controlling, and volatile management style. He continued to be aggressive and volatile at investor pitches, which directly impacted the fundraising team's ability to effectively fundraise capital. This caused significant internal turbulence on the capital fundraising team, as team members often felt gaslighted, abused, and harassed by Fitzgerald.

ANSWER: Deny the allegations in Paragraph 105.

106. Moreover, multiple EQT employees informed Carlson after the Transaction that Fitzgerald had burned bridges within the EQT organization after its acquisition of Exeter Property Group (and before the Transaction). As a result, other groups within EQT were unwilling to cross-sell to EQT Exeter, further impeding Carlson's ability to achieve his earnout. EQT was aware of the problems with Fitzgerald's leadership before its acquisition of Redwood.

ANSWER: Deny the allegations in Paragraph 106, except deny knowledge or information sufficient to form a belief as to the truth of the allegations related to private conversations held with Carlson.

107.  Finally, EQT took action to address the counterproductive nature of Fitzgerald's presence at EQT Exeter: sometime in the autumn of 2022, EQT removed Fitzerald from all external pitches relating to EMVF II.

ANSWER: Deny the allegations in Paragraph 107.

108.  EQT replaced Fitzgerald with Alok Gaur, who took over as head of capital raising.  Nevertheless, Fitzgerald continued to appear at pitches unannounced and behaved inappropriately.  This continued to limit the fundraising team's ability to efficiently gather capital.

ANSWER: Deny the allegations in Paragraph 108, except admit that Alok Gaur joined Exeter as Head of Client Relations and Capital Raising in late 2022.

109.  Despite this change in Fitzgerald's day-to-day role with respect to EMVF II, management at EQT Exeter remained chaotic and dysfunctional—further impeding Carlson's abilities to raise money for EMVF II.

ANSWER: Deny the allegations in Paragraph 109.

110.  Later, following a report from Bain & Company, EQT asked Fitzgerald to step down as Global Head of EQT Exeter.

ANSWER: Admit that Exeter at times worked with Bain & Company, and admit that Fitzgerald resigned on September 3, 2024.

111.  On September 3, 2024, Fitzgerald resigned, and Henry Steinberg became the global head of EQT Exeter.

ANSWER: Admit the allegations in Paragraph 111.

112. Around this time, Lennart Blecher, chairperson of EQT Exeter announced that EQT was suspending all efforts relating to the Workforce Housing Value Fund and returning all capital to its investors.

ANSWER: Deny the allegations in Paragraph 112, except admit that in 2024 Exeter began to shift its efforts away from the multifamily sector.

113. Acknowledging that the future of EQT's real estate business was rapidly evolving, Carlson approached Steinberg about how to best move forward after Fitzgerald's departure.  Despite EQT's deleterious conduct up to this point, Carlson's intent, as with all times during his employment at EQT, was to align his actions with the best interests of the company.  Carlson presented alternative business plans to Steinberg, representing his best efforts to find a successful path for EQT in the multifamily residential sector.

ANSWER: Deny the allegations in Paragraph 113, except deny knowledge or information sufficient to form a belief as to Carlson's state of mind.

114. Instead of working with Carlson to reach a solution, EQT terminated Carlson without cause.

ANSWER: Paragraph 114 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 114 is necessary, Exeter denies them, except admits that Carlson was notified his

employment was being terminated on December 2, 2024, and admits that Exeter ceased to employ Carlson in December 2024.

115.    Specifically, on December 2, 2024, Pete Lloyd called Carlson and informed him that EQT had "elected to go in a different direction" and Carlson's last day would be December 13, 2024.  Despite EQT Exeter's without cause termination of Carlson's employment, it has not paid him severance of one year's salary to which he is entitled.

ANSWER: Paragraph 115 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 115 is necessary, Exeter denies them, except admits that Carlson was notified his employment was being terminated on December 2, 2024, and admits that Exeter ceased to employ Carlson in December 2024.

116.    That same day, EQT fired Isaacson and approximately two-thirds of the US multifamily employees at EQT.

ANSWER: Admit that Exeter ceased to employ Isaacson and Carlson and enacted certain other layoffs in December 2024.

117.    This massive lay-off effectively terminated EQT's multifamily residential real estate business altogether. Indeed, shortly after the lay-offs, EQT shut down its US multifamily fund business and stated its intent to no longer pursue related investments.  This effectively meant the end of the business that Carlson had

spent over 16 years of his life building: within two and a half years of acquiring Redwood, EQT had decimated its value and eviscerated its team of dedicated employees.

ANSWER: Deny the allegations in Paragraph 117, except admit that Exeter ceased to employ Isaacson and Carlson and enacted certain other layoffs in December 2024, and admit that in 2024 Exeter began to shift its efforts away from the multifamily sector.

## COUNT I
## BREACH OF CONTRACT
### (Breach of Purchase Agreement)
### (Against All Defendants)

118.   Carlson repeats and incorporates herein by reference each of the allegations set forth above as if fully set forth herein.

ANSWER: Exeter incorporates by reference its responses to each allegation above as though fully set forth herein.

119.   Defendant EQT Exeter entered into a valid and binding Purchase Agreement with Carlson that, among other things, obligated it to pay Carlson $6,713,000 in Earn-Out Payments within ten business days following the closing of the Core/Core+ Fund or the Workforce Housing Value Fund, provided that the closing occurs within twelve months of the fund's launch, under Section 1.5 of the Purchase Agreement.

54

ANSWER: Paragraph 119 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 119 is necessary, Exeter denies them, except admits that Carlson, Issacson, TriPost, and Exeter entered into the Purchase Agreement on May 11, 2022.

120.   The first closing of the Workforce Housing Value Fund (EMVF II) occurred within twelve months of the fund's launch.

ANSWER: Deny the allegations in Paragraph 120.

121.   Defendant EQT Exeter breached Section 1.5 of the Purchase Agreement by failing to pay Carlson any Earn-Out Payments after the first closing of the Workforce Housing Value Fund.

ANSWER: Paragraph 121 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 121 is necessary, Exeter denies them.

122.   EQT Exeter acted as EQT's agent in breaching the Purchase Agreement by failing to pay Carlson the payments he was owed under the Purchase Agreement.

ANSWER: Paragraph 122 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 122 is necessary, Exeter denies them.

123.   At the time of the Transaction and at the time of the breach, EQT Exeter was a wholly owned subsidiary of EQT and under the control of EQT. On

information and belief, EQ controlled EQT Exeter with respect to the decision whether or not to pay the amounts owed to Carlson under the Purchase Agreement.

ANSWER: Paragraph 123 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 123 is necessary, Exeter denies them, except admit that EQT AB acquired Exeter in January 2021.

124.   Due to the foregoing breach, Carlson is entitled to an award of damages in an amount to be determined at trial, but not less than $6,713,000.

ANSWER: Paragraph 124 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 124 is necessary, Exeter denies them.

## COUNT II
## BREACH OF CONTRACT
### (Breach of the Earn-Out Covenant in Purchase Agreement)
### (Against All Defendants)

125.   Carlson repeats and incorporates herein by reference each of the allegations set forth above as if set forth fully herein.

ANSWER: Exeter incorporates by reference its responses to each allegation above as though fully set forth herein.

126.   Defendant EQT Exeter entered into a valid and binding Purchase Agreement with Carlson that, among other things, prohibited it from taking any action with the primary intent of interfering with Carlson's ability to achieve the

56

maximum Earn-Out Payments, pursuant to Section 1.5(d) of the Purchase Agreement.

ANSWER: Paragraph 126 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 126 is necessary, Exeter denies them, except admits that Carlson, Issacson, TriPost, and Exeter entered into the Purchase Agreement on May 11, 2022.

127. Defendant EQT Exeter breached Section 1.5(d) of the Purchase Agreement by wrongfully and improperly characterizing the Workforce Housing Value Fund as a "third fund" not contemplated under the Purchase Agreement, therefore preventing Carlson from receiving the benefit of the Earn-Out he was entitled to by completing the first closing of the EMVF II.

ANSWER: Paragraph 127 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 127 is necessary, Exeter denies them.

128. In addition to preventing Carlson from receiving the initial Earn-Out for the first closing of the Workforce Housing Fund ($6,713,000), Defendant EQT Exeter's wrongful re-characterization of the Workforce Housing Value Fund frustrated Carlson's ability to achieve the full amount of Earn-Out Payments he was potentially entitled to under the Purchase Agreement (an additional $17,262,000).

ANSWER: Paragraph 128 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 128 is necessary, Exeter denies them.

129.    At the time of the Transaction and at the time of the breach, EQT Exeter was a wholly owned subsidiary of EQT and under the control of EQT. On information and belief, EQT controlled EQT Exeter with respect to the decision to characterize EMVF II as a "third fund" not contemplated under the Purchase Agreement.

ANSWER: Paragraph 129 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 129 is necessary, Exeter denies them, except admit that EQT AB acquired Exeter in January 2021.

130.    Carlson was damaged as a result of this breach of the Purchase Agreement in an amount that will be proven at trial.

ANSWER: Paragraph 130 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 130 is necessary, Exeter denies them.

## COUNT III
## COMMON LAW FRAUD/FRAUDULENT INDUCEMENT
### (Purchase Agreement)
### <u>(Against All Defendants)</u>

131.    Carlson repeats and incorporates herein by reference each of the allegations set forth above as if set forth fully herein.

<u>ANSWER</u>: Exeter incorporates by reference its responses to each allegation above as though fully set forth herein.

132.    Defendants knowingly, and with the intent to defraud, made or caused to be made misrepresentations and omissions of material fact, or such misrepresentations and omissions of material fact were made on Defendants' behalf, including, but not limited to, those set forth in this Complaint.

<u>ANSWER</u>: Paragraph 132 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 132 is necessary, Exeter denies them.

133.    Defendants made affirmative representations to Carlson during the negotiations around execution of the Purchase Agreement that his role would be dedicated to developing two funds and only two funds: the Core/Core+ Fund and the Workforce Housing Value Fund.  Defendants further affirmatively represented that EQT Exeter had already begun developing one of the funds and would be transitioning that work to Carlson so that he could work on raising commitments for the first fund subject to the Earn-Out provision of the Purchase Agreement.

59

ANSWER: Deny the allegations in Paragraph 133.

134.    As just one example, on a Zoom call on Saturday, May 7, 2022 attended by numerous employees and executives of both EQT Exeter and EQT AB, and lawyers for all parties, Pete Lloyd stated that the PPM for the first fund was "ready" and that Carlson would therefore receive his first Earn-Out Payment promptly.

ANSWER: Deny the allegations in Paragraph 134, except admit that a Zoom meeting between Exeter and Redwood took place on May 7, 2022.

135.    A similar Zoom call took place the next day on Sunday, May 8, 2022.[2] Once again, all parties agreed that the PPM was ready, and Carlson would promptly receive his first Earn-Out Payment.

ANSWER: Deny the allegations in Paragraph 135, except admit that a Zoom meeting between Exeter and Redwood took place on May 8, 2022.

136.    Defendants knew or recklessly disregarded that such representations were false, because they actually considered EMVF II to be a third fund for which

---

[2]    The May 8, 2022 Zoom call was attended by the following: Filip Mark – Organizer from EQT Partners; Eric Gunnarson – EQT Partners; Jacob Tegner – EQT Partners; Viktor Leisnert – EQT Partners; Sandra Nordin – EQT Partners; Daniel Cole – DLA Piper; David Iozzi – Debevoise; GP Burges – Debevoise; Jesse Criz – DLA Piper; S. Huberfeld – Debevoise; Emily Snyder – DLA Piper; Clayton Culler – DLA Piper; Paul Dali – EQT Partners; Mark Isaacson – Redwood; David Carlson – Redwood; Isac Sigfridsson – EQT Partners; Brian Fogarty – EQT Exeter; Laurann Stepp – EQT Exeter; Pete Lloyd – EQT Exeter; Lisa Beeson – Centercap Group; Marcus Jacobsson – DK EY; Paul Mullen – Centercap Group; Tim Annerkull – SE EY; and John Venick – DLA Piper.

Carlson was not eligible for an Earn-Out under the Purchase Agreement. Defendants intentionally misled Carlson so that he would believe that EMVF II was the same Workforce Housing Value Fund described under the Purchase Agreement and, thus, devote his time to develop that fund. Defendants did so in order to evade their contractual obligations to Carlson, including their obligation to pay Carlson $6,713,000 upon the first closing of the Workforce Housing Value Fund.

ANSWER: Paragraph 136 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 136 is necessary, Exeter denies them.

137. Prior to the execution of the Purchase Agreement between Carlson and Defendant EQT Exeter, Defendants intentionally and actively concealed or suppressed material facts about the third fund. Defendants did not mention the existence of a third fund during their contract negotiations with Carlson, and the Purchase Agreement and the Employment Agreement do not contemplate the existence of a third fund.

ANSWER: Deny the allegations in Paragraph 137.

138. Defendants also made representations to Carlson in the Purchase Agreement and the Employment Agreement concerning the two-fund structure of the Transaction that they knew at the time were false, as set forth above.

ANSWER: Deny the allegations in Paragraph 138.

61

139.   Defendants knew that the representations and omissions as set forth above were false when made, or Defendants made the representations and omissions with reckless indifference to the truth.

ANSWER: Paragraph 139 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 139 is necessary, Exeter denies them.

140.   Defendants also knew during negotiations that they were failing to disclose material facts about the existence of a "third fund."  Defendants knew they failed to disclose their intention that the fund Carlson was led to believe was the Workforce Housing Value Fund was, in fact, a separate fund not defined under the Purchase Agreement and not covered by the Earn-Out provisions in the Purchase Agreement.

ANSWER: Paragraph 140 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 140 is necessary, Exeter denies them.

141.   Defendants made these misrepresentations and omissions, and intentionally failed to disclose that they considered EMVF II to be different from the Workforce Housing Value Fund, with the intent to induce Carlson to consummate the transaction.

ANSWER: Paragraph 141 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 141 is necessary, Exeter denies them.

142. Defendants' representations and omissions were material. Defendants knew that Carlson would have never agreed to the terms of the Purchase Agreement, including the time frames it provided for achieving the benchmarks necessary to receive the Earn-Out Payments, unless (1) the fund underway at the time of the Transaction was tied to the Earn-Out provision, and (2) that his work at EQT would be committed to the two funds directly tied to the Earn-Out provisions.

ANSWER: Paragraph 142 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 142 is necessary, Exeter denies them, except denies knowledge or information sufficient to form a belief as to Carlson's state of mind.

143. Carlson reasonably and justifiably relied upon Defendants' misrepresentations and material omissions in the pre-closing due diligence and in the Purchase Agreement.

ANSWER: Paragraph 143 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 143 is necessary, Exeter denies them.

63

144.    Carlson was induced into selling his portion of Redwood to Defendant EQT Exeter and entering into the Purchase Agreement. As a result of the Defendants' actions, he received less than the fair value of his shares of Redwood in the bargain to sell Redwood to EQT Exeter.

ANSWER: Paragraph 144 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 144 is necessary, Exeter denies them.

145.    Carlson would not have entered into the Purchase Agreement at all if he had known that Defendants intended to characterize EMVF II as something other than the Workforce Housing Value Fund, resulting in his fundraising for EMVF II being fruitless under the Purchase Agreement.

ANSWER: Deny the allegations in Paragraph 145, except deny knowledge or information sufficient to form a belief as to Carlson's state of mind.

146.    As a direct result of the Defendants' misrepresentations and concealment of material information, Carlson has been damaged in an amount that will be proven at trial.

ANSWER: Paragraph 146 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 146 is necessary, Exeter denies them.

## COUNT IV
## COMMON LAW FRAUD/FRAUDULENT INDUCEMENT
### (Employment Agreement)
### (Against All Defendants)

147.  Carlson repeats and incorporates herein by reference each of the allegations set forth above as if set forth fully herein.

ANSWER: Exeter incorporates by reference its responses to each allegation above as though fully set forth herein.

148.  Defendants knowingly, and with the intent to defraud, made or caused to be made misrepresentations and omissions of material fact, or such misrepresentations and omissions of material fact were made on Defendant EQT Exeter's behalf, including, but not limited to, those set forth in this Complaint.

ANSWER: Paragraph 148 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 148 is necessary, Exeter denies them.

149.  Defendants made affirmative representations to Carlson during the negotiations around execution of the Employment Agreement that his role would be dedicated to developing two funds and only two funds: the Core/Core+ Fund and the Workforce Housing Value Fund.  Defendants further affirmatively represented that EQT Exeter had already begun developing one of the funds, and would be transitioning that work to Carlson so that he could work on raising commitments for the first fund subject to the Earn-Out provision of the Purchase Agreement.

65

ANSWER: Deny the allegations in Paragraph 149.

150.   Defendants knew or recklessly disregarded that such representations were false, because they actually considered EMVF II to be a third fund for which Carlson was not eligible for an Earn-Out under the Purchase Agreement.  Defendants intentionally misled Carlson so that he would believe that EMVF II was the same Workforce Housing Value Fund described under the Purchase Agreement and, thus, devote his time to develop that fund.  Defendants did so in order to evade their contractual obligations to Carlson, including their obligation to pay Carlson $6,713,000 upon the first closing of the Workforce Housing Value Fund.

ANSWER: Paragraph 150 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 150 is necessary, Exeter denies them.

151.   Prior to the execution of the Employment Agreement between Carlson and Defendant EQT Exeter, Defendants intentionally and actively concealed or suppressed material facts about the third fund.  Defendants did not mention the existence of a third fund during their contract negotiations with Carlson, and the Purchase Agreement and Employment Agreement do not contemplate the existence of a third Fund.

66

ANSWER: Paragraph 151 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 151 is necessary, Exeter denies them.

152. Defendants also made representations to Carlson in the Purchase Agreement and Employment Agreement concerning the two-fund structure of the Transaction that they knew at the time were false, as set forth above.

ANSWER: Deny the allegations in Paragraph 152.

153. Defendants knew that the representations and omissions set forth above were false when made, or Defendants made these representations and omissions with reckless indifference to the truth.

ANSWER: Paragraph 153 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 153 is necessary, Exeter denies them.

154. Defendants also knew during negotiations that they were failing to disclose material facts about the existence of a "third fund." Defendants knew they failed to disclose their intention that the fund Carlson was led to believe was the Workforce Housing Value Fund was, in fact, a separate fund not defined under the Purchase Agreement and not covered by the Earn-Out provisions in the Purchase Agreement. Defendants knew this would undermine Carlson's efforts to achieve maximum Earn-Out Payments.

67

ANSWER: Paragraph 154 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 154 is necessary, Exeter denies them.

155. Defendants made these misrepresentations and omissions, and intentionally failed to disclose that they considered EMVF II to be different from the Workforce Housing Value Fund, with the intent to induce Carlson to sell his portion of Redwood for less than its value and become an employee of Defendant EQT Exeter.

ANSWER: Paragraph 155 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 155 is necessary, Exeter denies them.

156. Defendants' representations and omissions were material. Defendants knew that Carlson would have never agreed to sell his portion of Redwood for less than its total value and agree to the terms of his Employment Agreement unless the funds he was to be raising commitments for were directly tied to the Earn-Out provisions.

ANSWER: Paragraph 156 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 156 is necessary, Exeter denies them.

157.   Carlson reasonably and justifiably relied upon Defendant EQT Exeter's misrepresentations and material omissions in agreeing to the terms of the Employment Agreement.

ANSWER: Paragraph 157 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 157 is necessary, Exeter denies them.

158.   Carlson was induced into selling his ownership in Redwood to Defendant EQT Exeter for significantly less than the value of his share in Redwood, and into becoming an employee of Defendant EQT Exeter.

ANSWER: Paragraph 158 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 158 is necessary, Exeter denies them.

159.   Carlson would not have entered into the Employment Agreement at all if he had known that Defendants intended to characterize EMVF II as something other than the Workforce Housing Value Fund, resulting in his fundraising for EMVF II being fruitless under the Purchase Agreement.

ANSWER: Deny the allegations in Paragraph 159, except deny knowledge or information sufficient to form a belief as to Carlson's state of mind.

160.   As a direct result of Defendants' misrepresentations and concealment of material information, Carlson has been damaged in an amount that will be proven at trial.

ANSWER: Paragraph 160 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 160 is necessary, Exeter denies them.

## COUNT V
## NEGLIGENT MISREPRESENTATION
## (Against All Defendants)

161.   Carlson repeats and incorporates herein by reference each of the allegations set forth above as if set forth fully herein.

ANSWER: Exeter incorporates by reference its responses to each allegation above as though fully set forth herein.

162.   If the false statements or omissions set forth above were not made with knowledge or recklessness as to their falsity, then they were made negligently, or without due care, by Defendants.

ANSWER: Paragraph 162 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 162 is necessary, Exeter denies them.

163.   Defendants failed to exercise care and competence in failing to communicate to Carlson that it considered the EMVF II to be separate and apart

70

from the Core/Core+ Fund and the Workforce Housing Value Fund defined under the Purchase Agreement.

ANSWER: Paragraph 163 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 163 is necessary, Exeter denies them.

164.  Defendants knew that Carlson would reasonably rely on its representations, and Defendants intended to influence Carlson through those representations.

ANSWER: Paragraph 164 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 164 is necessary, Exeter denies them.

165.  Carlson was, in fact, deceived by those misrepresentations and omissions and reasonably and justifiably relied on them to his detriment.

ANSWER: Paragraph 165 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 165 is necessary, Exeter denies them.

166.   As a direct and proximate result of those negligent misrepresentations, Carlson was led to believe that the EMVF II was the Workforce Housing Value Fund, and that completing a first closing on that fund would result in him taking the initial Earn-Out of $6,713,000. promised under the Purchase Agreement.  Carlson

would have never entered the Purchase Agreement or the Employment Agreement if he had been informed that EMVF II was not the Workforce Housing Value Fund contemplated by the Purchase Agreement.

ANSWER: Paragraph 166 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 166 is necessary, Exeter denies them, except deny knowledge or information sufficient to form a belief as to Carlson's state of mind.

167.  As a direct result of Defendants' misrepresentations and omissions, Carlson has been damaged in an amount to be proven at trial.

ANSWER: Paragraph 167 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 167 is necessary, Exeter denies them.

## COUNT VI
## UNJUST ENRICHMENT/DISGORGEMENT
### (Against All Defendants)

168.  Carlson repeats and incorporates herein by reference each of the allegations set forth above as if set forth fully herein.

ANSWER: Exeter incorporates by reference its responses to each allegation above as though fully set forth herein.

169.  As alleged herein, Defendants fraudulently induced Carlson to enter into, and complete, the Purchase Agreement and the Employment Agreement, and

72

to provide Defendants with greater compensation in exchange for entering into such agreements than (a) was reasonable, or (b) Carlson would have agreed to provide were it not for Defendants' misconduct and deceptive practices.

ANSWER: Paragraph 169 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 169 is necessary, Exeter denies them.

170. As alleged herein, prior to the execution of the Purchase Agreement between Carlson and Defendant EQT Exeter, Defendants intentionally and actively concealed or suppressed material facts about the "third fund."

ANSWER: Paragraph 170 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 170 is necessary, Exeter denies them.

171. As alleged herein, Defendants also made representations to Carlson in the Purchase Agreement and the Employment Agreement concerning the two-fund structure of the Transaction that they knew at the time were false.

ANSWER: Deny the allegations in Paragraph 171.

172. Defendants knew that the representations and omissions as set forth above were false when made, or Defendants made the representations and omissions with reckless indifference to the truth.

73

ANSWER: Paragraph 172 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 172 is necessary, Exeter denies them.

173. Defendants also knew during negotiations that they were failing to disclose material facts about the existence of a "third fund." Defendants knew they failed to disclose their intention that the fund Carlson was led to believe was the Workforce Housing Value Fund was, in fact, a separate fund not defined under the Purchase Agreement and not covered by the Earn-Out provisions in the Purchase Agreement.

ANSWER: Paragraph 173 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 173 is necessary, Exeter denies them.

174. Defendants made these misrepresentations and omissions, and intentionally failed to disclose that they considered EMVF II to be different from the Workforce Housing Value Fund, with the intent to induce Carlson to consummate the transaction.

ANSWER: Deny the allegations in Paragraph 174.

175. Defendants reaped substantial financial benefits at the expense of Carlson in connection with the Purchase Agreement and related transactions.

74

ANSWER: Paragraph 175 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 175 is necessary, Exeter denies them.

176. Defendants further reaped substantial financial benefits at the expense of Carlson in connection with his employment by EQT Exeter.

ANSWER: Paragraph 176 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 176 is necessary, Exeter denies them.

177. Following the execution of the Purchase Agreement and the Employment Agreement, Defendants worked against the best interests of Carlson and for their own self-interest.

ANSWER: Deny the allegations in Paragraph 177.

178. Equity and good conscience do not allow for Defendants to keep the substantial financial benefits that it reaped from Carlson.

ANSWER: Paragraph 178 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 178 is necessary, Exeter denies them.

179. Defendants have been unjustly enriched, and Carlson has been damaged in an amount to be established at trial.

ANSWER: Paragraph 179 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 179 is necessary, Exeter denies them.

## COUNT VII
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
## (Against All Defendants)

180. Carlson repeats and incorporates herein by reference each of the allegations set forth above as if set forth fully herein.

ANSWER: Exeter incorporates by reference its responses to each allegation above as though fully set forth herein.

181. Defendant EQT Exeter and Carlson are each a party to the Purchase Agreement, under which Defendant EQT Exeter owes contractual obligations to Carlson.

ANSWER: Paragraph 181 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 181 is necessary, Exeter denies them, except admits that Carlson, Issacson, TriPost, and Exeter entered into the Purchase Agreement on May 11, 2022.

182. At the time of the Transaction and at the time of the breach, EQT Exeter was a wholly owned subsidiary of EQT AB and under the control of EQT AB. On information and belief, EQT AB controlled EQT Exeter with respect to (1) whether or not to pay the amounts owed to Carlson under the Purchase Agreement, and (2)

76

the decision to characterize EMVF II as a "third fund" not contemplated under the Purchase Agreement.

ANSWER: Paragraph 182 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 182 is necessary, Exeter denies them, except admits that Exeter was acquired by EQT in January 2021.

183.   Defendants' characterization of EMVF II as something other than the Workforce Housing Value Fund was not contemplated by the parties to the Purchase Agreement when they entered into the Purchase Agreement, was arbitrary and unreasonable, and has frustrated and continued to frustrate the fruits of the Purchase Agreement that Carlson reasonably expected.

ANSWER: Paragraph 183 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 183 is necessary, Exeter denies them.

184.   If Defendants' characterization of EMVF II as a "third fund" in order to evade its obligation to pay Carlson $6,713,000 upon the first closing of the Workforce Housing Value Fund does not breach the express terms of the Purchase Agreement, such action still breaches the implied covenant of good faith and fair dealing under the Purchase Agreement.

ANSWER: Paragraph 184 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 184 is necessary, Exeter denies them.

185. If Defendants' frustration of Carlson's ability to receive Earn-Out Payments under Section 1.5 of the Purchase Agreement does not breach the express terms of the Purchase Agreement, then Defendants' breaches of the implied covenant of good faith and fair dealing have harmed, and continue to harm, Carlson and have effectively prevented Carlson from receiving the fruits of the contractual rights agreed to by the parties in the Purchase Agreement.

ANSWER: Paragraph 185 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 185 is necessary, Exeter denies them.

186. Carlson has been damaged by the foregoing in amount to be proven at trial.

ANSWER: Paragraph 186 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 186 is necessary, Exeter denies them.

## COUNT VIII
## BREACH OF EMPLOYMENT AGREEMENT
## (Against EQT Exeter)

187. Carlson repeats and incorporates herein by reference each of the allegations set forth above as if set fully set forth herein.

ANSWER: Exeter incorporates by reference its responses to each allegation above as though fully set forth herein.

188. On May 11, 2022, Carlson and EQT Exeter entered into the Employment Agreement.

ANSWER: Admit that Carlson and Exeter entered into the Employment Agreement on May 11, 2022.

189. The Employment Agreement is valid, binding, and fully enforceable contract between Carlson and EQT Exeter.

ANSWER: Paragraph 189 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 189 is necessary, Exeter admits that Carlson and Exeter entered into the Employment Agreement on May 11, 2022.

190. Carlson has performed all of his obligations pursuant to the Employment Agreement.

79

ANSWER: Paragraph 190 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 190 is necessary, Exeter denies them.

191.   The Employment Agreement required EQT Exeter to provide Carlson with a written Notice of Termination and further required EQT Exeter to provide Carlson with at least sixty days' notice prior to his termination.  The Employment Agreement also required EQT Exeter to pay Carlson severance of one year's salary upon terminating his employment without cause.

ANSWER: Paragraph 191 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 191 is necessary, Exeter denies them. To the extent Paragraph 191 purports to quote from or characterize the Employment Agreement, Exeter respectfully refers the Court to that document for its contents and denies any allegation inconsistent therewith.

192.   On December 2, 2024, EQT Exeter orally terminated Carlson's employment, without cause, and informed him that his last day of employment would be eleven days later on December 13, 2024.

ANSWER: Paragraph 192 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 192 is necessary, Exeter denies them, except admits that Carlson was notified his

employment was being terminated on December 2, 2024, and admits that Exeter ceased to employ Carlson in December 2024.

193. EQT Exeter did not provide Carlson with a written Notice of Termination.

ANSWER: Paragraph 193 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 193 is necessary, Exeter denies them.

194. As such, EQT Exeter breached the Employment Agreement by, among other things, failing to provide Carlson with at least sixty (60) days' notice of his termination and by failing to provide him with a written Notice of Termination. EQT Exeter has further breached the Employment Agreement by, among other things, failing to pay Carlson severance of one year's salary.

ANSWER: Paragraph 194 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 194 is necessary, Exeter denies them.

195. As a direct and proximate result of EQT Exeter's conduct, Carlson suffered, and continues to suffer, damages, including lost wages.

ANSWER: Paragraph 195 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 195 is necessary, Exeter denies them.

## COUNT IX
## ILLINOIS WAGE PAYMENT AND COLLECTION ACT
## (Against EQT Exeter)

196.  Carlson repeats and incorporates herein by reference each of the allegations set forth above as if set forth fully herein.

ANSWER: Exeter incorporates by reference its responses to each allegation above as though fully set forth herein.

197.  Under the IWPCA, an "employer" includes "any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee." 820 ILCS 115/2.  Additionally, "any officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of [the IWPCA] shall be deemed to be the employers of the employees of the corporation." 820 ILCS 115/13.

ANSWER: Paragraph 197 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 197 is necessary, Exeter denies them.  To the extent Paragraph 197 purports to quote from or characterize the IWPCA, Exeter respectfully refers the Court to those materials for their contents and denies any allegation inconsistent therewith.

198.  At all relevant times, EQT Exeter was Carlson's "employer" as defined by the IWPCA.

ANSWER: Paragraph 198 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 198 is necessary, Exeter denies them, except admits that Carlson and Exeter entered into the Employment Agreement on May 11, 2022. To the extent Paragraph 198 purports to quote from or characterize the IWPCA, Exeter respectfully refers the Court to those materials for their contents and denies any allegation inconsistent therewith

199. At all relevant times, Carlson was EQT Exeter's "employee" as that term is defined by the IWPCA.

ANSWER: Paragraph 199 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 199 is necessary, Exeter denies them, except admit that Carlson and Exeter entered into the Employment Agreement on May 11, 2022. To the extent Paragraph 199 purports to quote from or characterize the IWPCA, Exeter respectfully refers the Court to those materials for their contents and denies any allegation inconsistent therewith

200. The Employment Agreement is an agreement for wages under the IWPCA.

ANSWER: Paragraph 200 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 200 is necessary, Exeter denies them. To the extent Paragraph 200 purports to characterize

the IWPCA, Exeter respectfully refers the Court to those materials for their contents and denies any allegation inconsistent therewith.

201. The Employment Agreement required EQT Exeter to provide Carlson with a written Notice of Termination and further required EQT Exeter to provide Carlson with at least sixty days' notice prior to his termination. The Employment Agreement also required EQT Exeter to pay Carlson severance of one year's salary upon terminating his employment without cause.

ANSWER: Paragraph 201 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 201 is necessary, Exeter denies them.

202. On December 2, 2024, EQT Exeter orally terminated Carlson's employment and informed him that his last day of employment would be eleven days later on December 13, 2024.

ANSWER: Deny the allegations in Paragraph 202, except Exeter admits that Carlson was notified his employment was being terminated on December 2, 2024, and admits that Exeter ceased to employ Carlson in December 2024.

203. EQT Exeter did not provide Carlson with a written Notice of Termination.

ANSWER: Paragraph 203 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 203 is necessary, Exeter denies them.

204. EQT Exeter violated the IWPCA by terminating Carlson without providing the required notice or a written Notice of Termination. EQT Exeter has further violated the IWPCA by, among other things, failing to pay Carlson severance of one year's salary.

ANSWER: Paragraph 204 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 204 is necessary, Exeter denies them.

205. EQT Exeter's failure to comply with the IWPCA was reckless and willful.

ANSWER: Paragraph 205 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 205 is necessary, Exeter denies them.

206. As a direct result of EQT Exeter's actions, Carlson suffered damages.

ANSWER: Paragraph 206 states legal conclusions to which no response is necessary. To the extent that any response to the allegations in Paragraph 206 is necessary, Exeter denies them.

207.    Carlson is entitled to recover compensation owed to him under the Employment Agreement, all damages as to which he is entitled, statutory damages pursuant to the IWPCA, and attorneys' fees and costs.

ANSWER: Paragraph 207 states legal conclusions to which no response is necessary.  To the extent that any response to the allegations in Paragraph 207 is necessary, Exeter denies them.

## PRAYER FOR RELIEF

WHEREFORE, Carlson respectfully requests that this Court enter judgment in its favor as follows:

1.    Against Defendants, in the amount of $6,713,000, as damages for EQT Exeter's failure to pay the initial Earn-Out Payment in breach of the Purchase Agreement or the implied covenant of good faith and fair dealing therein;

2.    Against Defendants, in the amount of $17,262,000, as damages for Defendants' breach of the Earn-Out Covenants provision of the Purchase Agreement or the implied covenant of good faith and fair dealing therein;

3.    Against Defendants, in an amount to be determined at trial, as damages for fraud in inducing Carlson to enter the Purchase Agreement and the Employment Agreement and causing him to surrender his interests in Redwood for less than their fair market value;

4.      Against Defendants, in an amount to be determined at trial, as damages for negligent misrepresentation resulting in Carlson's entry into the Purchase Agreement and the Employment Agreement and causing him to surrender his interests in Redwood for less than their fair market value;

5.      Disgorgement of ill-gotten gains obtained by Defendants;

6.      Against Defendant EQT Exeter for its breaches of the Employment Agreement and the IWPCA, for damages, lost wages and employment-related statutory damages in an amount to be determined at trial; and

7.      Any such other relief as the Court may deem just and proper.

ANSWER: Exeter denies that Carlson is entitled to the relief requested in this section, or to any relief.

## ADDITIONAL DEFENSES

As additional defenses, Exeter alleges, asserts, and states the following, which apply to each and every cause of action asserted in the Complaint to which such defense may be applicable.  By virtue of alleging these further defenses, Exeter does not assume any burden of proof, persuasion, or production not otherwise legally assigned to it.  Exeter also does not concede that facts contrary to one or more of the statements that follow would support liability as to it.  Exeter asserts and expressly reserves all rights to assert any and all other defenses as appropriate.  Exeter further reserves all rights to join additional parties and assert counterclaims.

## FIRST DEFENSE

The Complaint fails to state any claim upon which relief can be granted.

## SECOND DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff has not shown that Defendant owed the claimed contractual obligations under the relevant agreements or otherwise breached any obligations thereunder.

## THIRD DEFENSE

Plaintiff's claims are barred, in whole or in part, because Defendant performed its obligations under the relevant agreements.

## FOURTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff has not identified any material false statement or omission made by Defendant upon which Plaintiff justifiably or reasonably relied.

## FIFTH DEFENSE

Plaintiff's claims are barred, in whole or in part, for failing to plead fraud with particularity as required by Fed. R. Civ. P. 9(b).

## SIXTH DEFENSE

Plaintiff's claims are barred, in whole or in part, for failing to identify any violation of the Illinois Wage Payment and Collection Act.

## SEVENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff has failed to demonstrate the requisite scienter.

## EIGHTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations.

## NINTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the intervening acts, wrongs, omissions and/or negligence of other individuals or entities.

## TENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff has not suffered any injury or compensable damages.

## ELEVENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because any alleged injuries and damages were not legally or proximately caused by any acts or omissions of Defendant.

## TWELFTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to mitigate damages.

## THIRTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because any claimed injury or damage has been offset by benefits or payments Plaintiff received.

## FOURTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because the relief sought is broader than what is necessary to remedy the alleged harm.

## FIFTEENTH DEFENSE

Plaintiff would be unjustly enriched if he were permitted to obtain recovery in this action.

## SIXTEENTH DEFENSE

Defendant asserts that, should it be held liable to Plaintiff, which liability is specifically denied, Defendant would be entitled to contribution and/or indemnity from other parties, entities, or individuals.

## SEVENTEENTH DEFENSE

Plaintiff's claims are barred in whole or in part by the doctrines of waiver, laches, and/or estoppel.

## EIGHTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because he disclaimed reliance on extra-contractual statements in the Purchase Agreement.

## NINETEENTH DEFENSE

Defendant hereby reserves all affirmative and other defenses available under any applicable federal or state law.

## PRAYER FOR RELIEF

WHEREFORE, Exeter respectfully requests judgment dismissing the Complaint in its entirety and awarding costs and attorneys' fees, together with such other and further relief as the Court deems just and proper.

91

OF COUNSEL:

Shannon Rose Selden
Barrett J. Greenwell
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
(212) 909-6000
srselden@debevoise.com
bjgreenwell@debevoise.com

Date: April 29, 2026

*/s/ Christopher Fitzpatrick Cannataro*
A. Thompson Bayliss (#4379)
Christopher Fitzpatrick Cannataro (#6621)
ABRAMS & BAYLISS LLP
20 Montchanin Rd., Suite 200
Wilmington, DE 19807
(302) 778-1000
bayliss@abramsbayliss.com
cannataro@abramsbayliss.com

*Counsel for Exeter Property Group, LLC*